# EXHIBIT A

## to

## Plaintiff's Original Complaint

_____

# Securities Purchase and Contribution Agreement

## SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT

This Securities Purchase and Contribution Agreement (***"Agreement"***) is made as of February 4, 2022, by GOT Distribution SPV, LLC, a Delaware limited liability company (***"Buyer"***), Supercub Holdings, LLC, a Texas limited liability company (the ***"Seller"***), and Stephen Discher (the ***"Owner"***). Capitalized terms used and not otherwise defined in this Agreement have the meanings specified in **Schedule A**.

A.      Prior to the date hereof, Owner, as the sole owner of ISP Supplies, LLC, a Texas limited liability company and a subchapter S corporation for federal and state Income Tax purposes (the "***Company***"), formed Seller as a subchapter S corporation.

B.      As of the date hereof, (i) Owner owns all of the issued and outstanding membership interests of Seller and (ii) Owner owns all of the issued and outstanding membership interests of the Company (collectively, the "***Signing Date Units***").

C.      After the date hereof but at least two (2) days prior the Closing Date, Owner shall contribute all of the issued and outstanding equity interests in the Company to Seller in exchange for one hundred percent (100%) of the membership interests of Seller (the "***Contribution***"), and Seller shall make a timely election by which the Company was classified as a "qualified subchapter S subsidiary" pursuant to Section 1361(b)(3) of the Code (the "***QSub Election***"), effective as of the date of the Contribution, resulting in (i) Owner owning all of the issued and outstanding membership interest of Seller (a subchapter S corporation) and (ii) the Company being a wholly-owned subsidiary of Seller (collectively, the Contribution and the QSub Election, the "***Pre-Closing Contribution and Exchange***").

D.      Effective as of the day immediately following the date on which the Pre-Closing Contribution and Exchange was consummated, and at least one day prior to the Closing Date, Seller shall cause the Company to file an IRS Form 8832 and elect to be treated as "disregarded as an entity separate from its owner" for federal Income Tax purposes in accordance with Treasury Regulations Section 301.7701-3 (the "***Company DRE Election***" and together with the Pre-Closing Contribution and Exchange, the "***Restructuring***").

E.      As of the Closing Date, (i) Seller will own all of the issued and outstanding membership interests of the Company (collectively, the "***Closing Date Units***" and together with the Signing Date Units, the "***Units***"), and (ii) Owner owns all of the issued and outstanding membership interests of Seller.

F.      On the terms and subject to the conditions contained in this Agreement, Seller will sell 90.0% of the Closing Date Units to Buyer (the "***Purchased Units***"), and in exchange for the Purchased Units, Seller will be issued the Seller Note and receive the Closing Payment (as set forth and subject to adjustment as provided in this Agreement).

G.      WHEREAS, Seller desires to contribute to Buyer, and Buyer desires to accept as a contribution from Seller, 10.0% (without giving effect to Buyer's payment of the Momentum LOC Payoff Amount) of the Closing Date Units (the "***Contributed Units***") in exchange for 12,600 Class A Units of Buyer, representing 14.0% of the aggregate membership interests of Buyer (prior to giving effect to the issuance of any additional Incentive Units (as defined in the Buyer LLC Agreement)) (the "***Rollover Securities***") and become a member of Buyer and a party to the Buyer LLC Agreement, a copy of which along with all subsequent amendments has been provided to Seller.

**NOW THEREFORE,** the parties, intending to be legally bound, in consideration for the mutual covenants set forth herein, hereby agree as follows:

1.     <u>**Purchase, Sale and Contribution; Closing; Conditions; Termination; Adjustments**</u>.

    **1.1.**     **Sale and Transfer of Units; Closing.**  Subject to the terms and conditions of this Agreement, effective as of the Closing (a) Buyer shall purchase from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of the Purchased Units, free and clear of any Encumbrance, in exchange for the Closing Payment and the issuance of the Seller Note, and (b) Seller will contribute, assign, transfer and deliver to Buyer, free and clear of any Encumbrance, and Buyer will accept as a contribution from Seller, the Contributed Units, in exchange for the Rollover Securities. The total consideration to be paid (as adjusted, the ***"Purchase Price"***) is as follows, which will be paid as set forth on <u>**Schedule 1.1**</u>: (a) for the Purchased Units, the issuance of the Seller Note and an amount, payable in cash, equal to Eight Million and 0/100 Dollars ($8,000,000.00), (the "***Closing Payment***"), (v) the delivery of the Seller Note at the Closing, and (vi) the payment by Buyer of the Momentum LOC Payoff Amount; and (b) for the Contributed Units, the issuance of the Rollover Securities which are valued at the Rollover Amount. The purchase and sale (the ***"Closing"***) provided for in this Agreement shall take place at the offices of Buyer no later than three (3) Business Days following satisfaction or waiver of all of the conditions to the obligations of the parties to consummate the transactions contemplated hereby in accordance with this Agreement or at such other time, place and date as is mutually agreed to by the parties hereto, which may include closing by exchange of documents by electronic mail and overnight courier (the ***"Closing Date"***). The Closing will be deemed effective as of 12:01 a.m. on the Closing Date for tax and accounting purposes.

    **1.2.**     **Conditions to Buyer's Obligations.**  The obligations of Buyer are subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions. The benefits of these conditions are for Buyer only and may be waived in writing by Buyer at any time in its sole discretion.

    (a)     Buyer's reasonable satisfaction with Owner's and Seller's performance of the transition support obligations as set forth in <u>Section 4.1</u> and <u>Section 4.6</u>.

    (b)     Owner and/or Seller shall deliver to Buyer (i) instruments of transfer and assignment of the Closing Date Units to Buyer and (ii) the other items to be delivered in accordance with <u>Section 6.1</u>.

    (c)     No Proceedings will have been instituted or threatened to restrain, prohibit or delay any of the transactions contemplated by this Agreement.

    (d)     Each of the representations and warranties made by Seller and Owner contained in this Agreement that are qualified by materiality will be true and correct in all respects and each of the representations and warranties made by Seller and Owner contained in this Agreement that are not so qualified will be true and correct in all material respects, in each case, as if such representations or warranties were made on and as of the date of this Agreement and as of the Closing Date (except to the extent such representations and warranties speak as of a specific date or as of the date of this Agreement, in which case such representations and warranties will be so true and correct or so true and correct in all material respects, as the case may be, as of such specific date or as of the date of this Agreement, respectively) and Buyer will have received a certificate attesting thereto duly executed by Seller and Owner.

    (e)     Since the date of this Agreement, there shall have been no change, event or condition of any character (whether or not covered by insurance) that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect and Buyer will have received a certificate attesting thereto duly executed by Seller and Owner.

At the Closing, Owner shall deliver to Buyer instruments of transfer and assignment and take such other action as Buyer may reasonably require to transfer and assign the Closing Date Units to, and vest title to such in, Buyer and to consummate the transactions contemplated by this Agreement.  Owner and Seller hereby irrevocably constitutes and appoints Buyer as attorney-in-fact to transfer such Seller's Closing Date Units on the books of the Company with full power of delegation and substitution.

        **1.3.**    **Conditions to Seller's Obligations**.  The obligations of the Owner and Seller are subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions.  The benefits of these conditions are for Owner and Seller only and may be waived by Owner or Seller in writing at any time in its sole discretion.

        (a)    Buyer shall: (i) pay to the Owner the Closing Payment, by bank wire transfer of immediately available funds to the account or accounts designated in writing by Owner; (ii) deliver to the Owner (A) the original Rollover Securities certificate, if certificated, or evidence satisfactory to Owner that such Rollover Securities have been issued and (B) the other items to be delivered in accordance with <u>Section 6.2</u> and (iii) pay to Momentum Bank the Momentum LOC Payoff Amount.

        (b)    No Proceedings will have been instituted or threatened to restrain, prohibit or delay any of the transactions contemplated by this Agreement.

        (c)    Each of the representations and warranties of Buyer contained in this Agreement that are qualified by materiality will be true and correct in all respects and each of the representations and warranties of Buyer that are not so qualified will be true and correct in all material respects, in each case, as if such representations or warranties were made on and as of the date of this Agreement and as of the Closing Date (except to the extent such representations and warranties speak as of a specific date or as of the date of this Agreement, in which case such representations and warranties will be so true and correct or so true and correct in all material respects, as the case may be, as of such specific date or as of the date of this Agreement, respectively), and Owner will have received a certificate attesting thereto duly executed by Buyer.

        (d)    Buyer will have performed, satisfied and complied in all material respects with all covenants and agreements required by this Agreement and Seller will have received a certificate attesting thereto duly executed by Buyer.

        **1.4.**    **Termination.**  This Agreement and the transactions contemplated hereby may be terminated at any time prior to the Closing: (a) by mutual written agreement of Owner and Buyer; (b) by either Owner or Buyer if the Closing has not occurred by March 31, 2022, unless the failure to consummate the Closing is the result of a breach of this Agreement by the Party seeking to terminate this Agreement; (c) by any Party (provided that such Party is not then in material breach of any of its representations, warranties, covenants, or agreements under this Agreement), if the other Party hereto shall have materially breached any of its respective representations, warranties, covenants, obligations under this Agreement; provided, however, that the breach or failure to perform is incapable of being cured or has not been cured by the breaching Party on or prior to the date which is fifteen (15) business days immediately following written notice by the non-breaching Party of such breach or failure to perform; or (d) by any Party pursuant to <u>Section 2.4(b)(ii)</u>.

        **1.5.**    **Effect of Termination; Termination Fee**.

        (a)    Upon the termination of this Agreement in accordance with this Section, the obligations of each Party shall forthwith become null and void, without any liability on the part of any Party hereto.  Notwithstanding the foregoing, nothing contained in this Section shall relieve any Party of

any liability for a breach of any covenant, representation, and/or warranty set forth in this Agreement before the termination hereof.

(b)  In the event that Seller terminates this Agreement pursuant to Section 1.4(c) (or pursuant to Section 1.4(b) if, at the time of or prior to such termination, Seller would have been entitled to terminate this Agreement pursuant to Section 1.4(c) (each, a "Qualified Termination"), then, in either case, Buyer shall pay, or cause to be paid, to Seller or a designee thereof an amount equal to $67,000 (the "Buyer Termination Fee"), such payment to be made by wire transfer of immediately available funds within two (2) Business Days following such termination, it being understood that in no event shall Buyer be required to pay the Buyer Termination Fee on more than one occasion.  Notwithstanding anything to the contrary in this Agreement, but subject to Section 1.5(a), each of the Parties acknowledges and agrees that Seller's right to receive the Buyer Termination Fee payable pursuant to this Section 1.5(b) shall, in the event of a Qualified Termination in respect of which the Seller (or its designee) has been paid the Buyer Termination Fee pursuant to this Section 1.5(b), be the sole and exclusive remedy of Seller and Owner, the Company and their Affiliates against Buyer and its Affiliates and representatives for any loss or damage suffered by the Company, Seller, Owner and their Affiliates as a result of any breach of this Agreement by Buyer, including a breach that results in the failure of the Closing.

1.6.  **Withholding**.  Notwithstanding anything in this Agreement to the contrary, the Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to the Seller pursuant to this Agreement all amounts required under the Code or any applicable provision of any state, local, or foreign Tax Law to be deducted and withheld.  To the extent that any such amount is so deducted and withheld by Buyer, such amount shall be paid over to, or deposited with, the relevant Tax authority and shall be treated for all purposes of this Agreement as having been paid to the Seller.

2.  **Representations and Warranties of Seller**.  Seller and Owner, jointly and severally, represent and warrant to Buyer, as of the date hereof and as of the Closing, as follows:

2.1.  **Organization and Good Standing**.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of Texas, with full power and authority to conduct its business as it is being conducted, to own or use its assets, and to perform all its contractual obligations.  The Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the Company conducts business that requires such qualification.  Each jurisdiction in which the Company conducts business is listed on **Schedule 2.1**.  Owner has delivered to Buyer complete and correct copies of the Company's Organizational Documents.  The Company is not in default under or in violation of any of its Organizational Documents.  The Company has not conducted business under or otherwise used, for any purpose or in any jurisdiction, any legal, fictitious, or trade name other than the names listed on **Schedule 2.1**.

2.2.  **Enforceability and Authority; No Conflict**.  This Agreement has been duly executed and delivered by Seller and Owner and constitutes the legal, valid, and binding obligation of Seller and Owner, enforceable against Seller in accordance with its terms.  Seller and Owner each have the absolute and unrestricted right, power, authority, and capacity to execute and deliver, and to perform its obligations under, this Agreement.  Seller and the Company had, immediately prior to the Restructuring, all power and authority to consummate the Restructuring.  All of the transactions constituting the Restructuring to be consummated prior to the Closing have been consummated and have been consummated in accordance with all applicable Laws.  The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not (with or without notice or lapse of time): (a) conflict with or violate the Company's or Seller's Organizational Documents or any Legal Requirement; (b) result in the imposition or creation of any Encumbrance on any of the Company's assets; or (c) except as set forth on **Schedule 2.2**, breach, or give rise to any right of modification, termination, or

acceleration, or trigger additional rights or remedies with respect to, any Contract to which Seller or the Company is a party.  Except as set forth on **Schedule 2.2**, neither the Company nor Seller is required to give notice to or obtain Consent from any Person in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

### 2.3.    Capitalization; No Subsidiaries.

(a)    As of the date hereof, Owner is the sole record owner of all of the aggregate issued and outstanding membership interests of (i) the Company, which such membership interests are represented by the Signing Date Units, and (ii) Seller, in each case, free and clear of all Encumbrances, including any restriction on the right of any party to transfer the Signing Date Units in accordance with the Restructuring.  The instruments of transfer to be delivered by Owner to Seller in connection with the Restructuring will be sufficient to transfer Owner's entire interest in the equity of the Company (of record and beneficially) owned by Owner.  Upon transfer to Seller of 100% of the equity of the Company, Seller will receive good title to such equity, free and clear of all Encumbrances.

(b)    As of the Closing Date, Seller is the sole record owner of all of the aggregate issued and outstanding membership interests of the Company, which such membership interests are represented by the Closing Date Units, free and clear of all Encumbrances, including any restriction on the right of Seller to transfer the Purchased Units and Contributed Units to Buyer pursuant to this Agreement.  Upon transfer to Buyer of the Purchased Units and Contributed Units, Buyer will receive good title to the Purchased Units and Contributed Units, free and clear of all Encumbrances.   The Closing Date Units are not certificated.

(c)    The Units have been duly authorized and validly issued, are fully paid and nonassessable, and were not issued in violation of the Securities Act or any other Legal Requirement. Except as set forth on **Schedule 2.3**, there are no Contracts relating to the Units, including the sale, voting, or transfer thereof.  The Company has no outstanding subscription, option, warrant, or other Contract or obligations in effect giving any Person the right to acquire any Equity Security of the Company.

(d)    The Company does not have, and has never had, any subsidiaries.  The Company neither owns nor is party to or bound by any Contract to acquire any ownership interest in, and is not obligated to provide funds to or make any investment in, any other Person or business.

### 2.4.    Financial Statements; Good Faith Estimate; Conduct of the Company.

(a)    <u>Financial Statements</u>.  Owner has delivered to Buyer complete and correct copies of the Financial Statements.  The Financial Statements were prepared in accordance with the Accounting Principles, are consistent with the accounting records of the Company, and fairly present the financial position of the Company as of the dates thereof and the results of the operations and cash flows of the Company for the periods indicated.  Except as set forth on **Schedule 2.4**, the Company has no liability or obligation of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) other than liabilities or obligations to the extent shown on the Interim Balance Sheet and current liabilities incurred in the ordinary course of business since the date of the Interim Balance Sheet. All accounts receivable reflected on the Interim Balance Sheet represents valid obligations for sales actually made or services actually performed and are current and collectible.

(b)    <u>Good Faith Estimate</u>.

(i)    At least three (3) business day prior to the Closing Date, Owner and Seller shall deliver to Buyer a statement setting forth a good faith estimate (the "***Good Faith***

***Estimate***") of (i) the (A) Working Capital of the Company, (ii) the Momentum LOC Payoff Amount (which shall not exceed $4,800,000) and a certification that there is no other outstanding Indebtedness of the Company other than the Momentum LOC (the "***Closing Indebtedness***"), and (iii) the aggregate amount of unpaid Company Transaction Expenses.  Owner and Seller certify to Buyer that (x) the calculations of Working Capital, Closing Indebtedness and the Company Transaction Expenses were prepared in good faith and are a true and accurate calculation thereof as of the date of such calculation and Owner and Seller have delivered all related supporting schedules, calculations and documentation to the Buyer for such calculations and (y) all Company Transaction Expenses have been or will be paid in full by Seller with the Purchase Price on the Closing Date.   To the extent Owner and Seller desire to cause the Company to enter into any non-ordinary course transactions relating to the Working Capital of the Company prior to the Closing (i.e. a distribution of any excess Working Capital to Seller or Owner), then the Good Faith Estimate shall also include such transactions.

        (ii)     Upon delivery of the Good Faith Estimate, Buyer shall have two (2) Business Days to either (1) accept the Good Faith Estimate (and any proposed non-ordinary course transaction contained therein, if any), or (2) object to the Good Faith Estimate (and any proposed non-ordinary course transaction contained therein, if any), and work with Owner and Seller in good faith for a period of up to five (5) Business Days (with the Closing Date to be commensurately delayed during such period) to resolve any issues (including, without limitation, any adjustments to any proposed distributions of Working Capital of the Company prior to the Closing or an amendment to this Agreement adjusting the Purchase Price) (the "***Working Capital Negotiation***").  If the Owner and Seller, on one hand, and Buyer, on the other, are unable to resolve any such issues pursuant to the Working Capital Negotiation during such five (5) Business Day Period, then any of such Parties shall be entitled to terminate this agreement pursuant to Section 1.4(d).

        (c)     <u>Conduct of the Company</u>.  Subject to <u>Section 2.4(b)</u>, the Company has conducted its business only in the ordinary course of business and has not suffered any Material Adverse Change, and no event has occurred, and no circumstance exists, that can reasonably be expected to result in a Material Adverse Change.  Since January 1, 2021, Seller has conducted the business of the Company only in the ordinary course and have not: (A) incurred any Liability outside the ordinary course of business which is not consistent with their prior practices; (B) sold, transferred, leased to others or otherwise disposed of any of the Company's assets (except as referenced herein); or (C) suffered any damage, destruction or loss (whether or not covered by  insurance) which has materially and adversely affected the Company.

        **2.5.**    **Books and Records.**  The books of account and other records of the Company are complete and correct, represent actual, bona fide transactions, and have been maintained in accordance with sound business practices and applicable Legal Requirements.  The minute books of the Company contain complete and correct records of all meetings and actions taken by written consent of the Company's equityholders, board of directors, and committees of the board of directors, and no meeting of any such equityholders, board of directors, or committee has been held, and no other action has been taken, for which minutes or other evidence of action have not been prepared and included in such minute books.   The Company has at all times maintained complete and correct records of all issuances and transfers of its Equity Securities.  Buyer has been provided with complete and correct copies of all of the books and records contemplated in this <u>Section 2.5</u>.  At the Closing, all such minute books and records will be in the possession of the Company and located at the principal office of the Company.

        **2.6.**    **Real and Personal Property.**  The Company does not own any real property and does not lease any real property as a lessor or sublessor. **Schedule 2.6** lists each real property lease entered into by the Company (collectively, the ***"Leases"***), including a description of the premises leased and the

parties to such Leases. The only interests of the Company in any real property are the leasehold estates represented by the Leases, no other real property (or interest in real property) is used in the operation of the Company's business, and Seller have provided Buyer with complete and correct copies of all Leases.  No dispute exists with respect to the Company's right to enjoy the premises under the Leases. The Company's interests under the Leases and all tangible personal property and other assets reflected as owned in the Interim Balance Sheet (other than inventory sold since the date thereof in the ordinary course of business) are free and clear of all Encumbrances, other than Permitted Encumbrances. All tangible personal property acquired by the Company since the date of the Interim Balance Sheet (other than inventory acquired and sold since such date in the ordinary course of business) is owned by the Company free and clear of all Encumbrances, other than Permitted Encumbrances.  A complete and correct copy of the Company's fixed asset register as of December 31, 2021 has been delivered to Buyer.

2.7.    **Condition and Sufficiency of Assets.**  The buildings and equipment owned or leased by the Company are structurally sound, in good operating condition and repair, and adequate for the uses to which they are being put, and none of such buildings or equipment is in need of maintenance or repairs other than ordinary, routine maintenance that is not material in nature or cost.  The assets owned and leased by the Company constitute all the assets used in connection with its business and necessary for the Company to continue to conduct its business following the Closing as it is being conducted.

2.8.    **Taxes.**

(a)    The Company has timely filed all Tax Returns that it was required to file, has duly paid all Taxes due and payable (whether or not shown on any Tax Return) and has established sufficient reserves for all accrued Taxes not yet due and owing.  All Tax Returns filed by the Company are complete and correct.  There is no Proceeding concerning any Tax liability of the Company pending, being conducted or, to the Knowledge of Seller, threatened by a Governmental Body.  The Company has withheld and paid all Taxes required to have been withheld and paid in connection with any amount paid or owing to any employee, independent contractor, creditor, equityholder or other third party.  **Schedule 2.8** lists each jurisdiction in which the Company is subject to Tax or required to file a Tax Return and the Tax Returns required to be filed in each such jurisdiction.

(b)    No claim has been made by a Governmental Body in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.  The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(c)    The Company is not party to any understanding or arrangement described as a "reportable transaction" for purposes of Section 6707A of the Code and Treasury Regulations Section 1.6011-4.  No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings relating to Taxes have been entered into or issued by any Governmental Body with or with respect to the Company.

(d)    No activity of the Company gives rise, or may give rise, to the creation of a permanent establishment in any foreign country for Tax purposes.  None of the assets of the Company is subject to the limitations on "amortizable Section 197 intangibles" described in Section 197(f)(9) of the Code or any similar comparable limitation under state, local or foreign law.

(e)    The Company will not be required to include any item in taxable income or exclude any item of deduction or loss from taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of: (i) any "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Tax Law) executed on or prior to

the Closing Date, (ii) any installment sale, open transaction method, the long-term method of accounting, or the cash method of accounting with respect to a transaction that occurred on or prior to the Closing Date, (iii) any intercompany transactions or any excess loss account described in Section 1.1502-19 of the Treasury Regulations (or any similar provision of state, local or foreign law), (iv) any change in method of accounting (including adjustments pursuant to Section 481 of the Code) for a taxable period beginning before the Closing Date, or (v) any deferred revenue or prepaid amount received on or prior to the Closing Date.

(f)     At all times since its formation until the consummation of the Restructuring, the Company has been, for federal and applicable state and local income Tax purposes, properly classified as an "S corporation" within the meaning of Code Section 1361(a)(1).  For all periods during the Restructuring, the Company has been, for federal and applicable state and local income Tax purposes, properly classified as either an "S corporation" within the meaning of Code Section 1361(a)(1), a "qualified subchapter S subsidiary" under Code Section 1361(b)(3)(B), or "disregarded as an entity separate from its owner" in accordance with Treasury Regulations Section 301.7701-3(b)(1)(ii).  For all periods since the Restructuring until the Closing Date, the Company has been, for federal and applicable state and local income Tax purposes, properly classified as "disregarded as an entity separate from its owner" in accordance with Treasury Regulations Section 301.7701-3(b)(1)(ii).

(g)     The Company has not (i) deferred the payment of any payroll Taxes pursuant to Section 2302 of the CARES Act or IRS Notice 2020-65 or (ii) claimed the "employment retention credit" within the meaning of Section 2301 of the CARES Act or any other Tax credit applicable to employment Taxes under the Families First Coronavirus Response Act.

**2.9.    Employee Benefits.**  Set forth on **Schedule 2.9** is a complete list of each Employee Plan.  With respect to each Employee Plan, the Company has heretofore made available to Buyer complete and correct copies of each of the following documents: (a) the Employee Plan and all related documents (including all amendments thereto), (b) the three most recent Form 5500 annual reports, if applicable, including all attachments thereto, filed with the Department of Labor with respect to each such Employee Plan, (c) the summary plan description prepared for each such Employee Plan (including all amendments thereto), and (d) all Contracts with third-party administrators, actuaries, investment managers, consultants or other independent contractors related to each such Employee Plan.  Each Employee Plan has been administered and operated in material compliance with its terms, and the requirements of all applicable Legal Requirements, including ERISA and including applicable Legal Requirements relating to the form or content of the Employee Plan.  No Employee Plan is a "multiemployer plan" (within the meaning of Section 3(37) of ERISA) or a "multiple employer" plan (within the meaning of Section 4063 or 4064 of ERISA).

**2.10.    Compliance with Legal Requirements; Governmental Authorizations.**  The Company has at all times been in compliance with each Legal Requirement that is or was applicable to it or the conduct of its business or the ownership or use of any of its assets.  No event or circumstance exists that (with or without notice or lapse of time) would constitute or result in a violation of a Legal Requirement, loss of any Governmental Authorization, or obligation by the Company to take remedial action.  **Schedule 2.10** lists each Governmental Authorization that (a) is held by the Company, or (b) otherwise relates to the business of, or to any assets owned or used by, the Company and the holder of such Governmental Authorization if not the Company.  Each Governmental Authorization listed on **Schedule 2.10** is valid and in full force and effect.  The Company has not received any notice or other communication from any Person regarding any actual, alleged, or potential violation of, or failure to comply with, any Governmental Authorization or applicable Legal Requirement.

**2.11.   Legal Proceedings; Orders.**   Except as set forth on **Schedule 2.11**, for the previous five (5) years, there has not been, and there is not pending or, to the Knowledge of Seller, threatened, any Proceeding: (a) that relates to the Company's business or assets; (b) by or against the Company; (c) by or against any Seller that relates to the Units or the Company's business or assets; or (d) that challenges or could otherwise interfere with the transactions contemplated by this Agreement.  To the Knowledge of Seller, no event has occurred or circumstance exists that could give rise to any such Proceeding.  Except as set forth on **Schedule 2.11**, there is no Order to which the Company is subject, and no Seller is subject to any Order that relates to the Units or the Company's business or assets.

**2.12.   Contracts.  Schedule 2.12** lists, and Owner has delivered to Buyer a complete and correct copy of, each Applicable Contract (a) involving the performance of services, delivery of goods or materials, or payments by or to the Company, (b) affecting the ownership, lease, or use of any real or personal property (including the Leases), (c) containing covenants that in any way purport to restrict the right of the Company (or any other Person for the Company's benefit) to engage in any business activity, compete with any Person, or enter into (or solicit) a business relationship with any Person, (d) including IP assignments or licenses necessary for the Company to conduct its business as it is currently being conducted, or (e) that is otherwise material to the conduct of the Company's business (collectively, the **"Material Contracts"**).  Each Material Contract is in full force and effect, is valid and enforceable in accordance with its terms.  Neither the Company nor, to the Knowledge of Seller, any other party is or has been in breach of any Material Contract, and no event or circumstance has occurred or exists that (with or without notice or lapse of time) could result in a breach of any Material Contract, result in the creation of any Encumbrance affecting the Company or its assets or give the Company or any other party to any Material Contract the right to  cancel, terminate or modify such Material Contract.  The Company has not given to, or received from, any other Person any notice or other communication (whether oral or written) regarding any actual, alleged, or potential breach of any Material Contract or any intention to modify, cancel,  terminate  or not renew any Material Contract.

**2.13.   Insurance.**  The assets and business of the Company are insured under the various policies of insurance set forth on **Schedule 2.13**, each of which is currently, and will be after the Closing Date, in full force and effect without modification.  The Company has timely paid all premiums due and payable with respect to each policy set forth on **Schedule 2.13**, and no additional premiums are due as of the Closing Date.  Seller have provided Buyer with complete and correct copies of all such policies, and no policy has been modified since such copies were provided to Buyer.  The Company has not received any notice of cancellation or non-renewal with respect to (or disallowance of, or reservation of rights with respect to, any claim under) any such policies.  The insurance policies are the type and in the amounts customarily carried by companies conducting a business similar to the Company and are sufficient for compliance with all applicable laws and contracts to which the Company is a party or by which it is bound.

**2.14.   Employees.  Schedule 2.14** lists the following information for each Company employee (including those on leave of absence or layoff status): name, job title, date of hiring, details of leave of absence or layoff, rate of compensation, bonus arrangement, vacation, sick time, and personal leave accrued, and service credited for purposes of vesting and eligibility to participate under any Employee Plan. Each Person that is engaged by the  Company as an independent contractor, consultant, or sales agent qualifies as an independent  contractor under applicable Legal Requirements.  All compensation and bonuses due and owing to any employee or contractor of the Company as of the Closing Date have been paid in full or accrued in the full amount set forth on **Schedule 2.14**.  The Company is not a party to, nor otherwise bound by, any collective bargaining agreement or other Contract or understanding with a labor union or labor organization.  Except as provided on **Schedule 2.14**, no employee has terminated or threatened to terminate his or her employment with the Company, or given notice of such termination, and Seller have no reason to believe that any employee intends to terminate his or her employment with Company.  The Company has never received a (i) "no match letter" from the U.S.  Social Security

Administration, or (ii) written notice from the Department of Homeland Security that the immigration status or employment authorization documentation presented or referenced by an employee as proof of work authorization is assigned to another individual.

**2.15.    Intellectual Property.   Schedule 2.15** lists all Intellectual Property Assets.  The Company owns the entire right, title and interest in and to, or has the right to use pursuant to a valid and enforceable license, all Intellectual Property Assets.  The conduct of the Company's business, and the Company's products, processes and services, have not infringed upon the Intellectual Property rights of any Person.  To the Knowledge of Seller, no Person has infringed or otherwise violated, or is currently infringing or otherwise violating, any Intellectual Property Assets.  There are no pending or, to the Knowledge of Seller, threatened Proceedings (a) challenging the validity, enforceability or ownership of any of the Intellectual Property Assets or the Company's rights with respect thereto, or (b) alleging any infringement, misappropriation or other violation of the Intellectual Property of any Person by the Company.

**2.16.    Bank Accounts.  Schedule 2.16** lists (a) the names and locations of all banks and other financial institutions at which the Company maintains accounts of any nature, the type and number of all such accounts, and the names of all Persons authorized to make withdrawals therefrom, (b) all credit cards and revolving credit accounts in the name of the Company or used in the Company's business, (c) the location of all lock boxes, P.O.  boxes and safe deposit boxes maintained by the Company, together with the names of the Persons authorized to have access thereto, and (d) any powers of attorney granted by the Company.

**2.17.    Investment of Rollover Securities**. Seller is:

(a)      acquiring the Rollover Securities for its own account with the present intention of holding the Rollover Securities for investment purposes and not with a view to or for sale in connection with any public distribution of such securities in violation of any federal or state securities Laws;

(b)      is an "accredited investor" within the meaning of Securities and Exchange Commission Rule 501 of Regulation D, as presently in effect, and has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Rollover Securities;

(c)      is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Rollover Securities; and

(d)      acknowledges that the Rollover Securities has not been registered under the Securities Act, or any state securities Law and understands and agrees that Seller may not sell or dispose of any of the Rollover Securities except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable federal, state or foreign securities Laws.

**2.18.    Brokers or Finders.**   Neither the Company nor any Seller has incurred any obligation or liability, contingent or otherwise, for any brokerage or finder's fee or other similar payment in connection with this Agreement or the transactions contemplated hereby.

**2.19.    Disclosure.**  No representation or warranty or other statement made by any Seller in this Agreement, the attached Schedules, or otherwise in connection with the transactions contemplated hereunder contains any untrue statement of material fact or omits to state a material fact necessary to make the statements in this Agreement or therein, in light of the circumstances in which they were made, not misleading.

3.      **Representations and Warranties of Buyer.**  Buyer represents and warrants to Seller, as of the date hereof and as of the Closing, as follows:

3.1.     **Organization and Good Standing.**  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware with full power and authority to conduct its business as it is being conducted, to own or use its assets, and to perform all its contractual obligations.

3.2.     **Enforceability and Authority; No Conflict.**  The execution, delivery, and performance by Buyer of this Agreement have been duly authorized by all necessary corporate action.  This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.  Buyer has the absolute and unrestricted right, power, and authority to execute and deliver, and to perform its obligations under, this Agreement.  The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not conflict with or violate Buyer's Organizational Documents, any resolution adopted by Buyer's board of directors or equityholders, or any Legal Requirement.  Except as set forth on **Schedule 3.2**, Buyer is not required to give notice to or obtain Consent from any Person in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

3.3.     **Brokers or Finders.**  Buyer has not incurred any obligation or liability, contingent or otherwise, for any brokerage or finder's fee or other similar payment in connection with this Agreement or the transactions contemplated hereby.

3.4.     **Capitalization; Rollover Securities. Schedule 3.4.1** sets forth a true and complete statement of the capitalization of (i) the Buyer as of the immediately prior to the Closing and (ii) the Buyer as of immediately after the Closing. The Rollover Securities have been duly authorized and validly issued, are fully paid and nonassessable, and were not issued in violation of the Securities Act or any other Legal Requirement.  Except for issuances for which Owner shall have preemptive rights, incentive issuances contemplated by the Buyer LLC Agreement and prospective rollover issuances to certain sellers party to various outstanding term sheets (each which contemplated the issuance of rollover equity), Buyer has no outstanding subscription, option, warrant, or other Contract or obligations in effect giving any Person the right to acquire any Equity Security of Buyer.

3.5.     **Books and Records.**  The books of account and other records of Buyer are complete and correct, represent actual, bona fide transactions, and have been maintained in accordance with sound business practices and applicable Legal Requirements.  The minute books of Buyer contain complete and correct records of all meetings and actions taken by written consent of Buyer's equityholders, board of directors, and committees of the board of directors, and no meeting of any such equityholders, board of directors, or committee has been held, and no other action has been taken, for which minutes or other evidence of action have not been prepared and included in such minute books.  Buyer has at all times maintained complete and correct records of all issuances and transfers of its Equity Securities.

3.6.     **Compliance with Legal Requirements; Governmental Authorizations.**  Buyer has at all times been in material compliance with each Legal Requirement that is or was applicable to it or the conduct of its business or the ownership or use of any of its assets.  No event or circumstance exists that (with or without notice or lapse of time) would constitute or result in a violation of a Legal Requirement, loss of any Governmental Authorization, or obligation by Buyer to take remedial action.   Buyer has not received any written notice from any Person regarding any actual, alleged, or potential violation of, or failure to comply with, any Governmental Authorization or applicable Legal Requirement.

**3.7.    Legal Proceedings; Orders.**  There are no pending Proceedings: (a) that relates to Buyer's business or assets; (b) by or against Buyer; (c) by or against any Buyer that relates to the Rollover Securities or Buyer's business or assets; or (d) that challenges or could otherwise interfere with the transactions contemplated by this Agreement.  To the actual knowledge of Buyer, no event has occurred or circumstance exists that could give rise to any such Proceeding.  There is no Order to which Buyer is subject to that relates to the Rollover Securities or Buyer's business or assets.

**4.    Covenants.**

**4.1.    Cooperation and Proceedings; Access to Records.**  From the date of this Agreement through the Closing Date, Seller and Owner will give Buyer and Buyer's representatives full access to the Company, during normal business hours, to familiarize themselves with its operations and staff. Without limiting the foregoing, Selling shall provide Buyer access to observe the Company's operations, supervised access to the Company's information technology systems, access to the Company's employees, including the owners, to answer questions regarding the operations of the Company, and the opportunity to discuss with the Company's employees offers of employment with Buyer.  From the Closing, Owner and Seller each shall cooperate with Buyer and make itself reasonably available to Buyer in connection with the institution or defense of any Proceeding (whether existing or anticipated) involving or relating to the transactions contemplated under this Agreement or the Company, including providing testimony, records, and other information. Seller and Buyer will make reasonably available to the other any records in the non-requesting party's custody or control for the purpose of preparing any financial statement or Tax Return or preparing for or defending any tax-related examination of the requesting party or the Company by any Governmental Body.  Owner and Seller, on one hand, and Buyer, on the other, shall cooperate (and shall cause their respective Related Parties to cooperate) with each other and with each other's respective agents, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return, amended Tax Return, report, claim for refund, or any Tax claim or litigation in respect of the Company or its activities.

**4.2.    Tax Matters.**

(a)    Intended Tax Treatment; Purchase Price Allocation.  The parties hereby acknowledge and agree that, for federal and applicable state and local Income Tax purposes, the purchase, sale and contribution of the Units shall be treated as follows: (i) Buyer's purchase of the Purchased Units from Seller in exchange for the Closing Payment (including any assumed liabilities and any other items treated as taxable consideration for Tax purposes) (the "***Allocable Consideration***") is intended to be treated as the taxable purchase and sale of an undivided interest in a ratable portion of the assets of the Company, and (ii) Seller's contribution of the Contributed Units to Buyer in exchange for the Rollover Securities is intended to be treated as a contribution of an undivided interest in a ratable portion of the assets of the Company with a total value equal to the Rollover Amount in a transaction qualifying under Section 721(a) of the Code (the "***Intended Tax Treatment***").  The Allocable Consideration shall be allocated among the assets of the Company (attributable to the Purchased Units) for income Tax purposes in accordance with the methodology set forth in **Annex A** (the "***Allocation Schedule Methodology***"), which is consistent with Section 1060 of the Code.  Within ninety (90) days following the final determination of the Closing Payment, the Buyer shall deliver to Seller a draft allocation schedule of the Allocable Consideration among the Company's assets (attributable to the Purchased Units) (the "***Allocation Schedule***"), which shall be prepared in accordance with the Allocation Schedule Methodology.  Seller and Buyer shall attempt in good faith to resolve any disputes with respect to the Allocation Schedule.  No party hereto shall take or permit others to take on its behalf, any position, whether in connection with a Tax audit, a Tax Return or otherwise, that is inconsistent with the Allocation Schedule (as finally determined) and the Intended Tax Treatment unless required to do so by a Tax authority.

(b)     Tax Returns.

(i)     Seller, at its own expense, shall prepare or cause to be prepared and timely file or cause to be timely filed all income Tax Returns required to be filed by the Company for all Pre-Closing Tax Periods regardless of when they are required to be filed.  Such Tax Returns shall be prepared in a manner consistent with the past practices of the Company except as required by applicable Law.  Seller shall deliver or cause to be delivered a copy of each such Tax Return to Buyer at least thirty (30) days prior to the date on which such Tax Return is required to be filed (taking into consideration applicable extensions) for Buyer's review and comment.  Buyer shall submit any comments to Seller within fifteen (15) days after the delivery of such Tax Returns, and Seller shall incorporate any reasonable comments made by Buyer.

(ii)     Buyer, at the Company's expense, shall prepare or cause to be prepared and timely file or cause to be timely filed all (A) non-income Tax Returns required to be filed after the Closing Date for the Company for all Pre-Closing Tax Periods and (B) Tax Returns required to be filed for the Company for a Straddle Period.  Buyer shall deliver a copy of such Tax Returns to Seller at least thirty (30) days prior to the date on which such Tax Return is required to be filed (taking into consideration applicable extensions) for Seller's review and comment; provided, however, if such thirty (30) day period is not practical for such non-income Tax Return, Buyer shall provide a copy of such non-income Tax Return to Seller as soon as commercially reasonable.  Seller shall review submit any comments to Seller within fifteen (15) days after the delivery of such Tax Returns, and Buyer shall incorporate any reasonable comments made by Seller.

(iii)     To the extent permitted or required by Law or administrative practice, the taxable year of the Company shall be treated as closing on (and including) the Closing Date.  In the case of any Straddle Period, (A) the amount of any sales or use Tax, value-added Tax, employment Tax, withholding Tax and any Tax based on or measured by income, profits, or receipts, in each case, imposed upon or payable by or with respect to the Company for any Pre-Closing Straddle Period shall be determined based on an interim closing of the books of the Company as of the end of the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which the Company holds a beneficial interest shall be deemed to terminate at such time) and (B) the amount of any other Taxes imposed upon or payable by the Company for any Pre-Closing Straddle Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on and including the Closing Date and the denominator of which is the total number of days in such Straddle Period.

(c)     Contests.  Each of Buyer, on one hand, and Seller, on the other hand, shall promptly notify the other in writing upon receipt (including receipt by affiliates of Buyer or Seller) of any written notice of any pending or threatened federal, state, local, or foreign Proceeding that might reasonably be expected to affect the Tax liabilities of the Company, Seller, or Buyer (a "Tax Proceeding") with respect to any Pre-Closing Tax Period or any Straddle Period.  With respect to a Tax Proceeding that pertains to a Pre-Closing Tax Period, the Seller shall have the right to control any such Tax Proceeding and to employ counsel of its choice at its expense; provided, however, Buyer and its representatives shall be permitted, at Buyer's expense, to be present at, and participate in, any such Tax Proceeding.  If the Seller does not timely elect to control a Tax Proceeding that pertains to a Pre-Closing Tax Period, Buyer shall have the right to assume control of such Tax Proceeding.  With respect to a Tax Proceeding that pertains to a Straddle Period, Buyer shall have the sole right to control any such Tax Proceeding, and to employ counsel of its choice at its expense; provided, however, the Seller and its representatives shall be permitted, at Seller's expense, to be present at, and participate in, any such Tax Proceeding.  Neither Seller nor any of its affiliates (with

respect to a Tax Proceeding involving a Pre-Closing Tax Period), and neither Buyer nor any of its affiliates (with respect to a Tax Proceeding involving a Straddle Period) shall be entitled to settle, either administratively or after the commencement of litigation, any claim for Taxes that could reasonably be expected to adversely affect the liability for Taxes for which the other party may be liable under this Agreement without the prior written consent of the other party (which shall not be unreasonably delayed, conditioned, or withheld).  Notwithstanding any provision of this Agreement to the contrary, to the extent that a provision of this Section 4.2(c) directly conflicts with any provision of Article V, this Section 4.2(c) shall govern.

(d)       Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions under this Agreement (the "**Transfer Taxes**") shall be paid by the Seller when due.

(e)       Tax Sharing Agreements.   All Tax sharing agreements or similar agreements with respect to or involving the Company shall be terminated as of the Closing Date, and, after the Closing Date, the Company shall not be bound thereby or have any liability thereunder.

### 4.3.      Noncompetition, Nonsolicitation, and Confidentiality.

(a)       For a period of  five (5) years after the Closing Date, neither Owner nor Seller shall, directly or indirectly:

(i)       invest in, own, manage, advise, render services to, guarantee the obligations of, or in any manner be connected with any Person engaged in any Competitive Business within the Territory (provided, however, that Seller may own less than 1% of the outstanding capital stock of a Person that is listed on any national securities exchange); or

(ii)       solicit, induce, or otherwise cause (or attempt to solicit, induce, or otherwise cause) any employee, contractor, customer, or supplier (or any prospective customer or supplier that has been contacted or targeted for contact by the Company on or before the Closing Date), or any other person engaged in a business relationship with the Company, to terminate, curtail, or otherwise modify its relationship with the Company or engage in business with a competitor of the Company.

(b)       Owner and Seller each acknowledges the confidential and proprietary nature of the Confidential Information and agrees that such Seller shall, and shall require each of its Related Persons to, from and after the Closing: (i) keep the Confidential Information confidential and promptly deliver to Buyer (or destroy at Buyer's option) all embodiments and copies of the Confidential Information in such Seller's possession; and (ii) neither use the Confidential Information for any reason or purpose nor disclose the Confidential Information to any Person, except with Buyer's prior consent or as required by any applicable Legal Requirement or legal process. Owner and Seller each hereby assumes full responsibility and liability for the compliance of all of their respective Related Persons with the terms of this Section 4.3(b).  Prior to making any disclosure of any Confidential Information required by any applicable Legal Requirement or legal process, each Seller shall provide Buyer with (if and to the extent legally permitted) prompt written notice of such requirement, so that Buyer may seek a protective order or other remedy, and reasonable assistance in opposing such disclosure or seeking a protective order or other remedy

(c)       Owner and Seller each agrees that this Section 4.3, including the provisions relating to duration, geographical area, and scope, is reasonable and necessary to protect and

preserve Buyer's and the Company's legitimate business interests and the value of the Units and the Company, and to prevent an unfair advantage from being conferred on any Seller.  If any provision of this Section 4.3 would be held to be excessively broad as to duration, geographical area, or scope, for any reason, such provision shall be modified, by limiting and reducing it, so as to be enforceable to the extent allowed by applicable Legal Requirements.

(d)     Owner and Seller each acknowledges that any breach of this Section 4.3 would result in serious and irreparable injury to Buyer, Buyer could not be adequately compensated by monetary damages alone, and Buyer's remedy at law would not be adequate.   Therefore, Seller acknowledges and agrees that, in the event of a breach or any threatened breach by any such Seller or any of its Related Persons, Buyer shall be entitled, in addition to any other remedy at law or in equity to which Buyer may be entitled and without the necessity of proving actual or threatened damages or Loss, to equitable relief against such Seller and its Related Persons, and Seller waives the posting of a bond or undertaking as a condition to such relief.

(e)     In the event of two or more successive payment defaults by Buyer, which continues for a period of at least 120 days, with respect to its obligations under the Seller Note or this Agreement, then upon Buyer's receipt of written notice from the Owner, the Owner and Seller shall be released of the obligations, and covenants under this Section 4.3 (other than (i) solicitation of employees and contractors that are not employees and contracts of the Company as of the Closing Date pursuant to Section 4.3(a)(ii), and (ii) the confidentiality obligations pursuant to Section 4.3(b) (other than Confidential Information solely pertaining to the Company as of the Closing Date) (collectively, the "*Surviving Obligations*")) and this Section 4.3 (other than the Surviving Obligations) shall become null and void.

4.4.     **Seller's Release.**  Except for the obligations under this Agreement (or  under any other agreement or instrument to be executed in conjunction with this Agreement in order to consummate the transactions contemplated herein) and the Affiliated Leases, effective as of the Closing, (a) none of the Company, Buyer nor any Related Person of Buyer will have any debt, obligation or liability to Seller or Owner, and (b) Owner and Seller on behalf of itself and all of their respective Related Persons, hereby unconditionally releases and discharges the Company from any and all claims, debts, obligations and liabilities, whether known or unknown, contingent or non-contingent, at law or in equity, in each case arising from or in connection with Seller's ownership of the Company or resulting from Owner, Seller or any of their respective Related Persons having been a director, officer or employee of the Company.

4.5.     **Rollover Securities**. Assuming the accuracy of the representations and warranties set forth in Article 2 and 3, at the Closing, the Rollover Securities (a) have been offered and issued in compliance with applicable securities Laws and (b) will be validly issued, fully paid and nonassessable.

4.6.     **Conduct of Business in Normal Course**. Seller and Owner on behalf of itself or himself, as applicable, and all of their Related Persons covenants and agrees, from and after the date of this Agreement and until the Closing Date or the earlier termination of this Agreement pursuant to Section 1.4, to (a) preserve the present business organization of the Company intact, (b) use their best efforts to keep available the services of the present employees and agents of the Company, (c) use their best efforts to preserve present relationships and good will with suppliers, patients, creditors, employees, agents and other Persons having business dealings with the Company, and (d) generally operate the Company in the ordinary course of business.  Seller and Owner covenant and agree that, except as otherwise expressly contemplated by this Agreement or as specifically consented to in writing by Buyer, from and after the date of this Agreement and until the Closing Date or the earlier termination of this Agreement pursuant to Section 1.4, neither Seller nor Owner shall undertake or permit any action that would result in a breach of the representations and warranties contained in Section 2.4(c); provided, that Owner or his affiliated entity shall be permitted to purchase the underlying property located at 10770 State Highway 30, College Station 77845

and, subject to Buyer's approval, enter into a (x) lease agreement with the Company on substantially the form attached hereto as <u>Exhibit A</u>, and (y) sublease agreement with such current landlord (the "***Affiliated Leases***").

      **4.7.**    **Notification of Certain Matters**.  Owner and Buyer agree to give prompt notice to the other of (a) the occurrence, or failure to occur, of any event the occurrence or failure to occur of which would be likely to cause any of its representations or warranties contained in this Agreement to be untrue or inaccurate at any time from the date of this Agreement to the Closing Date, (b) any failure on its part to comply with or satisfy any covenant or agreement to be complied with or satisfied by it hereunder and (c) the occurrence of any event that may make the satisfaction of the conditions in <u>Section 1.2</u> or <u>Section 1.3</u>, as applicable, impossible or unlikely, including any failure by Seller to provide the transition support obligations required under <u>Section 4.1</u>; provided that the delivery of any notice pursuant to this <u>Section 4.7</u>, does not limit or otherwise affect the remedies available hereunder to the party receiving such notice, or the representations or warranties of, or the conditions to the obligations of, the parties hereto.

      **5.**      <u>**Indemnification; Payment; Reimbursement; Remedies.**</u>

      **5.1.**    **Survival.**  All representations, warranties, and covenants in this Agreement and any certificate, document, or other writing delivered pursuant to this Agreement will survive the Closing and the consummation and performance of the transactions contemplated in this Agreement.

      **5.2.**    **Indemnification By Seller.** Owner and Seller, jointly and severally, shall defend, indemnify and hold harmless Buyer, the Company, and their respective Related Persons (collectively, **"*Buyer Indemnified Persons"***) from, and shall pay to or reimburse Buyer Indemnified Persons to or for any Loss that Buyer Indemnified Persons or any of them may suffer or become subject to, as a result of, in connection with, or relating to: (a) any breach of any representation or warranty made by Seller in this Agreement or any other certificate, document, or other writing delivered by any Seller pursuant to this Agreement; (b) any breach of any covenant or obligation of any Seller in this Agreement or any other certificate, document, or other writing delivered by any Seller pursuant to this Agreement; or (c) any (i) Taxes of the Company for any Pre-Closing Tax Period or Pre-Closing Straddle Period, (ii) any liability of the Company for Taxes of any other Person as a transferee or successor, by Contract or otherwise, which Taxes relate to an event or transaction occurring prior to the Closing Date, (iii) Texas imposed on or payable by any Person with respect to the Restructuring, and (iv) Transfer Taxes payable by Seller pursuant to <u>Section 4.2(e)</u>.  Buyer shall have the right, by giving written notice to Seller, to control the defense of any third party claim against the Company for which any indemnification may be sought from Seller pursuant to this <u>Section 5.2</u>.  Buyer shall reasonably select counsel for such defense, and Seller shall pay the reasonable fees and costs of such counsel as incurred within 30 days of receipt of each invoice.

      **5.3.**    **Indemnification By Buyer.**  Buyer shall defend, indemnify and hold harmless Owner, Seller and their respective Related Persons (collectively, **"*Seller Indemnified Persons"***) from, and shall pay or reimburse Seller to or for any Loss that Seller  Indemnified Persons or any of them may suffer or become subject to, as a result of, in connection with, or relating to: (a) any breach of, or any inaccuracy in, any representation or warranty made by Buyer in this Agreement or any other certificate, document, or other writing delivered by Buyer pursuant to this Agreement; or (b) any breach of, or failure to perform or comply with, any covenant or obligation of Buyer in this Agreement or any other certificate, document, or other writing delivered by Buyer pursuant to this Agreement.  The Seller Indemnified Persons shall have the right, by giving written notice to Buyer, to control the defense of any third party claim against the Seller Indemnified Persons for which any indemnification may be sought from Buyer pursuant to this <u>Section 5.3</u>. Seller Indemnified Persons shall reasonably select counsel for such defense, and Buyer shall pay the reasonable fees and costs of such counsel as incurred within 30 days of receipt of each invoice.

**5.4. Time Limitations.** Owner and Seller shall have liability under <u>Section 5.2(a)</u> only if a Buyer Indemnified Person notifies Seller, and Buyer shall have liability under <u>Section 5.3(a)</u> only if a Seller Indemnified Person notifies Buyer, in either case, of a claim, specifying the factual basis of the claim in reasonable detail to the extent known by the claimant within the applicable Survival Period. ***"Survival Period"*** means (a) at any time after the Closing Date with respect to any Fundamental Representation or Fraud, and (c) within twenty-four (24) months after the Closing Date with respect to any Non-Fundamental Representation.

**5.5. Certain Limitations on Amount.** The aggregate liability of (a) Owner and Seller with respect to Losses for claims of breach of Non-Fundamental Representations under <u>Section 5.2(a)</u> and (b) Buyer with respect to Losses for claims of breach of Non-Fundamental Representations under <u>Section 5.3(a)</u> shall, in each case, not exceed the Rollover Amount; provided, however, for the avoidance of doubt the foregoing limitation in clause (b) shall not apply to the repayment obligations under the Seller Note.

**6. Closing Deliverables.**

**6.1. <u>Deliveries by Owner</u>.** On the Closing Date, Owner shall deliver, or cause to be delivered, to Buyer the following items:

(a) an assignment of the Purchased Units to Buyer, duly executed by Seller;

(b) the Seller Note, duly executed by Seller;

(c) the Employment Agreement, duly executed by Owner;

(d) such documents as Buyer may reasonably request with respect to Seller's admittance as a member of Buyer with respect to the Rollover Securities (including subscription documentation and the execution of a joinder to the Buyer LLC Agreement), duly executed by Seller;

(e) (i) a reasonably current certificate of existence (or equivalent document) for the Company issued by the Secretary of State (or equivalent) and of each state in which the Company is qualified to do business as a foreign entity and (ii) a copy of the operating agreement of the Company, certified by an officer of the Company;

(f) resolutions of Seller approving this Agreement, any Ancillary Agreement, and all other Transactions, certified by an officer of Seller;

(g) a unanimous written consent of Seller, duly executed by Seller, pursuant to which, among other things, (i) Buyer is appointed as the sole manager of the Company and (ii) Seller resigns as a manager of the Company;

(h) a non-foreign person affidavit that complies with the requirements of Treasury Regulations Section 1.1445-2(b), duly executed by Seller;

(i) Form W-9 of Seller, completed and duly executed by Seller;

(j) evidence that the Reorganization has been consummated on terms satisfactory to Buyer, together with copies (as timely filed with the IRS) of documentation evidencing the qualification of the Pre-Closing Contribution and Exchange, and Company DRE Election as a "reorganization" within the meaning of Section 368(a)(1)(F) of the Code (including copies and other

documents evidencing the timely filing of IRS Forms 8832 and IRS Form 8869 with respect to the Company DRE Election and the QSub Election) and copies (as filed with the Secretary of State of Texas) of documentation evidencing the Reorganization;

(k)     the consents listed on **Schedule 6.1(a)(k)**;

(l)     (i) a payoff letter, in form and substance reasonably acceptable to Buyer and Seller indicating the amount required to discharge, upon receipt of the payments specified in such payoff letter, the release of any Encumbrances securing the Momentum LOC for the Company as well as UCC-3 termination statements and other documents required to evidence the release of such Encumbrances and (ii) a release of Owner as the guarantor thereunder, in each case, in proper form and substance;

(m)     evidence reasonably satisfactory to Buyer that the Existing Employment Agreement has been terminated (and Owner and Seller acknowledge that such termination shall not trigger any rights to benefits, severance or otherwise pursuant to the terminated Existing Employment Agreement); and

(n)     such other documents and instruments as Buyer reasonably requests to consummate the Transactions.

**6.2.     Deliveries by Buyer**.  On the Closing Date, Buyer shall deliver, or cause to be delivered, to Seller the following items:

(a)     the Seller Note, duly executed by Buyer;

(b)     the Employment Agreement, duly executed by Buyer or one of its Affiliates;

(c)     the Closing Payment;

(d)     the Rollover Securities;

(e)     the Buyer LLC Agreement complete with all exhibits and the capitalization table and signature pages for the Owner to execute and join the Buyer LLC Agreement;

(f)     evidence of the release of Owner from any guaranty obligations with respect to the Momentum LOC; and

(g)     such other documents and instruments as Seller reasonably requests to consummate the Transactions.

**7.     Miscellaneous.**

**7.1.     Interpretation.**  The section, paragraph and schedule headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. The recitals are hereby incorporated by this reference and made a part of this Agreement.  Where the context requires, the use of the singular form herein shall include the plural, the use of the plural shall include the singular, and the use of any gender shall include any and all genders.

**7.2.** **Expenses.** Each party will bear its own respective fees and expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the consummation and performance of the transactions contemplated hereby. Notwithstanding the foregoing, in the event any Proceeding is brought in respect of this Agreement or any of the documents referred to in this Agreement, the prevailing party will be entitled to recover reasonable attorneys' fees and other costs incurred in such Proceeding, in addition to any relief to which such party may be entitled.

**7.3.** **Further Assurances.** The parties will execute and deliver to each other such other documents and do such other acts and things as a party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated hereby.

**7.4.** **Entire Agreement.** This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes (along with the Schedules, Exhibits, and other documents to be delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to the subject matter of this Agreement.

**7.5.** **Modification; Waivers.** This Agreement may only be amended, supplemented, or otherwise modified by a writing executed by Buyer and Seller. No waiver of any provision of this Agreement, and no consent to any departure by any Party therefrom, shall be effective unless it is in writing and signed by the Party from whom such waiver is sought, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

**7.6.** **Assignments and Successors.** No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior consent of the other parties, except that Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any subsidiary or to the purchaser of all or a substantial part of the Equity Securities or business of the Company. Any purported assignment of rights or delegation of obligations in violation of this Section will be void. Subject to the foregoing, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the parties' successors and permitted assigns.

**7.7.** **Governing Law.** All matters relating to or arising out of this Agreement or any transaction contemplated hereby and the rights of the parties (whether sounding in contract, tort, or otherwise) will be governed by and construed and interpreted under the laws of the State of Delaware without regard to conflicts of laws principles that would require the application of any other law.

**7.8.** **Jurisdiction.** Any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought in the applicable state or federal courts with jurisdiction over Harris County, Texas and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of such Proceeding shall be heard and determined only in any such court, and agrees not to bring any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court. EACH PARTY, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY, WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

**7.9.** **Notices.** All notices and other communications required or permitted by this Agreement shall be in writing and will be effective, and any applicable time period shall commence, (a) when delivered to the following address by hand or by a nationally recognized overnight courier service (costs prepaid) addressed to the following address; (b) three days after being deposited in the mail with

postage pre-paid if sent by certified mail return receipt requested or (c) transmitted electronically to the following facsimile numbers or email addresses, in each case marked to the attention of the Person (by name or title) designated below (or to such other address, facsimile number, email address, or Person as a party may designate by notice to the other parties):

<table>
<tr><td>Buyer:</td><td>Seller/Owner:</td></tr>
<tr><td>GOT Distribution SPV, LLC</td><td>To the addresses and email</td></tr>
<tr><td>1001 Brickell Bay Drive #2719</td><td>addresses set forth on</td></tr>
<tr><td>Miami, FL 33131</td><td>Seller's signature page.</td></tr>
</table>

      7.10.   **Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

      7.11.   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and each of which may bear the signature(s) of one or more of the parties, but all of which together shall constitute one and the same instrument.  A copy of this Agreement bearing the facsimile, photostatic, PDF or other copy of the signature of a party shall be as valid for all purposes as a copy bearing that party's original signature, and such signatures may be delivered electronically.

      7.12.   **Representation by Counsel.**  Each of the parties hereto has been represented or has had the opportunity to be represented by legal counsel of their own choice.  THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT BUYER HAS BEEN REPRESENTED IN THIS MATTER BY THE LAW FIRM OF MCGUIREWOODS LLP.

*[signature page follows]*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**

**GOT DISTRIBUTION SPV, LLC**

By:      GOT Management, LLC,
         its Manager

By: _____

Name: Glenford Carty
Title: Managing Partner

*[Signature Page to Securities Purchase and Contribution Agreement]*

**SELLER**:

**SUPERCUB HOLDINGS, LLC**

By: _Stephen Discher_

Name: Stephen Discher
Title: Manager

Address:      c/o Stephen Discher
706 Putter Ct
College Station, T 77845

**OWNER**:

Stephen Discher

Stephen Discher

## Schedule A – Definitions

*"Accounting Principles"* means the commercially reasonable historical accounting practices and policies of the Company consistently applied by the Company in the preparation of the Financial Statements.

*"Applicable Contract"* means any Contract under or by which the Company (a) has or could acquire any rights or become subject to any obligation, or (b) is or could become bound.

*"Buyer"* has the meaning set forth in the Preamble.

*"Buyer LLC Agreement*" means that certain Amended and Restated Limited Liability Company Agreement of Buyer, dated as of Closing Date, by and among the members of Buyer, as amended, substantially in the form attached hereto as Exhibit B.

*"Company"* has the meaning set forth in the Preamble.

*"Competitive Business"* means the business of selling products and services related to wired and wireless networking systems, routing and switching and fiber solutions to businesses.

*"Company Transaction Expenses"* means the costs and expenses incurred by Owner, Seller or the Company in connection with this Agreement or the transactions contemplated hereby, including (a) all fees, commissions, costs and expenses of investment bankers, financial advisors, accountants and legal counsel incurred in connection with the transactions contemplated hereby, (b) all other fees, commissions, costs and expenses of other third parties engaged by Owner, Seller or the Company to conduct any specific tasks or perform any specific analysis for Owner, Seller or the Company to the extent such expenses are incurred by or on behalf of Owner, Seller or the Company in connection with the transactions contemplated hereby, (c) all payments payable by Owner, Seller or the Company required under any contract or agreement (including those necessary to obtain third party consents) in connection with the consummation of the transactions contemplated by this Agreement, and (d) all change of control, severance, bonus (including any retention or stay bonus), stock appreciation, phantom stock or similar payments due by Owner, Seller or the Company to any Person, and other accelerations or increases in rights or benefits of the Company's employees (whether payable or occurring prior to, on or after the Closing Date), under any plan, agreement or arrangement of the Company, which obligation, in each case, arises either on or before the Closing Date or in whole or in part as a result of the consummation of the transactions contemplated by this Agreement, including all Taxes that are payable by Owner, Seller or the Company in connection with or as a result of the payment of such obligations.

*"Confidential Information"* means all non-public or proprietary information held or used by or relating to the Company, including non-public Intellectual Property Assets and information concerning the Company's business and affairs.  Confidential Information does not include information that becomes generally available to the public other than as a result of any Seller's act or omission, provided that information shall not be deemed "generally available to the public" merely because it is included or incorporated in more general information that is publicly available or because it combines features that individually may be publicly available.

*"Consent"* means any approval, consent, ratification, waiver, or other authorization.

*"Contract"* means any agreement, contract, lease, consensual obligation, promise, commitment, or undertaking (whether written or oral and whether express or implied), whether or not legally binding.

"**Employee Plan**" means any "employee benefit plan," as that term is defined in ERISA regardless of whether such plan is subject to ERISA, that is maintained or contributed to by the Company or Seller for the benefit of the Company's employees or with respect to which the Company has or may have any liability.

"**Employment Agreement**" means an employment agreement between Buyer or one of its Affiliates and Owner substantially in the form attached hereto as Exhibit C.

"**Encumbrance**" means any charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal, or similar restriction, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"**Equity Security**" means, in respect of any Person: (a) any capital stock or similar security; (b) any security convertible into or exchangeable for any security described in clause (a); (c) any option, warrant, or other right to purchase or otherwise acquire any security described in clause (a), (b), or (c); and (d) any "equity security" within the meaning of the Exchange Act.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.  "Exchange Act" means the Securities Exchange Act of 1934.

"*Existing Employment Agreement*" means that certain employment agreement between Owner and the Company effective as of on or around January 1, 2022.

"**Financial Statements**" means (a) the balance sheets for the Company as of, December 31, 2019, December 31, 2020 and the related audited statements of income for the fiscal years then ended and as of December 31, 2021, and the related statements of income and cash flows for each of the years ended on such dates, and (b) the Interim Balance Sheet and the related unaudited statements of income and cash flows for the twelve (12) months then ended.

"**Fraud**" means any material misrepresentation made with the intention of misleading the Party alleging any breach of a representation or warranty.

"**Fundamental Representation**" means any of the representations or warranties in any of Sections 2.1, 2.2, 2.3, 2.4(b), 2.8, 2.9, 2.10, 2.17, 3.1, 3.2 or 3.3.

"**Governmental Authorization**" means any (a) Consent, license, registration, or permit issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement, or (b) right under any Contract with any Governmental Body.

"**Governmental Body**" means any federal, state, municipal, local, or foreign government and any court, self-regulated organization, tribunal, arbitral body, administrative agency, department, board, subdivision, entity, commission or other governmental, quasi-governmental or regulatory authority, reporting agency, whether domestic, foreign or super-national.

"*Indebtedness*" of any Person at any date means, without duplication, (i) all indebtedness of such Person for borrowed money whether short-term or long-term, (ii) any liability or obligation evidenced by bonds, debentures, notes or similar instruments, (iii) any liability or obligation to pay the deferred purchase price of property or services (other than trade liabilities and accrued expenses incurred and payable in the ordinary course of business), (iv) any capitalized lease indebtedness or other indebtedness arising under conditional sales contracts and other similar title retention instruments, (v) all liability or obligation in

respect of letters of credit, bankers' acceptances or similar facilities, (vi) outstanding or unsatisfied obligations under any interest rate swap, interest rate cap, interest rate collar, currency swap agreement, cap agreement, collar agreement or other hedging or derivative agreement or arrangement (whether entered into for hedging or speculative purposes), (vii) all unpaid Tax liabilities of the Company for any Pre-Closing Tax Period or Pre-Closing Straddle Period, including the deferred payment of the employer's share of the Social Security employment Tax, (viii) all interest, penalties, fees (including any prepayment premiums) and other expenses owed with respect to indebtedness in the foregoing clauses (i) through (vii), and (ix) all indebtedness referred to in the foregoing clauses (i) through (viii) that is directly or indirectly guaranteed by such Person.

*"**Intellectual Property**"* means all intellectual property (and all rights and interests associated therewith or required for the exercise thereof), however arising, pursuant to applicable law, whether registered or unregistered, all registrations and applications for, and renewals and extensions of, such property and rights, and the goodwill connected with and symbolized by any of the foregoing, including any and all: (a) trademarks, service marks, trade names, logos, and similar designations; (b) websites, domain names, and social media accounts; (c) copyrights, designs, and works of authorship, whether or not copyrightable; (d) inventions, trade secrets, business and technical information and know-how, databases, and other confidential and proprietary information; (e) patents (including all reissues, divisionals, provisionals, continuations, and extensions thereof); and (f) software and firmware.

*"**Intellectual Property Assets**"* means all Intellectual Property owned, licensed, or used by the Company and material to its business or operations (excluding commercially available, off-the-shelf software programs licensed pursuant to shrink-wrap or "click to accept" agreements with a replacement cost or annual license fee of less than $1,000) .

*"**Interim Balance Sheet**"* means the unaudited balance sheet for the Company as at December 31, 2021.

*"**Knowledge of Seller**"* means the knowledge of Owner and Brad Smith. For purposes of this Agreement, any such individual shall be deemed to have knowledge of a particular fact or other matter if (a) such individual is actually aware of such fact or other matter or (b) the knowledge a prudent individual could be expected to discover in the course of conducting a reasonably comprehensive investigation of the pertinent matter.

*"**Legal Requirement**"* means any constitution, law, ordinance, principle of common law, code, rule, regulation, statute, act, treaty, or order of general applicability of any Governmental Body, including rules and regulations promulgated thereunder.

*"**Loss**"* means any cost, loss, liability, obligation, claim, cause of action, damage, deficiency, expense (including costs of investigation and defense and reasonable attorneys' fees and expenses), fine, penalty, judgment, award, assessment, or diminution of value.

*"**Material Adverse Change**"* means, with respect to the Company, any event, change, development, or occurrence that, individually or together with any other event, change, development, or occurrence, is materially adverse to its business, condition (financial or otherwise), assets, results of operations, or prospects.

*"**Material Interest**"* means direct or indirect beneficial ownership of voting securities or other voting interests representing at least 10% of the outstanding voting power of a Person or Equity Securities representing at least 10% of the outstanding equity interests in a Person.

"*Momentum LOC*" means that certain line of credit with Momentum Bank.

"*Momentum LOC Payoff Amount*" means the outstanding principal and interest owed under the Momentum LOC as of the Closing Date.

"*Non-Fundamental Representation*" means any representation or warranty set forth in Article 2, Article 3 or any other certificate, document, or other writing delivered by Buyer or Seller pursuant to this Agreement that is not a Fundamental Representation.

"*Order*" means any order, injunction, judgment, decree, ruling, assessment, or arbitration award of any Governmental Body or arbitrator.

"*Organizational Documents*" means (a) the articles or certificate of incorporation and the bylaws of a corporation, (b) the certificate of formation and limited liability company agreement, operating agreement, or like agreement of a limited liability company, (c) any charter or agreement or similar document adopted or filed in connection with the creation, formation, or organization of a Person, and (d) any amendment to or restatement of any of the foregoing.

"*Permitted Encumbrances*" means (a) Encumbrances for Taxes that are not yet due and payable, (b) Encumbrances of carriers, warehousemen, mechanics, and other like Encumbrances arising in the ordinary course of business (provided lien statements have not been filed or such Encumbrances otherwise perfected) and (c) statutory Encumbrances in favor of lessors arising in connection with any property leased to the Company.

"*Person*" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture, other entity, or a Governmental Body.

"*Pre-Closing Straddle Period*" means the portion of a Straddle Period that ends on the Closing Date.

"*Pre-Closing Tax Period*" means any taxable period that ends on or before the Closing Date.

"*Proceeding*" means any action, arbitration, mediation, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial, or investigative) commenced, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"*Related Person*" means: (a) with respect to an individual, any lineal descendant (whether by birth or adoption) of the grandparent of an individual and any spouse of any such lineal descendant , any other natural person who resides with him or her, and each Person in or for which any of the foregoing individuals holds a Material Interest or serves as a director, officer, partner, manager, or executor (or in a similar capacity); and (b) with respect to a Person other than an individual, (i) any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with, such specified Person, (ii) any Person that holds a Material Interest in such specified Person (and any Person in which such specified Person holds a Material Interest), and (iii) each Person that serves as a director, officer, partner, manager, or executor of such specified Person (or in a similar capacity).

"*Rollover Amount*" means $2,000,000.

"*Securities Act*" means the Securities Act of 1933.

"*Seller*" or "*Sellers*" has the meaning set forth in the Preamble.

"**Seller Note**" means a subordinate promissory note issued by Buyer in favor of Seller, in the original aggregate principal amount of $10,000,000, in a form mutually agreed by Seller and Buyer, substantially in the form attached hereto as <u>Exhibit D</u>.

"**Straddle Period**" means a taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Tax**" or "**Taxes**" means  any and all taxes, fees, levies, assessments, duties, tariffs, imposts and other charges of any kind (together with all interest and penalties imposed thereon) validly imposed by any Governmental Body and including obligations under applicable escheat or unclaimed property laws.

"**Tax Return**" means any return, report, statement, schedule, notice, claim for refund, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"**Territory**" means the United States.

"**Working Capital**" means the amount computed as of the Closing Date in accordance with the Accounting Principles by which the Company's current assets (including all cash and cash equivalents held by the Company) exceed the sum of its current liabilities.

## **<u>Annex A</u>**

Allocation Schedule Methodology

*[To be agreed upon by Buyer and Seller and attached prior to the Closing]*

**Exhibit A**

Form of Lease

(see attached)

**LEASE AGREEMENT**

**THE STATE OF TEXAS**                §
                                      §          **KNOW ALL MEN BY THESE PRESENTS:**
**COUNTY OF BRAZOS**                  §


That this Lease Agreement is made and entered into this _____ day of January, 2021, by and between, **SC INVESTMENTS, LLC,** a Texas Limited Liability Company, at **10770 STATE HIGHWAY 30 SUITE 200, COLLEGE STATION, TEXAS 77845,** hereinafter referred to as "Lessor", and **ISP SUPPLIES, LLC,** a Texas Limited Liability Company, at **10770 STATE HIGHWAY 30 SUITE 200, COLLEGE STATION, TEXAS 77845,** hereinafter referred to as "Lessee".

In consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, Lessor does hereby demise and lease to Lessee and Lessee does hereby lease from Lessor the premises situated in Brazos County, Texas, known as **10770 STATE HIGHWAY 30 SUITE 200, COLLEGE STATION, TEXAS 77845** and more particularly described as follows:

**Real Property:**  A _____ square foot building and fenced yard more fully described on Exhibit "A" attached here to and made a part thereof.

**I.**
**TERM**

Lessee takes the Leased Premises from Lessor, upon the terms and conditions herein contained, to have and to hold the same for the term of **60** full months**,** commencing on the "Commencement Date", as defined below, and terminating sixty full months thereafter "Termination Date", unless sooner terminated as herein provided.

The term of this Lease and Lessee's obligations to pay Minimum Annual Base Rent and all other charges due under this Lease will commence upon the "Commencement Date".  Although the Lease Term will commence at a date after the execution of this Lease, Lessor and Lessee will have vested rights immediately upon the full execution of this Lease and the Lease will be fully binding and in full force and effect from and after the execution of this document by Lessor and Lessee.

(a) Commencement Date - The date upon which the term of this Lease commences ("Commencement Date"), shall be _____**.**

(b) Conditions - None.

(c)  Termination Date - This Lease shall terminate on the Termination Date, or at the end of any extension or renewal thereof, without the necessity of notice from either Lessor or Lessee to terminate the same. Lessee hereby waives notice to vacate or quit the Leased Premises and agrees that Lessor shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Leased Premises from a Lessee holding over to the same extent as if statutory notice had been given.  Lessee hereby agrees that if it fails to surrender the Leased Premises at the end of the Term, or any renewal thereof, Lessee will be liable to Lessor for any and all reasonable damages which Lessor shall suffer by reason thereof, and Lessee will indemnify Lessor against all claims and demands made by any succeeding Lessees against Lessor, founded upon delay by Lessor in delivering possession of the Leased Premises to such succeeding Lessee.

## II.
## RENT

The amount payable in monthly installments, as specified below, is as follows:

| | |
|---|---|
| Months 1 thru 60: | $16,500 per month |

Lessee agrees to pay Lessor throughout the Term of this Lease, without demand and without any deduction, abatement, or set-off, the base rent, payable in equal monthly installments, in advance, and on the first day of each calendar month throughout the Term.

Rent shall commence upon the Commencement Date of the Term of this Lease, with proration of Rent for any partial calendar month of the Term.  All Rent is to be paid in lawful money of the United States of America.

If Lessee holds over and continues in possession of the leased premises after expiration of the term of this lease or any extension thereof, Lessee will be deemed to be occupying the premises on the basis of a month—to-month tenancy, subject to all of the terms and conditions of this Lease.  Rental shall increase by fifty percent (50%) over the lease rental rate in effect immediately prior to the holdover.

## III.
## RENEWAL OPTION

Lessee shall have the right to extend this Lease for **TWO (2)** additional term(s) of **60** months per term, provided no monetary default is existing or continuing in the performance of any of the terms or conditions of this Lease either at the time Lessee exercises its right or at the commencement date of the renewal term.  Lessee shall exercise its right to a renewal in the following manner:

Lessee must give Lessor at least **one hundred twenty (120)** days prior written notice prior to the expiration date of the then current Lease.  Notice must be sent certified mail, return receipt requested.

| | | |
|---|---|---|
| Option 1: | Months 60 thru 120: | $_____ **per month** |
| Option 2: | Months 121 thru 180 | $ _____ **per month** |

## IV.
## SECURITY DEPOSIT

Lessee, has deposited with Lessor the sum of **_____Dollars and No/100ths Dollars ($_____.00)** which is the deposit being given to secure the faithful performance by the Lessee of all the terms, covenants and conditions of this Lease.  Lessee agrees that if Lessee fails to pay Rent promptly when due, the deposit may, at option of the Lessor be applied to any Rent due and unpaid.  If Lessee violates any of the other terms, covenants and conditions of this Lease, said deposit may be applied to any damage suffered by Lessor as a result of Lessee's default, to the extent of the amount of the damages suffered.  Should any of the deposit have to be used to pay Rent due for any reason, and if this Lease is kept in full force and effect, at option of Lessor, Lessee shall reimburse Lessor the amount of said depletion of the deposit within thirty (30) days after written notice to Lessee, by Lessor, of such depletion of the deposit.

Nothing contained in this Section 4 shall in any way diminish or be construed as waiving any of the Lessor's other remedies as provided in this Lease, by law, or in equity. Should Lessee comply with all of the terms, covenants and conditions of this Lease and promptly pay the Rent when due and all other sums payable

by Lessee to Lessor, the deposit shall be returned in full to Lessee within 60 days from the end of the Lease Term.

Lessor may deliver the funds deposited by Lessee to any purchaser of Lessor's interest in the Leased Premises in the event that such interest is sold, and Lessor shall be discharged from further liability with respect to such deposit.

## V.
## BUSINESS USE

Lessee shall operate the leased premises for the use and purposes for which it is let, that being an Office / Warehouse and other related services.

## VI.
## CONSTRUCTION AND ACCEPTANCE OF PREMISES

Lessee agrees to accept the Leased Premises in its "As-Is" condition.

## VII.
## MAINTENANCE; REPAIRS; ALTERATIONS; LESSOR'S RIGHT/ACCESS

7.1     MAINTENANCE AND SURRENDER

Lessee shall maintain the roof and all structural components of the building.

Lessee shall maintain exterior grounds, including landscaping and sprinkler system.  Lessee will maintain interior of the building and be responsible for repair of any damage caused by Lessee.  Lessee will maintain in good order appropriate fire protection equipment.

Except as specifically provided hereinto the contrary, Lessee shall throughout the lease term maintain the building and other improvements constituting the leased premises in good repair, and keep the leased premises free from waste or nuisance.  Lessee shall deliver up the leased premises in a good, clean and sanitary condition at the termination of this lease, reasonable wear and tear, components to be maintained by Lessor, and damage by fire, tornado and other casualties excepted.

Lessee shall be responsible for all Governmental compliance.

7.2     ALTERATIONS BY LESSEE

Lessee shall not be permitted to make any alterations, additions or improvements to the leased premises without the prior written consent of the Lessor.

All alterations, additions or improvements made by Lessee after the Commencement date of the Lease, shall become the property of Lessor at the termination of said lease.  At the termination of said lease, Lessor, at its option, may require Lessee to remove any alterations, additions or improvements made by Lessee, and further, Lessor, at its option, may require Lessee to remove any and all property installed or placed on premises by Lessee.  In the event that Lessor requires Lessee to remove such alterations, additions or improvements, Lessee shall repair or cause to be repaired any damage to the premises caused by such removal.  All such removal and repairs shall be at the expense of Lessee.

SIGNAGE:   Lessor shall permit Lessee to continue the existing signage and any other reasonable

signage, as allowed by the appropriate municipality.

### 7.3    CONSTRUCTION WORK WITHIN LEASED PREMISES

All construction work done by Lessee within the leased premises shall be performed in a good workmanlike manner, in compliance with all governmental and insurance company requirements.  During any period of such work, Lessor shall have adequate fire extinguishers within the leased premises.  All costs of such work shall be paid promptly so as to prevent the assertion of any liens for labor or materials.  Lessee agrees to indemnify Lessor and hold Lessor harmless against any loss, liability or damage resulting from such work, and Lessee shall, if requested by Lessor, furnish bond or other security satisfactory to Lessor against any such loss, liability or damage.  Whenever Lessee proposes to do any construction work within the leased premises, Lessee shall first furnish to Lessor plans and specifications in such detail as Lessor may request covering all such work.  Such plans and specifications shall comply with such requirements as Lessor may from time to time prescribe for construction within the leased premises.  In no event shall any construction work be commenced within the leased premises without Lessor's written approval of such plans and specifications.

### 7.4    LESSOR'S RIGHT OF ACCESS

Lessor shall have the right to enter upon the leased premises at any time Lessee is or should be open for business, for the purpose of inspecting the same, or of making repairs or additions to the leased premises, or of showing the leased premises to prospective purchasers, lessees or lenders.  Lessor agrees to give Lessee twenty-four (24) hours notice, if reasonably possible, prior to any inspections of the leased premises.

## VIII.
## TAXES AND ASSESSMENTS

(a)    Lessee shall be liable for all taxes levied against personal property and trade fixtures placed by Lessee in the leased premises.  If any such taxes for which Lessee is liable are levied against Lessor or Lessor's property and if Lessor elects to pay the same, or if the assessed value of Lessor's property is increased by inclusion of personal property and trade fixtures placed by Lessee in the leased premises and Lessor elects to pay the taxes based on such increase, Lessee shall pay to Lessor upon demand that part of such taxes for which Lessee is primarily liable hereunder.

(b)    Lessee shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements constituting the Leased Premises.

## IX.
## UTILITIES

Lessee shall pay all utility charges for electricity, heat, gas and water and power used in conjunction with the leased premises.

## X.
## INSURANCE

Lessee shall during the term of this lease keep all buildings and structures on said premises insured against loss or damage from fire and casualty with extended coverage, of not less than the full fair insurable value thereof.  Such policy or policies of insurance shall name Lessor as a named insured and shall provide that any loss shall be payable solely to Lessor, which sum Lessor shall use for repair and restoration purposes.

Lessee, at its own expense, shall provide and maintain in force during the term of this lease, liability

and personal property damage insurance in the amount of **FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00)** with a **ONE MILLION AND NO/100 DOLLARS ($1,000,000.00)** umbrella policy covering Lessor as well as Lessee with one or more responsible insurance companies duly authorized to transact business in Texas.  Lessee shall furnish Lessor with certificates of all insurance required by this section.  If Lessee does not maintain such insurance in full force and effect, Lessor may notify Lessee of such failure and if Lessee does not deliver to Lessor within fifteen (15) days after such notice certification showing all such insurance to be in full force and effect, Lessor may, at its option, take out the necessary insurance to comply with the provisions hereof and pay the premiums on the items specified in such notice, and Lessee covenants thereupon to reimburse and pay Lessor any amount so paid or expended in the payment of the insurance premiums required hereby and specified in the notice, with interest thereon at the rate of twelve percent (12%) per annum from the date of such payment by Lessor until repaid by Lessee.

## XI.
## NON-LIABILITY FOR CERTAIN DAMAGE

Lessor shall not be liable to Lessee and his employees for any injury to person or damage to property caused by the lease premises becoming out of repair regarding repair required to be made by Lessee, or by gas, water, steam, electricity, or oil leaking or escaping into the leased premises, nor shall Lessor be liable to Lessee for any loss or damage that may be occasioned by or through the acts or omission of any persons whatsoever.

## XII.
## DAMAGE, DESTRUCTION OR CONDEMNATION OF THE LEASED PREMISES

12.1    DAMAGE OR DESTRUCTION.  Lessee shall give to Lessor prompt written notice of any damage to or destruction of any portion of the Leased Premises resulting from fire or other casualty.

In the event of (a) partial destruction of Leased Premises or the building during Lease Term which requires repairs to Leased Premises and/or building, (b) the Leased Premises or the building being declared unsafe or unfit for occupancy by any authorized public authority for any reason other than Lessee's act, use or occupation, which declaration requires repairs to either the Leased Premises or the building, Lessor shall make repairs, provided Lessee gives to Lessor thirty (30) days written notice of the necessity of such repairs.  No such partial destruction (including any destruction necessary in order to make repairs required by a declaration made by public authority) shall in any way annul or void this Lease except that Lessee shall be entitled to a proportionate reduction of Rent while such repairs are being made, such proportionate reduction to be based upon the extent to which the repairs shall interfere with the business carried on by Lessee in said Leased Premises.

If the Leased Premises are damaged or destroyed at any time during this Lease Term to the extent of more than twenty-five percent (25%) of its then replacement cost (excluding foundations) or if the remaining term of this Lease is not sufficient to amortize the cost of reconstruction, then Lessor may elect either to terminate this Lease as hereinafter provided or to proceed to rebuild and repair the Leased Premises.  Should Lessor elect to terminate this Lease, it shall give written notice of such election to Lessee within thirty (30) days after the occurrence of such casualty.  If Lessor elects to reconstruct Leased Premises, then it shall proceed with reasonable diligence and, at its sole cost and expense, rebuild and repair the Leased Premises to the condition existing immediately prior to the occurrence of the loss.  Lessee covenants and agrees to reopen for business within fifteen (15) days after notice from Lessor that Leased Premises are ready to occupy.  No damage or destruction of the Leased Premises shall allow Lessee to surrender possession of the Leased Premises nor affect Lessee's liability for the payment of rent (except as provided herein) or any other covenant herein.  In the event that more than fifty percent (50%) of the building is rendered unusable for more than forty-five (45) days, Lessee may terminate the Lease by providing written notice to Lessor.  Lessee shall receive a prorata reduction in rent for any portion of the leased premises rendered unusable while repairs are being made.

12.2    CONDEMNATION.  If more than twenty percent (20%) of the floor area of the Leased Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain, this Lease shall terminate and the Rent shall be abated during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

If less than twenty percent (20%) of the floor area of the Leased Premises should be taken as aforesaid, this Lease shall not terminate; however, the Rent payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession takes place.

### XIII.
### INDEMNITY

Landlord shall not be liable to Tenant, or to Tenant's employees, subtenants, assignees, agents, servants, patrons, visitors or customers, or to any other person whomsoever, for any damage to person or property caused by any act or omission or neglect of Tenant, or Tenant's subtenants, assignees, agents, servants, employees, patrons, visitors, or customers, or of any other person entering the LEASED PREMISES whether or not such entity is under the express or implied invitation of Tenant or arising out of the use of the leased premises by Tenant or by Tenant's subtenants and the conduct of its or their business therein or arising out of any breach or default by Tenant or by Tenant's subtenants in the performance of its or their obligations hereunder.  Neither shall Landlord be liable for any damage to Tenant or to Tenant's employees, subtenants, assignees, agents, servants, patrons, visitors or customers caused by any other tenant or subtenant leasing premises from Landlord or some other tenant.  Tenant covenants and agrees to indemnify and hold Landlord harmless from all damages, claims, demands, causes of action or judgment of any person or persons only by reason of the operations or conduct of the business of Tenant upon the leased premises or for any condition existing on the leased premises under the control of Tenant, irrespective of whether or not said conduct or condition is caused by Tenant's negligence.  In any suit or action for damages against the Tenant, in which action Landlord is included or made a defendant, Tenant agrees to assume all of the burden, cost and expense of the defense or settlement of such action or suit, including attorneys' fees in the defense of such action, claim or suit, and will pay any judgment that may be obtained against Landlord within thirty (30) days of the date such judgment shall become final.
.

### XIV.
### DEFAULT BY LESSEE AND REMEDIES

14.1    EVENTS OF DEFAULT.  The following events shall be deemed to be events of default by Lessee under this Lease:

(a)      Lessee shall fail to pay when due any installment of rent and such failure shall continue for a period of ten (10) days after written notice of failure to pay rent in a timely manner.

(b)      Lessee shall fail to comply with any term, provision or covenant of this Lease, other than the payment of rent, and shall not cure such failure within ten (10) days after Lessor has sent written notice thereof to Lessee.

(c)      Lessee shall become insolvent, shall make a transfer in fraud of creditors or shall make an assignment for the benefit of creditors.

(d)      Lessee shall file a petition under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or statute of the United States or any state thereof; or Lessee or such guarantor shall be adjudged bankrupt or insolvent in proceedings filed against Lessee

or such guarantor thereunder.

(e)     A receiver or trustee shall be appointed for the leased premises or for all or substantially all of the assets of Lessee or any guarantor or Lessee's obligations under this Lease.

(f)     Lessee shall desert or vacate any substantial portion of the leased premises.

(g)     Lessee shall do or permit to be done anything, which creates a lien upon the leased premises.

(h)     Lessee or any agent of Lessee shall falsify any report required to be furnished to Lessor pursuant to the terms of this Lease.

14.2    REMEDIES.  Upon the occurrence of any of such events of default, Lessor shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever.

(a)     After not less than fifteen (15) days written notice to Lessee, Lessor may remedy such default by any necessary action and in connection with such remedy may employ counsel.  All sums expended or obligation incurred by Lessor in connection with remedying Lessee's default shall be paid to Lessor by Lessee on demand, and/or failure of such reimbursement by Lessee, Lessor may, in addition to any other right or remedy Lessor may have, deduct these costs and expenses from amount subsequently becoming due under this lease. After written demand is made by Lessor, any and all unpaid sums due shall accrue with interest added at the highest legal rate and Lessee shall be obliged to pay interest from the date demand is made until all sums due are paid in full by Lessee; or

(b)     Lessor may terminate this lease by giving at least thirty (30) days written notice to Lessee of such intention.  In the event Lessor elects this option, the lease will be terminated on the date designated in Lessor's notice unless Lessee has cured the default(s) specified in Lessor's notice prior to the expiration of the thirty (30) day period.

(c)     Lessor may reenter and take possession of said premises and remove all persons and property therefrom, without being deemed guilty of any manner of trespass and relet the premises or any part thereof, for all or any part of the remainder of said term, to a party satisfactory to Lessor, and at such monthly rental as Lessor may with reasonable diligence be able to secure. Should Lessor be unable to relet after reasonable efforts to do so, or should such monthly rental be less than the rental Lessee was obligated to pay under this lease, or any removal thereof, plus the expense of reletting, then Lessee shall pay the amount of such deficiency to Lessor.

**XV.**
**ADDITIONAL RENT**

Should Lessor default in the performance of any term, covenant or condition required to be performed by it under this lease agreement, Lessee may elect either:

(a)     After not less than fifteen (15) days written notice to Lessor, Lessee may remedy such default by any necessary action and in connection with such remedy may employ counsel.  All sums expended or obligations incurred by Lessee in connection with remedying Lessor's default shall be paid to Lessee by Lessor on demand, and on failure of such reimbursement by Lessor, Lessee may, in addition to any other right or remedy Lessee may have, deduct these costs and expenses from amounts subsequently becoming due under this lease.  After written demand

is made by Lessee, any and all unpaid sums due shall accrue with interest added at the highest legal rate and Lessor shall be obliged to pay interest from the date demand is made until all sums due are paid in full by Lessor; or

(b)     Lessee may terminate this lease by giving at least thirty (30) days written notice to Lessor of such intention.  In the event Lessee elects this option, the lease will be terminated on the date designed in Lessee's notice unless Lessor has cured the default(s) specified in lessee's notice prior to the expiration of the thirty (30) day period.

## XVI.
## LATE CHARGES

(a)     Lessee shall pay to Lessor a "late charge" for any installment of rent or other payment of money provided by this Lease to be made by Lessee to Lessor, if such payment is not made within fifteen (15) days after the due date thereof, to reimburse Lessor for the extra expense incurred in handling such delinquent payment.  Such late charge shall be an amount equal to Twenty Five Dollars ($25.00) plus Five Dollars ($5.00) per day until all amounts due and owing are paid in full.  Any such late charges shall be payable immediately upon demand. Neither the assessment nor the collection by Lessor of any late charge provided for herein shall constitute a waiver by Lessor of any of the other rights or remedies which Lessor has under this Lease or under applicable law as a result of Lessee's failure to timely pay any rentals due hereunder.  In addition to any late charges or other charges imposed hereunder, Lessee shall also pay to Lessor a "return check charge" of $25.00 for each check issued by Lessee to Lessor which is returned unpaid to Lessor by the bank on which such check is drawn including, but not limited to, each check which is returned to Lessor because of insufficient funds on deposit in Lessee's bank account and each check which is returned to Lessor because the account which such check has been drawn has been closed.  Any such late charge or returned check charge assessed or collected hereunder shall not be considered interest but shall be charges to reimburse Lessor for the extra expense in handling such delinquent payment. Any late charge or return check charge, if not paid on demand, may, at Lessor's option, be deducted from the security deposit provided in paragraph XVIII hereof.

(b)     If Lessor fails to timely pay two (2) consecutive installments of rent or other payment specified herein, or any combination thereof, Lessor may require Lessee to pay (in addition to any "late charge") (as estimated by Lessor), additional rent and other payments specified herein (as estimated by Lessor, if necessary) quarterly in advance and, in such event, all future payments shall be made on or before the due date in cash or by cashier's check or money order, and the delivery of Lessee's personal or corporate check shall no longer constitute payment thereof. Any acceptance of Lessee's personal or corporate check thereafter by Lessor shall not be construed as a waiver of the requirement that such payments be made in cash or by cashier's check or money order.  Any amount so estimated by Lessor and paid by Lessee shall be adjusted promptly after actual figures become available and paid or credited to Lessor or Lessee, as the case may be.

(c)     Every payment required by this Lease to be made by Lessee to Lessor shall be additional rent, whether or not expressly designated as additional rent.  Lessee's failure to pay such additional rent shall, at Lessor's option, be treated as a default by Lessee in his obligations to pay rent.

## XVII.
## ASSIGNMENT AND SUBLETTING

17.1     ASSIGNMENT AND SUBLETTING.  Lessee may not sublet, assign, encumber and/or otherwise transfer this lease, and/or any right or interest in this lease or the lease premises or any improvement thereon without the written consent of Lessor.  Should Lessee, sublet, assign, encumber and/or otherwise transfer its rights or interests in this lease or the lease premises or any improvement thereon without the written consent of Lessor, Lessor, may, at its option, declare this lease terminated.

In the event Lessor consents in writing to an assignment, sublease and/or any other transfer of any or all Lessor's rights under this lease, the assignee or sublease must assume all of the Lessee's obligations under this lease and Lessee shall remain liable for every obligation under this lease unless waived in writing by Lessor. Lessor's consent under this section will not be arbitrarily or unreasonable withheld.

In the event in the change of ownership of the lease premises wherein the lease premises referenced herein are located, Lessor may assign or transfer any or all of its interests and obligations under the term of this lease to any new owner wherein the lease premises described herein are located.

17.2     ASSIGNMENT BY LESSOR.  In the event of the transfer and assignment by Lessor of Lessor's interest in this Lease and in the building containing the leased premises to a person or entity expressly assuming the Lessor's obligations under this Lease, Lessor shall thereby be released from any further responsibility hereunder, and Lessee agrees to look solely to such successor in interest of Lessor for performance of such obligations.  Any security given by Lessee to Lessor to secure performance of Lessee's obligations hereunder may be assigned and transferred by Lessor to such successor in interest of Lessor; and, upon acknowledgement by such successor of receipt of such security and its express assumption of the obligation to account to Lessee for such security in accordance with the terms of this Lease, Lessor shall thereby be discharged of any further obligation relating thereto.

## XVIII.
## USE FOR INTENDED PURPOSES

Should Lessee not be allowed by any governmental agency to use the leased premises for its intended purposes without alterations to building, Lessee at his option may declare this lease null and void.

## XIX.
## SUBORDINATION CLAUSE

This Lease, and any extensions of the term hereof, shall be subordinate, at the option of Lessor, to any and all encumbrances given by Lessor to secure funds for the purchase and improvements of the leased premises.  Additionally, Lessor agrees to subordinate any express or implied Lessor's lien to any encumbrance created by Lessee for purposes of obtaining financing for the purchase of equipment and inventory or the operation of the restaurant and bar.

## XX.
## NOTICES AND ADDRESSES

All notices provided to be given under this Agreement shall be given by certified or registered mail, addressed to the proper party at the following addresses:

Lessor:        SC INVESTMENTS, LLC
                      10770 STATE HIGHWAY 30 SUITE 200
                      COLLEGE STATION, TEXAS 77845
                      sdischer@ispsupplies.com

Lessee:        ISP SUPPLIES, LLC
                      10770 STATE HIGHWAY 30 SUITE 200
                      COLLEGE STATION, TEXAS 77845
                      sdischer@ispsupplies.com

## XXI.
## TEXAS LAW TO APPLY

This agreement shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Brazos County, Texas.

## XXII.
## TIME OF ESSENCE

Time is of the essence of this agreement.

## XXIII.
## PARTIES BOUND

This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns where permitted by this agreement.

## XXIV.
## LEGAL CONSTRUCTION

In case any one or more of the provisions contained in this agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision thereof and this agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

## XXV.
## PRIOR AGREEMENTS SUPERSEDED

This agreement constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter.

## XXVI.
## AMENDMENT

No amendment, modification or alteration of the terms hereof shall be binding unless the same be in writing, dated subsequent to the date hereof and duly executed by the parties hereto.

**XXVII.**
**RIGHTS AND REMEDIES CUMULATIVE**

The rights and remedies provided by this lease agreement are cumulative and the use of any one right or remedy by either party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**XXVIII.**
**WAIVER OF DEFAULT**

No waiver by the parties hereto of any default or breach of any term, condition or covenant of this lease shall be deemed to be a waiver of any other breach of the same or any other term, condition or covenant contained herein.

**XXIX.**
**ATTORNEY'S FEES**

In the event Lessor or Lessee breaches any of the terms of this agreement whereby the party not in default employs attorneys to protect or enforce its rights hereunder and prevails, then the defaulting party agrees to pay the other party reasonable attorney's fees so incurred by such other party.

**XXX.**
**FORCE MAJEURE**

Neither Lessor nor Lessee shall be required to perform any term, condition or covenant in this lease so long as such performance is delayed or prevented by force majeure, which shall mean acts of God, strikes, lockouts, material restrictions by any governmental authority, civil riot, floods and any other cause not reasonably within the control of the Lessor or Lessee and which by the exercise of due diligence Lessor or Lessee is unable, wholly or in part, to prevent or overcome.  Lessee has the right to terminate Lease if the business will be closed of no fault of Lessee for more than thirty (30) days.


**LESSOR:**                                         **LESSEE:**
**SC INVESTMENTS, LLC**                             **ISP SUPPLIES, LLC**
**BY:**                                             **BY:**


_____                  _____
STEPHEN DISCHER**,** Manager                        STEPHEN R. DISCHER, Managing Member

EXHIBIT "A"
## PROPERTY DESCRIPTION

(metes and bounds description attached hereto)

**<u>Exhibit B</u>**

Form of Buyer LLC Agreement

(see attached)

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**GOT DISTRIBUTION SPV, LLC**

**(a Delaware limited liability company)**

**[__], 2022**

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM.

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SPECIFIED IN THIS AGREEMENT, AND THE COMPANY RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH UNITS UNTIL SUCH RESTRICTIONS HAVE BEEN SATISFIED WITH RESPECT TO ANY TRANSFER.  A COPY OF SUCH RESTRICTIONS SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE.

# TABLE OF CONTENTS

**Page**

ARTICLE I FORMATION, NAME, PURPOSE, MEMBERS, DEFINITIONS, ETC............................1

    Section 1.1          General ..................................................................................................1

    Section 1.2          Name; Principal Office.........................................................................2

    Section 1.3          Purposes ................................................................................................2

    Section 1.4          Registered Agent; Registered Office.....................................................2

    Section 1.5          Commencement and Term .....................................................................2

    Section 1.6          Income Tax Classification.....................................................................2

    Section 1.7          Members................................................................................................2

    Section 1.8          Definitions.............................................................................................3

ARTICLE II UNITS; MEMBER CAPITAL CONTRIBUTIONS/ MEMBER LOANS ...........................3

    Section 2.1          Initial Capital Contributions; Units .....................................................3

    Section 2.2          Additional Capital Contributions .........................................................5

    Section 2.3          Member Loans.......................................................................................6

    Section 2.4          Member Guarantees ..............................................................................7

    Section 2.5          Maintenance of Capital Accounts/Reports; Withdrawal of Capital; No Interest .............................................................................................7

ARTICLE III NON-LIQUIDATING DISTRIBUTIONS ........................................................9

    Section 3.1          Available Cash ......................................................................................9

    Section 3.2          Withholding/Deemed Loans to Members ...........................................11

    Section 3.3          Limitations on Distributions/Liability for Repayment .......................12

    Section 3.4          Mandatory Distributions .....................................................................12

    Section 3.5          Determination of Available Cash ........................................................12

    Section 3.6          Offset...................................................................................................13

ARTICLE IV ALLOCATIONS OF PROFITS AND LOSSES .................................................13

    Section 4.1          General Allocation of Profits or Losses ..............................................13

    Section 4.2          Allocations of Certain Tax Items ........................................................13

    Section 4.3          Miscellaneous......................................................................................14

ARTICLE V MANAGEMENT ...................................................................................14

    Section 5.1          Management by Manager.....................................................................14

    Section 5.2          Limitation on Fiduciary Duties; Indemnification................................15

    Section 5.3          Members..............................................................................................18

    Section 5.4          Compensation/Reimbursement ...........................................................18

    Section 5.5          Officers................................................................................................18

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE VI MEMBER MEETINGS ................................................................18

  Section 6.1   Member Meetings ...............................................18

  Section 6.2   Quorum; Member Voting......................................19

  Section 6.3   Written Consent to Action....................................19

  Section 6.4   Members' Designated Representatives ........................20

  Section 6.5   Attendance at Member Meetings ............................20

ARTICLE VII UNREGISTERED SECURITIES ...........................................20

ARTICLE VIII TRANSFERS OF MEMBERSHIP INTERESTS; MEMBER  WITHDRAWAL; ADMISSION ADDITIONAL/SUBSTITUTE MEMBERS ....................21

  Section 8.1   General ...........................................................21

  Section 8.2   Limitations on Withdrawal/Transfers of Membership Interests................22

  Section 8.3   Admission of "Assignees" as Additional or Substitute "Members" ...........22

  Section 8.4   General Consequences of Transfers/Dispositions of Membership Interests .........................................24

  Section 8.5   Drag-Along Right................................................25

  Section 8.6   Right of First Refusal ..........................................27

  Section 8.7   Tag-Along Rights................................................27

  Section 8.8   Specific Performance ..........................................29

  Section 8.9   Transfers of Class A Units .....................................29

ARTICLE IX DISSOLUTION, WINDING UP AND LIQUIDATING DISTRIBUTIONS ...................30

  Section 9.1   Events of Dissolution ..........................................30

  Section 9.2   Winding Up .......................................................30

  Section 9.3   Liquidating Distributions ......................................30

  Section 9.4   Liquidating Trust................................................30

  Section 9.5   Certificate of Cancellation....................................31

ARTICLE X BOOKS AND RECORDS .........................................................31

  Section 10.1   Books and Records............................................31

  Section 10.2   Tax, Financial and Other Reports...........................31

  Section 10.3   Accounting Decisions ........................................31

  Section 10.4   Income Tax Elections..........................................31

  Section 10.5   Confidentiality..................................................31

  Section 10.6   Financial Statements ..........................................32

  Section 10.7   Expenses..........................................................32

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE XI TAX REPRESENTATIVE ........................................................................32

    Section 11.1        Appointment of Tax Representative..............................................32

    Section 11.2        Employment of Advisors .............................................................33

    Section 11.3        Notice and Indemnification ..........................................................33

ARTICLE XII MISCELLANEOUS ...............................................................................33

    Section 12.1        Notices.........................................................................................33

    Section 12.2        Binding Effect .............................................................................33

    Section 12.3        Construction ................................................................................34

    Section 12.4        Entire Agreement; Amendments ..................................................34

    Section 12.5        Assignees.....................................................................................34

    Section 12.6        Headings......................................................................................35

    Section 12.7        Severability..................................................................................35

    Section 12.8        Further Cooperation .....................................................................35

    Section 12.9        Governing Law; Venue ................................................................35

    Section 12.10       Waiver of Action for Partition.....................................................35

    Section 12.11       Counterpart Execution; Facsimile Execution...............................35

    Section 12.12       Time of the Essence .....................................................................35

    Section 12.13       Independent Legal Representation; Waiver of Conflict of Interests ............35

    Section 12.14       References ....................................................................................36

    Section 12.15       Third-Party Beneficiaries ............................................................36

    Section 12.16       Prevailing Attorneys' Fees ..........................................................36

<u>SCHEDULES AND APPENDICES</u>:

Schedule 1.7          Member Information

Appendix A          Definitions

Appendix B          Special Tax and Accounting Provisions

Appendix C          Illustrative Waterfall Calculation

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**GOT DISTRIBUTION SPV, LLC**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of GOT Distribution SPV, LLC, a Delaware limited liability company (the "Company"), is entered into as of [__], 2022 (the "Effective Date"), by and among the Company and each of the Members listed on the signature pages hereto.

## RECITALS

WHEREAS, the Company was formed as a Delaware limited liability company on October 28, 2021, by the filing of a Certificate of Formation for the Company with the Delaware Secretary of State;

WHEREAS, the Company has been governed since October 28, 2021 by that certain Limited Liability Company Agreement of the Company (the "Original Agreement");

WHEREAS, in accordance with the terms contained therein and herein, the Members desire to amend and restate the Original Agreement in its entirety, including the rights, preferences and obligations in respect of their membership interests, in accordance with the terms hereof;

WHEREAS, upon execution of this Agreement, the Members shall hold that number and class of Units set forth opposite each such Member's name on Schedule 1.7; and

WHEREAS, this Agreement shall constitute a limited liability company agreement within the meaning of Section 18-101(7) of the Act.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree to amend and restate the Original Agreement as follows:

## ARTICLE I
## FORMATION, NAME, PURPOSE, MEMBERS, DEFINITIONS, ETC.

**Section 1.1    General**.

(a)    Formation.  The Members acknowledge that the Company was formed as a Delaware limited liability company on September 30, 2021, by the filing of the Certificate with the Delaware Secretary of State and the Members hereby ratify such filings and registration.

(b)    Further Actions.  The Manager shall cause the Company (or duly appointed officer or other representative of the Company, as an "authorized person" within the meaning of the Act) to execute, deliver and/or file such documents and/or take such other actions as may be necessary to maintain the Company's status as a limited liability company under the Act and as a "partnership" under the Code, and to carry out the business purposes of the Company as set forth in Section 1.3, including causing the Company to be (or become and remain) qualified, formed or registered under assumed or fictitious name statutes, qualification to do business statutes and similar laws in any jurisdiction in which the Company transacts business and executing, delivering and/or filing all certificates or other instruments (and any amendments and restatements thereof) which may be required in connection therewith.  The Members shall, at the request of the Manager, promptly execute such documents and furnish such information as may be

necessary to enable the Manager to perform, on behalf of the Company, or to enable the Company to perform those actions contemplated under this <u>Section 1.1(b)</u>.

(c)     <u>Conflicts</u>.  In the event of any conflict between the terms or provisions of this Agreement and the Certificate (as the same may be amended from time to time) or between this Agreement and any of the terms or provisions of the Act (except any provisions of the Act which, by their terms, may not be superseded by the terms of this Agreement), the terms or provisions of this Agreement shall control.

**Section 1.2     Name; Principal Office**.  The name of the Company is "GOT Distribution SPV, LLC."  The principal office of the Company shall be located at c/o Group of Telecom 1001 Brickell Bay Drive #1200, Miami, FL 33131 or such other place as the Manager may designate by written notice to the Members from time to time.

**Section 1.3     Purposes**.  The purpose and business of the Company shall be limited to (a) acquiring, investing in, holding, managing, and disposing of Equity Interests (whether held directly or indirectly) (i) in the Operating Companies, and (ii) other businesses or entities which are complementary to the business of the Operating Companies and (b) making, entering into, and performing any contracts and other undertakings and to engage in any activities and transactions as may be ancillary to, or necessary or advisable for carrying out, the foregoing purposes.  Notwithstanding anything herein to the contrary, nothing set forth *herein* shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.  Subject to the Act and the provisions of this Agreement, the Company may, with the approval of the Manager, enter into and perform under any and all documents, agreements and instruments, all without any further act, vote or approval of any Member.

**Section 1.4     Registered Agent; Registered Office**.  The Company's registered agent and registered office in the State of Delaware are specified in the Certificate.  The Manager, on behalf of the Company, may change the registered office and/or the registered agent of the Company (in any state or other jurisdiction where appointment of a registered agent is required) from time to time.

**Section 1.5     Commencement and Term**.  The term of the Company commenced on the filing of the Certificate and shall thereafter continue in perpetuity unless sooner dissolved, liquidated and terminated as provided in <u>Article IX</u>.

**Section 1.6     Income Tax Classification**.  The Company is classified as a "partnership" for federal income tax purposes.  The Members acknowledge and agree that it is not the purpose or intent of the Members to cause the Company to be treated (or elect to be treated) for federal income tax purposes as an association taxable as a corporation, and no Member shall make an election or take any other action that would result in the Company being treated for federal income tax purposes as an association taxable as a corporation.

**Section 1.7     Members**.  The names and addresses of the Members and their respective Units and Membership Percentages are listed on <u>Schedule 1.7</u>.  Except as otherwise permitted by, and subject to the terms of, <u>Article VIII</u>, additional or substitute "members" of the Company may be admitted only with the prior written consent of the Manager, which consent may be given or arbitrarily withheld in the Manager's sole and absolute discretion.  The Manager shall cause <u>Schedule 1.7</u> to be amended from time to time to reflect any sale or other disposition by a Member of all or any portion of such Member's Units or the admission of any additional or substitute "members" of the Company in accordance with the express terms hereof, or, otherwise, to reflect any change in the information of any Member set forth therein (to the extent known or made known to the Manager).

**Section 1.8**     **Definitions**.  Words and phrases capitalized throughout this Agreement, but which are not otherwise defined herein (or in the Recitals hereto or the opening paragraph hereof), shall have the respective meanings ascribed thereto in Appendix A or Appendix B attached hereto and made a part hereof.

## ARTICLE II
## UNITS; MEMBER CAPITAL CONTRIBUTIONS/
## MEMBER LOANS

**Section 2.1**     **Initial Capital Contributions; Units**.

(a)     Outstanding Units.  The authorized Units which the Company has authority to initially issue consist of those Units described in Section 2.1(e). The ownership of outstanding Units shall be listed on Schedule 1.7, as from time to time amended or supplemented by or at the direction of the Manager in accordance with this Agreement.  Upon the execution and delivery of this Agreement by each Person listed on Schedule 1.7 as of the date hereof, and, with respect to the Class A Units, the making by such Person of its initial Capital Contribution set forth thereon, each such Person shall become a Member and shall receive the number and type of Units set forth opposite such Person's name on Schedule 1.7. From time to time, following the admission of any Members, or following the issuance, transfer or forfeiture of any Units, Schedule 1.7 shall be amended by or at the direction of the Manager to reflect such changes. The Members acknowledge that the GOT Sponsor was issued fully vested Profits Interests, as more particularly described in Section 2.1(d) below, solely in consideration for its performance of services to or for the benefit of the Company and its Subsidiaries, which consist of one Class B Unit.

(b)     Units; Issuance of Additional Units/Redeemed Units.  Membership Interests in the Company are divided into unit increments (each, a "Unit" and collectively, the "Units") and fractions thereof.  A fractional Unit entitles the holder thereof to the appropriate fraction of the rights and privileges of a whole Unit.  Subject to Section 2.2(b), the Company is authorized to issue an unlimited number of Units; provided, however, that without the consent of the Manager, the Company shall not be authorized to issue any Units (or fractional thereof) not otherwise issued as of the Effective Date hereof.  Any Units repurchased by the Company after the Effective Date hereof in accordance with this Agreement will no longer be deemed to be outstanding for any purposes of this Agreement and the Company will not be permitted to reissue any such repurchased Units in whole or in part at any time thereafter, without the consent of the Manager.

(c)     GOT Investor.  The Members acknowledge and agree that the GOT Investor (or its Affiliate) contributed $1,625,000.00 as a Capital Contribution directly into the Company in exchange for the Class A Units as set forth on Schedule 1.7, which are in addition to the Class B Unit granted to the GOT Sponsor, as more particularly described herein.

(d)     Profits Interests.

(i)     Profits Interests issued or to be issued to a Member hereunder shall be issued in consideration of services provided or to be provided to or for the benefit of the Company by such Member in a Member capacity or in anticipation of becoming a Member, and such Profits Interests, as of the time of issuance and receipt, are intended to constitute "profits interests" within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343 and Revenue Procedure 2001-43, 2001-34 IRB 191, and not an interest in the capital of the Company.  All terms and provisions of this Agreement relating to any Profits Interest issued hereunder shall be construed in a manner consistent with such intention.  Accordingly, any Member issued a Profits Interest hereunder shall take into account such Member's distributive share of the Company's Profits and Losses with respect to such Profits Interest from and after the date upon which such Profits Interest is issued to

3

such Member. The Company shall not claim any deduction with respect to the issuance or vesting of such Profits Interest (unless, and to the extent, that applicable tax rules require the holder of such Profits Interest to recognize income as a result of the issuance or vesting of such Profits Interest).

(ii)     Upon the issuance of any Profits Interest that the Manager intends to be "profits interests" for federal income tax purposes, the Manager shall specify the Distribution Threshold, if any, applicable to such Profits Interest and enter it into the Company's books and records. With respect to the Profits Interests issued to the GOT Sponsor (or its Affiliate) as of the date hereof, the Distribution Thresholds the Class B Unit (the "Class B Distribution Threshold") is set forth on Schedule 1.7. Notwithstanding any provision of this Agreement to the contrary, in no event will the Company make any distributions under Section 3.1 or Section 9.3(c) in respect of a Profits Interest unless and until the Company has already made aggregate distributions under Section 3.1 or Section 9.3(c) with respect to each Unit that is not a Profits Interest equal to the applicable Distribution Threshold, taking into account only distributions (and redemption payments) thereunder since the date of issuance of such Profits Interest, and thereafter such Profits Interest shall be entitled only to its pro rata share of excess distributions over and above its Distribution Threshold.

(iii)     Each person that receives a Profits Interest that is not fully vested on the date of grant shall make a timely and effective protective election under Section 83(b) of the Code with respect to such Profits Interest and shall promptly provide a copy of such election to the Company. Treasury Regulations governing the tax treatment of the issuance of Profits Interests in exchange for services have been proposed, but not finalized, as of the date of the execution of this Agreement. The proposed regulations, together with an accompanying notice (IRS Notice 2005-43) would render Revenue Procedures 93-27 and 2001-43 (both of which are discussed above) obsolete when the new regulations are finalized. If the proposed regulations and the accompanying IRS Notice are finalized, either in the form originally proposed or with similar provisions, the Members, intending to be legally bound, hereby authorize the Company to make an election (the "Safe Harbor Election") to have the "liquidation value safe harbor" provided in proposed Treasury Regulations §1.83-3(1) and the proposed Revenue Procedures set forth in IRS Notice 2005-43, as such "safe harbor" may be modified when such proposed guidance is issued in final form, or as amended by subsequent guidance (the "Safe Harbor") applied to any Profits Interest in the Company issued hereunder while the Safe Harbor Election remains effective, to the extent such interest meets the Safe Harbor requirements (collectively, such interests are referred to as the "Safe Harbor Interests"). The Tax Representative, as the Member who has the responsibility for federal income tax reporting by the Company, is authorized and directed to execute and file the Safe Harbor Election on behalf of the Company or the Members. The Company and the Members (including any Person to whom an interest in the Company is transferred in connection with the performance of services) hereby agree to comply with all requirements of the Safe Harbor (including forfeiture allocations) with respect to all Safe Harbor Interests and to prepare and file all U.S. federal income tax returns (and to the extent applicable, state income tax returns) reporting the tax consequences of the issuance and vesting of Safe Harbor Interests consistent with such Safe Harbor guidance.

(iv)     The Company may, at the discretion of the Manager, issue Incentive Units to key employees, officers, directors, managers, consultants, independent contractors and service providers of the Company and its Subsidiaries, in such amounts and on such terms and conditions as the Manager deems appropriate. Such terms and conditions shall be set forth in the GOT Distribution SPV Equity Incentive Plan, adopted on or around the date hereof by the Manager (as amended, restated, replace or otherwise modified from time to time, the "Incentive Plan"), and/or in an equity award, phantom equity award or any other award agreement pursuant to which such Incentive Units are issued (an "Incentive Award Agreement"), the form of which shall be

prescribed by the Manager.  Upon the issuance of any Incentive Units, the Manager shall specify the Distribution Threshold, if any, applicable to such Incentive Units and enter it into the Company's books and records.  Notwithstanding any provision of this Agreement to the contrary, in no event will the Company make any distributions under <u>Section 3.1</u> in respect of any Incentive Unit (other than Tax Distributions) unless and until the Company has already made aggregate distributions under <u>Section 3.1</u> on each other Unit that is not an Incentive Unit equal to the applicable Distribution Threshold and further taking into account any payments made to a Member in redemption of the Units held by such Member, taking into account only distributions (and redemption payments) thereunder since the date of issuance of such Incentive Unit, and thereafter such Incentive Unit shall be entitled only to its pro rata share of excess distributions over and above its Distribution Threshold.

(e)      <u>Rights and Privileges of Initial Classes of Units</u>.

(i)      There is hereby created a class of Units designated as the "<u>Class A Units</u>".  Each Class A Unit shall be identical to all other Class A Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of a Class A Unit as set forth herein.

(ii)      There is hereby created a Unit designated as the "<u>Class B Unit</u>".  The Class B Unit shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of the Class B Unit as set forth herein.

(iii)      There is hereby created a Unit designated as the "<u>Incentive Unit</u>".  The Incentive Unit shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of the Incentive Unit as set forth herein and shall be non-voting.

**Section 2.2      Additional Capital Contributions.**

(a)      <u>Other Additional Capital Contributions</u>.  No Member shall be required or, except as specified in <u>Section 2.2(b)</u>, permitted to make any additional Capital Contributions to the Company.

(b)      <u>Voluntary Additional Capital Contributions/Capital Calls</u>.

(i)      Except for issuances of (A) Equity Interests issued to third party lenders (who are not already a Member) to the Company and/or the Subsidiaries in connection with debt financings, refinancings, restructurings, recapitalizations or similar transactions, (B) Units issued in connection with any unit split or unit dividend or other division or combination of Units, (C) Equity Interests issued in connection with strategic transactions (other than a financing transaction) involving the Company and/or the Subsidiaries and other Persons (including Equity Interests issued as consideration in connection with an acquisition transaction), and (D) Incentive Units issued pursuant to an Incentive Agreement, if the Manager determines that the Company requires additional funds, the Manager is authorized to solicit and/or accept such additional funds, as a contribution to the capital of the Company, from any Person, provided, each Member is provided a reasonable opportunity to contribute each Member's Proportionate Share of the total additional funds otherwise then being solicited based upon the terms and conditions determined by the Manager in its discretion.  For purposes hereof, a Member shall be deemed to have waived its right to contribute such Member's Proportionate Share of any additional Capital Contributions solicited by the Manager, from time to time, in accordance with this <u>Section 2.2(b)</u>, if such Member shall fail to contribute such Member's Proportionate Share thereof within fifteen (15) days (or such longer period as may be specified by the Manager) of receipt of a written notice (a "<u>Voluntary</u>

<u>Capital Call Notice</u>") from the Company (or duly authorized representative of the Company acting at the direction of the Manager) specifying (A) the total additional funds which the Manager is then seeking be contributed to the Company by a Member or Members, (B) the reason such additional funds are required (i.e., the proposed use(s) by the Company of such additional funds), (C) the rights and preferences or relative rights and preferences to be afforded to the Members that make such additional Capital Contributions, and (D) such Member's Proportionate Share of such total additional Capital Contributions.

(ii)     If any Member fails to timely contribute (or affirmatively elects not to contribute) its Proportionate Share of the aggregate additional Capital Contributions to which a Voluntary Capital Call Notice relates (such Member being referred to as a "<u>Non-Funding Member</u>") in accordance with <u>Section 2.2(b)(i)</u>, then each (or any) other Member who timely contributed such Member's Proportionate Share (as determined in accordance with <u>Section 2.2(b)</u>) thereof (a "<u>Funding Member</u>"), may elect to make an additional Capital Contribution to the Company not in excess of the maximum amount the Non-Funding Member could have contributed under said Voluntary Capital Call Notice (or, if there is more than one Funding Member, up to each such Funding Member's Proportionate Share (as determined in accordance with <u>Section 2.2(b)</u>) of such maximum amount) within such time period as may be reasonably set forth in writing from the Company to the Funding Members notifying them of the amount or amounts that such Non-Funding Member or Members failed to contribute to the Company in accordance with the Voluntary Capital Call Notice.

(iii)     Any amounts a Member contributes to the Company under this <u>Section 2.2(b)</u> shall be in immediately available funds and deposited in a bank account owned by the Company, to be held or used for the purposes described in the Voluntary Capital Call Notice to which such contribution relates.  All such amounts so contributed by any Member shall be treated as an additional Capital Contribution by such Member to the Company for all purposes of this Agreement (including for purposes of maintaining the Members' Capital Accounts and <u>Section 3.1(b)</u>).

(iv)     In the event that any Non-Funding Member fails to timely contribute (or affirmatively elects not to contribute) its Proportionate Share of any additional Capital Contributions pursuant to a Voluntary Capital Call Notice and the Funding Member or Members fail to elect and timely contribute such additional Capital Contributions to the Company to the extent of the amount the Non-Funding Member or Members could have contributed under said Voluntary Capital Call Notice, then for a period of ninety (90) days following the delivery of such Voluntary Capital Call Notice, the Company and the Manager shall be free to offer and sell such additional Membership Interests (or Units) to any Person or Persons, including any Member or Affiliate thereof, at a price not less than the price set forth in the Voluntary Capital Call Notice and on terms and conditions not substantially more favorable to proposed offeree than the terms and conditions set forth in the Voluntary Capital Call Notice.  Any such additional Equity Interests not so issued and sold within such one-hundred and eighty (180)-day period may not be issued and sold by the Company unless the Company once again complies with the requirements of this <u>Section 2.2(b)</u>.

**Section 2.3     <u>Member Loans</u>**.

(a)     <u>General</u>.  In the event that, from time to time, the funds of the Company are insufficient to pay when due any authorized expenses or obligations of the Company or if the Company otherwise requires additional funds, the Manager, in its reasonable discretion, may cause the Company to borrow all or any portion of such funds from any Person, including any Member or Members (or Affiliate(s)

of any Member or Members) as the Manager may determine in its sole and absolute discretion; provided, that each Member shall be given a reasonable opportunity to loan (or cause an Affiliate of such Member to loan) the Company up to such Member's Proportionate Share, of the total funds which the Manager otherwise authorizes the Company to borrow at such time and pursuant to such terms as the Manager may determine in its reasonable discretion.  The provisions set forth in Section 2.2(b) shall apply *mutatis mutandis* to the funding of any loans by the Members pursuant to this Section 2.3(a).

(b)     Repayment Member/Affiliate Loans.  Any loans made (or deemed made) to the Company by a Member or Members, or any Affiliate(s) thereof, from time to time, as provided in Section 2.3(a) or Section 2.4, shall be repaid by the Company from its first available proceeds, as determined by the Manager in its reasonable discretion, and before distributions of Available Cash (or other cash or property) are made by the Company to the Members (or any Member), together with interest, as in effect from time to time during the period the principal amount of such loan (or loans) remain(s) outstanding.  In the event there shall be outstanding loans (or deemed loans) to the Company made by any two or more Members (or Affiliates thereof) in accordance with Section 2.3(a) or Section 2.4, any amounts otherwise to be paid by the Company in repayment of such loan or loans shall be paid, pro rata, among all such loans, based on the then relative outstanding balance of each such loan unless all lending Members (or Affiliates thereof) otherwise mutually agree.

Section 2.4     **Member Guarantees**.  No Member shall be required (or permitted) to guarantee any loan or obligation of the Company unless agreed to by such Member and approved by the Manager.  In the event a Member agrees to guarantee any Company loan or obligation with the consent of the Manager, and is later required to make any payment under such Member's guarantee thereof (excluding any payment required to be made by reason of such Member's breach of its obligations under such guarantee), then such payment shall be treated as a loan by such Member to the Company, to be repaid as provided in Section 2.3(b) which shall bear interest on the outstanding principal balance thereof at the Prime Rate as in effect from the time during the period such principal amount of such loan remains outstanding.

Section 2.5     **Maintenance of Capital Accounts/Reports; Withdrawal of Capital; No Interest**.

(a)     Capital Accounts.  An individual Capital Account shall be determined and maintained by the Company for each Member as provided in Section I of Appendix B attached hereto. Upon the sale, exchange or assignment of all or a portion of an interest in the Company, the Capital Account of the transferor, or the portion thereof that is attributable to the transferred interest, if the transferor disposed of less than the transferor's entire interest in the Company, shall be carried over to the transferee.

(b)     No Right to Withdraw Capital/No Right to Interest.  Except as otherwise provided in Section 3, no Member shall be entitled to withdraw all or any portion of such Member's Capital Contributions or the balance in such Member's Capital Account, in money or other property, prior to dissolution of the Company, and then only in accordance with the provisions of the Act and Section 9.3. Neither the Manager nor any Member shall be personally liable for the payment or return of any portion of any Member's Capital Contributions.  Except with respect to the Class A Preferred Return, no interest will be paid on account of any Capital Contributions (or on the credit balance in any Member's Capital Account). No Member shall have the right to receive or demand property other than cash in return for such Member's Capital Contributions, and no Member shall have priority over any other Member, either as to the return of such Member's Capital Contributions or as to distributions, except to the extent otherwise expressly specified in this Agreement.

**Section 2.6**     **Non-Competition and Non-Solicitation**.

    (a)     Definitions.

        (i)     "Employee Unitholder" means any Unitholder who is or was, or whose members or equityholders is or was an employee or independent contractor of the Company or any Subsidiary (other than, for the avoidance of doubt, GOT Investor and GOT Sponsor).

        (ii)     "Protected Customer or Supplier" means any customer, supplier or vendor of a Protected Employer.

        (iii)     "Protected Employee" means any officer, manager, employee or independent contractor of a Protected Employer.

        (iv)     "Protected Employer" means the Company or a Subsidiary of the Company that operates in the Restricted Business.

        (v)     "Restricted Period" means the period during which any Person is an Employee Unitholder and two (2) years thereafter.

        (vi)     "Restricted Business" means the business of the Operating Companies throughout the United States.

    (b)     Covenant Not to Compete, Solicit or Interfere.  Each Employee Unitholder hereby agrees that, during the Restricted Period, he shall not, directly or indirectly (including through Affiliates or by contract), as a partner, joint venturer, employer, employee, consultant, shareholder, member, principal, director, manager, agent, subcontractor, individual or otherwise:

        (i)     engage in any aspect of the Restricted Business;

        (ii)     own, manage, operate, finance, join, control or participate or lend money or his reputation to any business that in any way competes with any aspect of the Restricted Business (*provided*, *however*, that nothing herein shall be construed to prevent any Employee Unitholder from (i) holding as a passive investment not more than five percent (5%) of the shares in any company whose shares are traded on a national securities exchange or over-the-counter market or (ii) at any period of time when he is no longer an Employee Unitholder, becoming an employee of a company that provides marketing services for a diverse range of industries, so long as his position or duties as an employee are not related to the Restricted Business and he does not engage in activities that compete with the Restricted Business);

        (iii)     induce, solicit or cause, or attempt to induce, solicit or cause, any Protected Employee to terminate his or her employment with or engagement by the applicable Protected Employer;

        (iv)     engage or hire, or attempt to engage or hire, any Protected Employee until twelve (12) months after such individual's employment relationship with the applicable Protected Employer;

        (v)     induce, solicit or cause, or attempt to induce, solicit or cause, any Protected Customer or Supplier to terminate, reduce or adversely change its business with a Protected Employer;

(vi)     make any public statement that disparages the Company, the Unitholders or any Protected Employer, including any statement that disparages the products, services, finances, financial condition, capabilities or other aspect of the business of such Person; or

(vii)     engage in any practice the purpose or intended effect of which is to evade the provisions of this Section 2.6.

Notwithstanding the foregoing, in the event of two or more successive payment defaults by the Company, which continues for a period of at least 120 days, with respect to its obligations under the Seller Note, then upon the Company's receipt of written notice from Supercub Holdings, LLC, Supercub Holdings, LLC shall be released of the (a) obligations, and covenants under this Section 2.6 (other than solicitation of employees and contractors that are not employees and contracts of ISP Supplies, LLC as of [--], 2022[1]), and (b) the confidentiality restrictions contained in Section 10.5 solely with respect to Confidential Information solely pertaining to ISP Supplies, LLC as of [--], 2022.

(c)     Equitable Relief.  If any Employee Unitholder breaches, or threatens to commit a breach of, any provision of this Section 2.6, the Company will have the right and remedy (i) to have such provision specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach may cause irreparable injury to the Company and the Subsidiaries and that money damages may not provide an adequate remedy to the Company and the Subsidiaries, and (ii) to recover from such Employee Unitholder and its Affiliates, jointly and severally, all monetary damages suffered by the Company and the Subsidiaries as a result of any acts or omissions constituting a breach of this Section 2.6, and each such right and remedy will be independent of the others, severally enforceable and in addition to, and not in lieu of, any other rights and remedies available to the Company and the Subsidiaries at law or in equity.

(d)     Acknowledgements.     Each Employee Unitholder acknowledges that the restrictions contained in this Section 2.6 are reasonable and necessary to protect the legitimate interests of the Company and the Subsidiaries and constitute a material inducement to the Company to admit such Employee Unitholder as an Employee Unitholder.  In the event that any covenant contained in this Section 2.6 is ever adjudicated to exceed the temporal, geographic or other limitations permitted by applicable law in any jurisdiction, then any court is expressly empowered and instructed to reform such covenant, and such covenant will be deemed reformed, in such jurisdiction to reflect the maximum temporal, geographic, product or other limitations permitted by applicable law.  The covenants and other provisions contained in this Section 2.6 are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written will not invalidate or render unenforceable the remaining covenants or provisions of this Section 2.6, and any such invalidity or unenforceability in any jurisdiction will not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

## ARTICLE III
## NON-LIQUIDATING DISTRIBUTIONS

Section 3.1     Available Cash.     Prior to the Company's dissolution in accordance with Section 9.1, subject to the following provisions of this Section 3 and any restrictions on distributions to the Members otherwise specified in this Agreement (including, without limitation, Section 3.3 hereof), the Manager may cause the Company to distribute its Available Cash (after having first made any Tax Distributions required to be made under Section 3.2(d) for the current and all prior fiscal quarters), if any,

---

[1] MW NTD: To be closing date of ISP Supplies transaction.

at such time or times and in such amounts as the Manager may determine, to or among the Members as follows:

(a)  Distribution to Members.  Subject to Section 3.1(b), Available Cash will be distributed by the Company at such times and in such amounts as is determined by the Manager (provided that Tax Distributions shall be made at such times and in such amounts as specified in Section 3.2(d)), to or among the Members in the following order and priority:

(i)  First, if one or more Class A Members have Unreturned Capital Contributions as of the date of distribution, to those Class A Members who have Unreturned Capital Contributions in proportion to their relative Unreturned Capital Contributions until the Unreturned Capital Contributions of all Class A Members have been reduced to zero;

(ii)  Second, if one or more Class A Members have a Class A Preferred Return Distribution Deficit as of the date of distribution, to those Class A Members who have a Class A Preferred Return Distribution Deficit in proportion to their relative Class A Preferred Return Distribution Deficits until the Class A Preferred Return Distribution Deficits of all Class A Members have been reduced to zero; and

(iii)  Thereafter, to the holders of Class A Units and Participating Incentive Units (ratably among such holders based upon the number of Class A Units and Participating Incentive Units held by each such holder immediately prior to such distribution).

For purposes of determining the amount of distributions under this Section 3.1(a), each holder of a Unit shall be treated as having received any amounts received by any prior holders of such Unit in connection with any prior distributions made under this Section 3.1(a).

(b)  Distributions to the Outside Investors and the Class B Member.  Notwithstanding anything set forth in this Section 3.1 to the contrary, any distributions of Available Cash otherwise payable to the Class A Members other than the GOT Investor or its Affiliates (such Class A Members, the "Outside Investors") under Section 3.1(a) shall be made as follows:

(i)  First, if one or more Outside Investors have Unreturned Capital Contributions as of the date of distribution, to those Outside Investors who have Unreturned Capital Contributions in proportion to their relative Unreturned Capital Contributions until the Unreturned Capital Contributions of all Outside Investors have been reduced to zero;

(ii)  Second, if one or more Outside Investors have a Class A Preferred Return Distribution Deficit as of the date of distribution, to those Outside Investors who have a Class A Preferred Return Distribution Deficit in proportion to their relative Class A Preferred Return Distribution Deficits until the Class A Preferred Return Distribution Deficits of all Outside Investors have been reduced to zero;

(iii)  Third, one hundred percent (100%) to the Class B Member, until the Class B Member has received cumulative distributions under this Section 3.1(b) equal to (A) the Carry Percentage, multiplied by (B) the aggregate distributions paid to the Outside Investors and such Class B Member pursuant to Section 3.1(b)(ii) and this Section 3.1(b)(iii);  and

(iv)  Thereafter, (A) the Carry Percentage to the Class B Member, and (B) one hundred percent (100%) less the Carry Percentage to the Outside Investors (pro rata in accordance with their respective ownership of Class A Units).

For purposes of determining the amount of distributions under this Section 3.1(b), each holder of a Unit shall be treated as having received any amounts received by any prior holders of such Unit in connection with any prior distributions made under this Section 3.1(b). The Managers shall ensure, and the Members hereby agree, that the Class B Member shall receive distributions of cash and non-cash assets in the same denomination and proportion of cash and non-cash assets distributed to the other Members.

Attached hereto as **Appendix C** is an illustrative waterfall calculation, which assumes that no Incentive Units have been issued and that Supercub Holdings, LLC, GOT Investor and GOT Sponsor are the only Members.

Section 3.2     Withholding/Deemed Loans to Members.

(a)     Tax Withholding; Treatment.  If the Company is required (as determined in good faith by the Manager) to make a payment (a "Tax Payment") with respect to any Member to discharge any legal obligation of the Company (or the Manager) to make payments to any governmental authority with respect to any federal, foreign, state or local tax liability of such Member arising from such Member's ownership or disposition of a Membership Interest, then, notwithstanding any other provision of this Agreement to the contrary, the amount of such Tax Payment shall be treated as: (i) a distribution to such Member (and the payment by such Member of the tax to which such payment relates), which shall offset, in whole or part, the first distribution(s), if any, otherwise to be made by the Company to such Member as of the date thereof pursuant to Section 3.1 or Section 9.3, or (ii) to the extent such Tax Payment exceeds the distribution(s) otherwise then to be made to such Member (or if no distribution is then to be made to such Member), a loan by the Company to such Member, which loan shall bear interest at the Prime Rate (as determined as of the date such Tax Payment is made) and be payable upon demand by the Manager or, in the discretion of the Manager, by set off against the first distribution (or distributions) thereafter to be made by the Company to such Member, whether under Section 3.1 or Section 9.3.

(b)     Right of Holdback.  The Manager shall be entitled to hold back any distribution (including Company property to be distributed in-kind) otherwise payable by the Company to any Member if and to the extent the Manager believes, in good faith, that a Tax Payment is or will be required with respect to such Member in the future and the Manager believes that there will not be sufficient subsequent distributions to such Member to make such Tax Payment.

(c)     Special Allocations of Gain or Loss from Sale of Retained Property.  If applicable, in the event Company property, or a portion thereof, to be distributed in-kind to any Member is retained by the Company to make a Tax Payment for such Member, then such property, or applicable portion thereof, shall be deemed for purposes hereof to have been distributed to such Member as of the date such distribution in-kind was otherwise to have been made and all gain or loss, as determined for federal income tax purposes, from the Company's sale of such property to fund such Tax Payment, shall be allocated, in full, to such Member.

(d)     Tax Distributions.  With respect to any taxable year prior to the year in which the Company liquidates or a Sale of the Company occurs (subject to the following sentence), the Manager shall cause the Company to distribute to the Members with respect to each fiscal quarter an amount of cash to the extent of Available Cash (a "Tax Distribution") which equals (i) the amount of net taxable income allocable to the Members in respect of such fiscal quarter (net of taxable Losses allocated to the Member in respect of prior fiscal quarters and not previously taken into account under this clause) computed without regard to allocations of income or deductions under Sections 704(c) and 743(b) of the Code, multiplied by (ii) the Assumed Income Tax Rate, with such Tax Distribution to be made to the Members in the same proportions that net taxable income (as computed pursuant to this Section 3.2(d)) was allocated to the Members during such fiscal quarter.  The Manager shall also take into account distributions made pursuant

11

to Section 3.1 and this Section 3.2(d) for purposes of determining the amount of a Tax Distribution for a relevant quarter.  To the extent the Company does not have sufficient funds and thereby is unable to pay to the Members the full amount of any Tax Distribution otherwise payable pursuant to this Section 3.2(d), the Company shall pay the amount of such shortfall to the Members (pro rata, in accordance with the amount of any such shortfall then owning to such Members) as promptly thereafter as such funds become available. Tax Distributions shall be considered advances on distributions to Members under Section 3.1 and Section 9.3(c) and shall offset future distributions to which such Member would otherwise be entitled to receive pursuant to Section 3.1 and Section 9.3(c).

> **Section 3.3**      **Limitations on Distributions/Liability for Repayment**.

(a)      Statutory Restrictions.   Notwithstanding anything in this Agreement to the contrary, in accordance with §18-607(a) of the Act, the Company shall not make any distributions (other than guaranteed payments to any Member constituting reasonable compensation for present or past services of such Member to the Company, if applicable) to any of the Members if, immediately following such distribution, the Company would not otherwise have sufficient remaining properties (based on the fair value of its remaining properties) to pay its then total outstanding liabilities, other than liabilities to its Members on account of their Membership Interests in the Company and liabilities of the Company for which the recourse of the applicable Company creditor(s) is or are limited to specified Company property.  For purposes of applying the preceding sentence, the fair value of any Company property that is subject to a liability for which the recourse of an applicable Company creditor is limited, shall be included in the assets of the Company only to the extent that the fair value of such property exceeds that liability.

(b)      Member Repayment Obligations.   Any Member that receives a distribution made in violation of the terms of Section 3.3(a) and §18-607(a) of the Act, and who knew at the time of such distribution that such distribution was made in violation thereof, shall be liable to the Company for the amount of such distribution; provided, that, unless otherwise agreed (or unless otherwise provided by the Act), such Member shall have no liability to the Company for such distribution after the expiration of three years from the date thereof (or such longer or shorter period as may hereafter be specified by the Act) unless an action to recover such distribution from such Member is or was commenced prior to the expiration of said three year (or other applicable) period and an adjudication of liability against such Member is made in said action.

(c)      Erroneous Distributions.   If the Company has pursuant to a clear and manifest accounting, mathematical or similar error paid to any Member an amount in excess of the amount to which such Member is entitled pursuant to Section 3.1, Section 3.2(d) or Section 9.3, then such Member shall reimburse the Company to the extent of such excess (without interest) within thirty (30) days after demand by the Company to such Member for the reimbursement of such erroneous distribution or the Company shall be entitled to set off the amount of such erroneous distribution against the first distribution (or distributions) thereafter to be made to such Member, whether under Section 3.1 or Section 9.3(c).

> **Section 3.4**      **Mandatory Distributions**.  The Manager will cause the Company to distribute the Available Cash resulting from any Liquidity Event concurrently with the completion of any such transaction and consistent with Section 3.1 (or, if applicable, Section 9.3).

> **Section 3.5**      **Determination of Available Cash**.  Subject to Section 5.2(a)(i), in determining the amount of Available Cash, the Manager shall make a reasonable determination of the amount of cash reserves reasonably necessary or appropriate to be established and/or maintained by the Company in furtherance of its authorized business purposes, both considering current and future or anticipated operating needs and after giving effect to expenses of the Company.

Section 3.6 __Offset__. The Company shall have the right to set off against any distributions payable to a Member the amount of any withholding tax required to be paid by the Company in respect of such holder.

## ARTICLE IV
## ALLOCATIONS OF PROFITS AND LOSSES

**Section 4.1** __General Allocation of Profits or Losses__. Subject to Appendix B attached hereto, Profits or Losses of the Company for each Allocation Period commencing on or after the Effective Date hereof, shall be allocated as follows:

(a) __General__. Except as otherwise provided in this Agreement, Profits and Losses for any Allocation Period shall be allocated among the Members in such a manner that, as of the end of such Allocation Period, the sum of (i) the Capital Account of each Member, (ii) such Member's share of Company Minimum Gain (as determined according to Regulations § 1.704-2(g)) and (iii) such Member's allocation of Member Nonrecourse Debt Minimum Gain (as determined according to Regulations § 1.704-2(i)(3)) shall be equal to the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to the Company under this Agreement, determined as if the Company were to (A) liquidate the assets of the Company for an amount of cash equal to their Book Values (taking into account any Book Value adjustments for such period), (B) satisfy any Company liabilities in cash according to their terms (limited, with respect to each Nonrecourse Liability of the Company, to the Book Value of the assets securing such liability) and (C) distribute the proceeds of such liquidation (after satisfaction of such liabilities) to the Members pursuant to Section 9.3(c) (treating any unvested Units as vested for purposes of this Section 4.1(a)). Except in the year of liquidation or a year in which a Sale of the Company occurs, allocations pursuant to this Section 4.1(a) shall be allocations of net Profit or net Loss, as the case may be, as determined after taking into account any Regulatory Allocations. If the Manager determines that it is necessary and permissible (under the Code and applicable regulations and rulings) to allocate items of gross income and gain separate from items of deduction or loss to achieve the target set forth in the first sentence of this Section 4.1(a), the Manager shall make such allocations to the extent required in such manner as it determines is reasonable; provided that such allocations of gross income and gain do not have a material adverse impact with respect to any Member (taking into account any Tax Distributions with respect thereto).

(b) __Limitation on Losses__. The Losses allocated under Section 4.1(a) to any Member shall not exceed the maximum amount of Losses that can be so allocated without causing or increasing an Adjusted Capital Account Deficit with respect to such Member. If some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 4.1(a), then the limitation set forth in this Section 4.1(b) shall be applied so as to allocate the maximum permissible Losses to each Member under the preceding sentence and Regulations § 1.704-1(b)(2)(ii)(d). In the event that the allocation of Losses to any Member is prohibited under the first sentence of this Section 4.1(b), such Losses shall be allocated to the remaining Members in proportion to their respective positive Adjusted Capital Account balances. With respect to each Allocation Period (including Allocation Periods thereafter), Profits (or, to the extent necessary, gross income) shall be allocated to the Members up to the aggregate of, and in proportion to, any Losses previously allocated to each Member in accordance with this Section 4.1(b) in the reverse order in which such Losses were allocated.

**Section 4.2** __Allocations of Certain Tax Items__.

(a) __Code §704(c)__. All items of income, gain, loss, and deduction for federal income tax purposes shall be allocated in the same manner as the corresponding items are allocated for purposes of maintaining Capital Accounts pursuant to Section 4.1 and Appendix B; provided, however, that if any

13

property contributed to the Company by any Member is subject to the provisions of Code §704(c), the Members' distributive shares of income, gain, loss and deductions, as computed for income tax purposes, with respect to such property (and, to the extent permitted by the Regulations, with respect to other Company property), shall be determined in accordance with Code §704(c), utilizing such method of accounting as determined by the Manager.

(b)      <u>Code §704(c) Principles</u>.  In the event the Book Value of any Company asset is adjusted pursuant to <u>Section I.D.(2)</u> of <u>Appendix B</u>, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value utilizing such method of accounting as determined by the Manager.

(c)      <u>No Effect on Distributions</u>.  Allocations pursuant to this <u>Section 4.2</u> are solely for purposes of federal, state and local income taxes and shall not affect, or in any way be taken into account in computing any Member's (i) Capital Account, (ii) share of items of the Company's gross income, gains, losses or deductions for purposes of computing Capital Accounts, or (iii) distributions pursuant to any provision of this Agreement.

**Section 4.3**      **<u>Miscellaneous</u>**.

(a)      <u>Earning of Profits and Losses</u>.  For all purposes of this Agreement, including the determination of the allocable share of the Profits or Losses (or items thereof) of a Member who acquires or disposes of a Membership Interest during any Taxable Year, Profits or Losses of the Company (or items thereof) for any Taxable Year shall be allocated to the periods of such Taxable Year on the "interim closing of the books" method of accounting unless otherwise agreed by the Manager (and, if applicable, a selling Member).

(b)      <u>Consistent Tax Reporting</u>.  Each Member agrees to report to the appropriate taxing authorities such Member's share of Profits or Losses (and, if different, share of the net taxable income or loss of the Company) consistent with this <u>Section 4</u> and <u>Appendix B</u> attached hereto.

**ARTICLE V**
**MANAGEMENT**

**Section 5.1**      **<u>Management by Manager</u>**.

(a)      <u>General</u>.  The business and affairs of the Company shall be managed by the Manager.  Except for situations in which the approval of some or all of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law, the Manager shall have full, complete and plenary authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

(b)      <u>Appointment and Removal</u>.  The Manager shall be appointed, and may be removed and replaced at any time, by the GOT Investor.

14

**Section 5.2**      **Limitation on Fiduciary Duties; Indemnification**.

    (a)      Fiduciary Duties.

        (i)      In performing its duties, the Manager will be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports, or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Profits or Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid), that are furnished by one or more of the following Persons or groups: (A) one or more officers or employees of the Company or any Affiliate thereof; (B) any attorney, independent accountant, or other Person employed or engaged by the Company or any Affiliate thereof; or (C) any other Person who has been selected with reasonable care by or on behalf of the Company or any Affiliate thereof, in each case as to matters which such relying Person reasonably believes to be within any such other Person's or group's professional competence.  The preceding sentence will in no way limit any Person's right to rely on information to the extent provided in §18-406 of the Act.  The Manager will not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

        (ii)      To the extent that, at law or in equity, the Manager, any officer or any Member (individually, a "Covered Person") has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, such Covered Person shall have only the duties provided in this Agreement and, except as otherwise specifically provided in this Agreement, shall not be liable to the Company or to any other Covered Person for its breach of fiduciary duty for such Covered Person's good faith reliance on the provisions of this Agreement or for breach of contract and breach of duties (including fiduciary duties), or for any approval or authorization granted by the Company or any other Covered Person.  The provisions of this Agreement, to the extent they eliminate or restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties to this Agreement to replace such other duties and liabilities of such Covered Person, other than an act or omission which constitutes fraud or willful misconduct.

    (b)      Indemnification.

        (i)      The Company shall, to the fullest extent permitted by the Act, indemnify and defend each Person who was or is made a party or is threatened to be made a party to or is involved in or participates as a witness with respect to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company), by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Manager or an officer or Member, or is or was serving at the request of the Company as a director, officer, employee, fiduciary, or agent of another limited liability company or of a corporation, partnership, joint venture, trust, or other enterprise (each a "Proceeding"), against all expenses (including reasonable attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by such Person in connection with such Proceeding if such Person acted in good faith, with reasonable care, and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal Proceeding, had no reasonable cause to believe such Person's conduct was unlawful, *provided that* such Person shall not be indemnified if such expenses, judgments, fines, or amounts paid in settlement are primarily attributable to the fraud, willful misconduct or gross negligence of such Person, or a material breach of this Agreement by such Person.  The termination of any Proceeding by judgment,

order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which such Person reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal Proceeding, that the Person had reasonable cause to believe that his or her conduct was unlawful.

(ii)     The Company shall, to the fullest extent permitted by the Act, indemnify and defend any Person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Person, or a Person of whom he or she is the legal representative, is or was a Manager or a Member, or is or was serving at the request of the Company as a director, officer, employee, fiduciary, or agent of another limited liability company or of a corporation, partnership, joint venture, trust, or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such action or suit if such Person acted in good faith, with reasonable care, and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue, or matter as to which (A) such Person shall have been adjudged to be liable to the Company unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery of the State of Delaware or such other court shall deem proper, or (B) if such expenses are primarily attributable to the fraud, willful misconduct or gross negligence of such Person, or a material breach of this Agreement by such Person.

(iii)     The rights to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition conferred in this Section 5.2(b) shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, provision of this Agreement, any other agreement, or by affirmative vote of the Manager.

(iv)     Each of the Company and each Member hereby acknowledges that the Manager may have certain rights to indemnification, advancement of expenses, or insurance provided by one or more Members and certain of their Affiliates (collectively, the "Fund Indemnitors"). The Company and each of the Members hereby agree that (A) the Company is the indemnitor of first resort as to any matter as to which any Person is entitled to indemnification hereunder (i.e., its obligations to any such director or officer are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Manager are secondary), (B) the Company shall be required to advance the full amount of expenses incurred by the Manager and shall be liable for the full amount of all expenses, judgments, penalties, fines, and amounts paid in settlement by or on behalf of any such director or officer to the extent legally permitted and as required by this Agreement (or any agreement between the Company and the Manager), without regard to any rights the Manager may have against the Fund Indemnitors, and (C) the Company irrevocably waives, relinquishes, and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation, or any other recovery of any kind in respect thereof.  The Company and each of the Members further agree that no advancement or payment by the Fund Indemnitors on behalf of the Manager with respect to any claim for which such director or officer has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution, and be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Manager against the Company.

16

(c)    Expenses.  Subject to the Company having sufficient Available Cash taking into account the Company's operating needs, as determined in the reasonable discretion of the Manager, expenses incurred by the Manager or any Member described in Section 5.2(b)(i) or Section 5.2(b)(ii) hereof or of a member, manager or officer of the GOT Sponsor or any of its Affiliates performing services to, for, or on behalf of the Company or any of its Subsidiaries under the Management Agreement or any similar agreement in defending a Proceeding shall be paid by the Company in advance of such Proceeding's final disposition upon receipt of an undertaking by or on behalf of the Manager or such Member to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company. Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Manager deems appropriate.  Notwithstanding the foregoing such advancement shall also be provided to such Person to the extent available under an insurance policy covering such Persons.

(d)    Employees and Agents.  Persons who are not covered by the foregoing provisions of this Section 5.2 and who are or were the Manager, Members, employees, officers, or agents of the Company, or who are or were serving at the request of the Company as employees, officers or agents of an Affiliate of the Company, may be indemnified, retroactively or prospectively, to the extent authorized at any time or from time to time by the Manager.

(e)    Other Terms; Contract Rights.

(i)    The provisions of this Section 5.2 shall be deemed to be a contract right between the Company and each Manager or Member who serves in any such capacity at any time while this Section 5.2 and the relevant provisions of the Act or other applicable law are in effect, and any repeal or modification of this Section 5.2 or any such law shall not affect any then known (or knowable) right of any such Person or any obligation of the Company with respect to any act, omission, state of facts or Proceeding occurring prior to the time of such repeal or modification or otherwise then existing.

(ii)    Except as provided in this Section 5.2, the Company shall indemnify any such Person seeking indemnification in connection with a Proceeding initiated by such Person only if such Proceeding was authorized by the Manager.

(iii)    If the Act is amended after the Effective Date to authorize further or greater limitations on the liability or fiduciary duties of the Manager or Members than that specified herein, then the limitations on liability or fiduciary duties of the Manager or Company officers, as applicable, shall be expanded to the fullest extent permitted by the Act.  If the Act is amended to authorize greater indemnification of the Manager or Members or other Persons entitled to indemnification under the foregoing provisions of this Section 5.2, then the Company's indemnification obligations to such Person or Persons shall be expanded to the fullest extent permitted by the Act.

(iv)    The indemnification and other rights provided for in this Section 5.2 shall inure to the benefit of the successors, assigns, heirs, executors and administrators of any Person entitled to indemnification in accordance with the foregoing provisions of this Section 5.2.

(f)    Other Ventures.  Notwithstanding anything to the contrary contained in this Agreement but subject to compliance with Section 10.5, the Manager, each Member and their respective Affiliates may engage, directly or indirectly, in any other business venture or ventures of any nature and description, independently or with others (whether or not competitive with, relating to, or in any manner connected with, the business of the Company or any of its respective Subsidiaries), and neither the Company nor any of the other Members shall have any rights in and to any such business ventures or the income or

17

profits derived therefrom.  Each Member expressly agrees that the Manager, each other such Member and their respective Affiliates may engage independently, with each other or with others, for their own accounts and for the accounts of others, in other business ventures and activities of every nature and description, whether such ventures are competitive with the business of the Company, the Operating Companies or any of their respective Subsidiaries or otherwise.  Neither the Company nor any Member shall have any rights or obligations by virtue of this Agreement in and to such independent ventures and activities or the income or profits derived by the Manager or any such Member or their respective Affiliates therefrom.  Without limiting the generality of the foregoing, nothing contained in this Agreement shall limit the Manager, any Member or their respective Affiliates from making investments in any Person.

(g)     Management Agreement.  The Members acknowledge that the Company is party to the Management Services Agreement, dated as of the Effective Date, by and between the GOT Sponsor (or its Affiliate) and the Company (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "Management Agreement").

Section 5.3     **Members**.  No Member, in a Member's capacity as such, shall participate in or have any control over the management of the Company's business or transact any business for the Company; and no Member, in a Member's capacity as a "member" of the Company, shall have any power to sign for or bind the Company.

Section 5.4     **Compensation/Reimbursement**.  Without limiting the fees and payments to which affiliates of the Manager are entitled under Section 5.2(g), no Manager or Affiliate of a Manager or Class A Member shall otherwise receive any salary or other compensation from the Company or any of its Subsidiaries for his or her services to any such entity, except that the Manager shall be reimbursed by the Company for any reasonable out of pocket expenses directly incurred by it in its performance of any of the duties and responsibilities of such office, subject to submission of adequate substantiating receipts or records and, if applicable, subject to such limitations or other terms and conditions as the Manager may specify or determine, from time to time.  For clarity, the Manager shall not be entitled to reimbursement hereunder for office overhead expenses (including rent, compensation and the like) and other expenses related to its business and affairs generally.

Section 5.5     **Officers**.  The Manager may appoint individuals as officers of the Company as it deems necessary or desirable to carry on the business of the Company and the Manager may delegate to such officers such power and authority as the Manager deems advisable.  No officer need be a Member or Manager.  Any individual may hold two or more offices of the Company.  Each officer shall hold office until his successor is designated by the Manager or until his earlier death, resignation, or removal.  Any officer may resign at any time upon written notice to the Manager.  Any officer may be removed by the Manager with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal, or otherwise, may, but need not, be filled by the Manager.

**ARTICLE VI**
**MEMBER MEETINGS**

Section 6.1     **Member Meetings**.

(a)     Right to Call/Place of Meetings.  The Manager may call meetings of the Members at any time by giving notice as specified herein below.  Meetings of the Members shall be chaired by an individual selected by the Manager.  Unless held by telephone conference, each meeting of the Members shall be held at the principal office of the Company (or at such other location determined by the Manager); provided, any Member (or a Member's designated representative) may participate in any meeting of the Members not held by telephone conference, by use of a conference telephone or similar communications

equipment pursuant to which all Persons participating in the meeting (or entitled to participate) can hear and communicate with each other.

(b)   <u>Notice/Waiver of Notice</u>.  Notice of a meeting of the Members shall be given by the Manager to each Member or all Members, as applicable, entitled to vote (or the designated representative of each Member) not later than ten (10) days before and not earlier than thirty (30) days before the date designated for such meeting, and, in addition to any other information contained therein or attached thereto, a notice of a meeting of the Members must provide the date and time of such meeting, and a general description of the nature of the business to be transacted thereat.  Any Member (or the designated representative of a Member) may waive notice of any meeting of the Members, provided, the attendance of a Member (or a Member's designated representative) at any meeting of the Members shall constitute a waiver of notice of such meeting by such Member, except where such Member (or such Member's designated representative) attends a meeting for the express purpose of objecting, at the start of such meeting, to the transaction of any business at such meeting because the meeting was not lawfully called or convened.

(c)   <u>Meeting Minutes</u>.  The Manager shall cause written minutes to be prepared of all actions taken by the Members (or the designated representatives of the Members) at each meeting of the Members, and shall cause a copy thereof to be delivered to all Members (or their designated representatives) with reasonable diligence after the meeting to which the minutes relate.

(d)   <u>Adjournment</u>.  Any Member (or a Member's designated representative) shall be entitled to a reasonable adjournment of any meeting of the Members upon not less than two (2) business days' prior written notice to the Manager and the other Members (or their respective designated representatives).  When a meeting of the Members is adjourned to a different date, time or place, it shall not be necessary to give any notice of the new date, time or place of such meeting, if the new date, time or place of such meeting is announced at such meeting before an adjournment is taken, and any business may be transacted at the adjourned meeting that might have been transacted on the original date of such meeting without the need for any other or further notice.

**Section 6.2     Quorum; Member Voting**.  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of the those Class A Members entitled to vote owning more than fifty percent (50%) of the total Membership Percentages in the Company owned by all Class A Members entitled to vote shall constitute a quorum, and no action may be taken at a meeting of the Members unless such a quorum is present.  A Member entitled to vote may vote either in person or by written proxy signed by the Member or by his, her, or its duly authorized attorney in fact.  Persons present by telephone shall be deemed to be present "in person" for purposes hereof.  At each meeting of the Members, each Member (or such Member's designated representative) may vote such Member's Membership Percentage with respect to any matter to be considered at such meeting, as to which such Member is entitled to vote and which is subject to the vote, consent or approval of the Members (or the Members owning any specified Membership Percentages of the Units).  Except as may otherwise be expressly provided herein to the contrary, any matter subject to the consent, approval or direction of the Members hereunder or under the Act, shall require the agreement or approval of those Class A Members entitled to vote owning more than fifty percent (50%) of the total Membership Percentages in the Company owned by all Class A Members entitled to vote. Notwithstanding anything set forth herein to the contrary, holders of Incentive Units shall have no right in their capacity as such to vote on or consent to any action or matter submitted to a vote of the Members, or with respect to which the affirmative vote, approval or consent of the Members is otherwise required under this Agreement.

**Section 6.3     Written Consent to Action**.  Any action required or permitted to be taken by the Members (or by any Members), whether at a meeting or otherwise, may be taken without a meeting, without

prior notice and without a vote, if the action is evidenced by a written consent or other written instrument dated and signed (whether or not in counterparts and whether or not through facsimile or email copies) by that Member or those Members (or its or their designated representative) necessary to authorize or take the action which is the subject of such written consent.  All such written Member consent(s) shall be delivered to the Company at its principal office.  The Manager, within thirty (30) days after the Company obtains authorization to the taking of any action by a written consent of the Members, shall send a copy thereof to that Member (or those Members), if any, who (or whose designated representative) did not execute the same (or, otherwise, consent, in writing, to the action (or actions) which is (or are) the subject thereof).

Section 6.4    **Members' Designated Representatives**.

(a)    Appointment/Authority.  All actions, consents and approvals required or permitted to be taken or given hereunder by any Member which is not a natural person, shall be undertaken or given on each such Member's behalf by its "designated representative" or such other Person authorized to act on behalf of such Member.  For this purpose, each such Member admitted as a "member" of the Company that is not a natural person shall designate its designative representative on Schedule 1.7 or any amendments thereto.  Any Member may replace or remove its designated representative by sending written notice thereof to the Company setting forth the name of the replacement designated representative and the effective date of such replacement.

(b)    Right of Reliance.  The Manager and each other Member shall have the right to rely conclusively on any other Member's designated representative; and all notices, advices, reports, and other writings of whatsoever kind or nature required hereunder or pursuant to the Act to be sent to each such Member shall be deemed effective when served, in person, upon each such Member's designated representative.  Every act of commission or omission, approval or non-approval, consent of or rejection by a Member's designated representative shall be deemed to be the act of and shall conclusively bind such Member; and the Manager and other Members shall have the absolute right to rely upon every such act of whatsoever kind and nature as the act of such Member.

Section 6.5    **Attendance at Member Meetings**.  Each Member which is not a natural person agrees to cause its designated representative to be available for any meeting of the Members duly called or held as otherwise provided herein.  Each such Member, with the prior written consent of the Manager, shall have the right to have additional individuals attend all meetings of the Members; provided that, such additional invitees shall have no right to vote at any such meetings.

**ARTICLE VII**
**UNREGISTERED SECURITIES**

THE UNITS ISSUED BY THE COMPANY HAVE NOT BEEN REGISTERED, QUALIFIED, APPROVED OR DISAPPROVED UNDER ANY FEDERAL, STATE OR FOREIGN SECURITIES LAWS AND HAVE BEEN SOLD OR ISSUED IN BY THE COMPANY IN RELIANCE ON EXEMPTIONS FROM REGISTRATION AFFORDED BY APPLICABLE FEDERAL, STATE AND/OR FOREIGN SECURITIES LAWS.

THE UNITS ISSUED BY THE COMPANY MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH UNITS UNDER APPLICABLE FEDERAL, STATE AND/OR FOREIGN SECURITIES LAWS, UNLESS SOLD OR OTHERWISE TRANSFERRED PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION AND, IF REQUESTED BY THE MANAGER, THE TRANSFERRING MEMBER FIRST PROVIDES THE COMPANY WITH AN

OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE MANAGER TO SUCH EFFECT, WHICH OPINION SHALL BE AT THE COST AND EXPENSE OF THE COMPANY.

EACH MEMBER HEREBY REPRESENTS AND WARRANTS TO THE COMPANY, THE MANAGER, AND EACH OTHER MEMBER THAT EACH SUCH MEMBER (A) HAS ACQUIRED SUCH MEMBER'S UNITS FOR INVESTMENT PURPOSES ONLY, FOR ITS OWN ACCOUNT AND NOT WITH A VIEW TO DISTRIBUTION; (B) HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE TO EVALUATE THE MERITS AND RISKS OF ITS INVESTMENT IN THE COMPANY; (C) HAS BEEN PROVIDED WITH, OR GIVEN REASONABLE ACCESS TO, FULL AND FAIR DISCLOSURE OF ALL INFORMATION MATERIAL TO ITS INVESTMENT IN THE COMPANY; (D) UNDERSTANDS THAT NO MARKET IS LIKELY TO EXIST FOR ITS UNITS, AND IT DOES NOT ANTICIPATE THE NEED TO SELL ITS UNITS IN THE FORESEEABLE FUTURE; (E) HAS NOT PURCHASED ITS UNITS AS A RESULT OF ANY GENERAL SOLICITATION OR GENERAL ADVERTISING, INCLUDING ADVERTISEMENTS, ARTICLES, NOTICES, OR OTHER COMMUNICATIONS PUBLISHED IN ANY NEWSPAPER, MAGAZINE, OR SIMILAR MEDIA OR BROADCAST OVER RADIO OR TELEVISION, OR ANY SEMINAR OR MEETING WHOSE ATTENDEES HAVE BEEN INVITED BY GENERAL SOLICITATION OR GENERAL ADVERTISING; AND (F) CAN WITHSTAND THE LOSS OF ITS ENTIRE INVESTMENT WITHOUT SUFFERING SERIOUS FINANCIAL DIFFICULTIES.   IN ADDITION TO ANY OTHER CONDITIONS IMPOSED BY THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES AND UNDERSTANDS THE ABOVE RESTRICTIVE LEGENDS AND AGREES TO ACCEPT AND ABIDE BY THE ABOVE DESCRIBED RESTRICTIONS ON THE TRANSFERABILITY OF SUCH MEMBER'S UNITS (AND RELATED MEMBERSHIP INTEREST).

## ARTICLE VIII
## TRANSFERS OF MEMBERSHIP INTERESTS; MEMBER
## WITHDRAWAL; ADMISSION ADDITIONAL/SUBSTITUTE MEMBERS

**Section 8.1     General**.

(a)     Members' Intent.   The ownership and transferability of Units (and related Membership Interests) in the Company are substantially restricted.  These restrictions upon ownership and Transfer are not intended as a penalty, but as a method to further the legitimate business purposes of the Company and protect and preserve existing relationships among the Members, which are based on trust, and to protect and preserve the Company's capital and its ability to continue as a going concern.  No Member shall Transfer any interest in any Units except in compliance with this Section 8.  No Unitholder (the "Prohibited Unitholders") may Transfer, or offer or agree to Transfer, all or any part of any interest in such Prohibited Unitholder's Units without the prior written consent of the Manager, which consent may be withheld in the Manager's sole discretion, other than pursuant to (i) a Transfer that is a Permitted Transfer, (ii) a Transfer by a Drag-Along Member made as a result of a Drag-Along Sale under and in accordance with Section 8.5 or (iii) a Transfer by a Tag-Along Member made as a result of a Tag-Along Sale under and in accordance with Section 8.7).

(b)     Non-Recognition of Specified Transfers.  The Members agree that the Manager and the Company shall not be required to recognize the interest or purported interest in the Company of any Person who has obtained an interest or a purported interest in the Company, directly or indirectly, as a result of a Transfer which is not authorized by this Agreement, and further agree that any such Transfer shall be null and void for all purposes (except to the extent otherwise provided by law or in this Article VIII).  If there is a doubt as to the ownership of an interest in the Company or who is entitled to a distribution of Available Cash or of other property, including liquidating proceeds, the Manager (or liquidating trustee,

if applicable), may accumulate the Available Cash or liquidation proceeds or other property attributable to the interest(s) in question until the issue is resolved to the reasonable satisfaction of the Manager.

**Section 8.2**     **Limitations on Withdrawal/Transfers of Membership Interests**.

(a)     General Restrictions.  Except as otherwise set forth in this Article VIII, no Member shall have the right to: (i) withdraw or resign from the Company prior to the dissolution and winding up of the business and affairs of the Company; or (ii) Transfer, whether voluntary or involuntary, directly or indirectly, all or any portion of such Member's Membership Interest.  Any Transfer of all or any portion of a Membership Interest in violation of the foregoing shall be null and void and of no legal force or effect.

(b)     Permitted Transfers.  A Member shall be entitled to Transfer such Member's Membership Interest to a Permitted Transferee, subject to compliance with the provisions of Section 8.3(a) and Section 8.3(b) (any such Transfer in compliance therewith, a "Permitted Transfer").

(c)     Consequences of Withdrawal/Transfers in Violation of Section 8.2(a) or (b).

(i)     If a Member shall Transfer or suffer a Transfer, directly or indirectly, of all or any portion of such Member's Membership Interest in violation of Section 8.2(a) or (b), excluding a Transfer consisting solely of a charging order against such Member's Membership Interest, such Member (during the period in which such Member's Membership Interest remains subject to the Company's or any other Members' purchase option under Section 8.6), shall cease to have any (x) voting rights such Member otherwise has hereunder (or under the Act) for or with respect to such Member's Membership Interest, and (y) any rights such Member otherwise has to participate in the management of the business and affairs of the Company or to inspect books and records of the Company, unless otherwise permitted by written agreement of the Manager in its discretion.

(ii)     Notwithstanding anything in the preceding paragraph to the contrary, a Member in breach of this Article VIII, while a "member" of the Company, shall at all times be and remain subject to all applicable obligations, restrictions or limitations imposed on the Members, in general or on such Member specifically, by or under this Agreement (or the Act).

(iii)     Except as otherwise specifically provided in this Article VIII, the reasonable costs and expenses incurred by the Company in connection with the disposition by a Member (or assignee of a Member's Membership Interest not admitted as an additional or substitute "member" of the Company) of a Membership Interest or in connection with an assignee of a Membership Interest being admitted as a substitute "member" of the Company, including any filing, recording and publishing costs and the reasonable fees and disbursements of counsel, shall be paid by and be the sole responsibility of the Member (or assignee) disposing of such interest (and/or the assignee of the transferred Membership Interest, including any assignee to be admitted as an additional or substitute "member" of the Company).

**Section 8.3**     **Admission of "Assignees" as Additional or Substitute "Members"**.

(a)     An assignee of a Member's Membership Interest, or any portion thereof, who receives its Membership Interest in accordance with the terms of this Agreement, including an assignee of a Member's Membership Interest transferred in accordance with the provisions of Section 8.2(b), shall be admitted to the Company as an additional or substitute "member" of the Company, with respect to the transferred Membership Interest, if not otherwise then admitted as a "member", if (and only if) approved, in writing by the Manager, which approval may be given or withheld in the sole and absolute discretion of

the Manager, provided that no such required consent may be unreasonably withheld if the Transfer to such assignee is a Permitted Transfer; and, if such consent is given, such assignee executes and/or delivers to the Company the following:

        (i)      a joinder or amendment to this Agreement, in form and content acceptable to the Manager, pursuant to which such Person shall become bound by all of the terms and provisions of this Agreement in such Person's capacity as a "Member," as the same may be amended in connection with such Person's admission as such; and

        (ii)      such other documents, instruments or agreements, if any, required or requested by the Manager, in its sole discretion, including a written instrument, in form and content acceptable to the Manager, pursuant to which such Person shall assume all current or future obligations of the transferring Member (or any other predecessor owner of the Membership Interest transferred to such Person) to the Company (or to any other Member) hereunder (or under the Act), to the extent attributable to the transferred interest (which assumption shall be in addition to, and not as a novation or release of liability therefore of or by such transferring Member or other predecessor owner of such Person's Membership Interest).

        (b)      In addition to the requirements set forth above, an assignee of a Member's Membership Interest, or any portion thereof, who receives its Membership Interest in accordance with the terms of this Agreement, shall not be admitted to the Company as an additional or substitute "member" of the Company unless:

        (i)      to the extent required by applicable laws or regulations, appropriate government approvals have been obtained;

        (ii)      such transfer, and the admission of the transferee as a Member does not violate any provision of any law, statute or regulation applicable to the Company or any of its direct or indirect subsidiaries; and

        (iii)      such transferee discloses to the Manager:

        (A)      if the transferee is an entity, any foreign government, agency of a foreign government, or representative of a foreign government, business enterprise, or other entity organized, chartered, or incorporated under the laws of any country other than the United States or its territories, and any Person who is not a citizen or national of the United States (each a "Foreign Interest") that (1) owns or has a beneficial ownership of five percent (5%) or more of the transferee or if the transferee does not issue equity, indirectly or directly, subscribed for five percent (5%) or more of the transferee's total capital commitment, or (2) has the power, direct or indirect, whether or not exercised, and whether or not exercisable through the ownership of the transferee, by contractual arrangements or other means, to direct or decide matters affecting the management or operations of the transferee;

        (B)      if the transferee is an individual, if he or she is a citizen or national of the United States; and

        (C)      any ownership, directly or indirectly through subsidiaries and/or affiliates, of ten percent (10%) or more of any Foreign Interest.

(c)     Each Member acknowledges the restrictions that affiliation with or significant influence by a Foreign Interest may put on the prospects of the Company and its direct and indirect subsidiaries, and such Member and any applicable transferee, as a condition precedent to being admitted as an additional or substitute Member, will fully comply with the law with respect to mitigation of any such future affiliation or influence of such Foreign Interest.

**Section 8.4**     **General Consequences of Transfers/Dispositions of Membership Interests**.

(a)     <u>Continuation of the Company</u>.  Except as provided below, the Bankruptcy, death, retirement, resignation or expulsion of any Member or the occurrence of any other event which terminates the continued membership in the Company of any Member, shall not cause the Company to be dissolved, and upon and following the occurrence of any such event (subject to the other express provisions of this Agreement), the Company and its business and affairs shall continue without dissolution.  The Company shall dissolve upon the occurrence of any event that terminates the continued membership in the Company of the last remaining Member, unless within ninety (90) days after the occurrence of such event, the personal or other legal representative of the last remaining Member agrees, in writing, to continue the Company (such right to continue the Company being expressly granted hereby) and to the admission of the personal or other representative of such last remaining Member, or designee, as an additional or substitute "member" of the Company, effective as of the occurrence of the event that terminated the continued membership in the Company of the theretofore last remaining Member.

(b)     <u>Rights of Assignees/Transferring Members</u>.  Except as otherwise expressly provided herein or as agreed to by the Manager, a Transfer by or with respect to any Member's Membership Interest, or any portion thereof, including a Permitted Transfer, shall not entitle the assignee thereof to become a "member" of the Company or to exercise any rights or powers of a "Member" hereunder (or under the Act), nor shall the transferring Member have the right to exercise any rights or powers as a "Member" with respect to the transferred Membership Interest.  Unless admitted as an additional or substitute "member" of the Company, the assignment of a Membership Interest (not otherwise treated as null and void) shall only entitle the assignee thereof to receive such distribution(s) and to receive such allocations of income, gain, loss, deduction or credit or similar item to which the assigning Member (or other assignor thereof) is (or was) entitled, to the extent attributable to the assigned interest; and, regardless of whether such assignee is admitted as an additional or substitute "member" of the Company, such assignee shall be subject to all of the terms and provisions of this Agreement, including all of the provisions of this <u>Article VIII</u> and all applicable obligations, restrictions or limitations imposed on the Members by any other section or provision hereof, in general or on the transferring Member (or other predecessor owner of the transferred interest) specifically by or under this Agreement (or the Act).  If an assignee of a Membership Interest becomes admitted as an additional or substitute "member" of the Company as expressly provided herein, then, except as limited by the other terms of this Agreement, the voting, management and other participation rights associated with the transferred Membership Interest shall be held and may be exercised by such assignee, along with all other rights of a "Member" hereunder (to the extent attributable to said transferred Membership Interest). Notwithstanding anything to the contrary in this Agreement, no Incentive Units may be Transferred unless approved by the Manager.

(c)     <u>Cessation of Status as "Member</u>."  A Member ceases to be a "member" of the Company and to have the rights or powers of a "Member" hereunder (and/or under the Act) upon the sale or other disposition of such Member's entire Membership Interest, including the occurrence of any event (including dissolution, liquidation and termination or death) which results in a complete loss, sale or other disposition of such Member's entire Membership Interest.

(d)     <u>Death/Dissolution</u>.  Subject to the terms of any Incentive Award Agreement issued pursuant to the Incentive Plan (the terms of which shall control in the event of any conflict with this

Agreement), upon the death of an individual Member or dissolution of a Member who is not an individual, the Company shall have the option at any time thereafter to redeem or purchase the Interest in the Company held by the deceased or dissolved Member for an amount equal to the Fair Market Value of the Interest in the Company held by the deceased or dissolved Member.

(e)     Community Property.  Any Interest in the Company belonging to an individual Member and spouse as community property, and not just the community one-half (½) Interest of the Member, shall be subject to the provisions of this Agreement in the same manner as though solely belonging to such Member as such Member's separate property (though nothing herein shall deprive the spouse of any individual Member of such spouse's community interest in any Interest of the Company which is, in fact, community property).  Each individual Member is joined in such Member's obligation hereunder by such Member's spouse, who has executed the Agreement, but the joinder of such spouse shall not be essential to any modification of this Agreement unless such modification would work a fraud upon the interest of such spouse hereunder.  In the event of the dissolution of a Member's marriage by death of such Member's spouse or by divorce, if such spouse's community property interest in the Company will not pass to the spouse who is a Member, then in that event the Member spouse shall have the option of acquiring the non-Member spouse's community interest in the Company for the Fair Market Value of such Interest. In the event the Member spouse does not exercise the option within ninety (90) days of the dissolution of such Member's marriage, the remaining Members shall have the option of acquiring such non-Member spouses' Interest in the Company for such Interest's Fair Market Value.  The remaining Members' option in that regard shall expire ninety (90) days after termination of the Member spouse's option.  In the event the option is exercised by either the Member spouse or the remaining Members, the purchase price must be paid in full and in cash at closing, and the Interest to be transferred must be transferred free and clear of all liens and encumbrances.  In the event the option is not exercised by either the Member spouse or the remaining Members, then either non-Member spouse or the non-Member spouse's heirs, devisees or legatees shall retain or receive the non-Member spouse's community property interest in the Company and shall become Members subject to the terms and provisions of this Agreement.  In the event of any conflict between the provisions of this Section 7.6 and the terms of any Incentive Award Agreement issued pursuant to the Incentive Plan, the terms of such Incentive Award Agreement and the Incentive Plan shall control.

Section 8.5     **Drag-Along Right**.

(a)     Drag-Along Right.  Subject to compliance with the terms of this Section 8.5, the GOT Investor shall have the right (the "Drag-Along Right") (i) to consummate, in one transaction or a series of related transactions, the Sale of the Company to an independent third party (the "Third-Party Purchaser" and, such Sale of the Company, a "Drag-Along Sale"); and (ii) to require that each other Member (each, a "Drag-Along Member") participate in such Drag-Along Sale as provided in this Section 8.5.

(b)     Drag-Along Notice.  The GOT Investor shall notify the Drag-Along Members and the Company in writing of a proposed Drag-Along Sale ("Drag-Along Notice") no less than ten (10) days prior to the closing date of such Drag-Along Sale.  The Drag-Along Notice shall set forth the name and address of the Third-Party Purchaser, the material financial terms on which the Third-Party Purchaser proposes to consummate the Sale of the Company and the proposed closing date.

(c)     Waiver of Appraisal Rights.  Subject to satisfaction of the requirements of this Section 8.5, each of the Drag-Along Members hereby waives, to the extent permitted by applicable law, all applicable appraisal rights and rights to object to or dissent from a Drag-Along Sale, and agrees that such Drag-Along Member will raise no objections to a Drag-Along Sale.  Each Drag-Along Member agrees that it shall not take any action prejudicial to or inconsistent with a Drag-Along Sale.

25

(d)    Conditions.  The obligations of the Drag-Along Members in respect of a Drag-Along Sale under this Section 8.5 are subject to the satisfaction of the following conditions:

(i)    the consideration to be paid to the Members in such Drag-Along Sale shall be paid in accordance with Section 3.1; and

(ii)    each Drag-Along Member shall execute the applicable purchase agreement but shall be obligated to make representations and warranties only with respect to such Drag-Along Member's title to and ownership of its Units, authorization, execution and delivery of relevant documents, enforceability of such documents against such Drag-Along Member and other customary matters relating specifically to such other Drag-Along Member or its Units, and such Drag-Along Member shall not be jointly liable for any breach of any other Member's representations, warranties or covenants, except to the extent of any escrow.  Each Drag-Along Member would agree to be severally, but not jointly, liable with the other Members to indemnify the purchaser for any breach by the Company of its representations and warranties or other indemnity obligations under the purchase agreement, provided that the maximum liability of each Drag-Along Member under the purchase agreement shall not exceed its proportionate share of any such liability up to a cap equal to the actual proceeds received by such Drag-Along Member under the purchase agreement in the Drag-Along Sale, except with respect to fraud.

(e)    Required Actions.  As soon as practicable after receipt of the Drag-Along Notice, the Drag-Along Members shall cooperate and take all action requested by the GOT Investor to complete the Drag-Along Sale, including the following:

(i)    voting all Units in favor of, and consenting to, the Drag-Along Sale and matters ancillary thereto if deemed necessary or desirable by the GOT Investor;

(ii)    if so requested, surrendering to the Company, or the proposed buyer, the certificates, if any, for Units, properly endorsed for transfer to the Company or the proposed buyer against payment of the sale price for such Units in the Drag-Along Sale; and

(iii)    if so requested, executing all sale, liquidation and other agreements in such form as may be necessary to provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements required hereunder relating to such Drag-Along Sale and to accomplish the allocation and distribution of the aggregate consideration in such Drag-Along Sale (subject to the requirements and limitations set forth in Section 8.5(d)(ii)).

(f)    Fees and Expenses.  The out of pocket fees and expenses of the GOT Investor incurred in connection with a Drag-Along Sale that are for the benefit of all Drag-Along Members shall be paid or reimbursed by the Company to the extent such fees and expenses are not paid or reimbursed by the Third-Party Purchaser.

(g)    Irrevocable Proxy.  Each Member hereby appoints the GOT Investor as such Member's true and lawful proxy and attorney, with full power of substitution and re-substitution, to vote all Units owned by such Member or over which such Member has voting control to effectuate the agreements set forth in this Section 8.5 if such Member fails to comply on a timely basis (but in no event later than one (1) business day after the respective time periods described in this Section 8.5 have expired) with the provisions of this Section 8.5.  The proxies and powers granted by each Member pursuant to this Section 8.5(h) are coupled with an interest and are given to secure the performance of such Member's duties under this Section 8.5.  Such proxies are irrevocable for so long as this Section 8.5 shall remain in effect

and will survive the death, incapacity, incompetency or disability of any Member who is an individual and the merger, liquidation or dissolution of any Member that is a non-natural Person.

    (h)  <u>Final Consummation of the Sale</u>.  The GOT Investor shall have one hundred and eighty (180) days following the date of the Drag-Along Notice in which to consummate the Drag-Along Sale, on the terms set forth in the Drag-Along Notice.  If at the end of such period the GOT Investor has not completed the Drag-Along Sale, the GOT Investor may not then exercise its rights under this <u>Section 8.5</u> without again fully complying with the provisions of this <u>Section 8.5</u>.

    **Section 8.6**  <u>Right of First Refusal</u>.

    (a)  Any Member who proposes to make a Transfer to any Person that has been approved by the Manager pursuant to <u>Section 8.1(a)</u> (other than (i) a Transfer to the Company, (ii) a Transfer that is a Permitted Transfer, (iii) a Transfer by a Drag-Along Member made as a result of a Drag-Along Sale under and in accordance with <u>Section 8.5</u> or (iv) a Transfer by a Tag-Along Member made as a result of a Tag-Along Sale under and in accordance with <u>Section 8.7</u>), shall provide written notice thereof (the "<u>Sale Notice</u>") to the Manager and each of the Class A Members and the Class B Member (the "<u>ROFR Members</u>"), which Sale Notice shall include all of the terms of the proposed Transfer, including, *inter alia*, the price and payment terms for such Transfer, the name and address of the proposed Transferee, the number of such Member's Units to be Transferred, the date on which the proposed Transfer is to occur, the other material terms and conditions of the Transfer, and a copy of any form of agreement proposed to be executed in connection therewith.

    (b)  For a period of thirty (30) days after receipt of the Sale Notice, the ROFR Members shall have the option to purchase all, but not less than all, of the Units proposed to be Transferred, upon the same terms and conditions (including price and payment terms) as contained in the Sale Notice, on a pro rata basis with the ROFR Members in accordance with the ratio of (i) the Units of the ROFR Member desiring to exercise such purchase option to (ii) the aggregate of all Units of all ROFR Members desiring to exercise such purchase option.

    (c)  In the event the ROFR Members do not exercise their purchase options under <u>Section 8.6(b)</u>, the Member proposing to make a Transfer under <u>Section 8.6(a)</u> may proceed with such Transfer with respect to all, but not less than all, of the Units proposed to be Transferred pursuant to the Sale Notice, only upon such terms and conditions as are identical to those provided in the Sale Notice and in compliance with <u>Section 8.3</u>; provided, however, any such Transfer pursuant to this <u>Section 8.6</u> shall also require the consent of the Manager if such consent is required pursuant to <u>Section 8.1(a)</u>; <u>provided</u>, <u>further</u>, that in the event the Transfer is not completed within ninety (90) days following the date the Manager originally received (or approved) the Sale Notice, no Transfer of said Units shall be made without first complying with the terms and conditions of this <u>Section 8.6</u> anew.

    **Section 8.7**  <u>Tag-Along Rights.</u>

    (a)  <u>Participation</u>.  In the event any Member (the "<u>Selling Member</u>") proposes to Transfer any of its Units to any Person (other than (i) a Transfer to the Company, (ii) a Transfer that is a Permitted Transfer or (iii) a Transfer in connection with a Drag-Along Sale pursuant to <u>Section 8.5</u>) (as used in this <u>Section 8.7</u>, a "<u>Proposed Transferee</u>") and the Manager has approved such Transfer pursuant to <u>Section 8.1(a)</u>, then each of the Class A Members and the Class B Member (each such Member, a "<u>Tag-Along Member</u>") shall be permitted to participate in such sale (a "<u>Tag-Along Sale</u>") on the terms and conditions set forth in this <u>Section 8.7</u>.

    (b)  <u>Exercise of Tag-Along Rights</u>.

(i)      Each of the Selling Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale pursuant to Section 8.7(b)(ii) (such Tag-Along Member, an "Electing Tag-Along Member") shall have the right to Transfer in the Tag-Along Sale the number of Class A Units and/or Class B Units, as the case may be and with the Class A Units and Class B Units treated as a single class of Units for purposes of this calculation, equal to the product of (x) the aggregate number of Units that the Proposed Transferee proposes to buy as stated in the Sale Notice, and (y) a fraction (A) the numerator of which is equal to the number of Units then held by such Member, and (B) the denominator of which is equal to the aggregate number of Units then held by the Selling Member and all of the Electing Tag-Along Members (such amount, the "Tag-Along Portion").

(ii)      Each Tag-Along Member shall exercise its right to participate in the Tag-Along Sale by delivering to the Selling Member and each other Tag-Along Member a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of Units (up to its Tag-Along Portion) to be Transferred by it no later than fifteen (15) days after receipt of the Sale Notice (the "Tag-Along Period").  The offer of each Electing Tag-Along Member set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this Section 8.7; provided, however, if the principal terms of the Tag-Along Sale change with the result that any price per respective Unit shall be less than the price per applicable Unit set forth in the Sale Notice, each Tag-Along Member shall be permitted to withdraw the offer contained in his, her, or its Tag-Along Notice and shall be released from his, her, or its obligations thereunder. In the event any Tag-Along Member declines to exercise its rights hereunder, or elects to exercise it with respect to less than its full Tag-Along Portion, the Selling Member and the other Electing Tag-Along Members shall be permitted to sell its proportional share of additional Units (in excess of its Tag-Along Portion) to meet the number of applicable Units sought to be purchased by the Proposed Transferee as set forth in the Sale Notice.

(c)      Waiver.  Each Tag-along Member who does not deliver a Tag-Along Notice in compliance with Section 8.7(b)(ii) shall be deemed to have waived all of such Tag-Along Member's rights to participate in the Tag-Along Sale with respect to the Units owned by such Tag-Along Member, and the Selling Member (and all Electing Tag-Along Member) shall thereafter be free to sell to the Proposed Transferee at prices per Class A Unit and/or per Class B Unit that are no greater than the applicable prices per Class A Unit and/or per Class B Unit, as applicable, set forth in the Sale Notice and on other terms and conditions which are not materially more favorable to the Selling Member than those set forth in the Sale Notice, without any further obligation to the non-accepting Tag-Along Members.

(d)      Conditions of Sale.

(i)      The Selling Member and each Electing Tag-Along Member selling Class A Units shall receive the same consideration per Class A Unit and the Selling Member and each Electing Tag-Along Member selling Class B Units shall receive the same consideration per Class B Unit, in each case after deduction of such Member's proportionate share of the related expenses in accordance with Section 8.7(f).  The Selling Member, the Electing Tag-Along Members, and the Proposed Transferee shall each negotiate in good faith regarding the prices to be paid per Class B Unit and per Class A Unit, which prices shall reflect the relative rights, preferences, and priorities of the Class B Units and the Class A Units, in the case of any Transfer.  Notwithstanding anything to the contrary herein, no Tag-Along Sale may be consummated unless the Selling Member, the Electing Tag-Along Members, and the Proposed Transferee mutually agree upon the prices to be paid per Class B Unit and per Class A Unit in such Tag-Along Sale.

28

(ii)      Each Tag-Along Member shall make or provide the same representations, warranties, covenants, indemnities, and agreements as the Selling Member makes or provides in connection with the Tag-Along Sale; provided that each Tag-Along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Tag-Along Member, and other matters relating to such Tag-Along Member, but not with respect to any of the foregoing with respect to any other Members or their Units; provided further that all representations, warranties, covenants, and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-Along Member, in each case in an amount not to exceed the aggregate proceeds received by the Selling Member and each such Tag-Along Member in connection with the Tag-Along Sale.

(e)      Cooperation.  Each Tag-Along Member shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including entering into agreements and delivering certificates and instruments.

(f)      Expenses.  The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or on behalf of a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by the Selling Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale.

(g)      Consummation of the Sale.  The Selling Member shall have ninety (90) days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those set forth in the Tag-Along Notice.  If, at the end of such period, the Selling Member has not completed the Tag-Along Sale, the Selling Member may not then affect a Transfer that is subject to this Section 8.7 without again fully complying with the provisions of this Section 8.7.

Section 8.8      **Specific Performance**.  The Members hereby acknowledge and agree that Membership Interests in the Company cannot be readily purchased or sold on the open market and for that reason, among others, the Members will be irreparably damaged in the event the provisions of this Agreement relating to the sale and purchase of interests in the Company are not specifically enforced.  In the event of any controversy concerning the right or obligation to purchase or sell any interest in the Company, such right or obligation shall be enforced in a court of equity by decree of specific performance.  Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other remedy available to the Members (or any Member) or the Company.  If any Person shall institute any action or proceeding to enforce any such provisions, the Person against whom such action or proceeding is brought hereby waives the claim or defense that the Person instituting such action has an adequate remedy at law, and shall not urge in any such action or proceeding that a claim or remedy at law exists.

Section 8.9      **Transfers of Class A Units**.  The net proceeds of any Class A Transfer that is not a Permitted Transfer shall be allocated between the selling Class A Member and the Class B Member pursuant to Section 3.1(b) and treated, with respect to such selling Class A Member and the Class B Member, as if such proceeds were actually distributed pursuant to Section 3.1(b) for purposes of determining all future allocations between such selling Class A Member and the Class B Member.

## ARTICLE IX
## DISSOLUTION, WINDING UP AND LIQUIDATING DISTRIBUTIONS

**Section 9.1      Events of Dissolution**.  The Company shall be dissolved, and its assets liquidated pursuant to Section 9.3, upon the first to occur of the following (each, an "Event of Dissolution"):

(a)      the occurrence of any event that terminates the continued membership in the Company of the theretofore last remaining Member, unless the Company is continued in the manner provided in Section 8.4(a);

(b)      the determination of the Manager;

(c)      the entry of a decree of judicial dissolution or the administrative dissolution of the Company, as provided in the Act; or

(d)      the occurrence of any other event which causes a dissolution of the Company as set forth in the Act.

**Section 9.2      Winding Up**.  Upon the dissolution of the Company, as provided by Section 9.1, the Manager (or, as applicable, if none, the personal or other legal representative of the last remaining Member), shall immediately commence to wind up the Company's affairs and, except as provided in Section 9.3, shall distribute all the assets of the Company, in accordance with Section 9.3, in liquidation of the Company as soon as practicable.  During the wind-up phase of the Company, the Manager (or, if none, the personal or other legal representative of the last remaining Member, as the case may be), may take all actions necessary or appropriate to wind up the business and affairs of the Company, including selling or causing the Company to sell or otherwise dispose of the Company's assets as promptly as possible, but in a manner which is consistent with obtaining the Fair Market Value thereof.

**Section 9.3      Liquidating Distributions**.  Upon the winding up of the Company, and its business and affairs following the dissolution of the Company, as provided in Section 9.1 and Section 9.2, the Manager (or, as applicable, if none, the personal or other legal representative of the last remaining Member), shall distribute, or cause the Company to distribute its cash, including the proceeds from the disposition of the Company's noncash assets, as promptly as possible, in the following order of priority:

(a)      first, to the Company's creditors, including Members (or Affiliates of any Members) (or former Members) who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company;

(b)      second, unless inconsistent with Treasury Regulation Section 1.704-1(b)(2)(ii)(b), or any successor provision, to set up any reserves which the Manager deems reasonably necessary for contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the business of the Company; and

(c)      third, to the Members in accordance with Section 3.1.

**Section 9.4      Liquidating Trust**.  The Manager may cause the Company to establish a trust to receive the distributions to be made to the Members (or the successors or assigns of the last remaining Member) under Section 9.3(b) for the purposes of liquidating Company non-cash assets, collecting amounts owed to the Company, and paying liabilities or obligations of the Company.  Distributions from this trust, if established, to the Members (in their capacity as such) (or successors or assigns of the last remaining Member) shall occur, from time to time, in the reasonable discretion of the trustee of the liquidating trust,

30

in the same proportions as would have been distributed to the Members (or such successors and assigns) under <u>Section 9.3(b)</u>.

   **Section 9.5**  **Certificate of Cancellation**. In accordance with the Act, following the dissolution, wind-up and liquidation of the Company, the Manager (or, if none, the personal or other legal representative of the last remaining Member), shall prepare and file, or cause to prepared and filed, a Certificate of Cancellation (to the Certificate), as provided in §18-203 of the Act (or any successor provision thereto).

**ARTICLE X**
**BOOKS AND RECORDS**

   **Section 10.1**  **Books and Records**. The Company shall maintain, at the Company's principal office, adequate books and records, including all records required to be maintained by the Company pursuant to the Act. The books of the Company, for tax and financial reporting purposes, shall be kept on the accrual method of accounting in accordance with GAAP.

   **Section 10.2**  **Tax, Financial and Other Reports**. After the end of each Taxable Year and at the expense of the Company, the Manager shall cause to be prepared a complete accounting of the affairs of the Company, together with the Company's federal and state tax returns and an associated Schedule K-1 for each Member, together with such other information reasonably required by each Member for federal, state, and local income tax reporting purposes for that year, which accounting shall be completed and such information shall be furnished to each Member (and may be furnished by electronic means) as promptly as practicable after the close of such Taxable Year of the Company, but in any event, no later than ninety (90) days after the close of such Taxable Year.

   **Section 10.3**  **Accounting Decisions**. All decisions as to accounting matters, except as specifically provided to the contrary herein, to be made by the Manager, on behalf of the Company, shall be made consistent with the Company's method of accounting for federal income tax purposes.

   **Section 10.4**  **Income Tax Elections**. Except as otherwise provided herein to the contrary, the Manager may cause the Company to make any income tax elections which are otherwise available to the Company under the Code or applicable Treasury Regulations, as determined in the discretion of the Manager.

   **Section 10.5**  **Confidentiality**.

     (a) No Outside Investor shall disclose or permit the disclosure of any of the terms of this Agreement or of any other confidential, non-public or proprietary information relating to the business of the Company or any of its Subsidiaries (collectively, "<u>Confidential Information</u>"), except that such disclosure may be made (i) to any Person who is a bona fide accountant or attorney of such Member solely for their use and solely on a need-to-know basis or for purposes of monitoring or managing their interest in the Company, as long as such Persons are notified of the Member's confidentiality obligations hereunder and obligated to uphold such Member's obligations pursuant to this <u>Section 10.5</u>, (ii) with the prior written consent of the Manager, (iii) subject to <u>Section 10.5(b)</u>, in response to a subpoena or order issued by an arbitrator or governmental entity or as may be necessary to fulfill the Member's tax filing and/or reporting obligations or to comply with applicable law or regulation, (iv) to a bona fide prospective purchaser of a Member's Units in a Transfer permitted by this Agreement, or (v) in connection with any ongoing regulation or oversight by any governmental entity if counsel to such Member advises that disclosure is advisable; <u>provided</u> that in the case of <u>clause (iv)</u>, the Member proposing to disclose Confidential Information to any such prospective purchaser informs the Company of the identity of such proposed

31

purchaser and enters into a confidentiality agreement with such proposed purchaser for the benefit of the Company and on terms approved by the Manager.  Confidential Information shall not include (i) information that becomes known to a Member or any of its Affiliates after the date of this Agreement from a source other than the Company or one of its representatives which source is not in breach of a confidentiality agreement with, or duty of obligation to, the Company or any of its Subsidiaries known to such Member or Affiliate; (ii) information that becomes public other than by reason of a breach of this Agreement by the Member or any of its Affiliates or Persons with whom such Member has shared Confidential Information; or (iii) information that is developed by or on behalf of a Member or any of its Affiliates without the use of any Confidential Information as proven by such Member's or its Affiliate's written records.

(b)     If a Member receives a request or demand to disclose any Confidential Information under a subpoena or order, that Member shall, if legally permissible, (i) promptly notify the Manager thereof, (ii) consult with the Manager on the advisability of taking steps to resist or narrow that request or demand and (iii) if disclosure is required or deemed advisable in the determination of such Member's counsel, cooperate with the reasonable requests of the Manager to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed.

(c)     No Member may issue or publish any press release or other public communication about the Company or any Subsidiary or their respective businesses without the express written consent of the Manager.

**Section 10.6    Financial Statements**.  The Company shall promptly furnish to the Class A Members and the Class B Member annual and quarterly consolidated financial statements of the Company and its Subsidiaries.

**Section 10.7    Expenses**.  The Operating Companies shall bear all expenses incurred in connection with the preparation, distribution and filing of all reports and tax returns contemplated in this Article X, and the Company shall promptly cause the Operating Companies to pay such expenses when due and/or to reimburse the Manager for any such expenses advanced or incurred by the Manager on behalf of the Company.

**ARTICLE XI**
**TAX REPRESENTATIVE**

**Section 11.1    Appointment of Tax Representative**.  The Company and each Member hereby designate the GOT Investor as the "partnership representative" for purposes of Section 6223 of the Code (the "Tax Representative").  If any state or local tax law provides for a tax matters partner, partnership representative, or person having similar rights, powers, authority, or obligations, the Tax Representative shall also serve in such capacity.  The Tax Representative shall designate from time to time a "designated individual" to act on behalf of the Tax Representative, and such designated individual shall be subject to replacement by the Tax Representative in accordance with the Code and Regulations.  The Tax Representative, on behalf of the Company and its Members, shall be permitted to make any filing or election under the Code, the Treasury Regulations, or any other applicable law or regulations that it believes to be in the best interests of the Company or the Members.  Each Member agrees to cooperate with the Tax Representative and to do or refrain from doing any or all things reasonably required by the Tax Representative in connection with the conduct of all proceedings involving the Company.  Notwithstanding anything to the contrary in this Agreement, each Member (including for purposes of this Section 11.1 any Person who is or becomes a Member but who for any reason ceases to be a Member) (a) hereby covenants to treat each item of income, gain, loss, deduction, or credit attributable to the Company in a manner consistent with the treatment of such income, gain, loss deduction, or credit on the tax return of the

32

Company or as determined in a notice of final partnership adjustment pursuant to Section 6226 of the Code, (b) hereby agrees to indemnify and hold harmless the Company from such Member's share of any tax (including for purposes of this <u>Section 11.1</u> any penalties, interest and additions to tax) attributable to any adjustment to the income, gain, loss, deduction, or credit of the Company pursuant to Section 6226 of the Code, and (c) hereby agrees to take all other actions as the Tax Representative may reasonably direct with respect to the Member's (or, in respect of the Member, the Company's) tax liabilities, including filing an amended return for any "reviewed year" to account for all adjustments under Section 6225(a) of the Code properly allocable to the Member as provided in and otherwise contemplated by Section 6225(c) of the Code and any Treasury Regulations that may be promulgated thereunder.  The provisions of this <u>Section 11.1</u> shall survive the termination or dissolution of the Company or the termination of any Member's interest in the Company, any transfer of a Member's interest in the Company or withdrawal as a Member and shall remain binding on the Member.

**Section 11.2**   **Employment of Advisors**.  The Tax Representative may employ experienced tax advisors to represent the Company in connection with any significant tax matters involved in an audit, examination, investigation or other proceeding (each, a "<u>Tax Proceeding</u>").  The fees and expenses of such tax advisors shall be a Company expense and shall be paid by the Company.  Such advisors shall be responsible for representing the Company.

**Section 11.3**   **Notice and Indemnification**.  The Tax Representative shall keep the Manager reasonably informed of all Tax Proceedings involving the Company or any Company return.  The Company shall indemnify the Tax Representative against judgments, fines, amounts paid in settlement and expenses (including attorneys' fees) incurred by the Tax Representative in such capacity.

### ARTICLE XII
### MISCELLANEOUS

**Section 12.1**   **Notices**.  All notices or other communications given or made under this Agreement or pursuant to the Act shall be in writing.  Notices or other communications to the Manager, any of the Members or the Company shall be deemed to have been given or received if delivered by (a) personal delivery, upon such personal delivery, (b) registered or certified mail, return receipt requested, postage prepaid, upon three (3) days after deposited in the United States mail, or (c) Federal Express (or comparable nationally recognized over-night courier service) for guaranteed next business day delivery service, upon the next business day after deposit with Federal Express (or comparable nationally recognized over-night courier service) for guaranteed next business day delivery service, in each case, addressed as follows:

(a)   <u>Members</u>.  To the Members (or any Member), at the email address(es) and mailing address(es) set forth in <u>Schedule 1.7</u>, or at such other address as any Member may specify in a writing given to the Company, the Manager, and the other Members in accordance with this <u>Section 12.1</u>; or

(b)   <u>Company</u>.  To the Company at <u>glen.carty@groupoftelecom.com</u> and the principal office of the Company specified in <u>Section 1.2</u> (all notices to the Company to be sent to the attention of the Manager).

**Section 12.2**   **Binding Effect**.  Except as stated in this Agreement, every provision of this Agreement shall be binding upon and inure to the benefit each of the Members who are parties hereto and their respective successors and assigns, provided that nothing in this <u>Section 12.2</u> shall be interpreted as permitting any Transfer by any Member (or other party hereto or other Person bound by the terms hereof) of any rights or obligations of any Member (or any such other Person) hereunder which is not otherwise expressly permitted under another provision of this Agreement.

33

**Section 12.3**   **Construction**.  Any court or arbitrator shall construe every provision of this Agreement in accordance with its simple and fair meaning and not strictly for or against any Member.  No court or arbitrator shall interpret any provision of this Agreement as a penalty upon, or a forfeiture by, any party to this Agreement.  The parties hereto shared equally in the drafting of this Agreement and no court or arbitrator construing this Agreement shall construe it more strictly against one party than the other.

**Section 12.4**   **Entire Agreement; Amendments and Waivers**.

(a)   <u>Entire Agreement</u>.  This Agreement, together with its schedules and appendices, constitutes the entire agreement between the Members with respect to its subject matter, and supersedes the Original Agreement and any and all other prior agreements and undertakings with respect to such subject matter among them.  No Member is making any guarantee, promise, or undertaking any obligation to or with respect to the Company that is not expressly contained in this Agreement.

(b)   <u>Amendments and Waivers</u>.

(i)   Neither this Agreement nor the Certificate may be amended and no provision contained herein may be waived, unless such amendments or waivers are required or otherwise permitted by any of the terms hereof or shall have first been consented to, in writing, by the Manager; <u>provided</u>, <u>however</u>, that an amendment, waiver or modification modifying or waiving the rights or obligations of any Class A Member or the Class B Member in a manner that is disproportionately adverse to (A) such Member relative to the rights of other Members in respect of Units of the same class or series or (B) a class or series of Units relative to the rights of another class or series of Units, shall in each case be effective only with that Member's consent or the consent of the Members holding a majority of the Units in that class or series, as applicable.

(ii)   Notwithstanding <u>clause (i)</u> above, the Manager may amend this Agreement from time to time, without the consent of any Member, as reasonably required to (A) admit new Members or issue additional Units in accordance with the terms of this Agreement, (B) create additional Units or classes of Units in accordance with the terms of this Agreement, (C) reflect the repurchase or Transfer of Units, in each case described in <u>clause (A)</u>, <u>(B)</u>, or <u>(C)</u>, in connection with any additional Capital Contributions requested by the Manager and otherwise in accordance with the terms of this Agreement or (D) to correct any type of typographical or other drafting errors contained herein.

(iii)   Copies of any amendments to this Agreement shall be sent all Members as promptly as is reasonably possible following the adoption thereof.

**Section 12.5**   **Assignees**.

(a)   <u>Rights of Assignees to Profits/Losses</u>.  In the event any transferee or other successor-in-interest to a Member or to a Membership Interest (resulting from a transfer not treated as null and void hereunder) is not admitted as an additional or substitute "member" of the Company in accordance with the provisions of this Agreement, such transferee or other successor-in-interest shall be treated as an assignee, shall only have the right to be allocated or distributed the profits, losses or monies or other property, and shall be subject to all of the losses, liabilities, obligations and restrictions, to which the transferring Member (or other transferor) would otherwise be entitled or subject to, to the extent applicable to the transferred interest.

(b)   <u>Application of Agreement to Assignees</u>.  In applying the provisions of this Agreement, including <u>Section 3</u>, <u>Section 4</u> and <u>Appendix B</u>, each successor to an interest in the Company,

whether admitted as an additional or substitute "member" of the Company, shall be deemed to have made the aggregate Capital Contributions previously made with respect to the assigned interest by any predecessor owner thereof, and to have received the aggregate allocations or distributions previously made to each such predecessor owner, to the extent attributable to the assigned interest.

(c)     Limits on Rights of Assignees.  An assignee of an interest in the Company who is not otherwise admitted as an additional or substitute "member" of the Company shall not have: (i) voting, consent or approval rights otherwise afforded Members (or any Member) hereunder or under the Act; (ii) the right to interfere in the management or administration of the Company's business or affairs or (iii) the right to acquire any information or account of Company transactions or inspect Company books or records during the continuance of the Company, unless expressly allowed by the Act pursuant to any provision thereof which, as a matter of law, cannot be superseded by the foregoing terms of this Agreement.

Section 12.6     **Headings**.  Section and other headings contained in this Agreement are for reference purposes only and shall not be considered interpretive of the provisions thereof or hereof.

Section 12.7     **Severability**.  Every provision of this Agreement is intended to be severable.  If any term or provision is illegal or invalid for any reason, then its illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

Section 12.8     **Further Cooperation**.  Each Member agrees to perform all such further acts, including executing and/or delivering any other documents or instruments, as may be reasonably requested from time to time by the Manager, to carry out (or better carry out) any of the provisions of this Agreement.

Section 12.9     **Governing Law; Venue**.  The laws of the State of Delaware, exclusive of its conflicts of laws provisions, shall govern this Agreement, the organization and internal affairs of the Company, the liability of the Manager (subject to the provisions hereof) and the limited liability of the Members.  Venue for any legal or other action arising out of or in any way related to the Company or this Agreement shall lie exclusively in the courts of the State of Florida, and each of the Members (and each other party to this Agreement), on each such Member's (or other party's) behalf and on behalf of its or their successors and assigns, hereby consent to the exclusive personal jurisdiction of those courts and waive any other jurisdiction or venue.

Section 12.10    **Waiver of Action for Partition**.  Each Member hereby waives any right such Member may have to maintain any action for partition with respect to any assets of the Company.

Section 12.11    **Counterpart Execution; Facsimile Execution**.  This Agreement may be executed in any number of counterparts.  These executions may be transmitted to the Company and/or the other parties by facsimile or other electronic transmission and shall have the effect of an original signature.  All fully executed counterparts shall be construed together and shall constitute one agreement.

Section 12.12    **Time of the Essence**.  Time is of the essence with respect to each term of this Agreement; provided that in the event the day upon which any event specified herein is to take place falls on a Saturday, Sunday or other business holiday, then such event shall take place on the next succeeding business day.

Section 12.13    **Independent Legal Representation; Waiver of Conflict of Interests**.  The Members all acknowledge that McGuireWoods LLP ("Counsel") acted as legal counsel for the GOT Investor and the GOT Sponsor in connection with the preparation of this Agreement and that (a) the Members have been advised by such Counsel's representation of the Company in connection therewith will or may conflict with the interests of one or more (or all) Members' individually, (b) the Members have been

advised, before their execution of this Agreement, to seek the advice of independent counsel and tax advisors on the merits and detriments to such Member of the terms of this Agreement, and (c) each Member had the opportunity, prior to such Member's execution of this Agreement, to seek the advice of independent counsel.  The Members hereby jointly and severally waive any claim that Counsel's representation of the Company in connection with the preparation of this Agreement constitutes or creates a conflict of interest.

Section 12.14   **References**.   All references in this Agreement to articles, sections or other subdivisions refer to corresponding articles, sections or subdivisions of this Agreement unless expressly provided otherwise.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited (or limited by the context within which used).  Words in the singular form shall be construed to include the plural and vice versa, and words of one gender shall be construed to include all genders, unless the context otherwise requires.  The word "including" and words of similar import are to be construed as "including, without limitation".

Section 12.15   **Third-Party Beneficiaries**.  Except for (a) the indemnified parties in accordance with Section 5.4, or (b) the rights of counsel to rely on the waivers in Section 12.13, any agreement contained herein to make any contribution or to otherwise pay any amount, and any assumption of liability herein contained, express or implied, shall be only for the benefit of the Members who are parties to this Agreement (and their respective permitted successors and assigns), to the Manager, and to the Persons exculpated and indemnified under Section 5.2, and such agreements and assumptions shall not inure to the benefit of the obligees under any indebtedness, or to any other Person whomsoever, it being the intention of the Members that no other Person shall be deemed to be a third-party beneficiary of this Agreement or any portion hereof.

Section 12.16   **Prevailing Attorneys' Fees**.  If any Member or the Company (or the Manager) brings an action to enforce the terms hereof or to declare rights hereunder, the prevailing party (or parties) in any such action shall be entitled to such party's (or parties') court costs and reasonable attorneys' fees and costs, whether incurred before, at trial or on appeal or in any bankruptcy or other proceeding (including court order mediation or binding arbitration, if agreed to), to be paid by the non-prevailing party (or parties).

*(Signature Page Follows)*

The Company and undersigned Members have executed and delivered this Agreement as of the first date written above.

**COMPANY:**

**GOT DISTRIBUTION SPV, LLC**

By:     GOT Management, LLC,
         its Manager


By: _____
Name: Glenford Carty
Title: Managing Partner

**MANAGER:**

**GOT MANAGEMENT, LLC**


By: _____
Name: Glenford Carty
Title: Managing Partner

**MEMBERS:**

**GOT DISTRIBUTION, LLC**

By:     GOT Management, LLC,
         its Manager


By: _____
Name: Glenford Carty
Title: Managing Partner


**SUPERCUB HOLDINGS, LLC**


By: _____
Name: Stephen Discher
Title: Manager

**AMENDED AND RESTATED LLC AGREEMENT OF GOT DISTRIBUTION SPV, LLC**

**SCHEDULE 1.7**
**MEMBER INFORMATION**

*(As of [_____], 2022)*

| Members | Address | Class A Units | Class B Units [A] | Incentive Units [B] | Initial Capital Contribution | Proportionate Share |
|---------|---------|---------------|-------------------|---------------------|------------------------------|---------------------|
| GOT Investor | c/o Group of Telecom, 1001 Brickell Bay Drive #1200, Miami, FL 33131 | 77,400 | 0 | 0 | $1,625,000.00 | 86.00% |
| GOT Sponsor | c/o Group of Telecom, 1001 Brickell Bay Drive #1200, Miami, FL 33131 | 0 | 1 | 0 | $0.00 | n/a |
| Supercub Holdings, LLC | c/o Stephen Discher 706 Putter Ct College Station, T 77845 | 12,600 | 0 | 0 | $2,000,000.00 | 14.00% |
| Brian & Eva Enterprises, Inc.* | 706 Alexandria Drive Naperville, IL 60565 | 0 | 0 | 3,000 | n/a | n/a |
| **TOTAL** | | **90,000** | **1** | **3,000** | **$3,625,000** | **100.00%** |

**Notes:**
**A:** The Class B Distribution Threshold is $[_____].
**B**: 7,000 authorized but unissued Incentive Units, for a total Incentive Unit pool size of 10,000.
**\***:  Timing of issuance of Incentive Units to Brian & Eva Enterprises, Inc. to be determined.

# APPENDIX A

## DEFINITIONS

Capitalized words and phrases used in this Agreement, but which are not otherwise defined therein, shall have the following meanings (or the meanings set forth in Appendix B to this Agreement):

"Act" means the Delaware Limited Liability Company Act (6 Del. C. §18-101 et seq.), as it may amended from time to time.

"Affiliate" means, with respect to any Person, (a) any other Person directly or indirectly controlling, controlled by, or under common control with such Person, (b) any other Person who is an officer, director, manager, general partner, trustee, or holder of 10% or more of the voting stock or other voting securities of such Person (if a legal entity) or of any other Person (who is a legal entity) who is an Affiliate of such Person described in clause (a) above, or (c) any spouse, ancestor, child (including by adoption) or other lineal descendant, sibling, or in-law of such Person or of any other Person (who is a natural person) who is an Affiliate of such Person and described in either clause (a) or (b) above.  The term "control" as used in this definition of "Affiliate" means the power to direct the management and policies of the Person in question whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Assumed Income Tax Rate" means the sum of the highest stated federal, state and local income tax rates for any Taxable Year (reflecting any reduced rate or deduction applicable to any special class of income) to which an individual Member would be subject to on its net taxable income for such Taxable Year, as determined by the Manager based on the information available to it.  The Assumed Income Tax Rate shall be the same for all Members.

"Available Cash" means all cash of the Company on hand as of the last business day of any calendar month (or other fiscal period), as determined after payment of all then due or past due expenses and obligations of the Company and its Subsidiaries, other than cash which is (a) restricted from distribution under the terms of any agreement to which the Company is a party or (b) added to or retained in Company reserves in the discretion of the Manager.

"Bankruptcy" means, with respect to any Person, the occurrence of any of the following events:

(a)     such Person makes an assignment for the benefit of such Person's creditors;

(b)     such Person files a voluntary petition in bankruptcy;

(c)     such Person is adjudged a bankrupt or insolvent or has entered against such Person an order for any relief in any bankruptcy or insolvency proceeding;

(d)     such Person files a petition or answer seeking for it any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(e)     such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of this nature;

(f)     such Person seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of such Person or of all or any substantial part of such Person's properties; or

(g)     after one hundred and twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed; or after ninety (90) days after the appointment, without such Person's consent or acquiescence, of a trustee, receiver or liquidator of such Person or of any substantial part of such Person's property, the appointment has not been vacated or stayed or, if stayed, ninety (90) days following the expiration of any such stay if the appointment has not been vacated.

"Capital Contribution(s)" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed by such Member (or predecessor owner of such Member's Units) to the Company with respect to such Member's Units, in accordance with the terms of this Agreement (or the Original Agreement).

"Carry" means distributions received by the Class B Member pursuant to Section 3.1(b).

"Carry Percentage" means twenty percent (20%).

"Certificate" means the Certificate of Formation of the Company and any amendments thereto and restatement thereof filed on behalf of the Company with the Delaware Secretary of State pursuant to the Act.

"Class A Members" means the Members owning the Class A Units as set forth in Schedule 1.7.

"Class A Preferred Return" for a Taxable Year and for any Class A Member means an amount determined on an annual basis equal to a return of six percent (6%) (non-compounded) or such Class A Member's Unreturned Capital Contributions, determined from the date on which the Capital Contributions were made.

"Class A Preferred Return Distribution Deficit" means for any Class A Member the excess of such Member's aggregate Class A Preferred Return computed through the date of distribution over the aggregate amount of distributions made to such Member (and such Member's predecessor in ownership) by the Company pursuant to Section 3.1(a)(iii), or treated as so made pursuant to Section 9.3(c), from the inception of the Company to the date of distribution.

"Class A Members" means the Members owning the Class A Units as set forth in Schedule 1.7.

"Class A Transfer" means any Transfer of Class A Units.

"Class A Units" means a Unit having the rights and obligations specified with respect to Class A Units in this Agreement.

"Class B Member" means the Member owning the Class B Unit as set forth in Schedule 1.7.

"Class B Unit" means a Unit having the rights and obligations specified with respect to Class B Units in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" has the meaning set forth in the Preamble.

"Confidential Information" has the meaning set forth in Section 10.5(a).

"Counsel" has the meaning set forth in Section 12.13.

"Covered Person" has the meaning set forth in Section 5.2(a)(ii).

"Distribution Threshold" means, with respect to any Profits Interest, an amount determined by the Manager, which shall be equal to the amount determined by the Manager in its discretion to be necessary to attempt for such Incentive Unit to constitute a "profits interest" for federal income tax purposes being at least equal the aggregate Fair Market Value of the assets of the Company, net of all liabilities of the Company, as of the date such Profits Interest is granted.

"Drag-Along Member" has the meaning set forth in Section 8.5(a).

"Drag-Along Notice" has the meaning set forth in Section 8.5(b).

"Drag-Along Right" has the meaning set forth in Section 8.5(a).

"Drag-Along Sale" has the meaning set forth in Section 8.5(a).

"Effective Date" has the meaning set forth in the Preamble.

"Electing Tag-Along Member" has the meaning set forth in Section 8.7(b).

"Equity Interests" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in joint ventures, interests in other unincorporated organizations or any other equivalent of such ownership interest.

"Event of Dissolution" has the meaning set forth in Section 9.1.

"Fair Market Value" means the fair market value of the asset in question, as determined in the good faith judgment of the Manager or, if the Manager elects, pursuant to an independent appraisal or any other means.  In the case of Membership Units, Fair Market Value shall mean the amount which would be distributable in respect of such Membership Unit if the assets of the Company as a going concern were sold in an orderly transaction designed to maximize the proceeds therefrom, and such proceeds were then distributed in accordance with Section 9.3, as determined in good faith by the Manager with due regard to the value implied by any transaction giving rise to the need for a determination of Fair Market Value.  The determination of Fair Market Value as provided herein and determined by the Manager shall be final and binding on all holders of Membership Units.

"Foreign Interest" has the meaning set forth in Section 8.3(b)(iii)(A).

"Fund Indemnitors" has the meaning set forth in Section 5.2(b)(iv).

"Funding Member" has the meaning set forth in Section 2.2(b)(ii).

"GAAP" means United States generally accepted accounting principles consistently applied and currently in effect on the date of application.

"GOT Investor" means GOT Distribution, LLC, a Delaware limited liability company, or any Permitted Transferee thereof pursuant to Section 8.2(b) to which such Person has transferred any Units.

"GOT Sponsor" means GOT Sponsor I, LLC, a Delaware limited liability company, or any Permitted Transferee of the Class B Unit pursuant to Section 8.2(b) to which such Person has transferred any Units.

"Incentive Units" means Vested Incentive Unit and Unvested Incentive Unit.

"Liquidity Event" means any of the following: (a) a Sale of the Company, (b) a sale of any equity interests of any Subsidiary of the Company to a third party other than for working capital or add-on acquisition purposes of such Subsidiary of the Company (as a result of which the equity holders of such Subsidiary of the Company do not receive distributions) or (c) a liquidity event resulting from a financing or refinancing by the Company or its Subsidiaries (including any dividend recapitalization) as a result of which the equity holders of the Company or its Subsidiaries receive distributions.

"Management Agreement" as the meaning set forth in Section 5.2(g).

"Manager" means GOT Management, LLC, a Delaware limited liability company, and any manager substituted therefor and admitted as a manager of the Company in accordance with this Agreement.  References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires or permits, be deemed to include the plural or the masculine or feminine reference, as the case may be.

"Member(s)" means the Members signing this Agreement and who are admitted as a "member" of the Company as of the Effective Date and/or such (or each such) other Person, if any, subsequently admitted as an additional or substitute "member" of the Company, from time to time, in accordance with the terms of this Agreement, provided, that a Person shall cease to be a "Member" at such time as such Person shall dispose of such Person's entire Membership Interest in the Company or, otherwise, upon the occurrence of any event, including a Member's dissolution, liquidation and termination, which results in a transfer or other disposition of such Person's entire Membership Interest (or other termination of such Person's status as a "member" of the Company, as specified in this Agreement or in the Act, as the same may be modified or superseded by this Agreement).

"Membership Interest" means the entire interest of a Member (or assignee of a Member's "transferable interest" not otherwise admitted as an additional or substitute "member" of the Company) in the Company as a "member" thereof (or assignee of a Member's transferrable interest in the Company), including a Member's Units, voting rights (as a Member) and a Member's (or assignee's) interest in and to Company profits, losses and capital, including a Member's (or assignee's) right to receive both current and liquidating distributions from the Company.  The Members may hold any combination of Membership Interests (including Units of more than one class), and the Class A Units and Class B Units shall constitute the same class of Membership Interests for voting purposes under the Act and this Agreement, with each Unit being entitled to one vote per Unit, except to the extent this Agreement expressly provides otherwise.

"Membership Percentage" means with respect to each Member, (a) in reference to a Membership Percentage of any class of Units, that ratio, expressed as a percentage, the numerator of which is the number of Units of such class owned by such Member, and the denominator of which is the total Units of such class then outstanding, and (b) in reference to a Membership Percentage of all Units, that ratio, expressed as a

percentage, the numerator of which is the number of Units owned (irrespective of class) by such Member, and the denominator of which is the total Units (irrespective of class) then outstanding.

"Non-Funding Member" has the meaning set forth in Section 2.2(b)(ii).

"Operating Companies" means (a) Vargyas Networks, Inc. d/b/a Baltic Networks, Inc., an Illinois corporation and its Subsidiaries, (b) ISP Supplies, LLC, a Texas limited liability company, and (c) as the context may require, any successor or Affiliate thereof in which the Company has a direct or indirect interest.

"Participating Incentive Unit" means a Vested Incentive Unit for which the applicable Distribution Threshold has been satisfied.

"Permitted Transferee" means, as it relates to a Member, (a) an Affiliate of such Member, (b) a trust in which such Member is the sole trustee, or is co-trustee with his or her spouse (provided such Member controls such trust and no Transfers may be made from such trust without the consent of such Member), or (c) in the event of the death of such Member, such Member's executors, administrators, testamentary trustees, legatees or beneficiaries

"Person" means any individual who is a natural person, partnership, limited liability company, limited liability partnership, limited partnership, corporation, trust, and any other association or legal entity.

"Prime Rate" as of a particular date means the prime rate of interest as published on that date in the *Wall Street Journal*. If the *Wall Street Journal* is not published on a date for which the Prime Rate must be determined, then the Prime Rate shall be the prime rate published in the *Wall Street Journal* on the nearest-preceding date on which the Wall Street Journal is published.

"Proceeding" has the meaning set forth in Section 5.2(b)(i).

"Prohibited Unitholders" has the meaning set forth in Section 8.1(a)

"Profits Interests" means the Class B Units, the Incentive Units, and any other interest held by a Member in the Company which is issued in exchange for the performance of services, which at the time the interest is issued, provides the Member with the right to participate in the future Profits and Losses of the Company but does not convey to such Member any right to, or ownership in, the capital of the Company (i.e., the assets as the Company value at the Fair Market Value as of the date of issuance of such profits interests, reduced by the liabilities of the Company as of such date) at the date of issuance.

"Proportionate Share" means, with respect to any Member having an option to make a voluntary additional Capital Contribution to the Company under Section 2.2(b) of this Agreement, having an option to make a loan (or cause an Affiliate of such Member to make a loan) to the Company pursuant to Section 2.3 of this Agreement or having the right and option to purchase any Membership Interest under any provision of Article VIII of this Agreement, that ratio, expressed as a percentage, the numerator of which equals such Member's Membership Percentage of Class A Units (as otherwise determined, in the case of the purchase of Membership Interest, as of the first date such option may be exercised by such or any other Member, or, if different, such Member's Membership Percentage of Class A Units as of the expiration of the period during which such option may be exercised), and the denominator of which equals the aggregate Membership Percentages of Class A Units (as otherwise determined, in the case of the purchase of a Membership Interest, as of the first date such option may be exercised by such or any other Member, or, if different, as of the expiration of the period during which such option to purchase may be

exercised) of all Members having such option and who otherwise timely exercise such option in accordance with the applicable provisions of this Agreement.

"Proposed Transferee" has the meaning set forth in Section 8.7(a).

"ROFR Members" has the meaning set forth in Section 8.6(a).

"Sale Notice" has the meaning set forth in Section 8.6(a).

"Sale of the Company" means any of the following: (a) the sale of all or substantially all of the assets of the Company or any of its Subsidiaries on a consolidated basis, (b) the sale of fifty percent (50%) or more of the outstanding equity interests of the Company or all of its Subsidiaries or (c) the merger or combination of the Company or any of its Subsidiaries with any other Person, after which the current owners of the Company or such Subsidiary no longer hold fifty percent (50%) or more of the outstanding equity interests of the Company or such Subsidiary.

"Seller Note" means that certain Seller Note issued by the Company pursuant to that certain Securities Purchase and Contribution Agreement dated as of [--], 2022, by and among the Company, Supercub Holdings, LLC and Stephen Discher.

"Selling Member" has the meaning set forth in Section 8.7(a).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity, in any jurisdiction, of which (a) if a corporation, a limited liability company or a limited partnership (with voting securities), a majority of the total voting power of Equity Interests thereof entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees (or members of any similar governing body) thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company (without voting securities), a partnership, an association or other business entity, a majority of the Equity Interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person shall be deemed to have a majority ownership interest in a limited liability company, a partnership, an association or other business entity if such Person shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director, managing member or general partner (or equivalent) of such limited liability company, partnership, association or other business entity.

"Tag-Along Member" has the meaning set forth in Section 8.7(a).

"Tag-Along Notice" has the meaning set forth in Section 8.7(b)(ii).

"Tag-Along Period" has the meaning set forth in Section 8.7(b)(ii).

"Tag-Along Portion" has the meaning set forth in Section 8.7(b)(i).

"Tag-Along Sale" has the meaning set forth in Section 8.7(a).

"Tax Distribution" has the meaning set forth in Section 3.2(d).

"Tax Payment" has the meaning set forth in Section 3.2(a).

"Tax Proceedings" has the meaning set forth in Section 11.2.

"Tax Representative" has the meaning set forth in Section 11.1.

"Taxable Year" means, with respect to the Company, the calendar year (or such other fiscal period, if any, required to be adopted as the "taxable year" of the Company for federal income tax purposes) (or portion thereof during which the Company is in existence), in each case as determined by the Manager.

"Third-Party Purchaser" has the meaning set forth in Section 8.5(a).

"Transfer" means, as a noun, any voluntary or involuntary sale, exchange, pledge, assignment, hypothecation, or other disposition of any rights in tangible or intangible property, and, as a verb, means voluntarily or involuntarily (including an assignment or other disposition by reason of Bankruptcy) to sell, exchange, pledge, assign, hypothecate, abandon, or otherwise dispose of such property.  For any Member that is a corporation, partnership, joint venture, enterprise, limited liability company, unincorporated association, trust, estate or other business or legal entity, including any state law entity disregarded as a separate entity for federal and state income tax purposes, Transfer shall also mean any voluntary or involuntary, direct or indirect, transfer, assignment, sale, pledge hypothecation, abandonment or other disposition of more than fifty percent (50%) of the Equity Interests of the Member in a single transaction or a series of related transactions.  "Transfer" when used as a verb shall have a correlative meaning.

"Treasury Regulations" or "Regulations" means the Treasury Regulations promulgated under the Code, as such Treasury Regulations may be amended and in effect from time to time.

"Unit" or "Units" has the meaning set forth in Section 2.1(b).

"Unitholder" shall mean, with respect to any class of Units, a Member (or other Person) owning a Unit or Units of such class.

"Unreturned Capital Contributions" means, for any Class A Member, the amount of Capital Contributions made by such Class A Member (and by its predecessors-in-ownership with respect to the interest in the Company owned by such Class A Member), less the aggregate amount of distributions made to such Class A Member (and such Class A Member's predecessors-in-ownership) from inception of the Company pursuant to Section 3.1(a)(i) (or treated as so made pursuant to Section 9.3(c)).

"Unvested Incentive Unit" means, with respect to any Incentive Unit that is subject to vesting, any such Incentive Unit that has not yet vested in accordance with the terms of the Incentive Award Agreement pursuant to which such Incentive Unit was granted, as applicable.

"Vested Incentive Unit" means, with respect to any Incentive Unit that is subject to vesting, any such Incentive Unit that has vested in accordance with the terms of the Incentive Award Agreement pursuant to which such Incentive Unit was granted, as applicable.

**APPENDIX B**

**SPECIAL TAX AND ACCOUNTING PROVISIONS**

I.      <u>Tax and Accounting Definitions</u>.  The following terms, which are used predominantly in <u>Section 4</u> of this Agreement and this <u>Appendix B</u>, shall have the meanings set forth below:

A.      "<u>Adjusted Capital Account</u>" means, with respect to any Member, such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(1)      credit to such Capital Account any amounts which such Member is obligated to restore pursuant to this Agreement or as determined pursuant to Regulations §1.704-1(b)(2)(ii)(c), or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations §§1.704-2(g)(1) and 1.704-2(i)(5); and

(2)      debit to such Capital Account the items described in clauses (4), (5) and (6) of Regulations §1.704-1(b)(2)(ii)(d).

B.      "<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in such Member's Adjusted Capital Account.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

C.      "<u>Allocation Period</u>" means, unless otherwise required pursuant to the Code and Treasury Regulations, (i) the Taxable Year of the Company, (ii) any portion of the Taxable Year for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss, deduction or other items pursuant to <u>Article IV</u> or this <u>Appendix B</u> or (iii) any other period reasonably determined by the Manager as appropriate for a closing of the Company's books.

D.      "<u>Book Value</u>" means, with respect to any Company asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(1)      the initial Book Value of any asset (other than money) contributed by a Member to the Company shall be the fair market value thereof as of the date of contribution, as set forth in this Agreement or, if not set forth in this Agreement, as reasonably determined by the Manager and the contributing Member as of the date of contribution;

(2)      the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager (but subject to Code §7701(g)), as of the following times: (i) the acquisition of additional interests in the Company by any new or existing Member in exchange for more than a de minimis initial or additional Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of cash or property as consideration for an interest in the Company; (iii) the issuance by the Company of a non-compensatory option (other than an option to acquire a de minimis interest in the Company); (iv) in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; or (v) the Liquidation of the Company; <u>provided</u> that an adjustment described in <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u> immediately above shall be made only if the Manager reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(3)      the Book Value of any Company asset distributed to any Member shall be adjusted immediately before its distribution to equal its gross fair market value on the date of distribution, as reasonably determined by the Manager;

(4)      the Book Values of the Company's assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code §734(b) or Code §743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations §1.704-1(b)(2)(iv)(m); provided, however, that Book Values shall not be adjusted pursuant to this Section I.D(4) to the extent that an adjustment pursuant to Section I.D(2) is otherwise made thereto in connection with or as a result of any transaction or event that would otherwise result in an adjustment pursuant to this Section I.D(4); and

(5)      if the Book Value of any asset subject to the allowance for depreciation or amortization has been determined or adjusted pursuant to Section I.D(1), Section I.D(2), or Section I.D(4), such Book Value shall thereafter be adjusted by the Depreciation taken into account, from time to time, with respect to such asset for purposes of computing Profits or Losses of the Company.

For purposes Section I.D(2), the term "Liquidation of the Company" means the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining assets to its Members).

E.      "Capital Account" means, with respect to any Member, the Capital Account maintained by the Company for such Member in accordance with Regulations §1.704-1(b)(2). Except as otherwise provided in said Regulations section, each Member's Capital Account shall be maintained or adjusted in accordance with the following rules or provisions:

(1)      to each such Member's Capital Account, there shall be credited the amount of cash contributed to the Company by such Member and the initial Book Value of any property, other than cash, contributed to the capital of the Company such Member (net of any liability secured by such contributed property that the Company is considered to assume or to take subject to pursuant to Code §752), such Member's allocable share of Profits and any items of income or gain comprising the Profits that are allocated to such Member, and the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member;

(2)      to each such Member's Capital Account, there shall be debited the amount of cash and the Book Value of any property distributed by the Company to such Member pursuant to any provision of this Agreement (net of Company liabilities secured by such distributed property that such Member is considered to assume or take subject to pursuant to Code §752), such Member's allocable share of Losses and any items of expense or loss comprising the Losses that are allocated to such Member, and the amount of any liabilities of such Member (excluding liabilities taken into account in accordance with Section I.E(1)) assumed by the Company or that are secured by any property contributed by such Member to the Company;

(3)      to the extent that the unrealized income, gain, loss or deduction inherent in property distributed (or deemed to be distributed) in kind (whether or not distributed in liquidation) is not then reflected in the Members' Capital Accounts, the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property would be allocated among the Members under the Agreement

if there were a fully taxable disposition of such property for all cash for its then fair market value, as determined by the Manager, in its reasonable discretion, as of the date of its actual (or deemed) distribution;

(4)    in the event that the Book Value of Company assets are adjusted as described in Section I.D(2), the Members' Capital Accounts shall be adjusted to reflect their allocable share of the gain or loss (not then reflected in the Members' Capital Accounts) which the Company would recognize as of or immediately before such adjustment, if it sold all of its assets, as of such time, for all cash in a fully taxable transaction for an amount equal to such assets' adjusted Book Value;

(5)    in the event that any Company property is subject to Code §704(c), or in the event Company property is re-valued, at the election of the Manager, in accordance with Regulations § 1.704-1(b)(2)(iv)(f) and, as a result, has a Book Value different from such property's adjusted income tax basis, the Members' Capital Accounts shall be adjusted in accordance with Regulations §1.704-1(b)(2)(iv)(g) to reflect only allocations to them of Depreciation, if any, allowable for such Company property and by the gain or loss arising from the sale or other disposition of such property, as computed for book purposes and not for income tax purposes, by reference to such property's adjusted Book Value; and

(6)    If there is a transfer of a Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

The foregoing provisions and the other provisions of this Agreement (or this Appendix B) relating to the maintenance of Capital Accounts are intended to comply with Regulations §1.704-1(b) and §1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations.  The initial Capital Account balances of the Members are as set forth on Schedule 1.7.

F.    "Company Minimum Gain" has the same meaning as the term "partnership minimum gain" under Regulations §§1.704-2(b)(2) and 1.704-2(d).

G.    "Depreciation" means, for each Taxable Year, or other fiscal period of the Company, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if such depreciation, amortization or other cost recovery deductions with respect to any such asset for federal income tax purposes is zero for any Allocation Period, Depreciation shall be determined with reference to such asset's Book Value at the beginning of such period using any reasonable method selected by the Manager.

H.    "Economic Risk of Loss" has the meaning assigned to that term in Regulations §1.752-2(a).

I.    "Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" under Regulations §1.704-2(b)(4).

J.      "Member Nonrecourse Debt Minimum Gain" has the same meaning as the term "partner nonrecourse debt minimum gain" under Regulations §1.704-2(i)(2) and shall be determined in accordance with Regulations §1.704-2(i)(3).

K.      "Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" under Regulations §1.704-2(i)(1) and shall be determined in accordance with Regulations §1.704-2(i)(2).

L.      "Nonrecourse Debt" or "Nonrecourse Liability" has the same meaning as the term "nonrecourse liability" under Regulations §1.704-2(b)(3).

M.      "Nonrecourse Deductions" has the meaning set forth in Regulations §1.704-2(b)(1) and shall be determined according to the provisions of Regulations §1.704-2(c).

N.      "Profits" or "Losses" of the Company for each Allocation Period means an amount equal to the Company's taxable income or loss for each such Allocation Period, as determined for federal income tax purposes in accordance with the accounting method followed by the Company for federal income tax purposes and in accordance with Code §703 (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code §703(a)(1) shall be included in taxable income or loss), subject to the following modifications:

(1)      any income of the Company that is exempt from federal income taxation and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(2)      any expenditures of the Company described in Code §705(a)(2)(B) or treated as Code §705(a)(2)(B) expenditures pursuant to Regulations §1.704-1(b)(2)(iv)(i), and not otherwise taken into account, shall be subtracted from such taxable income or loss;

(3)      in the event the Book Value of any Company property is adjusted pursuant to Section I.D.(2) or Section I.D.(3) of this Appendix B, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the Company property) or an item of loss (if the adjustment decreases the Book Value of the item of Company property) from the disposition of such Company property and shall be taken into account for purposes of computing Profits or Losses;

(4)      gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the Company property disposed of, notwithstanding that the adjusted tax basis of such Company property differs from its Book Value;

(5)      in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Period, computed in accordance with the definition of Depreciation;

(6)      to the extent an adjustment to the adjusted tax basis of any item of Company property pursuant to Code §734(b) is required, pursuant to Regulations §1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the item of

Company property) or loss (if the adjustment decreases such basis) from the disposition of such item of Company property and shall be taken into account for purposes of computing Profits or Losses;

(7)     notwithstanding any other provision of this definition or <u>Article IV</u> of this Agreement, any items that are specially allocated pursuant to <u>Section II</u> of this <u>Appendix B</u> shall not be taken into account in computing Profits or Losses; and

(8)     the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to <u>Section II</u> shall be determined by applying rules analogous to those set forth in <u>subsections (1)</u> through <u>(6)</u> above.

II.     <u>Special Allocations</u>.  Notwithstanding the provisions of <u>Section 4.1</u> of this Agreement to the contrary, the following special rules shall apply:

A.     <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Regulations § 1.704-2(f), notwithstanding any other provision of this <u>Appendix B</u>, if there is a net decrease in Company Minimum Gain during any Allocation Period, each Member shall be specially allocated items of Company income and gain for such Allocation Period (and, if necessary, subsequent Allocation Periods) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations § 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations §§ 1.704-2(f)(6) and 1.704-2(j)(2).  This subsection is intended to comply with the minimum gain chargeback requirement in Regulations § 1.704-2(f) and shall be interpreted consistently therewith.

B.     <u>Member Minimum Gain Chargeback</u>.   Except as otherwise provided in Regulations § 1.704-2(i)(4), notwithstanding any other provision of this <u>Appendix B</u>, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Allocation Period (and, if necessary, subsequent Allocation Periods) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations § 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations §§ 1.704-2(i)(4) and 1.704-2(j)(2).  This subsection is intended to comply with the minimum gain chargeback requirement in Regulations § 1.704-2(i)(4) and shall be interpreted consistently therewith.

C.     <u>Qualified Income Offset</u>.  In the event that any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) and has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of <u>Section II.A</u> and <u>Section II.B</u> but before the application of any other provision of this <u>Section II</u>, items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this subsection shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Appendix B</u> have been tentatively made as if this subsection were not applicable.

D.    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Allocation Period (or other applicable period) shall be specially allocated pro rata among the Members in proportion to their respective Membership Percentages, except to the extent that the Code and Treasury Regulations require that such deductions be allocated in some other manner.  Any Member Nonrecourse Deductions for any Allocation Period shall be specially allocated to the Member who bears the Economic Risk of Loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations § 1.704-2(i)(1).  If more than one Member bears the Economic Risk of Loss with respect to Member Nonrecourse Debt, Member Nonrecourse Deductions attributable thereto shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss.

E.    <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Regulations § 1.704-1(b)(2)(iv)(m)(2) or Regulations § 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such provisions.

F.    <u>Curative Allocations</u>.

(1)    The allocations set forth in <u>Sections II.A</u> through <u>II.E</u> of this <u>Appendix B</u> are intended to comply with certain requirements imposed by Code §704(b) and the Regulations promulgated thereto (the "<u>Regulatory Allocations</u>").  If in any Taxable Year any Regulatory Allocations (which term shall include any other allocations required to be made under Code §704(b) or under the Regulations promulgated thereunder) are made, then in allocating the remainder of the Profits or Losses (or items thereof) thereafter pursuant to <u>Section 4.1</u> of this Agreement, whether in the same Allocation Period or in subsequent Allocation Periods, the Regulatory Allocations shall be taken into account so that, to the maximum extent possible and as quickly as possible, the net amount of allocations made to each of the Members under <u>Section 4.1</u> of this Agreement and <u>Sections II.A</u> through <u>II.E</u> of this <u>Appendix B</u> (and otherwise under Code §704(b) and the Regulations promulgated thereunder), and this <u>Section II.F(1)</u>, shall be equal to the net amount that would have been allocated to each of the Members solely under <u>Section 4.1</u> of this Agreement had the Regulatory Allocations not been applicable.  The application of this <u>Section II.F(1)</u> and the making of curative allocations pursuant hereto shall be made in any reasonable manner determined by the Manager, following consultation with the Company's tax advisors.

(2)    For purposes of applying <u>Section II.F(1)</u>, Regulatory Allocations which constitute allocations of Nonrecourse Deductions or Member Nonrecourse Deductions shall not be offset by subsequent curative allocations of Profits or items of income or gain comprising the Profits or Losses of the Company pursuant to <u>Section II.F(1)</u> prior to the first Taxable Year thereafter during which there is a net decrease in the Company Minimum Gain (or a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt, as the case may be), and then, shall only be offset by curative allocations pursuant to <u>Section II.F(1)</u>, if the Manager reasonably determines that such Regulatory Allocations are not offset (or reasonably likely to be offset) by allocations (including expected future allocations) of income or gain under <u>Section II.A</u> or <u>Section II.B</u> of this <u>Appendix B</u>.

III.    <u>Excess Nonrecourse Liabilities</u>.  For purposes of determining the Members' Proportionate Share of "excess nonrecourse liabilities," if any, of the Company within the meaning of Regulations §1.752-3(a)(3) for any Allocation Period, the Members' respective interests in Company "profits" shall be in the same proportions that the Members shared Profits during such Allocation Period.

IV.    <u>Tax Treatment of Fees Paid by the Company to Member/Affiliate</u>.  For income tax reporting purposes, any and all fees paid by the Company to any Member and/or any Affiliate thereof, shall be treated as expenses of the Company and, if paid to a Member, shall be treated as payments made pursuant to §707(a) of the Code.  To the extent that payments of such fees to any Member or Affiliate thereof (or any other fees or compensation paid to any Member or Affiliate thereof) ultimately are not determined to be Code §707(a) payments, the Member receiving such fee or compensation shall be specially allocated gross income of the Company in an amount equal to the amount of such fee or compensation, and the Member's Capital Account shall be adjusted to reflect the payment of such fee or compensation, subject to the next sentence.  If the Company's gross income for an Allocation Period is less than the amount of such fee or compensation paid in such year, the Member shall be specially allocated gross income of the Company in the succeeding Allocation Period(s) until the total amount so allocated equals the total amount of such fee or compensation.

V.    <u>Related Matters</u>.  Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement.

VI.    <u>Deficit Restoration</u>.  Notwithstanding any other provision of this Agreement to the contrary, upon liquidation of a Member's Membership Interest (whether or not in connection with a liquidation of the Company), no Member shall have any liability to restore any deficit in any deemed or hypothetical Capital Account.  In addition, no allocation to any Member of any Loss, whether attributable to depreciation or otherwise, shall create any asset of or obligation to the Company, even if that allocation reduces, or creates or increases a deficit in that Member's deemed or hypothetical Capital Account; it is also the intent of the Members that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.  Notwithstanding the foregoing, upon the liquidation of a Member's Membership Interest, the Company may, with the approval of the Manager, allocate to such Member items of income and gain with respect to the Taxable Year in which such liquidation occurs, and with respect to any prior Taxable Year to the extent permitted by law, in order to eliminate any such deficit.

APPENDIX C

ILLUSTRATIVE WATERFALL EXAMPLE

| Assumptions | |
|---|---|
| **Date** | **Event** |
| | |
| January 1, 2022 | The formation of GOT Distribution SPV, LLC |
| | |
| January 1, 2022 | Supercub Holdings, LLC contributes assets valued at $5,000,000.00. Company issues 12,600 Class A units. |
| | |
| January 1, 2022 | GOT Investor distribution contributes cash and assets valued at $5,000,000.00. Company issues 77,400 Class A units |
| | |
| Calendar tax year 2022 | No distributions. |
| | |
| Calendar tax year 2022 | Income = expenses resulting in no taxable income. |
| | |
| December 31, 2022 | Company liquidates after paying all expenses, the Company has net proceeds to distribute to the members in the amount of $100,000,000.00. |
| | |

| Member Name | Capital Account | Preferred Return Account | Class A Units | Proportionate Share |
|---|---|---|---|---|
| | | | | |
| Supercub Holdings, LLC | $5,000,000.00 | $300,000.00 | 12,600 | 14% |
| | | | | |
| GOT Investor | $5,000,000.00 | $300,000.00 | 77,400 | 86% |
| | | | | |

| Distributions under §3.1(a) | | |
|---|---|---|
| **Section Number** | **Supercub Holdings, LLC*** | **GOT Distribution** |
| | | |
| §3.1(a)(i) | $5,000,000.00 | $5,000,000.00 |
| | | |
| §3.1(a)(ii) | $300,000.00 | $300,000.00 |
| | | |
| §3.1(a)(iii) | $12,516,000.00 | $76,884,000.00 |

*Supercub Holdings, LLC actual distributions of $17,816,000.00 per §3.1(a) above are allocated between Supercub Holdings, LLC and the Class B Member, pursuant to §3.1(b), per below.

| Distributions under §3.1(b) | | |
|---|---|---|
| **Section Number** | **Supercub Holdings, LLC** | **Class B Members** |
| | | |
| §3.1(b)(i) | $5,000,000.00 | $0.00 |
| | | |
| §3.1(b)(ii) | $300,000.00 | $0.00 |
| | | |
| §3.1(b)(iii) | $0.00 | $72,000.00 |
| | | |
| §3.1(b)(iv) | $9,955,200.0 | $2,488,800.0 |

## **Exhibit C**

Form of Employment Agreement

(see attached)

Exhibit C

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "*Agreement*") is made and entered into by and between **STEPHEN DISCHER** ("*Executive*"), and **GOT DISTRIBUTION SPV, LLC,** a Delaware limited liability company (the "*Company*"); Executive and the Company are collectively referred to as the "*Parties*".

## WITNESSETH:

**WHEREAS**, the Company desires to hire Executive, and Executive desires to become employed by the Company; and

**WHEREAS**, Executive is entering into this Agreement as an inducement for the Company to hire Executive, to provide Executive the terms below, and to provide Executive access to its confidential information and goodwill.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending legally to be bound, hereby agree as follows:

1.      **Employment**.  Executive's employment by the Company under this Agreement shall begin upon Executive's start date for the Company (which shall be [_____], 2022)[1] and will end in thirty-six (36) months after the start date ("*Term Ending Date*") or when such employment is terminated by either of the Parties pursuant to the terms below. The period of time that Executive is employed by the Company under this Agreement is referred to as the "*Term*".  The Company's offer of employment is subject to Executive completing the Company's pre-screening processes to the Company's satisfaction and Executive's timely presentation of documents to confirm Executive's authorization to work in the United States in accordance with appliable federal laws.

2.      **Duties**.  Executive's position shall be as the Chief Executive Officer.  During the Term, Executive shall:

(a)      perform the services and duties customary and commensurate with Executive's position with the Company and/or as may be assigned to Executive from time to time by the Company, the sole manager of the Company (the "*Manager*"), which are all consistent with the office of a Chief Executive Officer role;

(b)      devote Executive's undivided professional time, attention and best efforts to the business of the Company and its affiliates and the performance of Executive's employment responsibilities. The Executive shall work, as mutually determined by the parties, the number of hours determined necessary to perform the Executive's job function at a satisfactory level on a daily schedule;

(c)      comply with all Company policies (that are consistent with the policies upon execution of this Agreement, as they may be amended from time to time) and lawful directions from the Company;

(d)      have a primary office location in College Station, Texas, and allowed to work remotely when deemed reasonable (provided that remote working does not interfere with the effectiveness

---

[1] MW NTD: To be the Closing Date (i.e. no interim period) and Steve's current agreement with ISP Supplies to be terminated at the Closing.

of the Executive's function at the time the remote work is conducted), and travel as necessary and when reasonable for business; and

      (e)    adhere faithfully to all applicable laws and professional ethics related to the Company's business.

      3.    **Compensation and Benefits**.

      (a)    **Salary**.  During the Term, the Company shall pay Executive a base salary ("***Base Salary***").  Executive's Base Salary shall be at a periodic rate equivalent to $240,000 on an annualized basis. The Company will pay the Base Salary to Executive in accordance with the Company's payroll practices for its employees.  The Base Salary may be increased by the Manager, but not decreased, in its discretion based upon its evaluation of Executive's and the Company's performance.

      (b)    **Annual Bonuses**.  During the Term and beginning with calendar year 2021, Executive shall be eligible to receive annual bonuses, with a target bonus opportunity equal to $120,000. The Manager will determine whether to award an annual bonus, and the amount of any bonus, for a given calendar year based its evaluation of Executive's and the Company's performance for that year relative to the financial and non-financial objectives set by the Manager for that year.  Any annual bonus will be pro-rated based on the number of days Executive is employed by the Company hereunder and during such fiscal year. An annual bonus awarded by the Company for a given calendar year will be paid in the following calendar year, with such payment typically being paid in the first quarter of such calendar year.  Executive must be employed by the Company on a bonus payment date to earn the bonus or any part thereof.

      (c)    **Benefits**. During the Term, Executive will be eligible to participate in the employee benefit programs sponsored by the Company for its employees, subject to the terms and conditions for such programs as they may be instituted, modified, or terminated from time to time by the Company.  Employee and his immediate family's monthly health insurance premiums as well as copays, prescription medicine and any medical expenses normally allowable by the IRS as reasonable and necessary will be paid by the Company or reimbursed by the Company upon presentation of an acceptable Expense Report and applicable backup documentation.

      (d)    **PTO**. During the Term, Executive will be eligible to take paid time off pursuant and subject to Company policies in effect from time to time, and Executive will be allowed twenty-one (21) days of paid time off in 2022 and twenty-one (21) days of paid time off each year thereafter plus the Executive shall be entitled to takeoff on all the national holidays.  Paid time off shall be taken at times that do not materially interfere with Executive's duties to the Company. Any accrued but unused paid time off at the end of a calendar year or at the end of employment shall be forfeited, unless such forfeiture is then prohibited by applicable law.

      (e)    **Business Expenses**. Upon submission of proper receipts and documentation to the Company, the Company will pay or reimburse Executive for reasonable and necessary business expenses incurred by Executive in the performance of Executive's duties during Executive's employment with the Company, subject to the terms of any applicable Company policies and procedures then in effect.

      4.    **Termination**.  Subject to the conditions set forth in this Section, the Term and Executive's employment by the Company shall terminate upon: Executive's death; the Company giving Executive notice of a termination due to Executive's Disability (as defined below), a Termination For Cause (as defined below), or a Termination Without Cause (as defined below); the close of business on the effective date of Executive's Resignation Without Good Reason (as defined below) or Resignation For Good Reason (as defined below); or the close of business on a mutually agreed to date designated by the Parties in writing.

(a)      "*__Disability__*" means Executive's inability to perform the essential functions and duties of Executive's position with the Company, with or without reasonable accommodation, as a result of any physical or mental impairment, as reasonably determined by the Manager.  Executive agrees, upon request by the Company, to submit to an examination by an independent, qualified physician selected by the Company and to provide the Company such medical evidence as is reasonably necessary for the Company to evaluate any potential Disability. The Company agrees to keep such medical information confidential as required by applicable law.

(b)      "*__Termination For Cause__*" means the Company's termination of Executive's employment with the Company as the result of:

(1)      theft, fraud, embezzlement, self-dealing, misappropriation of property, information or assets;

(2)      breach of fiduciary duty, or breach of duty of loyalty, by the Executive in connection with Executive's employment with the Company that causes material financial harm to the Company or its affiliates;

(3)      the Executive's indictment, conviction, guilty plea, or plea of nolo contendere or no contest for any felony or any crime involving fraud or moral turpitude;

(4)      Executive's intentional material violation of the Company's material policies, rules or regulations;

(5)      Executive's refusal to follow lawful, written instructions from the Manager or its designee that are consistent with the Executive's position and this Agreement, or Executive's material dishonesty to the Company or the Manager related to the Company;

(6)      Executive's willful dereliction of the duties assigned to the Executive or gross negligence in performing those services;

(7)      Executive's intentional misconduct or gross negligence in connection with providing services to the Company or its affiliates;

(8)      Executive's intentional misconduct outside of work that  causes material financial harm to the Company or its affiliates;

(9)      any act by the Executive or failure to act that causes the Company or its affiliates to violate in a material respect any applicable laws or regulations; or

(10)      the temporary or permanent regulatory, governmental or administrative suspension or prohibition of Executive from participating in any of the affairs of the Company or its affiliates.

If, after a Termination Without Cause, the Company first discovers that Executive engaged in conduct described above in <u>Section 4(b)(1)</u> during the Term that would have resulted in a Termination For Cause had the Company known about such conduct during the Term, then such termination shall be deemed a Termination For Cause.

Company must promptly provide the Executive written notice with reasonable details of a potential Termination For Cause after Company learns of the condition(s) justifying such

termination.  Upon receiving such notice, the Executive shall have 10-days to cure the condition(s) justifying Executive's Termination For Cause.  Prior to making its final decision, the Manager shall permit the Executive an opportunity to present a rebuttal of the allegation made against the Executive in a full Manager meeting. The Manager's decision shall be effective on the eleventh (11) day following the original notice.

(c)      "*Termination Without Cause*" means the Company's termination of Executive's employment with the Company for any reason other than Executive's death, Executive's Disability, or Executive's Termination For Cause.

(d)      Executive's "*Resignation Without Good Reason*" means Executive's termination of Executive's employment with the Company for any reason other than a Resignation For Good Reason. Executive is required to give the Company at least 30 calendar days' advance written notice of Executive's Resignation Without Good Reason, and the Company may make such resignation effective at any point during the notice period. Executive shall diligently perform any assigned duties during the notice period and help transfer Executive's job responsibilities to others at the Company, all to the extent requested by the Company.

(e)      Executive's "*Resignation For Good Reason*" means Executive's termination of Executive's employment with the Company as a result of:

(1)      Executive being required to report to someone other than the Manager without Executive's prior consent;

(2)      the Manager changing Executive's title or officer position such that Executive is no longer Chief Executive Officer, or assigning the Executive tasks and or projects that are not consistent with the typical office of a Chief Executive Officer, without Executive's prior written consent;

(3)      the Manager requiring the Executive to relocate to another city without Executive's prior written consent;

(4)      the Company's uncured material breach of this Agreement; or

(5)      two or more successive uncured payment defaults under the Seller Note, which remains uncured for at least 120 days upon the Company's receipt of written notice from Executive of such default(s).

Executive must provide the Company written notice of a potential Resignation For Good Reason within 30 days after Executive learns of the condition(s) justifying such resignation.  Upon receiving such notice, the Company shall have 30 days to cure the condition(s) justifying Executive's Resignation For Good Reason.  If such condition(s) are not cured within such period, the Resignation For Good Reason shall be effective on the 31st day following the original notice.

In the event that the Executive employment is terminated pursuant to clause (5) of the definition of Resignation For Good Reason, then the Executive shall be released of his duties, obligations, and covenants under Section 8 (Confidentiality) (only with respect to Confidential Information with respect to ISP Supplies, LLC as of the date of the closing of that transaction), Section 11 (Non-Compete), Section 12 (Non-Interference), and Section 13 (Non-Raiding) (only with respect to employees and contractors employed by ISP Supplies, LLC as of the date of the

closing of that transaction), and those provisions become null and void as to the Executive effective as of such termination.

5.      **Final Compensation**.  Upon the end of Executive's employment with the Company for any reason, Executive shall be entitled to the following (the "***Accrued Rights***"): (a) payment for any unpaid Base Salary for the period of time since the Company's last payroll date through Executive's separation date; (b) the reimbursement for any business expenses incurred by Executive prior to the separation date, pursuant to the terms and conditions in this Agreement and so long as Executive submits the expenses and reasonable documentation within 30 days following the separation date; (c) any vested rights under the qualified retirement plan sponsored by the Company, if applicable; and (d) any general right to continue certain benefits at Executive's expense in accordance with COBRA.  Except for the Accrued Rights, and any Severance Pay that is required under the following Section, Executive shall not be entitled to any further payments, wages, compensation or benefits from the Company or its affiliates following Executive's separation from employment with the Company.

6.      **Severance Pay**.

        (a)     If: (i) Executive's employment with the Company ends due to a Termination Without Cause or a Resignation For Good Reason; (ii) such termination of employment results in Executive incurring a "separation from service" as defined under Treasury Regulation 1.409A-1(h); (iii) Executive has not breached and continues to comply with the terms in this Agreement and any other written agreements with the Company or its affiliates; <u>and</u> (iv) Executive signs within 21 or 45 days of receipt from the Company, as determined by the Company, and does not revoke a full and general release relating to all matters relating to the employment relationship arising under this Agreement (the "***Release***"), prepared by and in form and substance satisfactory to the Company, then the Company will pay Executive severance pay in the form of fifty percent (50%) of Base Salary continuation for a period of 12 months following the separation date (the "***Severance Pay***").

        (b)     The Severance Pay will be paid over a twelve month period in equal installments in accordance with the Company's payroll practices for its employees and less applicable withholdings. The first installment of the Severance Pay will be on the Company's first regular payday that is thirty (30) days after the last day of Executive's employment and will cover the period from the last day of Executive's employment with the Company through the payment date. The Severance Pay under this Agreement shall be in addition to Executive's right to severance under any other Company agreement, plan, or program.

7.      **Conflicts**.  While employed by the Company, Executive shall not: (a) engage in any outside business activity that interferes with the Executive's duties arising under this Agreement without written authorization from the Company; (b) compete with the Company or its affiliates or solicit others to compete against the Company or its affiliates; or (c) engage in any conduct intended to or reasonably expected to harm the interests of the Company or its affiliates.  Consistent with the foregoing, Executive may engage in personal investment activities and charitable work which do not interfere with Executive's duties for the Company.

8.      **Confidential Information; Trade Secrets Notice**.

        (a)     Executive covenants and agrees that, except to the extent the use or disclosure of any Confidential Information (as defined below) is required to carry out Executive's assigned duties with the Company, during Executive's employment with the Company and thereafter Executive shall not use or disclose any Confidential Information.  However, this provision shall not preclude Executive from: (i) the use or disclosure of information known generally to the public (other than information known generally to the public as a result of Executive's violation of this Section); (ii) a disclosure required by law, court order

or subpoena, so long as Executive provides the Company written notice as soon as reasonably practicable of any such potential disclosure; or (iii) communicating in confidence or a government official solely for the purpose of reporting or investigating a suspected violation of law.

(b)     "***Confidential Information***" means confidential, proprietary or business information related to the Company or its business that is furnished to, obtained by, or created by Executive during Executive's employment with the Company. Confidential Information includes by way of illustration, but is not limited to, such information relating to the Company's: (i) strategies, tactics, methods, and know-how related to its e-commerce and digital / online marketing activities, including web-site design, optimization, paid and organic search efforts, social media advertising, upselling features, and Amazon storefront; (ii) customer acquisition and lead conversation strategies, tactics, methods, and know-how, including such information related to the Company's e-commerce, department store, and dropship sales channels; (iii) customers and suppliers, including customer lists and databases, supplier lists and databases, contact information, contractual terms, prices, and billing histories; (iv) finances, financial statements, balance sheets, forecasts, profit margins and cost analyses; (v) plans and projections for new and developing business opportunities and for maintaining existing business and research and development efforts; and (vi) designs for operating methods, business processes and techniques, services, products, prices, costs, service performance, and operating results.

(c)     For the avoidance of doubt, this provision in no way limits Executive's obligations under state or federal trade secrets statutes. Executive understands that the federal Defend Trade Secrets Act of 2016 provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

9.     **Return of Property**.  All property, documents, data, and Confidential Information prepared or collected by Executive as part of Executive's employment with the Company, in whatever form, are and shall remain the property of the Company.  Executive agrees that Executive shall return upon the Company's request at any time (and, in any event, before Executive's employment with the Company ends) all documents, data, Confidential Information, and other property belonging to the Company or its affiliates in Executive's possession or control, regardless of how stored or maintained and including all originals, copies and compilations.

10.     **Developments**.  Executive hereby assigns and agrees in the future to assign to the Company Executive's full right, title and interest in all Developments that are created by Executive during the Term of Employment (as defined below); however, the parties agree that term Development shall not include the Training Materials (defined below) or any publications, and related work product developed by the Executive prior to the effective date of this Agreement.  In addition, all copyrightable works that Executive creates in the course of or related to Executive's employment with the Company shall be considered "work made for hire" and shall be owned exclusively by the Company. "***Developments***" means any invention, formula, process, development, design, innovation or improvement made, conceived or first reduced to practice by Executive, solely or jointly with others, during Executive's employment with the Company and that was developed using the equipment, supplies, facilities or trade secret information of the Company or that relates at the time of conception or reduction to practice to: (a) the business of the Company, or (b) any work performed by Executive for the Company.

11.     **Non-Compete**.

(a)     During the Restricted Period (as defined below), Executive shall not, without the advance written consent of the Company, such consent to be granted or withheld in the Company's sole discretion, either directly or indirectly, as a proprietor, partner, stockholder (except as the holder of not more than five percent (5%) of the outstanding stock of a publicly held company), owner, member, director, employee, consultant, consultant, independent contractor, joint venturer, investor or in any other capacity, become employed by, engage in, affiliate with, own, manage, operate or control, or participate in the ownership, management, operation or control of, any entity that, within the Prohibited Territory (as defined below): (a) engages in Competitive activity (as defined below) with respect to the Prohibited Territory (as defined below); or (b) engages in the Restricted Business or any business activity that the Company has decided to enter into during the Restricted Period or within the twelve (12) month period following the Separation Date with respect to the Prohibited Territory (as defined below).

(b)     The "***Restricted Period***" means: (i) the period of time that Executive is employed by the Company; and (ii) the five (5) year period following the last day of Executive's employment with the Company (the "***Separation Date***").

(c)     "***Competitive Activity***" means: (i) engaging in work for a competitor of the Company that is the same as or substantially similar to the work Executive performed on behalf of the Company at any time during the 12 months prior to the Separation Date; and/or (ii) engaging in any aspect of the Restricted Business (as defined below) for which Executive had duties on behalf of the Company at any time during the 12 months prior to the Separation Date. Notwithstanding the preceding, passively owning less than 5% of a public company shall not constitute by itself Competitive Activity or assisting others to engage in Competitive Activity.

(d)     The "***Restricted Business***" means: (i) selling products and services related to wired and wireless networking systems, routing and switching and fiber solutions to businesses; and/or (ii) the businesses engaged in by the Company at any time during the 12-month period immediately preceding the Separation Date.

(e)     The "***Prohibited Territory***" means: (i) the United States; and/or (ii) each State in which the Company was engaged in any aspect of the Restricted Business at any time during the 12-month period immediately preceding the Separation Date.

(f)     Notwithstanding the foregoing, the Executive shall not be prohibited from conducting training seminars relating to the certifications for the installation of networking equipment ("***Training Seminars***"). The Owner has written and published training material that he uses in the Training Seminars (collectively referred to as "***Training Manuals***"). The Training Seminars and Training Manuals shall not be including in the definitions of Competitive Activity or Restricted Business.

12.     **Non-Interference**. During the Restricted Period, Executive shall not, directly or indirectly, on Executive's own behalf or on behalf of any person or entity, solicit, divert, induce, do business with or otherwise harm the Company's relationship with, or attempt to solicit divert, induce, do business with or otherwise harm the Company's relationship with, (a) any current client, customer, salesperson, supplier, vendor, licensee transacting business or business relation of the Company, (b) any past client, customer or salesperson, supplier, vendor, licensee transacting business or business relation who conducted business with the Company within one (1) year of the Separation Date, or (c) any person or entity which has, as of the Separation Date, a business relationship with the Company, including, without limitation, a sales representative, supplier, lender, borrower, guarantor, landlord, tenant, lessor or lessee, and employees.

13.      **Non-Raiding**. During the Restricted Period, Executive shall not, directly or indirectly, on Executive's own behalf or on behalf of any person or entity, solicit, employ, interfere with or attempt to entice away from the Company, any individual who is: (a) employed by the Company or (b) an independent contractor of the Company at the time of such solicitation, employment, interference or enticement; provided, however, that (i) Executive may hire any employee, independent contractor or member of the Company whose employment, engagement or membership has been terminated by the Company after the Separation Date, (ii) Executive may hire after two (2) years from the date of termination of employment, engagement or membership, any employee, independent contractor or member of the Company whose employment, engagement or membership has been terminated by such employee, independent contractor or member, or (iii) that the general solicitation, which shall not be directed toward any specific person, entity, or group of persons or entities, and hiring by the Executive conducted, directly or indirectly, in newspapers, trade journals, the Internet, or by any similar media shall not be deemed to be an attempt to induce, attempt to induce, hire or attempt to hire any officer, manager, director, or employee of the Company or cause any such person or entity to leave the employ of the Company or otherwise interfere with any relationship between any such person or entity and the Company in contravention of, or be deemed to otherwise violate this Section 13.

14.      **Certain Affiliates**.  The "*Company*" as used in Section 8 (Confidential Information), Section 9 (Return of Property), and Section 10 (Developments) shall mean the Company and its affiliates. The "*Company*" as used in Section 11 (Non-Compete), Section 12  (Non-Interference) and Section 13 (Non-Raiding) shall mean: (a) the Company; and (b) any affiliate or successor of the Company for whom Executive performed services or had responsibilities at any time during the last 12 months of Executive's employment with the Company.

15.      **Reasonableness**.   Executive has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions set forth herein are fair, reasonable, and necessary to protect the Company's legitimate business interests, including its goodwill with its customers and employees, and its confidential and trade secret information. In addition, Executive acknowledges and agrees that the foregoing restrictions do not unreasonably restrict Executive from earning a living should Executive's employment with the Company end.  Executive agrees not to contest the general validity or enforceability of this Agreement in any forum. The post-employment restrictions in this Agreement shall survive the end of the Executive's employment and shall be in addition to any restrictions imposed upon Executive by statute, at common law, or other agreements.

16.      **Breach By Executive**.  Executive acknowledges and agrees that Executive's breach of any of the post-employment restrictions hereunder would result in irreparable damage and continuing injury to the Company.  Therefore, in the event of any breach or threatened breach of such covenants, the Company shall be entitled to an injunction from a court of competent jurisdiction enjoining Executive from committing any violation or threatened violation of those covenants, without the Company posting a bond. All remedies available to the Company by reason of a breach by Executive of the provisions of this Agreement are cumulative, none is exclusive, and all remedies may be exercised concurrently or consecutively at the Company's option. The duration of any restriction shall be tolled during the period of time during which Executive is in breach of such restriction. If Executive breaches any of the post-employment restrictions in this Agreement, Executive shall immediately refund to the Company, upon the Company's demand, any Severance Pay already paid to Executive pursuant to this Agreement beyond the first $5,000 (gross) in Severance Pay (the "*Release Consideration*"), and Executive shall forfeit at the time of such breach the right to any Severance Pay pursuant to this Agreement beyond the Release Consideration, without limiting the Company's other remedies.

17.      **Cooperation**.  Following the Term, Executive shall, to the extent requested by the Company, cooperate in good faith with the Company and its lawyers to assist the Company in the pursuit

or defense of any claim, administrative charge, or cause of action by or against the Company (except if Executive is adverse to the Company with respect to such matter) as to which Executive has relevant knowledge by virtue of Executive's prior positions with the Company or its affiliates, including providing truthful testimony without the need for a subpoena. The Company shall reimburse Executive for any reasonable out-of-pocket travel expenses incurred by Executive at the Company's request in order to comply with this Section.

18.     **Third Party Obligations**.  Executive represents and warrants that Executive is not currently bound by, and will not during Executive's employment with the Company become a party to, any agreements that purport to: (a) limit Executive's right to be employed by the Company; or (b) prohibit Executive from engaging in any activities on behalf of the Company contemplated by this Agreement. In the course of Executive's employment with the Company, Executive is not to breach any obligation of confidentiality that Executive has with a third party and shall not use or disclose any trade secrets belonging to a third party.

19.     **Section 409A**.  All payments to Executive under this Agreement shall be reduced by (i) any tax or other amounts required to be withheld under applicable law, if any, and (ii) other amounts appropriately authorized by Executive. The intent of the Parties is that this Agreement and the payments hereunder be exempt from or comply with the provisions of Internal Revenue Code section 409A and the U.S. Treasury Regulations thereunder (collectively, "***Section 409A***"), and this Agreement shall be interpreted consistent with that intent.  In no event will the Company or its agents have any liability to Executive with respect to Section 409A.  Executive is advised to consult with Executive's own tax professionals regarding all tax matters related to compensation and benefits from the Company.

20.     **Assignment**.  This Agreement, being personal in nature to Executive, may not be assigned or delegated by Executive.  The Company shall not have the right to assign or transfer this Agreement to any affiliated entity or any successor to all or part of the business and/or assets of the Company without notice to the Executive.

21.     **Law, Venue, Jurisdiction, No Jury**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to principles of conflicts of law.  Any legal suit, action or Proceeding brought by any Party or any of its Affiliates arising out of or based upon this Agreement shall only and exclusivity be instituted in any federal or state court that has jurisdiction and venue over Harris County, Texas, and each Party waives any objection which it may now or hereafter have to the laying of venue of any such Proceeding, and irrevocably submits to the jurisdiction of such courts in any such suit, action or Proceeding.

22.     **Severability**.  If a court of competent jurisdiction or an arbitration panel to which a dispute is submitted determines that any provision of this Agreement is invalid, then the parties request that such court or panel modify such provision in order to render such provision not invalid, and then enforce the provision as modified.  The parties further agree that each provision of this Agreement is severable from each other provision of this Agreement.

23.     **Miscellaneous**.  No modification, termination, or attempted waiver of any of the provisions of this Agreement shall be binding upon either party unless reduced to writing and signed by the party to be bound.  This Agreement shall be construed according to a plain reading of its terms and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision in this Agreement.  Any number of counterparts of this Agreement may be signed and delivered, each of which shall be considered an original and all of which, together, shall constitute one and the same instrument. Electronic signatures and the electronic exchange of counterparts shall be the same as hand-written signatures and the exchange of originals.

24.      **<u>Entire Agreement</u>**.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter contained herein and supersedes any and all prior and contemporaneous agreements, representations and understandings of the Parties related to the subject matter contained herein

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned hereto set their hands and seals to be effective as of Executive's start date with the Company.

**EXECUTIVE**

_____

**STEPHEN DISCHER**

**GOT DISTRIBUTION SPV, LLC**

By:      GOT Management, LLC,
         its manager

By: _____
Name: Glendord Carty
Title: Managing Partner

*[Signature Page to Employment Agreement (S. Discher)]*

## **Exhibit D**

Form of Seller Note

(see attached)

THIS UNSECURED PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS.

THIS UNSECURED PROMISSORY NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN ARTICLE III HEREOF AND EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY SUCH PROVISIONS.

UNSECURED PROMISSORY NOTE

$10,000,000.00                                                                                           [--], 2021

FOR VALUE RECEIVED, the undersigned, **GOT DISTRIBUTION SPV, LLC**, a Delaware limited liability company ("*Maker*"), promises to pay to the order of **SUPERCUB HOLDINGS, LLC**, a Texas limited liability company ("*Holder*"), the principal sum of Ten Million and no/100 Dollars ($10,000,000.00), together with interest accruing on the outstanding principal amount of this Unsecured Promissory Note (the "*Note*"), as provided below.  As used herein, the terms "*Maker*" and "*Holder*" shall be deemed to include their respective successors, and assigns, whether by voluntary action of the parties or by operation of law.

Maker, Holder and certain other Persons are parties to that certain Securities Purchase and Employment Agreement (both defined herein) This Note is given by Maker to Holder pursuant to the terms of the Purchase Agreement.  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

ARTICLE I
TERMS OF PAYMENT

SECTION 1.01.  Maturity Date.  The entire unpaid amount of this Note, including any accrued and unpaid interest, shall be due and payable on the third anniversary of the date of this Note (the "*Maturity Date*").

SECTION 1.02.  Interest.  Simple interest shall accrue on the outstanding principal amount of this Note at the rate of 4.0% per annum, compounded monthly, and shall be payable as required below. Beginning thirty (30) days after an uncured Event of Default, interest shall accrue on the outstanding amount of this Note at the Default Rate.

SECTION 1.03.  Payment.  During the term of this Note, Maker shall pay monthly payments, representing accrued and unpaid interest only, in thirty-six equal installments of $35,353.29, due on the 1st day of each calendar month prior to the Maturity Date (each a "*Payment Date*"), with the first such payment due on [--][1], 2022. Interest on all unpaid balances of principal due hereon is to be first deducted from the payments and the balance after the monthly payments is to be applied to the principal due herein. In the event of any prepayment on this Note, the unpaid principal of this Note will be amortized by Maker over the remaining term of this Note so that such unpaid principal, together with any interest thereafter accruing thereon prior to the Maturity Date, will be paid in equal installments due on the Payment Dates remaining

---

[1] NTD:  To be the first day of the first month after the Closing Date.

after such prepayment.  All payments shall be made to Holder at the address set forth in <u>Section 4.01</u>; provided, however, Holder may direct payments to be made by wire transfer to a financial institution designated by Holder.

SECTION 1.04.  <u>Voluntary Prepayment</u>. Maker may at any time or from time to time prepay the unpaid principal amount of this Note, in whole or in part and at Maker's sole and absolute discretion, without premium or penalty.  Partial prepayments shall be applied first to accrued but unpaid interest and thereafter to principal.  Any amount repaid pursuant to the exercise of rights provided under <u>Section 1.06</u> shall be deemed a prepayment hereunder.

SECTION 1.05.  <u>Payments and Computations</u>.  Maker shall make each scheduled payment hereunder not later than 5:00 P.M. (Delaware time) on the applicable Payment Date, in same day funds. All computations of interest shall be made on the basis of actual days elapsed over a year of 365 days. Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

SECTION 1.06.  <u>Offset Rights</u>.  Maker shall have no right of offset against this Note for any claims arising under the Purchase Agreement or the Employment Agreement, except for the following: (a) any adjustment payments to the Closing Payment (as defined in the Purchase Agreement) in favor of the Company, as finally determined pursuant to Section 1.6(e) of the Purchase Agreement; and (b) any unpaid, determined Losses of the Buyer Indemnified Persons under Article 5 of the Purchase Agreement, if determined by either (i) a final court order or (ii) an agreement in writing between Maker and Holder.

SECTION 1.07.  <u>Events of Default</u>. If any of the following events shall occur and be continuing (in each case, an "***Event of Default***"):

(a)     Maker shall fail to pay any principal of, or interest on, this Note on or before the date on which such payment is due, and such failure shall continue for three Business Days after Holder shall deliver to Maker written demand therefor (including, for the avoidance of doubt, as a result of any limitation or prohibition that arises under <u>Article III</u>).

(b)     Maker materially breach and or shall fail to perform any other obligation required under this Note (other than subparagraph (a)), immediately above, and such failure shall not be remedied within 30 Business Days after Holder gives Maker written notice of such failure to perform.

(c)     Any representation or warranty made by Maker in this Note or in the Purchase Agreement, or which is contained in any certificate, instrument, document, opinion, financial statement, is incorrect, false or misleading in any material respect on or as of the date made or deemed made.

(d)     The entry of a judgment, Lien, or the issuance of a warrant of attachment, execution or similar process against Maker or any of its assets or subsidiaries in excess of $25,000.00, which is not dismissed, discharged, stayed pending appeal or bonded within thirty (30) days after entry and, if bonded, such bond (or a replacement bond) does not continue in effect at all times until such judgment is dismissed or discharged.

(e)     The occurrence of any Material Adverse Change in the assets, liabilities, financial condition, business, operations, affairs, or circumstances of Maker or its subsidiaries

(f)     Maker's uncured material breach of the Employment Agreement or the Purchase Agreement.

       (g)     An involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking:

            (i)     relief in respect of Maker, or of a substantial part of the property or assets of Maker, under any applicable bankruptcy, insolvency, receivership or similar law,

            (ii)     the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Maker or for a substantial part of the property or assets of Maker or the winding-up or liquidation of either Maker or any of its subsidiaries; and such proceeding or petition shall continue undismissed or unstayed for sixty days or an order or decree approving or ordering any of the foregoing shall be entered; or

            (iii)     Maker shall (A) voluntarily commence any proceeding or file any petition seeking relief under any applicable bankruptcy, insolvency, receivership or similar law, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in subsection (ii) above, (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Maker or for a substantial part of the property or assets of Maker, or (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding,

            (iv)     make a general assignment for the benefit of creditors,

            (v)     admit in writing its inability or fail generally to pay its debts as they become due, or

            (vi)     take any corporate action for the purpose of effecting any of the foregoing.

SECTION 1.08.  Remedies

       (a)     Upon the occurrence of an uncured Event of Default, which remains uncured for at least 60 days, Holder shall, at its option, be entitled to, in addition to and not in lieu of the remedies, declare the entire principal amount of all Note then outstanding, including principal, interest, costs, fees and expenses, to be immediately due and payable without presentment, demand, notice of protest, protest, or dishonor or other notice of any default of any kind, all of which Maker hereby expressly waives; provided, however, that upon the occurrence of an event specified in Section [1.07(a)] herein, all amount owed by Maker to Holder under the Note shall be immediately due and payable in full, and Holder shall be entitled to exercise any and all remedies available by contract, at law or in equity to collect such amounts.

       (b)     Maker Upon the occurrence of an uncured Event of Default, Holder may exercise any other remedy or right provided in law or in equity.

       (c)     All rights and all remedies available to Holder hereunder shall be cumulative and in addition to all other rights and remedies granted to Lender by contract, at law or in equity, and may be exercised from time to time, and as often as may be deemed expedient by Holder, whether the Note is due and payable and whether or not Holder shall have instituted any suit for collection, foreclosure or other action in connection with this Note.

SECTION 1.09.  Usury Savings Clause.  If for any reason whatsoever the interest and loan fees and charges paid or payable by Maker hereunder shall exceed the maximum amounts collectible under applicable laws, then, ipso facto, the obligation to pay such interest and loan fees and charges shall be reduced to the maximum amounts collectible under applicable laws, and any amounts collected by Holder

that exceed such maximum amounts shall be applied to the reduction of the outstanding principal balance, or if the outstanding principal balance is paid to zero, any excessive amounts collected shall be refunded to Maker, so that at no time shall the interest and loan fees and charges paid or payable exceed the maximum amounts permitted from time to time by applicable law.

ARTICLE II
MAKER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 2.01. Representations and Warranties.   Maker hereby makes the following representations and warranties:

(a)   Organization, Authority and Qualification.   Maker is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all necessary power and authority to execute and deliver this Note and to perform its obligations hereunder.

(b)   Due Authorization.   The execution and delivery of this Note by Maker and the performance by Maker of its obligations hereunder have been duly authorized by all requisite limited liability company action on the part of Maker.   This Note has been duly executed and delivered by Maker and constitutes a legal, valid and binding obligation of Maker enforceable against Maker in accordance with its terms, subject to applicable law, bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors rights and remedies generally and subject to rules of law governing specific performance, injunctive relief and to general principles of equity.

(c)   No Conflict.   The execution, delivery and performance of this Note by Maker does not violate, conflict with or result in the breach of any applicable law, provision .

(d)   No Consent.   With respect to the execution, delivery and performance of this Note, Maker does not and will not require any registration with, consent or approval of, notice to, or action by, any other person or court, including, without limitation, any regulatory authority, governmental body, or court of the United States or of any state thereof, or any political subdivision of the United States or of any state thereof.

SECTION 2.02. Affirmative Covenants. Maker hereby covenants and agrees with Holder that:

(a)   Existence.   Maker shall do or cause to be done all things necessary to preserve, renew, and keep in full force and effect its existence, material rights, licenses, permits and franchises and conduct and operate its business and subsidiaries in substantially the manner in which it is presently conducted and operated (subject to changes in the ordinary course).

(b)   Books and Records.   Maker will at all times keep and maintain accurate, complete, and accurate books and records of its operations in connection with its business and subsidiaries. Maker's books and records shall at all times be maintained at the address for Maker set forth in this Note.

(d)   Timely Payment of Debts. Maker shall timely pay all of its monetary obligations that arise in the normal course of its business, and it shall cause its subsidiaries to pay all of its monetary obligations that arise in the normal course of its business.

(e)   Intervening Liens and Encumbrances.   Maker and its subsidiaries shall satisfy and pay all claims for labor or materials, rents, and other obligations that, if unpaid, will or might become a Lien, except where Maker promptly and diligently contests in good faith by appropriate proceedings and Maker has established adequate reserves, therefore.

(f)   Taxes.   Maker and its subsidiaries shall pay and discharge promptly all taxes and governmental charges, levies, and assessments affecting Maker or its subsidiaries, except where such taxes and charges are promptly and diligently contested in good faith by Maker by appropriate proceedings, and where Maker has established adequate reserves, therefore.

SECTION 2.03.   Negative Covenants.   Maker hereby covenants and agrees with Holder that, without either (x) the prior written consent of Holder or (y) the outstanding amounts owed hereunder being paid in full prior to or commensurately with the consummation of the following actions, Maker will not:

(a)   Discontinuance of Business; Dissolution; Etc.   Discontinue its usual business, or commence to dissolve, wind-up or liquidate itself.

(b)   Assignment.   Assign or transfer any of Maker's rights, remedies, powers, duties, liabilities or obligations arising under or pursuant to this Note (other than to a controlled affiliate of Maker).

(c)   Transfers.   Sell, assign, transfer or otherwise dispose of substantially all of Maker's and or its subsidiaries' assets, except contemporaneously with the payoff of this Note.


ARTICLE III
SUBORDINATION PROVISIONS

SECTION 3.01.   Subordination.   Maker and Holder hereby covenant and agree that any and all payments under this Note (collectively, the "*Junior Payments*") will be subordinate in right of payment, to the extent and in the manner hereinafter set forth, to the prior payment of Senior Debt outstanding on the date hereof or hereinafter incurred, provided that Maker shall pay, and Holder shall accept, Junior Payments pursuant to the terms of this Note so long as no event of default has occurred and is continuing under the Senior Debt.

(a)   "*Senior Debt*" means any and all indebtedness, obligations and liabilities in connection with that certain Business Loan and Security Agreement (as may be amended, restated, supplemented or otherwise modified from time to time), dated October 27, 2021 (the "*Closing Date Senior Credit Facility*"), by and between GOT Distribution, LLC and WebBank (the "*Senior Lender*"), or any credit agreement (or equivalent) that GOT Distribution, LLC may enter into in the future in connection with any refinancing, replacement or substitute of the Closing Date Senior Credit Facility.

(b)   Maker and Holder hereby covenant and agree (i) that the Junior Payments are and will remain unsecured, (ii) that holder of the Senior Debt is an express third party beneficiary of the provisions of this Article III and may enforce them against holders of the Junior Payments directly, (iii) that any amendments to this Note will not be effective to decrease the rights of the holder of the Senior Debt without such holder's prior written consent, and (iv) to do or cause to be done any and all further acts and things and to execute and deliver any and all further documents and instruments as Maker or any of its Affiliates or the holder of the Senior Debt deem necessary or appropriate to carry out the full intent and purpose of this Article III.

(c)   Subject to condition that Maker shall continue to pay the Junior Payments so long as no event of default has occurred and is continuing under the Senior Debt, the holder of the Senior Debt may at any time and from time to time,  without the consent of or notice to Holder, without incurring responsibility to Holder, and without impairing or releasing the obligation of Holder under this Article III, (i) renew, refund or extend the maturity of, or increase or decrease the amount of, any Senior Debt, or any

part thereof, or otherwise revise, amend or alter the terms and conditions thereof, (ii) sell, exchange, release or otherwise deal with any property by whomsoever at any time pledged, mortgaged or otherwise hypothecated or subjected to a lien to secure any Senior Debt, and (iii) exercise or refrain from exercising any rights against Maker or any of its Affiliates or Subsidiaries and others, including Holder.

(d)     Holder will not sell, assign or otherwise transfer any Junior Payment, or any part thereof, except subject to and in accordance with the terms hereof and upon the agreement of the transferee or assignee to abide by and be bound by the terms of this Article III.

(e)     This Article III, which the parties hereto expressly acknowledge is a "subordinated agreement" under Section 510(a) of title 11 of the United States Bankruptcy Code, as in effect from time to time, shall be effective before and after the commencement of any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of Maker or any of its Affiliates or Subsidiaries party to a Senior Agreement.

(j)     The provisions of Article III shall survive payment in full of this Note, and the holders of any Senior Debt shall be entitled to rely on and enforce the provisions thereof notwithstanding payment in full of the Note.

ARTICLE IV
MISCELLANEOUS

SECTION 4.01.  Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by e-mail of a .pdf document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient. Such communications must be sent to the respective parties at the addresses indicated below or at such other address as such party may designate by ten days' advance written notice to the other parties in accordance with this Section 4.01:

if to Holder:

c/o Stephen Discher
706 Putter Ct
College Station, T 77845

with copies (not constituting notice) to:

Rob H. Holt, Attorney at Law
P.O. Box 10890
College Station, TX 77840
Telephone: (979) 846-8176
Email:  rhh@robhholt.com

if to Maker:

GOT Distribution SPV, LLC

c/o b3 Kinetics
1001 Brickell Bay Drive #2719
Miami, FL 33131
Attention:  Glen Carty
Telephone: 786-483-5430
E-mail: glen.carty@groupoftelecom.com

with copies (not constituting notice) to:

McGuireWoods LLP
2000 McKinney Ave., Suite 1400
Dallas, TX 75201
Attention: Jon Finger
Telephone: 214 932 6404
Email: jfinger@mcguirewoods.com

SECTION 4.02.  <u>Assignment</u>.  This Note shall be binding upon, inure to the benefit of and be enforceable by any successor in interest to Holder.  Maker may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Holder.

SECTION 4.03.  <u>Amendment</u>.  This Note may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, Holder and Maker or (b) by a waiver in accordance with <u>Section 4.04</u>.  Notwithstanding the foregoing, the provisions of <u>Article III</u> shall not be amended without the prior written consent of the holders of the Senior Debt.

SECTION 4.04.  <u>Waiver</u>.  Either Maker or Holder may (a) extend the time for the performance of any of the obligations or other acts of the other party or (b) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 4.05.  <u>No Third Party Beneficiaries</u>.  This Note shall be binding upon and inure solely to the benefit of the parties hereto, their affiliates and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Note.

SECTION 4.06.  <u>Currency</u>.  Unless otherwise specified in this Note, all references to currency, monetary values and dollars set forth herein shall mean United States dollars and all payments hereunder shall be made in United States dollars.

SECTION 4.07.  <u>Expenses</u>.  Maker shall pay all reasonable out-of-pocket expenses incurred by Holder, including the reasonable fees of any counsel, in connection with the enforcement of this Note.

SECTION 4.08.  <u>Counterparts</u>.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Note.  Delivery of an executed signature page of this Note by electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.

SECTION 4.09.  Headings.  The headings of the sections of this Note are solely for convenient reference and will not be deemed to affect the meaning or interpretation of any provision of this Note.

SECTION 4.10.  Integration. This Note constitutes the entire among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 4.11.  Severability. Any provision of this Note held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 4.12.  Governing Law; Venue.  This Note shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflicts of laws principles. Any legal suit, action or Proceeding brought by any Party or any of its Affiliates arising out of or based upon this Agreement shall only and exclusivity be instituted in any federal or state court that has jurisdiction and venue over Harris County, Texas, and each Party waives any objection which it may now or hereafter have to the laying of venue of any such Proceeding, and irrevocably submits to the jurisdiction of such courts in any such suit, action or Proceeding.

SECTION 4.13.  Time of Essence.  Time is of the essence with regard to each and every provision of this Note.

SECTION 4.14.  Relationship of Lender and Borrower.  Maker and Holder intend that the relationship between them shall be solely that of creditor and debtor.  Nothing contained in this Note, nor the consummation of the transactions contemplated herein or therein, shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture, or co-ownership by or between Maker and Holder, or to create a relationship between Maker and Holder other than that of creditor and debtor, or to cause Holder to be liable or responsible in any way for the actions, liabilities, debts, or obligations of Maker.

SECTION 4.15.  Definitions. For the purposes of this Note, the following terms shall have the following meanings, unless the context otherwise requires:

"***Default Rate***" shall mean the lesser of (a) six percent (6%), or (b) the maximum lawful rate of interest permitted by law.

"***Lien***" means any interest securing an obligation owed to, or a claim by, a person, whether such interest is based on the common law, statute, or contract, and including, but not limited to, the lien or security interest arising from a security instrument, encumbrance, pledge, security agreement, conditional sale, work performed, or material supplied

"***Material Adverse Effect***" or "***Material Adverse Change***" shall mean any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in the business, results of operations, financial condition, assets, liabilities or prospects of Maker being affected in such a manner as is likely to impair (a) the ability of Maker to perform any of its obligations under the Note, (b) the rights and remedies of Holder under this Note, or (c) the legality, validity or enforceability of any of the Note.

"***Purchase Agreement***" shall mean that certain Securities Purchase and Contribution Agreement dated on or about February [--], 2022 by and between among Maker, Holder, and Stephen Discher.

"***Employment Agreement***" shall mean that certain Employment Agreement dated on or about [--], 2022 by and between among Maker and Stephen Discher.

*[Remainder of page intentionally left blank; signature page follows]*

WITNESS WHEREOF, Maker has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

**MAKER**:

**GOT DISTRIBUTION SPV, LLC**

By:   GOT Management, LLC,
       its manager


By:   _____
       Name: Glenford Carty
       Title: Managing Partner

**ACCEPTED BY HOLDER**:

**SUPERCUB HOLDINGS, LLC**


By:_____
Name: Stephen Discher
Title: Manager

[*Unsecured Promissory Note*]

# First Amendment to Securities Purchase and Contribution Agreement

**FIRST AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT**

**THIS FIRST AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT** (the "First Amendment")*,* dated as of March 30, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

**RECITALS**

A.        Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022 (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

B.        The Parties desire to amend the Purchase Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.        Amendment of Section 1.4.  Section 1.4 is hereby amended by deleting in full the reference therein to "March 31, 2022" and replacing it with "April 29, 2022".

2.        Full Force and Effect.  Except as expressly provided in this First Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

3.        Headings.  The headings contained in this First Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this First Amendment.

4.        Counterparts.  This First Amendment may be executed in two or more counterparts (any of which may be delivered by facsimile or email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

5.        Governing Law.  This First Amendment will be governed by and construed and enforced in accordance with Section 7.5 of the Purchase Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this First Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:　　GOT Management, LLC,
　　　　its manager

By:　_Glen Carty_____
Name: Glenford Carty
Title: Managing Partner

**SELLER**:

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER**:

_____
Stephen Discher

*[Signature Page to First Amendment to Securities Purchase and Contribution Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this First Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:      GOT Management, LLC,
         its manager

By:_____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER:**
_____
Stephen Discher

*[Signature Page to First Amendment to Securities Purchase and Contribution Agreement]*

# Second Amendment to Securities Purchase and Contribution Agreement

**SECOND AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT**

      **THIS SECOND AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT** (the "Second Amendment"*)*, dated as of April 27, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

**RECITALS**

      A.      Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022, as amended by the First Amendment to Securities Purchase and Contribution Agreement, dated as of March 30, 2022 (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

      B.      The Parties desire to amend the Purchase Agreement as set forth herein.

      **NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

      1.      Amendment of Section 1.4.  Section 1.4 is hereby amended by deleting in full the reference therein to "April 29, 2022" and replacing it with "May 13, 2022".

      2.      Full Force and Effect.  Except as expressly provided in this Second Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

      3.      Headings.  The headings contained in this Second Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this Second Amendment.

      4.      Counterparts.  This Second Amendment may be executed in two or more counterparts (any of which may be delivered by facsimile or email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

      5.      Governing Law.  This Second Amendment will be governed by and construed and enforced in accordance with Section 7.5 of the Purchase Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Second Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
       its manager

By: _Glen Carty_
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

*[Signature Page to Second Amendment to Securities Purchase and Contribution Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Second Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
       its manager

By:_____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

*[Signature Page to Second Amendment to Securities Purchase and Contribution Agreement]*

# Third Amendment to Securities Purchase and Contribution Agreement

DocuSign Envelope ID: E5FD3345-2623-4344-8877-16C965A18F11

## THIRD AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT

**THIS THIRD AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT** (the "Third Amendment"), dated as of May 13, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

## RECITALS

A. Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022, as amended by the First Amendment to Securities Purchase and Contribution Agreement, dated as of March 30, 2022 and the Second Amendment to Securities Purchase and Contribution Agreement, dated as of April 27, 2022 (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

B. The Parties desire to amend the Purchase Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. <u>Amendment of Section 1.4</u>. Section 1.4 is hereby amended by deleting in full the reference therein to "May 13, 2022" and replacing it with "May 31, 2022".

2. <u>Full Force and Effect</u>. Except as expressly provided in this Third Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

3. <u>Headings</u>. The headings contained in this Third Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this Third Amendment.

4. <u>Counterparts</u>. This Third Amendment may be executed in two or more counterparts (any of which may be delivered by facsimile or email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

5. <u>Governing Law</u>. This Third Amendment will be governed by and construed and enforced in accordance with <u>Section 7.5</u> of the Purchase Agreement.

[Signature Page Follows]

DocuSign Envelope ID: E5ED3345-2623-4344-8877-16C965A18F11

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Third Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
       its manager

By: _____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By: _____
Name: Stephen Discher
Title: Manager

**OWNER**:

_____
Stephen Discher

*[Signature Page to Third Amendment to Securities Purchase and Contribution Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Third Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:     GOT Management, LLC,
        its manager

By:_____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

# Fourth Amendment to Securities Purchase and Contribution Agreement

DocuSign Envelope ID: AD883GG7-2BEE-458A-98DE-3DAD34EF7966

**FOURTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT**

THIS **FOURTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT** (the "Fourth Amendment"*)*, dated as of May 28, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

## RECITALS

A.       Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022, as amended by the First Amendment to Securities Purchase and Contribution Agreement, dated as of March 30, 2022, the Second Amendment to Securities Purchase and Contribution Agreement, dated as of April 27, 2022, and the Third Amendment to Securities Purchase and Contribution Agreement, dated as of May 13, 2022 (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

B.       The Parties desire to amend the Purchase Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.       Amendment of Section 1.4.  Section 1.4 is hereby amended by deleting in full the reference therein to "May 31, 2022" and replacing it with "June 30, 2022".

2.       Full Force and Effect.  Except as expressly provided in this Fourth Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

3.       Headings.  The headings contained in this Fourth Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this Fourth Amendment.

4.       Counterparts.  This Fourth Amendment may be executed in two or more counterparts (any of which may be delivered by facsimile or email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

5.       Governing Law.  This Fourth Amendment will be governed by and construed and enforced in accordance with Section 7.5 of the Purchase Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Fourth Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:     GOT Management, LLC,
        its manager

By: _Glen Carty_____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By: _____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

*[Signature Page to Fourth Amendment to Securities Purchase and Contribution Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Fourth Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
        its manager

By:_____
Name: Glenford Carty
Title: Managing Partner

**SELLER**:

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER**:

_____
Stephen Discher

*[Signature Page to Fourth Amendment to Securities Purchase and Contribution Agreement]*

# Fifth Amendment to Securities Purchase and Contribution Agreement

# FIFTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT

**THIS FIFTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT** (the "Fifth Amendment"*)*, dated as of June 28, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

## RECITALS

A.     Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022, as amended by the First Amendment to Securities Purchase and Contribution Agreement, dated as of March 30, 2022, the Second Amendment to Securities Purchase and Contribution Agreement, dated as of April 27, 2022, the Third Amendment to Securities Purchase and Contribution Agreement, dated as of May 13, 2022, and the Fourth Amendment to Securities Purchase and Contribution Agreement, dated as of May 28, 2022 (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

B.     The Parties desire to amend the Purchase Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.     Amendment of Section 1.4.  Section 1.4 is hereby amended by deleting in full the reference therein to "June 30, 2022" and replacing it with "July 31, 2022".

2.     Full Force and Effect.  Except as expressly provided in this Fifth Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

3.     Headings.  The headings contained in this Fifth Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this Fifth Amendment.

4.     Counterparts.  This Fifth Amendment may be executed in two or more counterparts (any of which may be delivered by email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

5.     Governing Law.  This Fifth Amendment will be governed by and construed and enforced in accordance with Section 7.5 of the Purchase Agreement.

[Signature Page Follows]

      IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Fifth Amendment to be duly executed and delivered as of the date first written above.

**<u>BUYER</u>**

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
       its manager

By: _Glen Carty_ _____
         D639E9CEA5AC434
Name: Glenford Carty
Title: Managing Partner

**<u>SELLER</u>:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**<u>OWNER</u>:**

_____
Stephen Discher

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Fifth Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:     GOT Management, LLC,
        its manager


By:_____
Name: Glenford Carty
Title: Managing Partner


**SELLER:**

**SUPERCUB HOLDINGS, LLC**


By:_____
Name: Stephen Discher
Title: Manager


**OWNER:**

_____
Stephen Discher

*[Signature Page to Fifth Amendment to Securities Purchase and Contribution Agreement]*

# Sixth Amendment to Securities Purchase and Contribution Agreement

**SIXTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT**

THIS SIXTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT (the "Sixth Amendment"*)*, dated as of July 29, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

**RECITALS**

A.      Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022, as amended by the First Amendment to Securities Purchase and Contribution Agreement, dated as of March 30, 2022, the Second Amendment to Securities Purchase and Contribution Agreement, dated as of April 27, 2022, the Third Amendment to Securities Purchase and Contribution Agreement, dated as of May 13, 2022, the Fourth Amendment to Securities Purchase and Contribution Agreement, dated as of May 28, 2022, and the Fifth Amendment to Securities Purchase and Contribution Agreement, dated as of June 28, 2022 (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

B.      The Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      Amendment of Section 1.4.  Section 1.4 is hereby amended by deleting in full the reference therein to "July 31, 2022" and replacing it with "September 30, 2022".

2.      Full Force and Effect.  Except as expressly provided in this Sixth Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

3.      Headings.  The headings contained in this Sixth Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this Sixth Amendment.

4.      Counterparts.  This Sixth Amendment may be executed in two or more counterparts (any of which may be delivered by email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

5.      Governing Law.  This Sixth Amendment will be governed by and construed and enforced in accordance with Section 7.5 of the Purchase Agreement.

[Signature Page Follows]

DocuSign Envelope ID: E075051C-0774-46B3-93A1-B8B317161273

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Sixth Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:     GOT Management, LLC,
        its manager

By: _____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By: _____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

*[Signature Page to Sixth Amendment to Securities Purchase and Contribution Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Sixth Amendment to be duly executed and delivered as of the date first written above.

**<u>BUYER</u>**

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
        its manager

By:_____
Name: Glenford Carty
Title: Managing Partner

**<u>SELLER</u>:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**<u>OWNER</u>:**

_____
Stephen Discher

# Seventh Amendment to Securities Purchase and Contribution Agreement

**SEVENTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT**

**THIS SEVENTH AMENDMENT TO SECURITIES PURCHASE AND CONTRIBUTION AGREEMENT** (the "Seventh Amendment"*)*, dated as of September 30, 2022, is entered into between GOT Distribution SPV, LLC, a Delaware limited liability company ("Buyer"), and Supercub Holdings, LLC, a Texas limited liability company (the "Seller") and Stephen Discher ("Owner").

**RECITALS**

A.       Seller, Buyer and Owner (collectively, the "Parties") entered into that certain Securities Purchase and Contribution Agreement, dated as of February 4, 2022, as amended by the First Amendment to Securities Purchase and Contribution Agreement, dated as of March 30, 2022, the Second Amendment to Securities Purchase and Contribution Agreement, dated as of April 27, 2022, the Third Amendment to Securities Purchase and Contribution Agreement, dated as of May 13, 2022, the Fourth Amendment to Securities Purchase and Contribution Agreement, dated as of May 28, 2022, the Fifth Amendment to Securities Purchase and Contribution Agreement, dated as of June 28, 2022, and the Sixth Amendment to Securities Purchase and Contribution Agreement, dated as of July 29, 2022  (the "Purchase Agreement") in connection with the Seller's sale, and Buyer's purchase, of the Purchased Units of ISP Supplies, LLC, a Texas limited liability company, and Seller's contribution, and Buyer's acceptance, of the Contributed Units. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Purchase Agreement.

B.       The Parties desire to amend the Purchase Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.       Amendment of Recitals. Recitals F and G are hereby deleted in their entirety and replaced with the following:

F. On the terms and subject to the conditions contained in this Agreement, Seller will sell 71.43% of the Closing Date Units to Buyer (the "***Purchased Units***"), and in exchange for the Purchased Units, Seller will be issued the Seller Note and receive the Closing Payment (as set forth and subject to adjustment as provided in this Agreement).

G. Seller desires to contribute to Buyer, and Buyer desires to accept as a contribution from Seller, 28.57% (without giving effect to Buyer's payment of the Momentum LOC Payoff Amount) of the Closing Date Units (the "***Contributed Units***") in exchange for 14,400 Class A Units of Buyer, representing 16% of the aggregate membership interests of Buyer (prior to giving effect to the issuance of any additional Incentive Units (as defined in the Buyer LLC Agreement)) (the "***Rollover Securities***") and become a member of Buyer and a party to the Buyer LLC Agreement, a copy of which along with all subsequent amendments has been provided to Seller.

2.       Amendment of Section 1.1. Section 1.1 is hereby amended in subsection (a), by deleting in full the reference to the Closing Payment therein to "Eight Million and 0/100 Dollars ($8,000,000.00)" and replacing it with "Three Million and 0/100 Dollars ($3,000,000.00)."

3.       Amendment of Schedule A - Definitions.  Schedule A is hereby amended as follows:

a. The definition of "Seller Note" is hereby amended by deleting in full the reference to "$10,000,000" and replacing it with "$7,000,0000".

b. The definition of "Rollover Amount" is hereby deleted in its entirety and replaced with the following:

"***Rollover Amount***" means $4,000,000.

4. <u>Amendment of Employment Agreement</u>. All references to the Employment Agreement, Existing Employment Agreement, and Exhibit C are hereby deleted, including, but not limited to, in Sections <u>6.1(c)</u>, <u>6.1(m)</u>, <u>6.2(b)</u>, <u>Schedule A</u>, and <u>Exhibit C</u>.

5. <u>Amendment of Section 1.4</u>. <u>Section 1.4</u> is hereby amended by deleting in full the reference therein to "September 30, 2022" and replacing it with "October 14, 2022".

6. <u>Full Force and Effect</u>. Except as expressly provided in this Seventh Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

7. <u>Headings</u>. The headings contained in this Seventh Amendment are included for purposes of convenience only and do not affect the meaning or interpretation of this Seventh Amendment.

8. <u>Counterparts</u>. This Seventh Amendment may be executed in two or more counterparts (any of which may be delivered by email transmission), each of which will be deemed an original, but all of which together will constitute one and the same instrument.

9. <u>Governing Law</u>. This Seventh Amendment will be governed by and construed and enforced in accordance with <u>Section 7.5</u> of the Purchase Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Seventh Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:      GOT Management, LLC,
          its manager

By:

Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By:_____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

*[Signature Page to Seventh Amendment to Securities Purchase and Contribution Agreement]*

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Seventh Amendment to be duly executed and delivered as of the date first written above.

**BUYER**

**GOT DISTRIBUTION SPV, LLC**

By:      GOT Management, LLC,
         its manager

By:_____
Name: Glenford Carty
Title: Managing Partner

**SELLER:**

**SUPERCUB HOLDINGS, LLC**

By: _____
Name: Stephen Discher
Title: Manager

**OWNER:**

_____
Stephen Discher

*[Signature Page to Seventh Amendment to Securities Purchase and Contribution Agreement]*