Exhibit 3 to Defendant's 12(b)(1) Motion to Dismiss

Amended GOT SPV LLC Agreement

EXECUTION COPY

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**GOT DISTRIBUTION SPV, LLC**

**(a Delaware limited liability company)**

**October 14, 2022**

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM.

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SPECIFIED IN THIS AGREEMENT, AND THE COMPANY RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH UNITS UNTIL SUCH RESTRICTIONS HAVE BEEN SATISFIED WITH RESPECT TO ANY TRANSFER.  A COPY OF SUCH RESTRICTIONS SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE.

## TABLE OF CONTENTS

**Page**

ARTICLE I FORMATION, NAME, PURPOSE, MEMBERS, DEFINITIONS, ETC.............................1

    Section 1.1         General ...................................................................................1

    Section 1.2         Name; Principal Office.............................................................2

    Section 1.3         Purposes ..................................................................................2

    Section 1.4         Registered Agent; Registered Office.........................................2

    Section 1.5         Commencement and Term .........................................................2

    Section 1.6         Income Tax Classification.........................................................2

    Section 1.7         Members...................................................................................2

    Section 1.8         Definitions ...............................................................................3

ARTICLE II UNITS; MEMBER CAPITAL CONTRIBUTIONS/ MEMBER LOANS ...........................3

    Section 2.1         Initial Capital Contributions; Units ..........................................3

    Section 2.2         Additional Capital Contributions ..............................................5

    Section 2.3         Member Loans..........................................................................6

    Section 2.4         Member Guarantees ..................................................................7

    Section 2.5         Maintenance of Capital Accounts/Reports; Withdrawal of Capital; No Interest ...............................................................7

ARTICLE III NON-LIQUIDATING DISTRIBUTIONS ........................................................9

    Section 3.1         Available Cash .........................................................................9

    Section 3.2         Withholding/Deemed Loans to Members ...................................11

    Section 3.3         Limitations on Distributions/Liability for Repayment..................12

    Section 3.4         Mandatory Distributions ...........................................................12

    Section 3.5         Determination of Available Cash ...............................................12

    Section 3.6         Offset.......................................................................................13

ARTICLE IV ALLOCATIONS OF PROFITS AND LOSSES ..................................................13

    Section 4.1         General Allocation of Profits or Losses .....................................13

    Section 4.2         Allocations of Certain Tax Items ...............................................13

    Section 4.3         Miscellaneous..........................................................................14

ARTICLE V MANAGEMENT ....................................................................................14

    Section 5.1         Management by Manager...........................................................14

    Section 5.2         Limitation on Fiduciary Duties; Indemnification.........................15

    Section 5.3         Members..................................................................................19

    Section 5.4         Compensation/Reimbursement ..................................................19

    Section 5.5         Officers...................................................................................19

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE VI MEMBER MEETINGS ............................................................................... 19

Section 6.1          Member Meetings ................................................................. 19

Section 6.2          Quorum; Member Voting ...................................................... 20

Section 6.3          Written Consent to Action .................................................... 20

Section 6.4          Members' Designated Representatives .................................. 20

Section 6.5          Attendance at Member Meetings ......................................... 21

ARTICLE VII UNREGISTERED SECURITIES ............................................................ 21

ARTICLE VIII TRANSFERS OF MEMBERSHIP INTERESTS; MEMBER  WITHDRAWAL; ADMISSION ADDITIONAL/SUBSTITUTE MEMBERS ................................. 22

Section 8.1          General ................................................................................. 22

Section 8.2          Limitations on Withdrawal/Transfers of Membership Interests ................. 22

Section 8.3          Admission of "Assignees" as Additional or Substitute "Members" ............ 23

Section 8.4          General Consequences of Transfers/Dispositions of Membership Interests ........................................................................... 24

Section 8.5          Drag-Along Right ................................................................. 26

Section 8.6          Right of First Refusal ........................................................... 27

Section 8.7          Tag-Along Rights ................................................................. 28

Section 8.8          Specific Performance ........................................................... 30

Section 8.9          Transfers of Class A Units ................................................... 30

ARTICLE IX DISSOLUTION, WINDING UP AND LIQUIDATING DISTRIBUTIONS .................. 30

Section 9.1          Events of Dissolution ........................................................... 30

Section 9.2          Winding Up .......................................................................... 31

Section 9.3          Liquidating Distributions ...................................................... 31

Section 9.4          Liquidating Trust ................................................................. 31

Section 9.5          Certificate of Cancellation .................................................... 31

ARTICLE X BOOKS AND RECORDS ........................................................................... 31

Section 10.1         Books and Records .............................................................. 31

Section 10.2         Tax, Financial and Other Reports ........................................ 32

Section 10.3         Accounting Decisions .......................................................... 32

Section 10.4         Income Tax Elections ........................................................... 32

Section 10.5         Confidentiality ..................................................................... 32

Section 10.6         Financial Statements ........................................................... 33

Section 10.7         Expenses .............................................................................. 33

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|

ARTICLE XI TAX REPRESENTATIVE ...............................................................33

Section 11.1    Appointment of Tax Representative...............................................33

Section 11.2    Employment of Advisors ..............................................................34

Section 11.3    Notice and Indemnification ..........................................................34

ARTICLE XII MISCELLANEOUS ......................................................................34

Section 12.1    Notices ...........................................................................................34

Section 12.2    Binding Effect ...............................................................................34

Section 12.3    Construction ...................................................................................34

Section 12.4    Entire Agreement; Amendments ...................................................34

Section 12.5    Assignees........................................................................................35

Section 12.6    Headings .........................................................................................36

Section 12.7    Severability.....................................................................................36

Section 12.8    Further Cooperation .......................................................................36

Section 12.9    Governing Law; Venue ..................................................................36

Section 12.10   Waiver of Action for Partition.......................................................36

Section 12.11   Counterpart Execution; Facsimile Execution................................36

Section 12.12   Time of the Essence .......................................................................36

Section 12.13   Independent Legal Representation; Waiver of Conflict of Interests ...........36

Section 12.14   References .......................................................................................36

Section 12.15   Third-Party Beneficiaries ..............................................................37

Section 12.16   Prevailing Attorneys' Fees ............................................................37

SCHEDULES AND APPENDICES:

Schedule 1.7        Member Information

Appendix A          Definitions

Appendix B          Special Tax and Accounting Provisions

Appendix C          Illustrative Waterfall Calculation

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**GOT DISTRIBUTION SPV, LLC**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of GOT Distribution SPV, LLC, a Delaware limited liability company (the "Company"), is entered into as of October 14, 2022 (the "Effective Date"), by and among the Company and each of the Members listed on the signature pages hereto.

**RECITALS**

WHEREAS, the Company was formed as a Delaware limited liability company on October 28, 2021, by the filing of a Certificate of Formation for the Company with the Delaware Secretary of State;

WHEREAS, the Company has been governed since October 28, 2021 by that certain Limited Liability Company Agreement of the Company (the "Original Agreement");

WHEREAS, in accordance with the terms contained therein and herein, the Members desire to amend and restate the Original Agreement in its entirety, including the rights, preferences and obligations in respect of their membership interests, in accordance with the terms hereof;

WHEREAS, upon execution of this Agreement, the Members shall hold that number and class of Units set forth opposite each such Member's name on Schedule 1.7; and

WHEREAS, this Agreement shall constitute a limited liability company agreement within the meaning of Section 18-101(7) of the Act.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree to amend and restate the Original Agreement as follows:

**ARTICLE I**
**FORMATION, NAME, PURPOSE, MEMBERS, DEFINITIONS, ETC.**

**Section 1.1    General**.

(a)    Formation.  The Members acknowledge that the Company was formed as a Delaware limited liability company on September 30, 2021, by the filing of the Certificate with the Delaware Secretary of State and the Members hereby ratify such filings and registration.

(b)    Further Actions.  The Manager shall cause the Company (or duly appointed officer or other representative of the Company, as an "authorized person" within the meaning of the Act) to execute, deliver and/or file such documents and/or take such other actions as may be necessary to maintain the Company's status as a limited liability company under the Act and as a "partnership" under the Code, and to carry out the business purposes of the Company as set forth in Section 1.3, including causing the Company to be (or become and remain) qualified, formed or registered under assumed or fictitious name statutes, qualification to do business statutes and similar laws in any jurisdiction in which the Company transacts business and executing, delivering and/or filing all certificates or other instruments (and any amendments and restatements thereof) which may be required in connection therewith.  The Members shall, at the request of the Manager, promptly execute such documents and furnish such information as may be

necessary to enable the Manager to perform, on behalf of the Company, or to enable the Company to perform those actions contemplated under this <u>Section 1.1(b)</u>.

(c)     <u>Conflicts</u>.  In the event of any conflict between the terms or provisions of this Agreement and the Certificate (as the same may be amended from time to time) or between this Agreement and any of the terms or provisions of the Act (except any provisions of the Act which, by their terms, may not be superseded by the terms of this Agreement), the terms or provisions of this Agreement shall control.

**Section 1.2     <u>Name; Principal Office</u>**.  The name of the Company is "GOT Distribution SPV, LLC."  The principal office of the Company shall be located at c/o Group of Telecom 1001 Brickell Bay Drive #1200, Miami, FL 33131 or such other place as the Manager may designate by written notice to the Members from time to time.

**Section 1.3     <u>Purposes</u>**.  The purpose and business of the Company shall be limited to (a) acquiring, investing in, holding, managing, and disposing of Equity Interests (whether held directly or indirectly) (i) in the Operating Companies, and (ii) other businesses or entities which are complementary to the business of the Operating Companies and (b) making, entering into, and performing any contracts and other undertakings and to engage in any activities and transactions as may be ancillary to, or necessary or advisable for carrying out, the foregoing purposes.  Notwithstanding anything herein to the contrary, nothing set forth *herein* shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.  Subject to the Act and the provisions of this Agreement, the Company may, with the approval of the Manager, enter into and perform under any and all documents, agreements and instruments, all without any further act, vote or approval of any Member.

**Section 1.4     <u>Registered Agent; Registered Office</u>**.  The Company's registered agent and registered office in the State of Delaware are specified in the Certificate.  The Manager, on behalf of the Company, may change the registered office and/or the registered agent of the Company (in any state or other jurisdiction where appointment of a registered agent is required) from time to time.

**Section 1.5     <u>Commencement and Term</u>**.  The term of the Company commenced on the filing of the Certificate and shall thereafter continue in perpetuity unless sooner dissolved, liquidated and terminated as provided in <u>Article IX</u>.

**Section 1.6     <u>Income Tax Classification</u>**.  The Company is classified as a "partnership" for federal income tax purposes.  The Members acknowledge and agree that it is not the purpose or intent of the Members to cause the Company to be treated (or elect to be treated) for federal income tax purposes as an association taxable as a corporation, and no Member shall make an election or take any other action that would result in the Company being treated for federal income tax purposes as an association taxable as a corporation.

**Section 1.7     <u>Members</u>**.  The names and addresses of the Members and their respective Units and Membership Percentages are listed on <u>Schedule 1.7</u>.  Except as otherwise permitted by, and subject to the terms of, <u>Article VIII</u>, additional or substitute "members" of the Company may be admitted only with the prior written consent of the Manager, which consent may be given or arbitrarily withheld in the Manager's sole and absolute discretion.  The Manager shall cause <u>Schedule 1.7</u> to be amended from time to time to reflect any sale or other disposition by a Member of all or any portion of such Member's Units or the admission of any additional or substitute "members" of the Company in accordance with the express terms hereof, or, otherwise, to reflect any change in the information of any Member set forth therein (to the extent known or made known to the Manager).

**Section 1.8**    **Definitions**. Words and phrases capitalized throughout this Agreement, but which are not otherwise defined herein (or in the Recitals hereto or the opening paragraph hereof), shall have the respective meanings ascribed thereto in Appendix A or Appendix B attached hereto and made a part hereof.

**ARTICLE II**
**UNITS; MEMBER CAPITAL CONTRIBUTIONS/**
**MEMBER LOANS**

**Section 2.1**    **Initial Capital Contributions; Units**.

(a)    Outstanding Units. The authorized Units which the Company has authority to initially issue consist of those Units described in Section 2.1(e). The ownership of outstanding Units shall be listed on Schedule 1.7, as from time to time amended or supplemented by or at the direction of the Manager in accordance with this Agreement. Upon the execution and delivery of this Agreement by each Person listed on Schedule 1.7 as of the date hereof, and, with respect to the Class A Units, the making by such Person of its initial Capital Contribution set forth thereon, each such Person shall become a Member and shall receive the number and type of Units set forth opposite such Person's name on Schedule 1.7. From time to time, following the admission of any Members, or following the issuance, transfer or forfeiture of any Units, Schedule 1.7 shall be amended by or at the direction of the Manager to reflect such changes. The Members acknowledge that the GOT Sponsor was issued fully vested Profits Interests, as more particularly described in Section 2.1(d) below, solely in consideration for its performance of services to or for the benefit of the Company and its Subsidiaries, which consist of one Class B Unit.

(b)    Units; Issuance of Additional Units/Redeemed Units. Membership Interests in the Company are divided into unit increments (each, a "Unit" and collectively, the "Units") and fractions thereof. A fractional Unit entitles the holder thereof to the appropriate fraction of the rights and privileges of a whole Unit. Subject to Section 2.2(b), the Company is authorized to issue an unlimited number of Units; provided, however, that without the consent of the Manager, the Company shall not be authorized to issue any Units (or fractional thereof) not otherwise issued as of the Effective Date hereof. Any Units repurchased by the Company after the Effective Date hereof in accordance with this Agreement will no longer be deemed to be outstanding for any purposes of this Agreement and the Company will not be permitted to reissue any such repurchased Units in whole or in part at any time thereafter, without the consent of the Manager.

(c)    GOT Investor. The Members acknowledge and agree that the GOT Investor (or its Affiliate) contributed $<span style="background:black">      </span> as a Capital Contribution directly into the Company in exchange for the Class A Units as set forth on Schedule 1.7, which are in addition to the Class B Unit granted to the GOT Sponsor, as more particularly described herein.

(d)    Profits Interests.

(i)    Profits Interests issued or to be issued to a Member hereunder shall be issued in consideration of services provided or to be provided to or for the benefit of the Company by such Member in a Member capacity or in anticipation of becoming a Member, and such Profits Interests, as of the time of issuance and receipt, are intended to constitute "profits interests" within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343 and Revenue Procedure 2001-43, 2001-34 IRB 191, and not an interest in the capital of the Company. All terms and provisions of this Agreement relating to any Profits Interest issued hereunder shall be construed in a manner consistent with such intention. Accordingly, any Member issued a Profits Interest hereunder shall take into account such Member's distributive share of the Company's Profits and Losses with respect to such Profits Interest from and after the date upon which such Profits Interest is issued to

3

such Member.  The Company shall not claim any deduction with respect to the issuance or vesting of such Profits Interest (unless, and to the extent, that applicable tax rules require the holder of such Profits Interest to recognize income as a result of the issuance or vesting of such Profits Interest).

(ii)  Upon the issuance of any Profits Interest that the Manager intends to be "profits interests" for federal income tax purposes, the Manager shall specify the Distribution Threshold, if any, applicable to such Profits Interest and enter it into the Company's books and records.  With respect to the Profits Interests issued to the GOT Sponsor (or its Affiliate) as of the date hereof, the Distribution Thresholds the Class B Unit (the "Class B Distribution Threshold") is set forth on Schedule 1.7.  Notwithstanding any provision of this Agreement to the contrary, in no event will the Company make any distributions under Section 3.1 or Section 9.3(c) in respect of a Profits Interest unless and until the Company has already made aggregate distributions under Section 3.1 or Section 9.3(c) with respect to each Unit that is not a Profits Interest equal to the applicable Distribution Threshold, taking into account only distributions (and redemption payments) thereunder since the date of issuance of such Profits Interest, and thereafter such Profits Interest shall be entitled only to its pro rata share of excess distributions over and above its Distribution Threshold.

(iii)  Each person that receives a Profits Interest that is not fully vested on the date of grant shall make a timely and effective protective election under Section 83(b) of the Code with respect to such Profits Interest and shall promptly provide a copy of such election to the Company.  Treasury Regulations governing the tax treatment of the issuance of Profits Interests in exchange for services have been proposed, but not finalized, as of the date of the execution of this Agreement.  The proposed regulations, together with an accompanying notice (IRS Notice 2005-43) would render Revenue Procedures 93-27 and 2001-43 (both of which are discussed above) obsolete when the new regulations are finalized.  If the proposed regulations and the accompanying IRS Notice are finalized, either in the form originally proposed or with similar provisions, the Members, intending to be legally bound, hereby authorize the Company to make an election (the "Safe Harbor Election") to have the "liquidation value safe harbor" provided in proposed Treasury Regulations §1.83-3(1) and the proposed Revenue Procedures set forth in IRS Notice 2005-43, as such "safe harbor" may be modified when such proposed guidance is issued in final form, or as amended by subsequent guidance (the "Safe Harbor") applied to any Profits Interest in the Company issued hereunder while the Safe Harbor Election remains effective, to the extent such interest meets the Safe Harbor requirements (collectively, such interests are referred to as the "Safe Harbor Interests").  The Tax Representative, as the Member who has the responsibility for federal income tax reporting by the Company, is authorized and directed to execute and file the Safe Harbor Election on behalf of the Company or the Members.  The Company and the Members (including any Person to whom an interest in the Company is transferred in connection with the performance of services) hereby agree to comply with all requirements of the Safe Harbor (including forfeiture allocations) with respect to all Safe Harbor Interests and to prepare and file all U.S. federal income tax returns (and to the extent applicable, state income tax returns) reporting the tax consequences of the issuance and vesting of Safe Harbor Interests consistent with such Safe Harbor guidance.

(iv)  The Company may, at the discretion of the Manager, issue Incentive Units to key employees, officers, directors, managers, consultants, independent contractors and service providers of the Company and its Subsidiaries, in such amounts and on such terms and conditions as the Manager deems appropriate.  Such terms and conditions shall be set forth in any incentive equity plan adopted by the Company (as amended, restated, replace or otherwise modified from time to time, the "Incentive Plan"), and/or in an equity award, phantom equity award or any other award agreement pursuant to which such Incentive Units are issued (an "Incentive Award Agreement"), the form of which shall be prescribed by the Manager.  Upon the issuance of any

Incentive Units, the Manager shall specify the Distribution Threshold, if any, applicable to such Incentive Units and enter it into the Company's books and records. Notwithstanding any provision of this Agreement to the contrary, in no event will the Company make any distributions under Section 3.1 in respect of any Incentive Unit (other than Tax Distributions) unless and until the Company has already made aggregate distributions under Section 3.1 on each other Unit that is not an Incentive Unit equal to the applicable Distribution Threshold and further taking into account any payments made to a Member in redemption of the Units held by such Member, taking into account only distributions (and redemption payments) thereunder since the date of issuance of such Incentive Unit, and thereafter such Incentive Unit shall be entitled only to its pro rata share of excess distributions over and above its Distribution Threshold.

(e)     Rights and Privileges of Initial Classes of Units.

(i)     There is hereby created a class of Units designated as the "Class A Units". Each Class A Unit shall be identical to all other Class A Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of a Class A Unit as set forth herein.

(ii)     There is hereby created a Unit designated as the "Class B Unit". The Class B Unit shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of the Class B Unit as set forth herein.

(iii)     There is hereby created a Unit designated as the "Incentive Unit". The Incentive Unit shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of the Incentive Unit as set forth herein and shall be non-voting.

**Section 2.2     Additional Capital Contributions.**

(a)     Other Additional Capital Contributions. No Member shall be required or, except as specified in Section 2.2(b), permitted to make any additional Capital Contributions to the Company.

(b)     Voluntary Additional Capital Contributions/Capital Calls.

(i)     Except for issuances of (A) Equity Interests issued to third party lenders (who are not already a Member) to the Company and/or the Subsidiaries in connection with debt financings, refinancings, restructurings, recapitalizations or similar transactions, (B) Units issued in connection with any unit split or unit dividend or other division or combination of Units, (C) Equity Interests issued in connection with strategic transactions (other than a financing transaction) involving the Company and/or the Subsidiaries and other Persons (including Equity Interests issued as consideration in connection with an acquisition transaction), and (D) Incentive Units issued pursuant to an Incentive Agreement, if the Manager determines that the Company requires additional funds, the Manager is authorized to solicit and/or accept such additional funds, as a contribution to the capital of the Company, from any Person, provided, each Member is provided a reasonable opportunity to contribute each Member's Proportionate Share of the total additional funds otherwise then being solicited based upon the terms and conditions determined by the Manager in its discretion. For purposes hereof, a Member shall be deemed to have waived its right to contribute such Member's Proportionate Share of any additional Capital Contributions solicited by the Manager, from time to time, in accordance with this Section 2.2(b), if such Member shall fail to contribute such Member's Proportionate Share thereof within fifteen (15) days (or such longer period as may be specified by the Manager) of receipt of a written notice (a "Voluntary Capital Call Notice") from the Company (or duly authorized representative of the Company acting

5

at the direction of the Manager) specifying (A) the total additional funds which the Manager is then seeking be contributed to the Company by a Member or Members, (B) the reason such additional funds are required (i.e., the proposed use(s) by the Company of such additional funds), (C) the rights and preferences or relative rights and preferences to be afforded to the Members that make such additional Capital Contributions, and (D) such Member's Proportionate Share of such total additional Capital Contributions.

(ii)     If any Member fails to timely contribute (or affirmatively elects not to contribute) its Proportionate Share of the aggregate additional Capital Contributions to which a Voluntary Capital Call Notice relates (such Member being referred to as a "Non-Funding Member") in accordance with Section 2.2(b)(i), then each (or any) other Member who timely contributed such Member's Proportionate Share (as determined in accordance with Section 2.2(b)) thereof (a "Funding Member"), may elect to make an additional Capital Contribution to the Company not in excess of the maximum amount the Non-Funding Member could have contributed under said Voluntary Capital Call Notice (or, if there is more than one Funding Member, up to each such Funding Member's Proportionate Share (as determined in accordance with Section 2.2(b)) of such maximum amount) within such time period as may be reasonably set forth in writing from the Company to the Funding Members notifying them of the amount or amounts that such Non-Funding Member or Members failed to contribute to the Company in accordance with the Voluntary Capital Call Notice.

(iii)     Any amounts a Member contributes to the Company under this Section 2.2(b) shall be in immediately available funds and deposited in a bank account owned by the Company, to be held or used for the purposes described in the Voluntary Capital Call Notice to which such contribution relates.  All such amounts so contributed by any Member shall be treated as an additional Capital Contribution by such Member to the Company for all purposes of this Agreement (including for purposes of maintaining the Members' Capital Accounts and Section 3.1(b)).

(iv)     In the event that any Non-Funding Member fails to timely contribute (or affirmatively elects not to contribute) its Proportionate Share of any additional Capital Contributions pursuant to a Voluntary Capital Call Notice and the Funding Member or Members fail to elect and timely contribute such additional Capital Contributions to the Company to the extent of the amount the Non-Funding Member or Members could have contributed under said Voluntary Capital Call Notice, then for a period of ninety (90) days following the delivery of such Voluntary Capital Call Notice, the Company and the Manager shall be free to offer and sell such additional Membership Interests (or Units) to any Person or Persons, including any Member or Affiliate thereof, at a price not less than the price set forth in the Voluntary Capital Call Notice and on terms and conditions not substantially more favorable to proposed offeree than the terms and conditions set forth in the Voluntary Capital Call Notice.  Any such additional Equity Interests not so issued and sold within such one-hundred and eighty (180)-day period may not be issued and sold by the Company unless the Company once again complies with the requirements of this Section 2.2(b).

**Section 2.3     Member Loans**.

(a)     General.  In the event that, from time to time, the funds of the Company are insufficient to pay when due any authorized expenses or obligations of the Company or if the Company otherwise requires additional funds, the Manager, in its reasonable discretion, may cause the Company to borrow all or any portion of such funds from any Person, including any Member or Members (or Affiliate(s) of any Member or Members) as the Manager may determine in its sole and absolute discretion; provided,

that each Member shall be given a reasonable opportunity to loan (or cause an Affiliate of such Member to loan) the Company up to such Member's Proportionate Share, of the total funds which the Manager otherwise authorizes the Company to borrow at such time and pursuant to such terms as the Manager may determine in its reasonable discretion.  The provisions set forth in <u>Section 2.2(b)</u> shall apply *mutatis mutandis* to the funding of any loans by the Members pursuant to this <u>Section 2.3(a)</u>.

   (b) <u>Repayment Member/Affiliate Loans</u>.  Any loans made (or deemed made) to the Company by a Member or Members, or any Affiliate(s) thereof, from time to time, as provided in <u>Section 2.3(a)</u> or <u>Section 2.4</u>, shall be repaid by the Company from its first available proceeds, as determined by the Manager in its reasonable discretion, and before distributions of Available Cash (or other cash or property) are made by the Company to the Members (or any Member), together with interest, as in effect from time to time during the period the principal amount of such loan (or loans) remain(s) outstanding.  In the event there shall be outstanding loans (or deemed loans) to the Company made by any two or more Members (or Affiliates thereof) in accordance with <u>Section 2.3(a)</u> or <u>Section 2.4</u>, any amounts otherwise to be paid by the Company in repayment of such loan or loans shall be paid, pro rata, among all such loans, based on the then relative outstanding balance of each such loan unless all lending Members (or Affiliates thereof) otherwise mutually agree.

   **Section 2.4** <u>**Member Guarantees**</u>.  No Member shall be required (or permitted) to guarantee any loan or obligation of the Company unless agreed to by such Member and approved by the Manager.  In the event a Member agrees to guarantee any Company loan or obligation with the consent of the Manager, and is later required to make any payment under such Member's guarantee thereof (excluding any payment required to be made by reason of such Member's breach of its obligations under such guarantee), then such payment shall be treated as a loan by such Member to the Company, to be repaid as provided in <u>Section 2.3(b)</u> which shall bear interest on the outstanding principal balance thereof at the Prime Rate as in effect from the time during the period such principal amount of such loan remains outstanding.

   **Section 2.5** <u>**Maintenance of Capital Accounts/Reports; Withdrawal of Capital; No Interest**</u>.

   (a) <u>Capital Accounts</u>.  An individual Capital Account shall be determined and maintained by the Company for each Member as provided in <u>Section I</u> of <u>Appendix B</u> attached hereto.  Upon the sale, exchange or assignment of all or a portion of an interest in the Company, the Capital Account of the transferor, or the portion thereof that is attributable to the transferred interest, if the transferor disposed of less than the transferor's entire interest in the Company, shall be carried over to the transferee.

   (b) <u>No Right to Withdraw Capital/No Right to Interest</u>.  Except as otherwise provided in <u>Section 3</u>, no Member shall be entitled to withdraw all or any portion of such Member's Capital Contributions or the balance in such Member's Capital Account, in money or other property, prior to dissolution of the Company, and then only in accordance with the provisions of the Act and <u>Section 9.3</u>.  Neither the Manager nor any Member shall be personally liable for the payment or return of any portion of any Member's Capital Contributions.  Except with respect to the Class A Preferred Return, no interest will be paid on account of any Capital Contributions (or on the credit balance in any Member's Capital Account).  No Member shall have the right to receive or demand property other than cash in return for such Member's Capital Contributions, and no Member shall have priority over any other Member, either as to the return of such Member's Capital Contributions or as to distributions, except to the extent otherwise expressly specified in this Agreement.

**Section 2.6**      <u>Non-Competition and Non-Solicitation</u>.

    (a)      <u>Definitions</u>.

    (i)      "<u>Employee Unitholder</u>" means any Unitholder who is or was, or whose members or equityholders is or was an employee or independent contractor of the Company or any Subsidiary (other than, for the avoidance of doubt, GOT Investor and GOT Sponsor).

    (ii)      "<u>Protected Customer or Supplier</u>" means any customer, supplier or vendor of a Protected Employer.

    (iii)      "<u>Protected Employee</u>" means any officer, manager, employee or independent contractor of a Protected Employer.

    (iv)      "<u>Protected Employer</u>" means the Company or a Subsidiary of the Company that operates in the Restricted Business.

    (v)      "<u>Restricted Period</u>" means the period during which any Person is an Employee Unitholder and two (2) years thereafter.

    (vi)      "<u>Restricted Business</u>" means the business of the Operating Companies throughout the United States.

    (b)      <u>Covenant Not to Compete, Solicit or Interfere</u>. Each Employee Unitholder hereby agrees that, during the Restricted Period, he shall not, directly or indirectly (including through Affiliates or by contract), as a partner, joint venturer, employer, employee, consultant, shareholder, member, principal, director, manager, agent, subcontractor, individual or otherwise:

    (i)      engage in any aspect of the Restricted Business;

    (ii)      own, manage, operate, finance, join, control or participate or lend money or his reputation to any business that in any way competes with any aspect of the Restricted Business (*provided*, *however*, that nothing herein shall be construed to prevent any Employee Unitholder from (i) holding as a passive investment not more than five percent (5%) of the shares in any company whose shares are traded on a national securities exchange or over-the-counter market or (ii) at any period of time when he is no longer an Employee Unitholder, becoming an employee of a company that provides marketing services for a diverse range of industries, so long as his position or duties as an employee are not related to the Restricted Business and he does not engage in activities that compete with the Restricted Business);

    (iii)      induce, solicit or cause, or attempt to induce, solicit or cause, any Protected Employee to terminate his or her employment with or engagement by the applicable Protected Employer;

    (iv)      engage or hire, or attempt to engage or hire, any Protected Employee until twelve (12) months after such individual's employment relationship with the applicable Protected Employer;

    (v)      induce, solicit or cause, or attempt to induce, solicit or cause, any Protected Customer or Supplier to terminate, reduce or adversely change its business with a Protected Employer;

(vi)     make any public statement that disparages the Company, the Unitholders or any Protected Employer, including any statement that disparages the products, services, finances, financial condition, capabilities or other aspect of the business of such Person; or

(vii)     engage in any practice the purpose or intended effect of which is to evade the provisions of this Section 2.6.

Notwithstanding the foregoing, in the event of two or more successive payment defaults by the Company, which continues for a period of at least 120 days, with respect to its obligations under the Seller Note, then upon the Company's receipt of written notice from Supercub Holdings, LLC, Supercub Holdings, LLC shall be released of the (a) obligations, and covenants under this Section 2.6 (other than solicitation of employees and contractors that are not employees and contracts of ISP Supplies, LLC as of October 14, 2022), and (b) the confidentiality restrictions contained in Section 10.5 solely with respect to Confidential Information solely pertaining to ISP Supplies, LLC as of October 14, 2022.

(c)     Equitable Relief.  If any Employee Unitholder breaches, or threatens to commit a breach of, any provision of this Section 2.6, the Company will have the right and remedy (i)  to have such provision specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach may cause irreparable injury to the Company and the Subsidiaries and that money damages may not provide an adequate remedy to the Company and the Subsidiaries, and (ii) to recover from such Employee Unitholder and its Affiliates, jointly and severally, all monetary damages suffered by the Company and the Subsidiaries as a result of any acts or omissions constituting a breach of this Section 2.6, and each such right and remedy will be independent of the others, severally enforceable and in addition to, and not in lieu of, any other rights and remedies available to the Company and the Subsidiaries at law or in equity.

(d)     Acknowledgements.     Each Employee Unitholder acknowledges that the restrictions contained in this Section 2.6are reasonable and necessary to protect the legitimate interests of the Company and the Subsidiaries and constitute a material inducement to the Company to admit such Employee Unitholder as an Employee Unitholder.   In the event that any covenant contained in this Section 2.6 is ever adjudicated to exceed the temporal, geographic or other limitations permitted by applicable law in any jurisdiction, then any court is expressly empowered and instructed to reform such covenant, and such covenant will be deemed reformed, in such jurisdiction to reflect the maximum temporal, geographic, product or other limitations permitted by applicable law.  The covenants and other provisions contained in this Section 2.6are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written will not invalidate or render unenforceable the remaining covenants or provisions of this Section 2.6, and any such invalidity or unenforceability in any jurisdiction will not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

### ARTICLE III
### NON-LIQUIDATING DISTRIBUTIONS

Section 3.1     Available Cash.     Prior to the Company's dissolution in accordance with Section 9.1, subject to the following provisions of this Section 3 and any restrictions on distributions to the Members otherwise specified in this Agreement (including, without limitation, Section 3.3 hereof), the Manager may cause the Company to distribute its Available Cash (after having first made any Tax Distributions required to be made under Section 3.2(d) for the current and all prior fiscal quarters), if any, at such time or times and in such amounts as the Manager may determine, to or among the Members as follows:

(a)     <u>Distribution to Members</u>.   Subject to <u>Section 3.1(b)</u>, Available Cash will be distributed by the Company at such times and in such amounts as is determined by the Manager (provided that Tax Distributions shall be made at such times and in such amounts as specified in <u>Section 3.2(d)</u>), to or among the Members in the following order and priority:

(i)     <u>First</u>, if one or more Class A Members have Unreturned Capital Contributions as of the date of distribution, to those Class A Members who have Unreturned Capital Contributions in proportion to their relative Unreturned Capital Contributions until the Unreturned Capital Contributions of all Class A Members have been reduced to zero;

(ii)     <u>Second</u>, if one or more Class A Members have a Class A Preferred Return Distribution Deficit as of the date of distribution, to those Class A Members who have a Class A Preferred Return Distribution Deficit in proportion to their relative Class A Preferred Return Distribution Deficits until the Class A Preferred Return Distribution Deficits of all Class A Members have been reduced to zero; and

(iii)     <u>Thereafter</u>, to the holders of Class A Units and Participating Incentive Units (ratably among such holders based upon the number of Class A Units and Participating Incentive Units held by each such holder immediately prior to such distribution).

For purposes of determining the amount of distributions under this <u>Section 3.1(a)</u>, each holder of a Unit shall be treated as having received any amounts received by any prior holders of such Unit in connection with any prior distributions made under this <u>Section 3.1(a)</u>.

(b)     <u>Distributions to the Outside Investors and the Class B Member</u>.   Notwithstanding anything set forth in this <u>Section 3.1</u> to the contrary, any distributions of Available Cash otherwise payable to the Class A Members other than the GOT Investor or its Affiliates (such Class A Members, the "<u>Outside Investors</u>") under <u>Section 3.1(a)</u> shall be made as follows:

(i)     <u>First</u>, if one or more Outside Investors have Unreturned Capital Contributions as of the date of distribution, to those Outside Investors who have Unreturned Capital Contributions in proportion to their relative Unreturned Capital Contributions until the Unreturned Capital Contributions of all Outside Investors have been reduced to zero;

(ii)     <u>Second</u>, if one or more Outside Investors have a Class A Preferred Return Distribution Deficit as of the date of distribution, to those Outside Investors who have a Class A Preferred Return Distribution Deficit in proportion to their relative Class A Preferred Return Distribution Deficits until the Class A Preferred Return Distribution Deficits of all Outside Investors have been reduced to zero;

(iii)     <u>Third</u>, one hundred percent (100%) to the Class B Member, until the Class B Member has received cumulative distributions under this <u>Section 3.1(b)</u> equal to (A) the Carry Percentage, <u>multiplied by</u> (B) the aggregate distributions paid to the Outside Investors and such Class B Member pursuant to <u>Section 3.1(b)(ii)</u> and this <u>Section 3.1(b)(iii)</u>;   and

(iv)     <u>Thereafter</u>, (A) the Carry Percentage to the Class B Member, and (B) one hundred percent (100%) <u>less</u> the Carry Percentage to the Outside Investors (pro rata in accordance with their respective ownership of Class A Units).

For purposes of determining the amount of distributions under this <u>Section 3.1(b)</u>, each holder of a Unit shall be treated as having received any amounts received by any prior holders of such Unit in connection

with any prior distributions made under this Section 3.1(b). The Managers shall ensure, and the Members hereby agree, that the Class B Member shall receive distributions of cash and non-cash assets in the same denomination and proportion of cash and non-cash assets distributed to the other Members.

Attached hereto as **Appendix C** is an illustrative waterfall calculation, which assumes that no Incentive Units have been issued and that Supercub Holdings, LLC, GOT Investor and GOT Sponsor are the only Members.

### Section 3.2   Withholding/Deemed Loans to Members.

(a)   Tax Withholding; Treatment.  If the Company is required (as determined in good faith by the Manager) to make a payment (a "Tax Payment") with respect to any Member to discharge any legal obligation of the Company (or the Manager) to make payments to any governmental authority with respect to any federal, foreign, state or local tax liability of such Member arising from such Member's ownership or disposition of a Membership Interest, then, notwithstanding any other provision of this Agreement to the contrary, the amount of such Tax Payment shall be treated as: (i) a distribution to such Member (and the payment by such Member of the tax to which such payment relates), which shall offset, in whole or part, the first distribution(s), if any, otherwise to be made by the Company to such Member as of the date thereof pursuant to Section 3.1 or Section 9.3, or (ii) to the extent such Tax Payment exceeds the distribution(s) otherwise then to be made to such Member (or if no distribution is then to be made to such Member), a loan by the Company to such Member, which loan shall bear interest at the Prime Rate (as determined as of the date such Tax Payment is made) and be payable upon demand by the Manager or, in the discretion of the Manager, by set off against the first distribution (or distributions) thereafter to be made by the Company to such Member, whether under Section 3.1 or Section 9.3.

(b)   Right of Holdback.  The Manager shall be entitled to hold back any distribution (including Company property to be distributed in-kind) otherwise payable by the Company to any Member if and to the extent the Manager believes, in good faith, that a Tax Payment is or will be required with respect to such Member in the future and the Manager believes that there will not be sufficient subsequent distributions to such Member to make such Tax Payment.

(c)   Special Allocations of Gain or Loss from Sale of Retained Property.  If applicable, in the event Company property, or a portion thereof, to be distributed in-kind to any Member is retained by the Company to make a Tax Payment for such Member, then such property, or applicable portion thereof, shall be deemed for purposes hereof to have been distributed to such Member as of the date such distribution in-kind was otherwise to have been made and all gain or loss, as determined for federal income tax purposes, from the Company's sale of such property to fund such Tax Payment, shall be allocated, in full, to such Member.

(d)   Tax Distributions.  With respect to any taxable year prior to the year in which the Company liquidates or a Sale of the Company occurs (subject to the following sentence), the Manager shall cause the Company to distribute to the Members with respect to each fiscal quarter an amount of cash to the extent of Available Cash (a "Tax Distribution") which equals (i) the amount of net taxable income allocable to the Members in respect of such fiscal quarter (net of taxable Losses allocated to the Member in respect of prior fiscal quarters and not previously taken into account under this clause) computed without regard to allocations of income or deductions under Sections 704(c) and 743(b) of the Code, multiplied by (ii) the Assumed Income Tax Rate, with such Tax Distribution to be made to the Members in the same proportions that net taxable income (as computed pursuant to this Section 3.2(d)) was allocated to the Members during such fiscal quarter.  The Manager shall also take into account distributions made pursuant to Section 3.1 and this Section 3.2(d) for purposes of determining the amount of a Tax Distribution for a relevant quarter.  To the extent the Company does not have sufficient funds and thereby is unable to pay to

11

the Members the full amount of any Tax Distribution otherwise payable pursuant to this Section 3.2(d), the Company shall pay the amount of such shortfall to the Members (pro rata, in accordance with the amount of any such shortfall then owning to such Members) as promptly thereafter as such funds become available. Tax Distributions shall be considered advances on distributions to Members under Section 3.1 and Section 9.3(c) and shall offset future distributions to which such Member would otherwise be entitled to receive pursuant to Section 3.1 and Section 9.3(c).

Section 3.3    **Limitations on Distributions/Liability for Repayment**.

(a)    Statutory Restrictions.    Notwithstanding anything in this Agreement to the contrary, in accordance with §18-607(a) of the Act, the Company shall not make any distributions (other than guaranteed payments to any Member constituting reasonable compensation for present or past services of such Member to the Company, if applicable) to any of the Members if, immediately following such distribution, the Company would not otherwise have sufficient remaining properties (based on the fair value of its remaining properties) to pay its then total outstanding liabilities, other than liabilities to its Members on account of their Membership Interests in the Company and liabilities of the Company for which the recourse of the applicable Company creditor(s) is or are limited to specified Company property.    For purposes of applying the preceding sentence, the fair value of any Company property that is subject to a liability for which the recourse of an applicable Company creditor is limited, shall be included in the assets of the Company only to the extent that the fair value of such property exceeds that liability.

(b)    Member Repayment Obligations.    Any Member that receives a distribution made in violation of the terms of Section 3.3(a) and §18-607(a) of the Act, and who knew at the time of such distribution that such distribution was made in violation thereof, shall be liable to the Company for the amount of such distribution; provided, that, unless otherwise agreed (or unless otherwise provided by the Act), such Member shall have no liability to the Company for such distribution after the expiration of three years from the date thereof (or such longer or shorter period as may hereafter be specified by the Act) unless an action to recover such distribution from such Member is or was commenced prior to the expiration of said three year (or other applicable) period and an adjudication of liability against such Member is made in said action.

(c)    Erroneous Distributions.    If the Company has pursuant to a clear and manifest accounting, mathematical or similar error paid to any Member an amount in excess of the amount to which such Member is entitled pursuant to Section 3.1, Section 3.2(d) or Section 9.3, then such Member shall reimburse the Company to the extent of such excess (without interest) within thirty (30) days after demand by the Company to such Member for the reimbursement of such erroneous distribution or the Company shall be entitled to set off the amount of such erroneous distribution against the first distribution (or distributions) thereafter to be made to such Member, whether under Section 3.1 or Section 9.3(c).

Section 3.4    **Mandatory Distributions**.  The Manager will cause the Company to distribute the Available Cash resulting from any Liquidity Event concurrently with the completion of any such transaction and consistent with Section 3.1 (or, if applicable, Section 9.3).

Section 3.5    **Determination of Available Cash**.  Subject to Section 5.2(a)(i), in determining the amount of Available Cash, the Manager shall make a reasonable determination of the amount of cash reserves reasonably necessary or appropriate to be established and/or maintained by the Company in furtherance of its authorized business purposes, both considering current and future or anticipated operating needs and after giving effect to expenses of the Company.

12

**Section 3.6    Offset**.  The Company shall have the right to set off against any distributions payable to a Member the amount of any withholding tax required to be paid by the Company in respect of such holder.

### ARTICLE IV
### ALLOCATIONS OF PROFITS AND LOSSES

**Section 4.1    General Allocation of Profits or Losses**.  Subject to Appendix B attached hereto, Profits or Losses of the Company for each Allocation Period commencing on or after the Effective Date hereof, shall be allocated as follows:

(a)    General.  Except as otherwise provided in this Agreement, Profits and Losses for any Allocation Period shall be allocated among the Members in such a manner that, as of the end of such Allocation Period, the sum of (i) the Capital Account of each Member, (ii) such Member's share of Company Minimum Gain (as determined according to Regulations § 1.704-2(g)) and (iii) such Member's allocation of Member Nonrecourse Debt Minimum Gain (as determined according to Regulations § 1.704-2(i)(3)) shall be equal to the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to the Company under this Agreement, determined as if the Company were to (A) liquidate the assets of the Company for an amount of cash equal to their Book Values (taking into account any Book Value adjustments for such period), (B) satisfy any Company liabilities in cash according to their terms (limited, with respect to each Nonrecourse Liability of the Company, to the Book Value of the assets securing such liability) and (C) distribute the proceeds of such liquidation (after satisfaction of such liabilities) to the Members pursuant to Section 9.3(c) (treating any unvested Units as vested for purposes of this Section 4.1(a)).  Except in the year of liquidation or a year in which a Sale of the Company occurs, allocations pursuant to this Section 4.1(a) shall be allocations of net Profit or net Loss, as the case may be, as determined after taking into account any Regulatory Allocations.  If the Manager determines that it is necessary and permissible (under the Code and applicable regulations and rulings) to allocate items of gross income and gain separate from items of deduction or loss to achieve the target set forth in the first sentence of this Section 4.1(a), the Manager shall make such allocations to the extent required in such manner as it determines is reasonable; provided that such allocations of gross income and gain do not have a material adverse impact with respect to any Member (taking into account any Tax Distributions with respect thereto).

(b)    Limitation on Losses.  The Losses allocated under Section 4.1(a) to any Member shall not exceed the maximum amount of Losses that can be so allocated without causing or increasing an Adjusted Capital Account Deficit with respect to such Member.  If some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 4.1(a), then the limitation set forth in this Section 4.1(b) shall be applied so as to allocate the maximum permissible Losses to each Member under the preceding sentence and Regulations § 1.704-1(b)(2)(ii)(d).  In the event that the allocation of Losses to any Member is prohibited under the first sentence of this Section 4.1(b), such Losses shall be allocated to the remaining Members in proportion to their respective positive Adjusted Capital Account balances.  With respect to each Allocation Period (including Allocation Periods thereafter), Profits (or, to the extent necessary, gross income) shall be allocated to the Members up to the aggregate of, and in proportion to, any Losses previously allocated to each Member in accordance with this Section 4.1(b) in the reverse order in which such Losses were allocated.

**Section 4.2    Allocations of Certain Tax Items**.

(a)    Code §704(c).  All items of income, gain, loss, and deduction for federal income tax purposes shall be allocated in the same manner as the corresponding items are allocated for purposes of maintaining Capital Accounts pursuant to Section 4.1 and Appendix B; provided, however, that if any

property contributed to the Company by any Member is subject to the provisions of Code §704(c), the Members' distributive shares of income, gain, loss and deductions, as computed for income tax purposes, with respect to such property (and, to the extent permitted by the Regulations, with respect to other Company property), shall be determined in accordance with Code §704(c), utilizing such method of accounting as determined by the Manager.

(b)    Code §704(c) Principles.  In the event the Book Value of any Company asset is adjusted pursuant to Section I.D.(2) of Appendix B, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value utilizing such method of accounting as determined by the Manager.

(c)    No Effect on Distributions.  Allocations pursuant to this Section 4.2 are solely for purposes of federal, state and local income taxes and shall not affect, or in any way be taken into account in computing any Member's (i) Capital Account, (ii) share of items of the Company's gross income, gains, losses or deductions for purposes of computing Capital Accounts, or (iii) distributions pursuant to any provision of this Agreement.

Section 4.3    **Miscellaneous**.

(a)    Earning of Profits and Losses.  For all purposes of this Agreement, including the determination of the allocable share of the Profits or Losses (or items thereof) of a Member who acquires or disposes of a Membership Interest during any Taxable Year, Profits or Losses of the Company (or items thereof) for any Taxable Year shall be allocated to the periods of such Taxable Year on the "interim closing of the books" method of accounting unless otherwise agreed by the Manager (and, if applicable, a selling Member).

(b)    Consistent Tax Reporting.  Each Member agrees to report to the appropriate taxing authorities such Member's share of Profits or Losses (and, if different, share of the net taxable income or loss of the Company) consistent with this Section 4 and Appendix B attached hereto.

**ARTICLE V**
**MANAGEMENT**

Section 5.1    **Management by Manager**.

(a)    General.  The business and affairs of the Company shall be managed by the Manager.  Except for situations in which the approval of some or all of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law, the Manager shall have full, complete and plenary authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

(b)    Appointment and Removal.  The Manager shall be appointed, and may be removed and replaced at any time, by the GOT Investor.

(c)    Consent Rights.  Until the Company has paid at least $4,000,000 in principal payments under the Seller Note, without the prior written consent of Supercub Holdings, LLC, neither the

Company nor the Manager shall (and each of them shall cause the Operating Companies and their Subsidiaries not to):

> (i)     amend or otherwise modify the constituent documents or any shareholders agreement the Operating Companies or any of their Subsidiaries, or any other agreements or documents in a manner that modifies the rights, preferences, privileges or other terms of the Equity Interests in any of the Operating Companies or any of their Subsidiaries or otherwise adversely affects the rights of the Company as a shareholder or member, as applicable, of the Operating Companies or any of their respective Subsidiaries;

> (ii)    amend or otherwise modify the Management Agreement;

> (iii)   issue any Incentive Units (A) that would cause the total number of outstanding Incentive Units (without regard to vesting) to exceed ten percent (10%) of the total number of outstanding Class A Units and Incentive Units or (B) to any Person who is employed by, or who owns an interest in, GOT Management or any of its Affiliates (other than the Company and its Subsidiaries);

> (iv)    cause any material change to the principal line of business of any of the Company, the Operating Companies or their respective Subsidiaries;

> (v)     incur or cause to be incurred any material obligation, or transaction, or acquisition on behalf of the Company in excess of $100,000 with respect to a single matter, or in excess of $250,000 in the aggregate (other than the Company's anticipated acquisition of ███████████ which shall not require the consent of Supercub Holdings, LLC); and

> (vi)    effect a Sale of the Company that is not in the form of either a sale of the equity interests of Holdco or a merger that, in either case, is treated as a sale of the equity interests of Holdco for federal income tax purposes.

For the avoidance of doubt, upon the Company's payment of at least $4,000,000 in principal payments under the Seller Note, this Section 5.1(c) shall not longer be effective.

**Section 5.2     Limitation on Fiduciary Duties; Indemnification**.

(a)     Fiduciary Duties.

> (i)     In performing its duties, the Manager will be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports, or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Profits or Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid), that are furnished by one or more of the following Persons or groups: (A) one or more officers or employees of the Company or any Affiliate thereof; (B) any attorney, independent accountant, or other Person employed or engaged by the Company or any Affiliate thereof; or (C) any other Person who has been selected with reasonable care by or on behalf of the Company or any Affiliate thereof, in each case as to matters which such relying Person reasonably believes to be within any such other Person's or group's professional competence.  The preceding sentence will in no way limit any Person's right to rely on information to the extent provided in §18-406 of the Act.  The Manager will not be personally liable under any judgment of a court, or in any other manner, for any debt,

obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

(ii)     To the extent that, at law or in equity, the Manager, any officer or any Member (individually, a "Covered Person") has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, such Covered Person shall have only the duties provided in this Agreement and, except as otherwise specifically provided in this Agreement, shall not be liable to the Company or to any other Covered Person for its breach of fiduciary duty for such Covered Person's good faith reliance on the provisions of this Agreement or for breach of contract and breach of duties (including fiduciary duties), or for any approval or authorization granted by the Company or any other Covered Person.  The provisions of this Agreement, to the extent they eliminate or restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties to this Agreement to replace such other duties and liabilities of such Covered Person, other than an act or omission which constitutes fraud or willful misconduct.

(b)     Indemnification.

(i)     The Company shall, to the fullest extent permitted by the Act, indemnify and defend each Person who was or is made a party or is threatened to be made a party to or is involved in or participates as a witness with respect to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company), by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Manager or an officer or Member, or is or was serving at the request of the Company as a director, officer, employee, fiduciary, or agent of another limited liability company or of a corporation, partnership, joint venture, trust, or other enterprise (each a "Proceeding"), against all expenses (including reasonable attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by such Person in connection with such Proceeding if such Person acted in good faith, with reasonable care, and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal Proceeding, had no reasonable cause to believe such Person's conduct was unlawful, *provided that* such Person shall not be indemnified if such expenses, judgments, fines, or amounts paid in settlement are primarily attributable to the fraud, willful misconduct or gross negligence of such Person, or a material breach of this Agreement by such Person.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which such Person reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal Proceeding, that the Person had reasonable cause to believe that his or her conduct was unlawful.

(ii)     The Company shall, to the fullest extent permitted by the Act, indemnify and defend any Person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Person, or a Person of whom he or she is the legal representative, is or was a Manager or a Member, or is or was serving at the request of the Company as a director, officer, employee, fiduciary, or agent of another limited liability company or of a corporation, partnership, joint venture, trust, or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such action or suit if such Person acted in good faith, with reasonable care, and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue, or matter

16

as to which (A) such Person shall have been adjudged to be liable to the Company unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery of the State of Delaware or such other court shall deem proper, or (B) if such expenses are primarily attributable to the fraud, willful misconduct or gross negligence of such Person, or a material breach of this Agreement by such Person.

(iii)      The rights to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition conferred in this <u>Section 5.2(b)</u> shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, provision of this Agreement, any other agreement, or by affirmative vote of the Manager.

(iv)      Each of the Company and each Member hereby acknowledges that the Manager may have certain rights to indemnification, advancement of expenses, or insurance provided by one or more Members and certain of their Affiliates (collectively, the "<u>Fund Indemnitors</u>"). The Company and each of the Members hereby agree that (A) the Company is the indemnitor of first resort as to any matter as to which any Person is entitled to indemnification hereunder (i.e., its obligations to any such director or officer are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Manager are secondary), (B) the Company shall be required to advance the full amount of expenses incurred by the Manager and shall be liable for the full amount of all expenses, judgments, penalties, fines, and amounts paid in settlement by or on behalf of any such director or officer to the extent legally permitted and as required by this Agreement (or any agreement between the Company and the Manager), without regard to any rights the Manager may have against the Fund Indemnitors, and (C) the Company irrevocably waives, relinquishes, and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation, or any other recovery of any kind in respect thereof. The Company and each of the Members further agree that no advancement or payment by the Fund Indemnitors on behalf of the Manager with respect to any claim for which such director or officer has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution, and be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Manager against the Company.

(c)      <u>Expenses</u>.  Subject to the Company having sufficient Available Cash taking into account the Company's operating needs, as determined in the reasonable discretion of the Manager, expenses incurred by the Manager or any Member described in <u>Section 5.2(b)(i)</u> or <u>Section 5.2(b)(ii)</u> hereof or of a member, manager or officer of the GOT Sponsor or any of its Affiliates performing services to, for, or on behalf of the Company or any of its Subsidiaries under the Management Agreement or any similar agreement in defending a Proceeding shall be paid by the Company in advance of such Proceeding's final disposition upon receipt of an undertaking by or on behalf of the Manager or such Member to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company. Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Manager deems appropriate.  Notwithstanding the foregoing such advancement shall also be provided to such Person to the extent available under an insurance policy covering such Persons.

(d)      <u>Employees and Agents</u>.  Persons who are not covered by the foregoing provisions of this <u>Section 5.2</u> and who are or were the Manager, Members, employees, officers, or agents of the Company, or who are or were serving at the request of the Company as employees, officers or agents of an

Affiliate of the Company, may be indemnified, retroactively or prospectively, to the extent authorized at any time or from time to time by the Manager.

(e)     Other Terms; Contract Rights.

(i)     The provisions of this Section 5.2 shall be deemed to be a contract right between the Company and each Manager or Member who serves in any such capacity at any time while this Section 5.2 and the relevant provisions of the Act or other applicable law are in effect, and any repeal or modification of this Section 5.2 or any such law shall not affect any then known (or knowable) right of any such Person or any obligation of the Company with respect to any act, omission, state of facts or Proceeding occurring prior to the time of such repeal or modification or otherwise then existing.

(ii)     Except as provided in this Section 5.2, the Company shall indemnify any such Person seeking indemnification in connection with a Proceeding initiated by such Person only if such Proceeding was authorized by the Manager.

(iii)     If the Act is amended after the Effective Date to authorize further or greater limitations on the liability or fiduciary duties of the Manager or Members than that specified herein, then the limitations on liability or fiduciary duties of the Manager or Company officers, as applicable, shall be expanded to the fullest extent permitted by the Act.  If the Act is amended to authorize greater indemnification of the Manager or Members or other Persons entitled to indemnification under the foregoing provisions of this Section 5.2, then the Company's indemnification obligations to such Person or Persons shall be expanded to the fullest extent permitted by the Act.

(iv)     The indemnification and other rights provided for in this Section 5.2 shall inure to the benefit of the successors, assigns, heirs, executors and administrators of any Person entitled to indemnification in accordance with the foregoing provisions of this Section 5.2.

(f)     Other Ventures.  Notwithstanding anything to the contrary contained in this Agreement but subject to compliance with Section 10.5, the Manager, each Member and their respective Affiliates may engage, directly or indirectly, in any other business venture or ventures of any nature and description, independently or with others (whether or not competitive with, relating to, or in any manner connected with, the business of the Company or any of its respective Subsidiaries), and neither the Company nor any of the other Members shall have any rights in and to any such business ventures or the income or profits derived therefrom.  Each Member expressly agrees that the Manager, each other such Member and their respective Affiliates may engage independently, with each other or with others, for their own accounts and for the accounts of others, in other business ventures and activities of every nature and description, whether such ventures are competitive with the business of the Company, the Operating Companies or any of their respective Subsidiaries or otherwise.  Neither the Company nor any Member shall have any rights or obligations by virtue of this Agreement in and to such independent ventures and activities or the income or profits derived by the Manager or any such Member or their respective Affiliates therefrom.  Without limiting the generality of the foregoing, nothing contained in this Agreement shall limit the Manager, any Member or their respective Affiliates from making investments in any Person.

(g)     Management Agreement.  The Members acknowledge that the Company is party to the Management Services Agreement, dated as of the Effective Date, by and between the GOT Sponsor (or its Affiliate) and the Company (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "Management Agreement").

18

Section 5.3    **Members**.  No Member, in a Member's capacity as such, shall participate in or have any control over the management of the Company's business or transact any business for the Company; and no Member, in a Member's capacity as a "member" of the Company, shall have any power to sign for or bind the Company.

Section 5.4    **Compensation/Reimbursement**.  Without limiting the fees and payments to which affiliates of the Manager are entitled under Section 5.2(g), no Manager or Affiliate of a Manager or Class A Member shall otherwise receive any salary or other compensation from the Company or any of its Subsidiaries for his or her services to any such entity, except that the Manager shall be reimbursed by the Company for any reasonable out of pocket expenses directly incurred by it in its performance of any of the duties and responsibilities of such office, subject to submission of adequate substantiating receipts or records and, if applicable, subject to such limitations or other terms and conditions as the Manager may specify or determine, from time to time.  For clarity, the Manager shall not be entitled to reimbursement hereunder for office overhead expenses (including rent, compensation and the like) and other expenses related to its business and affairs generally.

Section 5.5    **Officers**.  The Manager may appoint individuals as officers of the Company as it deems necessary or desirable to carry on the business of the Company and the Manager may delegate to such officers such power and authority as the Manager deems advisable.  No officer need be a Member or Manager.  Any individual may hold two or more offices of the Company.  Each officer shall hold office until his successor is designated by the Manager or until his earlier death, resignation, or removal.  Any officer may resign at any time upon written notice to the Manager.  Any officer may be removed by the Manager with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal, or otherwise, may, but need not, be filled by the Manager.

## ARTICLE VI
## MEMBER MEETINGS

Section 6.1    **Member Meetings**.

(a)    Right to Call/Place of Meetings.  The Manager may call meetings of the Members at any time by giving notice as specified herein below.  Meetings of the Members shall be chaired by an individual selected by the Manager.  Unless held by telephone conference, each meeting of the Members shall be held at the principal office of the Company (or at such other location determined by the Manager); provided, any Member (or a Member's designated representative) may participate in any meeting of the Members not held by telephone conference, by use of a conference telephone or similar communications equipment pursuant to which all Persons participating in the meeting (or entitled to participate) can hear and communicate with each other.

(b)    Notice/Waiver of Notice.  Notice of a meeting of the Members shall be given by the Manager to each Member or all Members, as applicable, entitled to vote (or the designated representative of each Member) not later than ten (10) days before and not earlier than thirty (30) days before the date designated for such meeting, and, in addition to any other information contained therein or attached thereto, a notice of a meeting of the Members must provide the date and time of such meeting, and a general description of the nature of the business to be transacted thereat.  Any Member (or the designated representative of a Member) may waive notice of any meeting of the Members, provided, the attendance of a Member (or a Member's designated representative) at any meeting of the Members shall constitute a waiver of notice of such meeting by such Member, except where such Member (or such Member's designated representative) attends a meeting for the express purpose of objecting, at the start of such meeting, to the transaction of any business at such meeting because the meeting was not lawfully called or convened.

(c)     <u>Meeting Minutes</u>.  The Manager shall cause written minutes to be prepared of all actions taken by the Members (or the designated representatives of the Members) at each meeting of the Members, and shall cause a copy thereof to be delivered to all Members (or their designated representatives) with reasonable diligence after the meeting to which the minutes relate.

(d)     <u>Adjournment</u>.  Any Member (or a Member's designated representative) shall be entitled to a reasonable adjournment of any meeting of the Members upon not less than two (2) business days' prior written notice to the Manager and the other Members (or their respective designated representatives).  When a meeting of the Members is adjourned to a different date, time or place, it shall not be necessary to give any notice of the new date, time or place of such meeting, if the new date, time or place of such meeting is announced at such meeting before an adjournment is taken, and any business may be transacted at the adjourned meeting that might have been transacted on the original date of such meeting without the need for any other or further notice.

**Section 6.2     <u>Quorum; Member Voting</u>**.  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of the those Class A Members entitled to vote owning more than fifty percent (50%) of the total Membership Percentages in the Company owned by all Class A Members entitled to vote shall constitute a quorum, and no action may be taken at a meeting of the Members unless such a quorum is present.  A Member entitled to vote may vote either in person or by written proxy signed by the Member or by his, her, or its duly authorized attorney in fact.  Persons present by telephone shall be deemed to be present "in person" for purposes hereof.  At each meeting of the Members, each Member (or such Member's designated representative) may vote such Member's Membership Percentage with respect to any matter to be considered at such meeting, as to which such Member is entitled to vote and which is subject to the vote, consent or approval of the Members (or the Members owning any specified Membership Percentages of the Units).  Except as may otherwise be expressly provided herein to the contrary, any matter subject to the consent, approval or direction of the Members hereunder or under the Act, shall require the agreement or approval of those Class A Members entitled to vote owning more than fifty percent (50%) of the total Membership Percentages in the Company owned by all Class A Members entitled to vote. Notwithstanding anything set forth herein to the contrary, holders of Incentive Units shall have no right in their capacity as such to vote on or consent to any action or matter submitted to a vote of the Members, or with respect to which the affirmative vote, approval or consent of the Members is otherwise required under this Agreement.

**Section 6.3     <u>Written Consent to Action</u>**.  Any action required or permitted to be taken by the Members (or by any Members), whether at a meeting or otherwise, may be taken without a meeting, without prior notice and without a vote, if the action is evidenced by a written consent or other written instrument dated and signed (whether or not in counterparts and whether or not through facsimile or email copies) by that Member or those Members (or its or their designated representative) necessary to authorize or take the action which is the subject of such written consent.  All such written Member consent(s) shall be delivered to the Company at its principal office.  The Manager, within thirty (30) days after the Company obtains authorization to the taking of any action by a written consent of the Members, shall send a copy thereof to that Member (or those Members), if any, who (or whose designated representative) did not execute the same (or, otherwise, consent, in writing, to the action (or actions) which is (or are) the subject thereof).

**Section 6.4     <u>Members' Designated Representatives</u>**.

(a)     <u>Appointment/Authority</u>.  All actions, consents and approvals required or permitted to be taken or given hereunder by any Member which is not a natural person, shall be undertaken or given on each such Member's behalf by its "designated representative" or such other Person authorized to act on behalf of such Member.  For this purpose, each such Member admitted as a "member" of the Company that is not a natural person shall designate its designative representative on <u>Schedule 1.7</u> or any amendments

20

thereto. Any Member may replace or remove its designated representative by sending written notice thereof to the Company setting forth the name of the replacement designated representative and the effective date of such replacement.

(b)  Right of Reliance.  The Manager and each other Member shall have the right to rely conclusively on any other Member's designated representative; and all notices, advices, reports, and other writings of whatsoever kind or nature required hereunder or pursuant to the Act to be sent to each such Member shall be deemed effective when served, in person, upon each such Member's designated representative.  Every act of commission or omission, approval or non-approval, consent of or rejection by a Member's designated representative shall be deemed to be the act of and shall conclusively bind such Member; and the Manager and other Members shall have the absolute right to rely upon every such act of whatsoever kind and nature as the act of such Member.

**Section 6.5**     **Attendance at Member Meetings**.  Each Member which is not a natural person agrees to cause its designated representative to be available for any meeting of the Members duly called or held as otherwise provided herein.  Each such Member, with the prior written consent of the Manager, shall have the right to have additional individuals attend all meetings of the Members; provided that, such additional invitees shall have no right to vote at any such meetings.

**ARTICLE VII**
**UNREGISTERED SECURITIES**

THE UNITS ISSUED BY THE COMPANY HAVE NOT BEEN REGISTERED, QUALIFIED, APPROVED OR DISAPPROVED UNDER ANY FEDERAL, STATE OR FOREIGN SECURITIES LAWS AND HAVE BEEN SOLD OR ISSUED IN BY THE COMPANY IN RELIANCE ON EXEMPTIONS FROM REGISTRATION AFFORDED BY APPLICABLE FEDERAL, STATE AND/OR FOREIGN SECURITIES LAWS.

THE UNITS ISSUED BY THE COMPANY MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH UNITS UNDER APPLICABLE FEDERAL, STATE AND/OR FOREIGN SECURITIES LAWS, UNLESS SOLD OR OTHERWISE TRANSFERRED PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION AND, IF REQUESTED BY THE MANAGER, THE TRANSFERRING MEMBER FIRST PROVIDES THE COMPANY WITH AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE MANAGER TO SUCH EFFECT, WHICH OPINION SHALL BE AT THE COST AND EXPENSE OF THE COMPANY.

EACH MEMBER HEREBY REPRESENTS AND WARRANTS TO THE COMPANY, THE MANAGER, AND EACH OTHER MEMBER THAT EACH SUCH MEMBER (A) HAS ACQUIRED SUCH MEMBER'S UNITS FOR INVESTMENT PURPOSES ONLY, FOR ITS OWN ACCOUNT AND NOT WITH A VIEW TO DISTRIBUTION; (B) HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE TO EVALUATE THE MERITS AND RISKS OF ITS INVESTMENT IN THE COMPANY; (C) HAS BEEN PROVIDED WITH, OR GIVEN REASONABLE ACCESS TO, FULL AND FAIR DISCLOSURE OF ALL INFORMATION MATERIAL TO ITS INVESTMENT IN THE COMPANY; (D) UNDERSTANDS THAT NO MARKET IS LIKELY TO EXIST FOR ITS UNITS, AND IT DOES NOT ANTICIPATE THE NEED TO SELL ITS UNITS IN THE FORESEEABLE FUTURE; (E) HAS NOT PURCHASED ITS UNITS AS A RESULT OF ANY GENERAL SOLICITATION OR GENERAL ADVERTISING, INCLUDING ADVERTISEMENTS, ARTICLES, NOTICES, OR OTHER COMMUNICATIONS PUBLISHED IN ANY NEWSPAPER, MAGAZINE, OR SIMILAR MEDIA OR BROADCAST OVER RADIO OR TELEVISION, OR ANY SEMINAR OR MEETING WHOSE ATTENDEES HAVE BEEN INVITED BY GENERAL SOLICITATION OR GENERAL

ADVERTISING; AND (F) CAN WITHSTAND THE LOSS OF ITS ENTIRE INVESTMENT WITHOUT SUFFERING SERIOUS FINANCIAL DIFFICULTIES.  IN ADDITION TO ANY OTHER CONDITIONS IMPOSED BY THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES AND UNDERSTANDS THE ABOVE RESTRICTIVE LEGENDS AND AGREES TO ACCEPT AND ABIDE BY THE ABOVE DESCRIBED RESTRICTIONS ON THE TRANSFERABILITY OF SUCH MEMBER'S UNITS (AND RELATED MEMBERSHIP INTEREST).

## ARTICLE VIII
## TRANSFERS OF MEMBERSHIP INTERESTS; MEMBER
## WITHDRAWAL; ADMISSION ADDITIONAL/SUBSTITUTE MEMBERS

**Section 8.1**      **General**.

(a)      Members' Intent.   The ownership and transferability of Units (and related Membership Interests) in the Company are substantially restricted.  These restrictions upon ownership and Transfer are not intended as a penalty, but as a method to further the legitimate business purposes of the Company and protect and preserve existing relationships among the Members, which are based on trust, and to protect and preserve the Company's capital and its ability to continue as a going concern.  No Member shall Transfer any interest in any Units except in compliance with this Section 8.  No Unitholder (the "Prohibited Unitholders") may Transfer, or offer or agree to Transfer, all or any part of any interest in such Prohibited Unitholder's Units without the prior written consent of the Manager, which consent may be withheld in the Manager's sole discretion, other than pursuant to (i) a Transfer that is a Permitted Transfer, (ii) a Transfer by a Drag-Along Member made as a result of a Drag-Along Sale under and in accordance with Section 8.5 or (iii) a Transfer by a Tag-Along Member made as a result of a Tag-Along Sale under and in accordance with Section 8.7).

(b)      Non-Recognition of Specified Transfers.  The Members agree that the Manager and the Company shall not be required to recognize the interest or purported interest in the Company of any Person who has obtained an interest or a purported interest in the Company, directly or indirectly, as a result of a Transfer which is not authorized by this Agreement, and further agree that any such Transfer shall be null and void for all purposes (except to the extent otherwise provided by law or in this Article VIII).  If there is a doubt as to the ownership of an interest in the Company or who is entitled to a distribution of Available Cash or of other property, including liquidating proceeds, the Manager (or liquidating trustee, if applicable), may accumulate the Available Cash or liquidation proceeds or other property attributable to the interest(s) in question until the issue is resolved to the reasonable satisfaction of the Manager.

**Section 8.2**      **Limitations on Withdrawal/Transfers of Membership Interests**.

(a)      General Restrictions.  Except as otherwise set forth in this Article VIII, no Member shall have the right to: (i) withdraw or resign from the Company prior to the dissolution and winding up of the business and affairs of the Company; or (ii) Transfer, whether voluntary or involuntary, directly or indirectly, all or any portion of such Member's Membership Interest.  Any Transfer of all or any portion of a Membership Interest in violation of the foregoing shall be null and void and of no legal force or effect.

(b)      Permitted Transfers.  A Member shall be entitled to Transfer such Member's Membership Interest to a Permitted Transferee, subject to compliance with the provisions of Section 8.3(a) and Section 8.3(b) (any such Transfer in compliance therewith, a "Permitted Transfer").

(c)     Consequences of Withdrawal/Transfers in Violation of Section 8.2(a) or (b).

(i)     If a Member shall Transfer or suffer a Transfer, directly or indirectly, of all or any portion of such Member's Membership Interest in violation of Section 8.2(a) or (b), excluding a Transfer consisting solely of a charging order against such Member's Membership Interest, such Member (during the period in which such Member's Membership Interest remains subject to the Company's or any other Members' purchase option under Section 8.6), shall cease to have any (x) voting rights such Member otherwise has hereunder (or under the Act) for or with respect to such Member's Membership Interest, and (y) any rights such Member otherwise has to participate in the management of the business and affairs of the Company or to inspect books and records of the Company, unless otherwise permitted by written agreement of the Manager in its discretion.

(ii)     Notwithstanding anything in the preceding paragraph to the contrary, a Member in breach of this Article VIII, while a "member" of the Company, shall at all times be and remain subject to all applicable obligations, restrictions or limitations imposed on the Members, in general or on such Member specifically, by or under this Agreement (or the Act).

(iii)     Except as otherwise specifically provided in this Article VIII, the reasonable costs and expenses incurred by the Company in connection with the disposition by a Member (or assignee of a Member's Membership Interest not admitted as an additional or substitute "member" of the Company) of a Membership Interest or in connection with an assignee of a Membership Interest being admitted as a substitute "member" of the Company, including any filing, recording and publishing costs and the reasonable fees and disbursements of counsel, shall be paid by and be the sole responsibility of the Member (or assignee) disposing of such interest (and/or the assignee of the transferred Membership Interest, including any assignee to be admitted as an additional or substitute "member" of the Company).

**Section 8.3     Admission of "Assignees" as Additional or Substitute "Members".**

(a)     An assignee of a Member's Membership Interest, or any portion thereof, who receives its Membership Interest in accordance with the terms of this Agreement, including an assignee of a Member's Membership Interest transferred in accordance with the provisions of Section 8.2(b), shall be admitted to the Company as an additional or substitute "member" of the Company, with respect to the transferred Membership Interest, if not otherwise then admitted as a "member", if (and only if) approved, in writing by the Manager, which approval may be given or withheld in the sole and absolute discretion of the Manager, provided that no such required consent may be unreasonably withheld if the Transfer to such assignee is a Permitted Transfer; and, if such consent is given, such assignee executes and/or delivers to the Company the following:

(i)     a joinder or amendment to this Agreement, in form and content acceptable to the Manager, pursuant to which such Person shall become bound by all of the terms and provisions of this Agreement in such Person's capacity as a "Member," as the same may be amended in connection with such Person's admission as such; and

(ii)     such other documents, instruments or agreements, if any, required or requested by the Manager, in its sole discretion, including a written instrument, in form and content acceptable to the Manager, pursuant to which such Person shall assume all current or future obligations of the transferring Member (or any other predecessor owner of the Membership Interest transferred to such Person) to the Company (or to any other Member) hereunder (or under the Act), to the extent attributable to the transferred interest (which assumption shall be in addition to, and

23

not as a novation or release of liability therefore of or by such transferring Member or other predecessor owner of such Person's Membership Interest).

(b)   In addition to the requirements set forth above, an assignee of a Member's Membership Interest, or any portion thereof, who receives its Membership Interest in accordance with the terms of this Agreement, shall not be admitted to the Company as an additional or substitute "member" of the Company unless:

(i)   to the extent required by applicable laws or regulations, appropriate government approvals have been obtained;

(ii)   such transfer, and the admission of the transferee as a Member does not violate any provision of any law, statute or regulation applicable to the Company or any of its direct or indirect subsidiaries; and

(iii)   such transferee discloses to the Manager:

(A)   if the transferee is an entity, any foreign government, agency of a foreign government, or representative of a foreign government, business enterprise, or other entity organized, chartered, or incorporated under the laws of any country other than the United States or its territories, and any Person who is not a citizen or national of the United States (each a "Foreign Interest") that (1) owns or has a beneficial ownership of five percent (5%) or more of the transferee or if the transferee does not issue equity, indirectly or directly, subscribed for five percent (5%) or more of the transferee's total capital commitment, or (2) has the power, direct or indirect, whether or not exercised, and whether or not exercisable through the ownership of the transferee, by contractual arrangements or other means, to direct or decide matters affecting the management or operations of the transferee;

(B)   if the transferee is an individual, if he or she is a citizen or national of the United States; and

(C)   any ownership, directly or indirectly through subsidiaries and/or affiliates, of ten percent (10%) or more of any Foreign Interest.

(c)   Each Member acknowledges the restrictions that affiliation with or significant influence by a Foreign Interest may put on the prospects of the Company and its direct and indirect subsidiaries, and such Member and any applicable transferee, as a condition precedent to being admitted as an additional or substitute Member, will fully comply with the law with respect to mitigation of any such future affiliation or influence of such Foreign Interest.

**Section 8.4   General Consequences of Transfers/Dispositions of Membership Interests**.

(a)   _Continuation of the Company_.   Except as provided below, the Bankruptcy, death, retirement, resignation or expulsion of any Member or the occurrence of any other event which terminates the continued membership in the Company of any Member, shall not cause the Company to be dissolved, and upon and following the occurrence of any such event (subject to the other express provisions of this Agreement), the Company and its business and affairs shall continue without dissolution.  The Company shall dissolve upon the occurrence of any event that terminates the continued membership in the Company of the last remaining Member, unless within ninety (90) days after the occurrence of such event, the personal or other legal representative of the last remaining Member agrees, in writing, to continue the Company

24

(such right to continue the Company being expressly granted hereby) and to the admission of the personal or other representative of such last remaining Member, or designee, as an additional or substitute "member" of the Company, effective as of the occurrence of the event that terminated the continued membership in the Company of the theretofore last remaining Member.

(b)     <u>Rights of Assignees/Transferring Members</u>.    Except as otherwise expressly provided herein or as agreed to by the Manager, a Transfer by or with respect to any Member's Membership Interest, or any portion thereof, including a Permitted Transfer, shall not entitle the assignee thereof to become a "member" of the Company or to exercise any rights or powers of a "Member" hereunder (or under the Act), nor shall the transferring Member have the right to exercise any rights or powers as a "Member" with respect to the transferred Membership Interest.   Unless admitted as an additional or substitute "member" of the Company, the assignment of a Membership Interest (not otherwise treated as null and void) shall only entitle the assignee thereof to receive such distribution(s) and to receive such allocations of income, gain, loss, deduction or credit or similar item to which the assigning Member (or other assignor thereof) is (or was) entitled, to the extent attributable to the assigned interest; and, regardless of whether such assignee is admitted as an additional or substitute "member" of the Company, such assignee shall be subject to all of the terms and provisions of this Agreement, including all of the provisions of this <u>Article VIII</u> and all applicable obligations, restrictions or limitations imposed on the Members by any other section or provision hereof, in general or on the transferring Member (or other predecessor owner of the transferred interest) specifically by or under this Agreement (or the Act).  If an assignee of a Membership Interest becomes admitted as an additional or substitute "member" of the Company as expressly provided herein, then, except as limited by the other terms of this Agreement, the voting, management and other participation rights associated with the transferred Membership Interest shall be held and may be exercised by such assignee, along with all other rights of a "Member" hereunder (to the extent attributable to said transferred Membership Interest). Notwithstanding anything to the contrary in this Agreement, no Incentive Units may be Transferred unless approved by the Manager.

(c)     <u>Cessation of Status as "Member."</u>   A Member ceases to be a "member" of the Company and to have the rights or powers of a "Member" hereunder (and/or under the Act) upon the sale or other disposition of such Member's entire Membership Interest, including the occurrence of any event (including dissolution, liquidation and termination or death) which results in a complete loss, sale or other disposition of such Member's entire Membership Interest.

(d)     <u>Death/Dissolution</u>.  Subject to the terms of any Incentive Award Agreement issued, upon the death of an individual Member or dissolution of a Member who is not an individual, the Company shall have the option at any time thereafter to redeem or purchase the Interest in the Company held by the deceased or dissolved Member for an amount equal to the Fair Market Value of the Interest in the Company held by the deceased or dissolved Member.

(e)     <u>Community Property</u>.  Any Interest in the Company belonging to an individual Member and spouse as community property, and not just the community one-half (½) Interest of the Member, shall be subject to the provisions of this Agreement in the same manner as though solely belonging to such Member as such Member's separate property (though nothing herein shall deprive the spouse of any individual Member of such spouse's community interest in any Interest of the Company which is, in fact, community property).  Each individual Member is joined in such Member's obligation hereunder by such Member's spouse, who has executed the Agreement, but the joinder of such spouse shall not be essential to any modification of this Agreement unless such modification would work a fraud upon the interest of such spouse hereunder.  In the event of the dissolution of a Member's marriage by death of such Member's spouse or by divorce, if such spouse's community property interest in the Company will not pass to the spouse who is a Member, then in that event the Member spouse shall have the option of acquiring the non-Member spouse's community interest in the Company for the Fair Market Value of such Interest.

25

In the event the Member spouse does not exercise the option within ninety (90) days of the dissolution of such Member's marriage, the remaining Members shall have the option of acquiring such non-Member spouses' Interest in the Company for such Interest's Fair Market Value.  The remaining Members' option in that regard shall expire ninety (90) days after termination of the Member spouse's option. In the event the option is exercised by either the Member spouse or the remaining Members, the purchase price must be paid in full and in cash at closing, and the Interest to be transferred must be transferred free and clear of all liens and encumbrances.  In the event the option is not exercised by either the Member spouse or the remaining Members, then either non-Member spouse or the non-Member spouse's heirs, devisees or legatees shall retain or receive the non-Member spouse's community property interest in the Company and shall become Members subject to the terms and provisions of this Agreement.  In the event of any conflict between the provisions of this Section 8.4 and the terms of any Incentive Award Agreement, the terms of such Incentive Award Agreement and the Incentive Plan, if any, shall control.

> **Section 8.5     Drag-Along Right**.

> (a)     Drag-Along Right.  Subject to compliance with the terms of this Section 8.5, the GOT Investor shall have the right (the "Drag-Along Right") (i) to consummate, in one transaction or a series of related transactions, the Sale of the Company to an independent third party (the "Third-Party Purchaser" and, such Sale of the Company, a "Drag-Along Sale"); and (ii) to require that each other Member (each, a "Drag-Along Member") participate in such Drag-Along Sale as provided in this Section 8.5.

> (b)     Drag-Along Notice.  The GOT Investor shall notify the Drag-Along Members and the Company in writing of a proposed Drag-Along Sale ("Drag-Along Notice") no less than ten (10) days prior to the closing date of such Drag-Along Sale.  The Drag-Along Notice shall set forth the name and address of the Third-Party Purchaser, the material financial terms on which the Third-Party Purchaser proposes to consummate the Sale of the Company and the proposed closing date.

> (c)     Waiver of Appraisal Rights.  Subject to satisfaction of the requirements of this Section 8.5, each of the Drag-Along Members hereby waives, to the extent permitted by applicable law, all applicable appraisal rights and rights to object to or dissent from a Drag-Along Sale, and agrees that such Drag-Along Member will raise no objections to a Drag-Along Sale.  Each Drag-Along Member agrees that it shall not take any action prejudicial to or inconsistent with a Drag-Along Sale.

> (d)     Conditions.  The obligations of the Drag-Along Members in respect of a Drag-Along Sale under this Section 8.5 are subject to the satisfaction of the following conditions:

> (i)     the consideration to be paid to the Members in such Drag-Along Sale shall be paid in accordance with Section 3.1; and

> (ii)     each Drag-Along Member shall execute the applicable purchase agreement but shall be obligated to make representations and warranties only with respect to such Drag-Along Member's title to and ownership of its Units, authorization, execution and delivery of relevant documents, enforceability of such documents against such Drag-Along Member and other customary matters relating specifically to such other Drag-Along Member or its Units, and such Drag-Along Member shall not be jointly liable for any breach of any other Member's representations, warranties or covenants, except to the extent of any escrow.  Each Drag-Along Member would agree to be severally, but not jointly, liable with the other Members to indemnify the purchaser for any breach by the Company of its representations and warranties or other indemnity obligations under the purchase agreement, provided that the maximum liability of each Drag-Along Member under the purchase agreement shall not exceed its proportionate share of any

such liability up to a cap equal to the actual proceeds received by such Drag-Along Member under the purchase agreement in the Drag-Along Sale, except with respect to fraud.

(e)    <u>Required Actions</u>.  As soon as practicable after receipt of the Drag-Along Notice, the Drag-Along Members shall cooperate and take all action requested by the GOT Investor to complete the Drag-Along Sale, including the following:

(i)    voting all Units in favor of, and consenting to, the Drag-Along Sale and matters ancillary thereto if deemed necessary or desirable by the GOT Investor;

(ii)    if so requested, surrendering to the Company, or the proposed buyer, the certificates, if any, for Units, properly endorsed for transfer to the Company or the proposed buyer against payment of the sale price for such Units in the Drag-Along Sale; and

(iii)    if so requested, executing all sale, liquidation and other agreements in such form as may be necessary to provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements required hereunder relating to such Drag-Along Sale and to accomplish the allocation and distribution of the aggregate consideration in such Drag-Along Sale (subject to the requirements and limitations set forth in <u>Section 8.5(d)(ii)</u>).

(f)    <u>Fees and Expenses</u>.  The out of pocket fees and expenses of the GOT Investor incurred in connection with a Drag-Along Sale that are for the benefit of all Drag-Along Members shall be paid or reimbursed by the Company to the extent such fees and expenses are not paid or reimbursed by the Third-Party Purchaser.

(g)    <u>Irrevocable Proxy</u>.  Each Member hereby appoints the GOT Investor as such Member's true and lawful proxy and attorney, with full power of substitution and re-substitution, to vote all Units owned by such Member or over which such Member has voting control to effectuate the agreements set forth in this <u>Section 8.5</u> if such Member fails to comply on a timely basis (but in no event later than one (1) business day after the respective time periods described in this <u>Section 8.5</u> have expired) with the provisions of this <u>Section 8.5</u>.  The proxies and powers granted by each Member pursuant to this <u>Section 8.5(h)</u> are coupled with an interest and are given to secure the performance of such Member's duties under this <u>Section 8.5</u>.  Such proxies are irrevocable for so long as this <u>Section 8.5</u> shall remain in effect and will survive the death, incapacity, incompetency or disability of any Member who is an individual and the merger, liquidation or dissolution of any Member that is a non-natural Person.

(h)    <u>Final Consummation of the Sale</u>.  The GOT Investor shall have one hundred and eighty (180) days following the date of the Drag-Along Notice in which to consummate the Drag-Along Sale, on the terms set forth in the Drag-Along Notice.  If at the end of such period the GOT Investor has not completed the Drag-Along Sale, the GOT Investor may not then exercise its rights under this <u>Section 8.5</u> without again fully complying with the provisions of this <u>Section 8.5</u>.

Section 8.6    <u>**Right of First Refusal**</u>.

(a)    Any Member who proposes to make a Transfer to any Person that has been approved by the Manager pursuant to <u>Section 8.1(a)</u> (other than (i) a Transfer to the Company, (ii) a Transfer that is a Permitted Transfer, (iii) a Transfer by a Drag-Along Member made as a result of a Drag-Along Sale under and in accordance with <u>Section 8.5</u> or (iv) a Transfer by a Tag-Along Member made as a result of a Tag-Along Sale under and in accordance with <u>Section 8.7</u>), shall provide written notice thereof (the "Sale Notice") to the Manager and each of the Class A Members and the Class B Member (the "ROFR

27

Members"), which Sale Notice shall include all of the terms of the proposed Transfer, including, *inter alia*, the price and payment terms for such Transfer, the name and address of the proposed Transferee, the number of such Member's Units to be Transferred, the date on which the proposed Transfer is to occur, the other material terms and conditions of the Transfer, and a copy of any form of agreement proposed to be executed in connection therewith.

(b)     For a period of thirty (30) days after receipt of the Sale Notice, the ROFR Members shall have the option to purchase all, but not less than all, of the Units proposed to be Transferred, upon the same terms and conditions (including price and payment terms) as contained in the Sale Notice, on a pro rata basis with the ROFR Members in accordance with the ratio of (i) the Units of the ROFR Member desiring to exercise such purchase option to (ii) the aggregate of all Units of all ROFR Members desiring to exercise such purchase option.

(c)     In the event the ROFR Members do not exercise their purchase options under Section 8.6(b), the Member proposing to make a Transfer under Section 8.6(a) may proceed with such Transfer with respect to all, but not less than all, of the Units proposed to be Transferred pursuant to the Sale Notice, only upon such terms and conditions as are identical to those provided in the Sale Notice and in compliance with Section 8.3; provided, however, any such Transfer pursuant to this Section 8.6 shall also require the consent of the Manager if such consent is required pursuant to Section 8.1(a); provided, further, that in the event the Transfer is not completed within ninety (90) days following the date the Manager originally received (or approved) the Sale Notice, no Transfer of said Units shall be made without first complying with the terms and conditions of this Section 8.6 anew.

**Section 8.7     Tag-Along Rights.**

(a)     Participation.  In the event any Member (the "Selling Member") proposes to Transfer any of its Units to any Person (other than (i) a Transfer to the Company, (ii) a Transfer that is a Permitted Transfer or (iii) a Transfer in connection with a Drag-Along Sale pursuant to Section 8.5) (as used in this Section 8.7, a "Proposed Transferee") and the Manager has approved such Transfer pursuant to Section 8.1(a), then each of the Class A Members and the Class B Member (each such Member, a "Tag-Along Member") shall be permitted to participate in such sale (a "Tag-Along Sale") on the terms and conditions set forth in this Section 8.7.

(b)     Exercise of Tag-Along Rights.

(i)     Each of the Selling Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale pursuant to Section 8.7(b)(ii) (such Tag-Along Member, an "Electing Tag-Along Member") shall have the right to Transfer in the Tag-Along Sale the number of Class A Units and/or Class B Units, as the case may be and with the Class A Units and Class B Units treated as a single class of Units for purposes of this calculation, equal to the product of (x) the aggregate number of Units that the Proposed Transferee proposes to buy as stated in the Sale Notice, and (y) a fraction (A) the numerator of which is equal to the number of Units then held by such Member, and (B) the denominator of which is equal to the aggregate number of Units then held by the Selling Member and all of the Electing Tag-Along Members (such amount, the "Tag-Along Portion").

(ii)     Each Tag-Along Member shall exercise its right to participate in the Tag-Along Sale by delivering to the Selling Member and each other Tag-Along Member a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of Units (up to its Tag-Along Portion) to be Transferred by it no later than fifteen (15) days after receipt of the Sale Notice (the "Tag-Along Period").  The offer of each Electing Tag-Along Member set forth in a

Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this Section 8.7; provided, however, if the principal terms of the Tag-Along Sale change with the result that any price per respective Unit shall be less than the price per applicable Unit set forth in the Sale Notice, each Tag-Along Member shall be permitted to withdraw the offer contained in his, her, or its Tag-Along Notice and shall be released from his, her, or its obligations thereunder. In the event any Tag-Along Member declines to exercise its rights hereunder, or elects to exercise it with respect to less than its full Tag-Along Portion, the Selling Member and the other Electing Tag-Along Members shall be permitted to sell its proportional share of additional Units (in excess of its Tag-Along Portion) to meet the number of applicable Units sought to be purchased by the Proposed Transferee as set forth in the Sale Notice.

(c)    Waiver. Each Tag-along Member who does not deliver a Tag-Along Notice in compliance with Section 8.7(b)(ii) shall be deemed to have waived all of such Tag-Along Member's rights to participate in the Tag-Along Sale with respect to the Units owned by such Tag-Along Member, and the Selling Member (and all Electing Tag-Along Member) shall thereafter be free to sell to the Proposed Transferee at prices per Class A Unit and/or per Class B Unit that are no greater than the applicable prices per Class A Unit and/or per Class B Unit, as applicable, set forth in the Sale Notice and on other terms and conditions which are not materially more favorable to the Selling Member than those set forth in the Sale Notice, without any further obligation to the non-accepting Tag-Along Members.

(d)    Conditions of Sale.

(i)    The Selling Member and each Electing Tag-Along Member selling Class A Units shall receive the same consideration per Class A Unit and the Selling Member and each Electing Tag-Along Member selling Class B Units shall receive the same consideration per Class B Unit, in each case after deduction of such Member's proportionate share of the related expenses in accordance with Section 8.7(f). The Selling Member, the Electing Tag-Along Members, and the Proposed Transferee shall each negotiate in good faith regarding the prices to be paid per Class B Unit and per Class A Unit, which prices shall reflect the relative rights, preferences, and priorities of the Class B Units and the Class A Units, in the case of any Transfer. Notwithstanding anything to the contrary herein, no Tag-Along Sale may be consummated unless the Selling Member, the Electing Tag-Along Members, and the Proposed Transferee mutually agree upon the prices to be paid per Class B Unit and per Class A Unit in such Tag-Along Sale.

(ii)    Each Tag-Along Member shall make or provide the same representations, warranties, covenants, indemnities, and agreements as the Selling Member makes or provides in connection with the Tag-Along Sale; provided that each Tag-Along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Tag-Along Member, and other matters relating to such Tag-Along Member, but not with respect to any of the foregoing with respect to any other Members or their Units; provided further that all representations, warranties, covenants, and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-Along Member, in each case in an amount not to exceed the aggregate proceeds received by the Selling Member and each such Tag-Along Member in connection with the Tag-Along Sale.

29

(e)      Cooperation.  Each Tag-Along Member shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including entering into agreements and delivering certificates and instruments.

(f)      Expenses.  The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or on behalf of a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by the Selling Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale.

(g)      Consummation of the Sale.  The Selling Member shall have ninety (90) days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those set forth in the Tag-Along Notice.  If, at the end of such period, the Selling Member has not completed the Tag-Along Sale, the Selling Member may not then affect a Transfer that is subject to this Section 8.7 without again fully complying with the provisions of this Section 8.7.

Section 8.8      **Specific Performance**.  The Members hereby acknowledge and agree that Membership Interests in the Company cannot be readily purchased or sold on the open market and for that reason, among others, the Members will be irreparably damaged in the event the provisions of this Agreement relating to the sale and purchase of interests in the Company are not specifically enforced.  In the event of any controversy concerning the right or obligation to purchase or sell any interest in the Company, such right or obligation shall be enforced in a court of equity by decree of specific performance. Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other remedy available to the Members (or any Member) or the Company.  If any Person shall institute any action or proceeding to enforce any such provisions, the Person against whom such action or proceeding is brought hereby waives the claim or defense that the Person instituting such action has an adequate remedy at law, and shall not urge in any such action or proceeding that a claim or remedy at law exists.

Section 8.9      **Transfers of Class A Units**.  The net proceeds of any Class A Transfer that is not a Permitted Transfer shall be allocated between the selling Class A Member and the Class B Member pursuant to Section 3.1(b) and treated, with respect to such selling Class A Member and the Class B Member, as if such proceeds were actually distributed pursuant to Section 3.1(b) for purposes of determining all future allocations between such selling Class A Member and the Class B Member.

## ARTICLE IX
## DISSOLUTION, WINDING UP AND LIQUIDATING DISTRIBUTIONS

Section 9.1      **Events of Dissolution**.  The Company shall be dissolved, and its assets liquidated pursuant to Section 9.3, upon the first to occur of the following (each, an "Event of Dissolution"):

(a)      the occurrence of any event that terminates the continued membership in the Company of the theretofore last remaining Member, unless the Company is continued in the manner provided in Section 8.4(a);

(b)      the determination of the Manager;

(c)      the entry of a decree of judicial dissolution or the administrative dissolution of the Company, as provided in the Act; or

(d)     the occurrence of any other event which causes a dissolution of the Company as set forth in the Act.

**Section 9.2     Winding Up**.  Upon the dissolution of the Company, as provided by Section 9.1, the Manager (or, as applicable, if none, the personal or other legal representative of the last remaining Member), shall immediately commence to wind up the Company's affairs and, except as provided in Section 9.3, shall distribute all the assets of the Company, in accordance with Section 9.3, in liquidation of the Company as soon as practicable.  During the wind-up phase of the Company, the Manager (or, if none, the personal or other legal representative of the last remaining Member, as the case may be), may take all actions necessary or appropriate to wind up the business and affairs of the Company, including selling or causing the Company to sell or otherwise dispose of the Company's assets as promptly as possible, but in a manner which is consistent with obtaining the Fair Market Value thereof.

**Section 9.3     Liquidating Distributions**.  Upon the winding up of the Company, and its business and affairs following the dissolution of the Company, as provided in Section 9.1 and Section 9.2, the Manager (or, as applicable, if none, the personal or other legal representative of the last remaining Member), shall distribute, or cause the Company to distribute its cash, including the proceeds from the disposition of the Company's noncash assets, as promptly as possible, in the following order of priority:

(a)     first, to the Company's creditors, including Members (or Affiliates of any Members) (or former Members) who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company;

(b)     second, unless inconsistent with Treasury Regulation Section 1.704-1(b)(2)(ii)(b), or any successor provision, to set up any reserves which the Manager deems reasonably necessary for contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the business of the Company; and

(c)     third, to the Members in accordance with Section 3.1.

**Section 9.4     Liquidating Trust**.  The Manager may cause the Company to establish a trust to receive the distributions to be made to the Members (or the successors or assigns of the last remaining Member) under Section 9.3(b) for the purposes of liquidating Company non-cash assets, collecting amounts owed to the Company, and paying liabilities or obligations of the Company.  Distributions from this trust, if established, to the Members (in their capacity as such) (or successors or assigns of the last remaining Member) shall occur, from time to time, in the reasonable discretion of the trustee of the liquidating trust, in the same proportions as would have been distributed to the Members (or such successors and assigns) under Section 9.3(b).

**Section 9.5     Certificate of Cancellation**.  In accordance with the Act, following the dissolution, wind-up and liquidation of the Company, the Manager (or, if none, the personal or other legal representative of the last remaining Member), shall prepare and file, or cause to prepared and filed, a Certificate of Cancellation (to the Certificate), as provided in §18-203 of the Act (or any successor provision thereto).

## ARTICLE X
## BOOKS AND RECORDS

**Section 10.1     Books and Records**.  The Company shall maintain, at the Company's principal office, adequate books and records, including all records required to be maintained by the Company

31

pursuant to the Act.  The books of the Company, for tax and financial reporting purposes, shall be kept on the accrual method of accounting in accordance with GAAP.

Section 10.2     **Tax, Financial and Other Reports**.  After the end of each Taxable Year and at the expense of the Company, the Manager shall cause to be prepared a complete accounting of the affairs of the Company, together with the Company's federal and state tax returns and an associated Schedule K-1 for each Member, together with such other information reasonably required by each Member for federal, state, and local income tax reporting purposes for that year, which accounting shall be completed and such information shall be furnished to each Member (and may be furnished by electronic means) as promptly as practicable after the close of such Taxable Year of the Company, but in any event, no later than ninety (90) days after the close of such Taxable Year.

Section 10.3     **Accounting Decisions**.  All decisions as to accounting matters, except as specifically provided to the contrary herein, to be made by the Manager, on behalf of the Company, shall be made consistent with the Company's method of accounting for federal income tax purposes.

Section 10.4     **Income Tax Elections**.  Except as otherwise provided herein to the contrary, the Manager may cause the Company to make any income tax elections which are otherwise available to the Company under the Code or applicable Treasury Regulations, as determined in the discretion of the Manager.

Section 10.5     **Confidentiality**.

(a)     No Outside Investor shall disclose or permit the disclosure of any of the terms of this Agreement or of any other confidential, non-public or proprietary information relating to the business of the Company or any of its Subsidiaries (collectively, "Confidential Information"), except that such disclosure may be made (i) to any Person who is a bona fide accountant or attorney of such Member solely for their use and solely on a need-to-know basis or for purposes of monitoring or managing their interest in the Company, as long as such Persons are notified of the Member's confidentiality obligations hereunder and obligated to uphold such Member's obligations pursuant to this Section 10.5, (ii) with the prior written consent of the Manager, (iii) subject to Section 10.5(b), in response to a subpoena or order issued by an arbitrator or governmental entity or as may be necessary to fulfill the Member's tax filing and/or reporting obligations or to comply with applicable law or regulation, (iv) to a bona fide prospective purchaser of a Member's Units in a Transfer permitted by this Agreement, or (v) in connection with any ongoing regulation or oversight by any governmental entity if counsel to such Member advises that disclosure is advisable; provided that in the case of clause (iv), the Member proposing to disclose Confidential Information to any such prospective purchaser informs the Company of the identity of such proposed purchaser and enters into a confidentiality agreement with such proposed purchaser for the benefit of the Company and on terms approved by the Manager.  Confidential Information shall not include (i) information that becomes known to a Member or any of its Affiliates after the date of this Agreement from a source other than the Company or one of its representatives which source is not in breach of a confidentiality agreement with, or duty of obligation to, the Company or any of its Subsidiaries known to such Member or Affiliate; (ii) information that becomes public other than by reason of a breach of this Agreement by the Member or any of its Affiliates or Persons with whom such Member has shared Confidential Information; or (iii) information that is developed by or on behalf of a Member or any of its Affiliates without the use of any Confidential Information as proven by such Member's or its Affiliate's written records.

(b)     If a Member receives a request or demand to disclose any Confidential Information under a subpoena or order, that Member shall, if legally permissible, (i) promptly notify the Manager thereof, (ii) consult with the Manager on the advisability of taking steps to resist or narrow that request or

demand and (iii) if disclosure is required or deemed advisable in the determination of such Member's counsel, cooperate with the reasonable requests of the Manager to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed.

(c)     No Member may issue or publish any press release or other public communication about the Company or any Subsidiary or their respective businesses without the express written consent of the Manager.

**Section 10.6     Financial Statements**.  The Company shall promptly furnish to the Class A Members and the Class B Member annual and quarterly consolidated financial statements of the Company and its Subsidiaries.

**Section 10.7     Expenses**.  The Operating Companies shall bear all expenses incurred in connection with the preparation, distribution and filing of all reports and tax returns contemplated in this Article X, and the Company shall promptly cause the Operating Companies to pay such expenses when due and/or to reimburse the Manager for any such expenses advanced or incurred by the Manager on behalf of the Company.

**ARTICLE XI**
**TAX REPRESENTATIVE**

**Section 11.1     Appointment of Tax Representative**.  The Company and each Member hereby designate the GOT Investor as the "partnership representative" for purposes of Section 6223 of the Code (the "Tax Representative").  If any state or local tax law provides for a tax matters partner, partnership representative, or person having similar rights, powers, authority, or obligations, the Tax Representative shall also serve in such capacity.  The Tax Representative shall designate from time to time a "designated individual" to act on behalf of the Tax Representative, and such designated individual shall be subject to replacement by the Tax Representative in accordance with the Code and Regulations.  The Tax Representative, on behalf of the Company and its Members, shall be permitted to make any filing or election under the Code, the Treasury Regulations, or any other applicable law or regulations that it believes to be in the best interests of the Company or the Members.  Each Member agrees to cooperate with the Tax Representative and to do or refrain from doing any or all things reasonably required by the Tax Representative in connection with the conduct of all proceedings involving the Company.  Notwithstanding anything to the contrary in this Agreement, each Member (including for purposes of this Section 11.1 any Person who is or becomes a Member but who for any reason ceases to be a Member) (a) hereby covenants to treat each item of income, gain, loss, deduction, or credit attributable to the Company in a manner consistent with the treatment of such income, gain, loss deduction, or credit on the tax return of the Company or as determined in a notice of final partnership adjustment pursuant to Section 6226 of the Code, (b) hereby agrees to indemnify and hold harmless the Company from such Member's share of any tax (including for purposes of this Section 11.1 any penalties, interest and additions to tax) attributable to any adjustment to the income, gain, loss, deduction, or credit of the Company pursuant to Section 6226 of the Code, and (c) hereby agrees to take all other actions as the Tax Representative may reasonably direct with respect to the Member's (or, in respect of the Member, the Company's) tax liabilities, including filing an amended return for any "reviewed year" to account for all adjustments under Section 6225(a) of the Code properly allocable to the Member as provided in and otherwise contemplated by Section 6225(c) of the Code and any Treasury Regulations that may be promulgated thereunder.  The provisions of this Section 11.1 shall survive the termination or dissolution of the Company or the termination of any Member's interest in the Company, any transfer of a Member's interest in the Company or withdrawal as a Member and shall remain binding on the Member.

Section 11.2    **Employment of Advisors**.  The Tax Representative may employ experienced tax advisors to represent the Company in connection with any significant tax matters involved in an audit, examination, investigation or other proceeding (each, a "Tax Proceeding").  The fees and expenses of such tax advisors shall be a Company expense and shall be paid by the Company.  Such advisors shall be responsible for representing the Company.

Section 11.3    **Notice and Indemnification**.  The Tax Representative shall keep the Manager reasonably informed of all Tax Proceedings involving the Company or any Company return.  The Company shall indemnify the Tax Representative against judgments, fines, amounts paid in settlement and expenses (including attorneys' fees) incurred by the Tax Representative in such capacity.

# ARTICLE XII
# MISCELLANEOUS

Section 12.1    **Notices**.  All notices or other communications given or made under this Agreement or pursuant to the Act shall be in writing.  Notices or other communications to the Manager, any of the Members or the Company shall be deemed to have been given or received if delivered by (a) personal delivery, upon such personal delivery, (b) registered or certified mail, return receipt requested, postage prepaid, upon three (3) days after deposited in the United States mail, or (c) Federal Express (or comparable nationally recognized over-night courier service) for guaranteed next business day delivery service, upon the next business day after deposit with Federal Express (or comparable nationally recognized over-night courier service) for guaranteed next business day delivery service, in each case, addressed as follows:

(a)    Members.  To the Members (or any Member), at the email address(es) and mailing address(es) set forth in Schedule 1.7, or at such other address as any Member may specify in a writing given to the Company, the Manager, and the other Members in accordance with this Section 12.1; or

(b)    Company.  To the Company at glen.carty@groupoftelecom.com and the principal office of the Company specified in Section 1.2 (all notices to the Company to be sent to the attention of the Manager).

Section 12.2    **Binding Effect**.  Except as stated in this Agreement, every provision of this Agreement shall be binding upon and inure to the benefit each of the Members who are parties hereto and their respective successors and assigns, provided that nothing in this Section 12.2 shall be interpreted as permitting any Transfer by any Member (or other party hereto or other Person bound by the terms hereof) of any rights or obligations of any Member (or any such other Person) hereunder which is not otherwise expressly permitted under another provision of this Agreement.

Section 12.3    **Construction**.  Any court or arbitrator shall construe every provision of this Agreement in accordance with its simple and fair meaning and not strictly for or against any Member.  No court or arbitrator shall interpret any provision of this Agreement as a penalty upon, or a forfeiture by, any party to this Agreement.  The parties hereto shared equally in the drafting of this Agreement and no court or arbitrator construing this Agreement shall construe it more strictly against one party than the other.

Section 12.4    **Entire Agreement; Amendments and Waivers**.

(a)    Entire Agreement.  This Agreement, together with its schedules and appendices, constitutes the entire agreement between the Members with respect to its subject matter, and supersedes the Original Agreement and any and all other prior agreements and undertakings with respect to such subject matter among them.  No Member is making any guarantee, promise, or undertaking any obligation to or with respect to the Company that is not expressly contained in this Agreement.

34

(b) <u>Amendments and Waivers</u>.

(i) Neither this Agreement nor the Certificate may be amended and no provision contained herein may be waived, unless such amendments or waivers are required or otherwise permitted by any of the terms hereof or shall have first been consented to, in writing, by the Manager; <u>provided</u>, <u>however</u>, that an amendment, waiver or modification modifying or waiving the rights or obligations of any Class A Member or the Class B Member in a manner that is disproportionately adverse to (A) such Member relative to the rights of other Members in respect of Units of the same class or series or (B) a class or series of Units relative to the rights of another class or series of Units, shall in each case be effective only with that Member's consent or the consent of the Members holding a majority of the Units in that class or series, as applicable.

(ii) Notwithstanding <u>clause (i)</u> above, the Manager may amend this Agreement from time to time, without the consent of any Member, as reasonably required to (A) admit new Members or issue additional Units in accordance with the terms of this Agreement, (B) create additional Units or classes of Units in accordance with the terms of this Agreement, (C) reflect the repurchase or Transfer of Units, in each case described in <u>clause (A)</u>, <u>(B)</u>, or <u>(C)</u>, in connection with any additional Capital Contributions requested by the Manager and otherwise in accordance with the terms of this Agreement or (D) to correct any type of typographical or other drafting errors contained herein.

(iii) Copies of any amendments to this Agreement shall be sent all Members as promptly as is reasonably possible following the adoption thereof.

**Section 12.5** <u>**Assignees**</u>.

(a) <u>Rights of Assignees to Profits/Losses</u>.  In the event any transferee or other successor-in-interest to a Member or to a Membership Interest (resulting from a transfer not treated as null and void hereunder) is not admitted as an additional or substitute "member" of the Company in accordance with the provisions of this Agreement, such transferee or other successor-in-interest shall be treated as an assignee, shall only have the right to be allocated or distributed the profits, losses or monies or other property, and shall be subject to all of the losses, liabilities, obligations and restrictions, to which the transferring Member (or other transferor) would otherwise be entitled or subject to, to the extent applicable to the transferred interest.

(b) <u>Application of Agreement to Assignees</u>.  In applying the provisions of this Agreement, including <u>Section 3</u>, <u>Section 4</u> and <u>Appendix B</u>, each successor to an interest in the Company, whether admitted as an additional or substitute "member" of the Company, shall be deemed to have made the aggregate Capital Contributions previously made with respect to the assigned interest by any predecessor owner thereof, and to have received the aggregate allocations or distributions previously made to each such predecessor owner, to the extent attributable to the assigned interest.

(c) <u>Limits on Rights of Assignees</u>.  An assignee of an interest in the Company who is not otherwise admitted as an additional or substitute "member" of the Company shall not have: (i) voting, consent or approval rights otherwise afforded Members (or any Member) hereunder or under the Act; (ii) the right to interfere in the management or administration of the Company's business or affairs or (iii) the right to acquire any information or account of Company transactions or inspect Company books or records during the continuance of the Company, unless expressly allowed by the Act pursuant to any provision thereof which, as a matter of law, cannot be superseded by the foregoing terms of this Agreement.

**Section 12.6** **Headings**.  Section and other headings contained in this Agreement are for reference purposes only and shall not be considered interpretive of the provisions thereof or hereof.

**Section 12.7** **Severability**.  Every provision of this Agreement is intended to be severable.  If any term or provision is illegal or invalid for any reason, then its illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

**Section 12.8** **Further Cooperation**.  Each Member agrees to perform all such further acts, including executing and/or delivering any other documents or instruments, as may be reasonably requested from time to time by the Manager, to carry out (or better carry out) any of the provisions of this Agreement.

**Section 12.9** **Governing Law; Venue**.  The laws of the State of Delaware, exclusive of its conflicts of laws provisions, shall govern this Agreement, the organization and internal affairs of the Company, the liability of the Manager (subject to the provisions hereof) and the limited liability of the Members.  Venue for any legal or other action arising out of or in any way related to the Company or this Agreement shall lie exclusively in the courts of the State of Florida, and each of the Members (and each other party to this Agreement), on each such Member's (or other party's) behalf and on behalf of its or their successors and assigns, hereby consent to the exclusive personal jurisdiction of those courts and waive any other jurisdiction or venue.

**Section 12.10** **Waiver of Action for Partition**.  Each Member hereby waives any right such Member may have to maintain any action for partition with respect to any assets of the Company.

**Section 12.11** **Counterpart Execution; Facsimile Execution**.  This Agreement may be executed in any number of counterparts.  These executions may be transmitted to the Company and/or the other parties by facsimile or other electronic transmission and shall have the effect of an original signature.  All fully executed counterparts shall be construed together and shall constitute one agreement.

**Section 12.12** **Time of the Essence**.  Time is of the essence with respect to each term of this Agreement; provided that in the event the day upon which any event specified herein is to take place falls on a Saturday, Sunday or other business holiday, then such event shall take place on the next succeeding business day.

**Section 12.13** **Independent Legal Representation; Waiver of Conflict of Interests**.  The Members all acknowledge that McGuireWoods LLP ("Counsel") acted as legal counsel for the GOT Investor and the GOT Sponsor in connection with the preparation of this Agreement and that (a) the Members have been advised by such Counsel's representation of the Company in connection therewith will or may conflict with the interests of one or more (or all) Members' individually, (b) the Members have been advised, before their execution of this Agreement, to seek the advice of independent counsel and tax advisors on the merits and detriments to such Member of the terms of this Agreement, and (c) each Member had the opportunity, prior to such Member's execution of this Agreement, to seek the advice of independent counsel.  The Members hereby jointly and severally waive any claim that Counsel's representation of the Company in connection with the preparation of this Agreement constitutes or creates a conflict of interest.

**Section 12.14** **References**.  All references in this Agreement to articles, sections or other subdivisions refer to corresponding articles, sections or subdivisions of this Agreement unless expressly provided otherwise.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited (or limited by the context within which used).  Words in the singular form shall be construed to include the plural and vice versa, and words of one gender shall be construed to include all genders, unless

the context otherwise requires.  The word "including" and words of similar import are to be construed as "including, without limitation".

        **Section 12.15    Third-Party Beneficiaries**.  Except for (a) the indemnified parties in accordance with Section 5.4, or (b) the rights of counsel to rely on the waivers in Section 12.13, any agreement contained herein to make any contribution or to otherwise pay any amount, and any assumption of liability herein contained, express or implied, shall be only for the benefit of the Members who are parties to this Agreement (and their respective permitted successors and assigns), to the Manager, and to the Persons exculpated and indemnified under Section 5.2, and such agreements and assumptions shall not inure to the benefit of the obligees under any indebtedness, or to any other Person whomsoever, it being the intention of the Members that no other Person shall be deemed to be a third-party beneficiary of this Agreement or any portion hereof.

        **Section 12.16    Prevailing Attorneys' Fees**.  If any Member or the Company (or the Manager) brings an action to enforce the terms hereof or to declare rights hereunder, the prevailing party (or parties) in any such action shall be entitled to such party's (or parties') court costs and reasonable attorneys' fees and costs, whether incurred before, at trial or on appeal or in any bankruptcy or other proceeding (including court order mediation or binding arbitration, if agreed to), to be paid by the non-prevailing party (or parties).

*(Signature Page Follows)*

The Company and undersigned Members have executed and delivered this Agreement as of the first date written above.

**COMPANY**:

**GOT DISTRIBUTION SPV, LLC**

By:    GOT Management, LLC,
       its Manager

By: _____
Name: Glenford Carty
Title: Managing Partner

**MANAGER**:

**GOT MANAGEMENT, LLC**

By: _____
Name: Glenford Carty
Title: Managing Partner

**MEMBERS**:

**GOT DISTRIBUTION, LLC**

By:    GOT Management, LLC,
       its Manager

By: _____
Name: Glenford Carty
Title: Managing Partner

**SUPERCUB HOLDINGS, LLC**

By: _____
Name: Stephen Discher
Title: Manager

The Company and undersigned Members have executed and delivered this Agreement as of the first date written above.

**COMPANY**:

**GOT DISTRIBUTION SPV, LLC**

By:     GOT Management, LLC,
         its Manager

By: _Glen Carty_____
Name: Glenford Carty
Title: Managing Partner

**MANAGER**:

**GOT MANAGEMENT, LLC**

By: _Glen Carty_____
Name: Glenford Carty
Title: Managing Partner

**MEMBERS**:

**GOT DISTRIBUTION, LLC**

By:     GOT Management, LLC,
         its Manager

By: _Glen Carty_____
Name: Glenford Carty
Title: Managing Partner

**SUPERCUB HOLDINGS, LLC**

By: _____
Name: Stephen Discher
Title: Manager

The Company and undersigned Members have executed and delivered this Agreement as of the first date written above.

<u>**COMPANY**</u>:

**GOT DISTRIBUTION SPV, LLC**

By:      GOT Management, LLC,
          its Manager


By: _____
Name: Glenford Carty
Title: Managing Partner

<u>**MANAGER**</u>:

**GOT MANAGEMENT, LLC**


By: _____
Name: Glenford Carty
Title: Managing Partner

<u>**MEMBERS**</u>:

**GOT DISTRIBUTION, LLC**

By:      GOT Management, LLC,
          its Manager


By: _____
Name: Glenford Carty
Title: Managing Partner


**SUPERCUB HOLDINGS, LLC**

By: _Stephen Discher_
Name: Stephen Discher
Title: Manager

**SCHEDULE 1.7**
**MEMBER INFORMATION**

*(As of October 14, 2022)*

| Members | Address | Class A Units | Class B Units | Incentive Units [A] | Initial Capital Contribution | Proportionate Share |
|---|---|---|---|---|---|---|
| GOT Investor | c/o Group of Telecom, 1001 Brickell Bay Drive #1200, Miami, FL 33131 | 75,600 | 0 | 0 | $███████ | 84.00% |
| GOT Sponsor | c/o Group of Telecom, 1001 Brickell Bay Drive #1200, Miami, FL 33131 | 0 | 1 | 0 | $██ | n/a |
| Supercub Holdings, LLC | c/o Stephen Discher 706 Putter Ct College Station, TX 77845 | 14,400 | 0 | 0 | $██████ | 16.00% |
| Brian & Eva Enterprises, Inc.* | 706 Alexandria Drive Naperville, IL 60565 | 0 | 0 | ███ | n/a | n/a |
| **TOTAL** | | **90,000** | **1** | ███ | $███████ | **100.00%** |

**Notes:**
**A:** 7,000 authorized but unissued Incentive Units, for a total Incentive Unit pool size of 10,000.
**\*:** Not a member as of the date hereof. Timing of issuance of Incentive Units to Brian & Eva Enterprises, Inc. to be handled post-closing.

# APPENDIX A

## DEFINITIONS

Capitalized words and phrases used in this Agreement, but which are not otherwise defined therein, shall have the following meanings (or the meanings set forth in Appendix B to this Agreement):

"Act" means the Delaware Limited Liability Company Act (6 Del. C. §18-101 et seq.), as it may amended from time to time.

"Affiliate" means, with respect to any Person, (a) any other Person directly or indirectly controlling, controlled by, or under common control with such Person, (b) any other Person who is an officer, director, manager, general partner, trustee, or holder of 10% or more of the voting stock or other voting securities of such Person (if a legal entity) or of any other Person (who is a legal entity) who is an Affiliate of such Person described in clause (a) above, or (c) any spouse, ancestor, child (including by adoption) or other lineal descendant, sibling, or in-law of such Person or of any other Person (who is a natural person) who is an Affiliate of such Person and described in either clause (a) or (b) above.  The term "control" as used in this definition of "Affiliate" means the power to direct the management and policies of the Person in question whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Assumed Income Tax Rate" means the sum of the highest stated federal, state and local income tax rates for any Taxable Year (reflecting any reduced rate or deduction applicable to any special class of income) to which an individual Member would be subject to on its net taxable income for such Taxable Year, as determined by the Manager based on the information available to it.  The Assumed Income Tax Rate shall be the same for all Members.

"Available Cash" means all cash of the Company on hand as of the last business day of any calendar month (or other fiscal period), as determined after payment of all then due or past due expenses and obligations of the Company and its Subsidiaries, other than cash which is (a) restricted from distribution under the terms of any agreement to which the Company is a party or (b) added to or retained in Company reserves in the discretion of the Manager.

"Bankruptcy" means, with respect to any Person, the occurrence of any of the following events:

(a)       such Person makes an assignment for the benefit of such Person's creditors;

(b)       such Person files a voluntary petition in bankruptcy;

(c)       such Person is adjudged a bankrupt or insolvent or has entered against such Person an order for any relief in any bankruptcy or insolvency proceeding;

(d)       such Person files a petition or answer seeking for it any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(e)       such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of this nature;

(f)      such Person seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of such Person or of all or any substantial part of such Person's properties; or

(g)      after one hundred and twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed; or after ninety (90) days after the appointment, without such Person's consent or acquiescence, of a trustee, receiver or liquidator of such Person or of any substantial part of such Person's property, the appointment has not been vacated or stayed or, if stayed, ninety (90) days following the expiration of any such stay if the appointment has not been vacated.

"Capital Contribution(s)" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed by such Member (or predecessor owner of such Member's Units) to the Company with respect to such Member's Units, in accordance with the terms of this Agreement (or the Original Agreement).

"Carry" means distributions received by the Class B Member pursuant to Section 3.1(b).

"Carry Percentage" means twenty percent (20%).

"Certificate" means the Certificate of Formation of the Company and any amendments thereto and restatement thereof filed on behalf of the Company with the Delaware Secretary of State pursuant to the Act.

"Class A Members" means the Members owning the Class A Units as set forth in Schedule 1.7.

"Class A Preferred Return" for a Taxable Year and for any Class A Member means an amount determined on an annual basis equal to a return of six percent (6%) (non-compounded) or such Class A Member's Unreturned Capital Contributions, determined from the date on which the Capital Contributions were made.

"Class A Preferred Return Distribution Deficit" means for any Class A Member the excess of such Member's aggregate Class A Preferred Return computed through the date of distribution over the aggregate amount of distributions made to such Member (and such Member's predecessor in ownership) by the Company pursuant to Section 3.1(a)(iii), or treated as so made pursuant to Section 9.3(c), from the inception of the Company to the date of distribution.

"Class A Members" means the Members owning the Class A Units as set forth in Schedule 1.7.

"Class A Transfer" means any Transfer of Class A Units.

"Class A Units" means a Unit having the rights and obligations specified with respect to Class A Units in this Agreement.

"Class B Member" means the Member owning the Class B Unit as set forth in Schedule 1.7.

"Class B Unit" means a Unit having the rights and obligations specified with respect to Class B Units in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" has the meaning set forth in the Preamble.

"Confidential Information" has the meaning set forth in Section 10.5(a).

"Counsel" has the meaning set forth in Section 12.13.

"Covered Person" has the meaning set forth in Section 5.2(a)(ii).

"Distribution Threshold" means, with respect to any Profits Interest, an amount determined by the Manager, which shall be equal to the amount determined by the Manager in its discretion to be necessary to attempt for such Incentive Unit to constitute a "profits interest" for federal income tax purposes being at least equal the aggregate Fair Market Value of the assets of the Company, net of all liabilities of the Company, as of the date such Profits Interest is granted.

"Drag-Along Member" has the meaning set forth in Section 8.5(a).

"Drag-Along Notice" has the meaning set forth in Section 8.5(b).

"Drag-Along Right" has the meaning set forth in Section 8.5(a).

"Drag-Along Sale" has the meaning set forth in Section 8.5(a).

"Effective Date" has the meaning set forth in the Preamble.

"Electing Tag-Along Member" has the meaning set forth in Section 8.7(b).

"Equity Interests" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in joint ventures, interests in other unincorporated organizations or any other equivalent of such ownership interest.

"Event of Dissolution" has the meaning set forth in Section 9.1.

"Fair Market Value" means the fair market value of the asset in question, as determined in the good faith judgment of the Manager or, if the Manager elects, pursuant to an independent appraisal or any other means.  In the case of Membership Units, Fair Market Value shall mean the amount which would be distributable in respect of such Membership Unit if the assets of the Company as a going concern were sold in an orderly transaction designed to maximize the proceeds therefrom, and such proceeds were then distributed in accordance with Section 9.3, as determined in good faith by the Manager with due regard to the value implied by any transaction giving rise to the need for a determination of Fair Market Value.  The determination of Fair Market Value as provided herein and determined by the Manager shall be final and binding on all holders of Membership Units.

"Foreign Interest" has the meaning set forth in Section 8.3(b)(iii)(A).

"Fund Indemnitors" has the meaning set forth in Section 5.2(b)(iv).

"Funding Member" has the meaning set forth in Section 2.2(b)(ii).

"GAAP" means United States generally accepted accounting principles consistently applied and currently in effect on the date of application.

"GOT Investor" means GOT Distribution, LLC, a Delaware limited liability company, or any Permitted Transferee thereof pursuant to Section 8.2(b) to which such Person has transferred any Units.

"GOT Sponsor" means GOT Sponsor I, LLC, a Delaware limited liability company, or any Permitted Transferee of the Class B Unit pursuant to Section 8.2(b) to which such Person has transferred any Units.

"Incentive Units" means Vested Incentive Unit and Unvested Incentive Unit.

"Liquidity Event" means any of the following: (a) a Sale of the Company, (b) a sale of any equity interests of any Subsidiary of the Company to a third party other than for working capital or add-on acquisition purposes of such Subsidiary of the Company (as a result of which the equity holders of such Subsidiary of the Company do not receive distributions) or (c) a liquidity event resulting from a financing or refinancing by the Company or its Subsidiaries (including any dividend recapitalization) as a result of which the equity holders of the Company or its Subsidiaries receive distributions.

"Management Agreement" as the meaning set forth in Section 5.2(g).

"Manager" means GOT Management, LLC, a Delaware limited liability company, and any manager substituted therefor and admitted as a manager of the Company in accordance with this Agreement.  References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires or permits, be deemed to include the plural or the masculine or feminine reference, as the case may be.

"Member(s)" means the Members signing this Agreement and who are admitted as a "member" of the Company as of the Effective Date and/or such (or each such) other Person, if any, subsequently admitted as an additional or substitute "member" of the Company, from time to time, in accordance with the terms of this Agreement, provided, that a Person shall cease to be a "Member" at such time as such Person shall dispose of such Person's entire Membership Interest in the Company or, otherwise, upon the occurrence of any event, including a Member's dissolution, liquidation and termination, which results in a transfer or other disposition of such Person's entire Membership Interest (or other termination of such Person's status as a "member" of the Company, as specified in this Agreement or in the Act, as the same may be modified or superseded by this Agreement).

"Membership Interest" means the entire interest of a Member (or assignee of a Member's "transferable interest" not otherwise admitted as an additional or substitute "member" of the Company) in the Company as a "member" thereof (or assignee of a Member's transferrable interest in the Company), including a Member's Units, voting rights (as a Member) and a Member's (or assignee's) interest in and to Company profits, losses and capital, including a Member's (or assignee's) right to receive both current and liquidating distributions from the Company.  The Members may hold any combination of Membership Interests (including Units of more than one class), and the Class A Units and Class B Units shall constitute the same class of Membership Interests for voting purposes under the Act and this Agreement, with each Unit being entitled to one vote per Unit, except to the extent this Agreement expressly provides otherwise.

"Membership Percentage" means with respect to each Member, (a) in reference to a Membership Percentage of any class of Units, that ratio, expressed as a percentage, the numerator of which is the number of Units of such class owned by such Member, and the denominator of which is the total Units of such class then outstanding, and (b) in reference to a Membership Percentage of all Units, that ratio, expressed as a

percentage, the numerator of which is the number of Units owned (irrespective of class) by such Member, and the denominator of which is the total Units (irrespective of class) then outstanding.

"Non-Funding Member" has the meaning set forth in Section 2.2(b)(ii).

"Operating Companies" means (a) Vargyas Networks, Inc. d/b/a Baltic Networks, Inc., an Illinois corporation and its Subsidiaries, (b) ISP Supplies, LLC, a Texas limited liability company, and (c) as the context may require, any successor or Affiliate thereof in which the Company has a direct or indirect interest.

"Participating Incentive Unit" means a Vested Incentive Unit for which the applicable Distribution Threshold has been satisfied.

"Permitted Transferee" means, as it relates to a Member, (a) an Affiliate of such Member, (b) a trust in which such Member is the sole trustee, or is co-trustee with his or her spouse (provided such Member controls such trust and no Transfers may be made from such trust without the consent of such Member), or (c) in the event of the death of such Member, such Member's executors, administrators, testamentary trustees, legatees or beneficiaries

"Person" means any individual who is a natural person, partnership, limited liability company, limited liability partnership, limited partnership, corporation, trust, and any other association or legal entity.

"Prime Rate" as of a particular date means the prime rate of interest as published on that date in the *Wall Street Journal*. If the *Wall Street Journal* is not published on a date for which the Prime Rate must be determined, then the Prime Rate shall be the prime rate published in the *Wall Street Journal* on the nearest-preceding date on which the Wall Street Journal is published.

"Proceeding" has the meaning set forth in Section 5.2(b)(i).

"Prohibited Unitholders" has the meaning set forth in Section 8.1(a)

"Profits Interests" means the Class B Units, the Incentive Units, and any other interest held by a Member in the Company which is issued in exchange for the performance of services, which at the time the interest is issued, provides the Member with the right to participate in the future Profits and Losses of the Company but does not convey to such Member any right to, or ownership in, the capital of the Company (i.e., the assets as the Company value at the Fair Market Value as of the date of issuance of such profits interests, reduced by the liabilities of the Company as of such date) at the date of issuance.

"Proportionate Share" means, with respect to any Member having an option to make a voluntary additional Capital Contribution to the Company under Section 2.2(b) of this Agreement, having an option to make a loan (or cause an Affiliate of such Member to make a loan) to the Company pursuant to Section 2.3 of this Agreement or having the right and option to purchase any Membership Interest under any provision of Article VIII of this Agreement, that ratio, expressed as a percentage, the numerator of which equals such Member's Membership Percentage of Class A Units (as otherwise determined, in the case of the purchase of Membership Interest, as of the first date such option may be exercised by such or any other Member, or, if different, such Member's Membership Percentage of Class A Units as of the expiration of the period during which such option may be exercised), and the denominator of which equals the aggregate Membership Percentages of Class A Units (as otherwise determined, in the case of the purchase of a Membership Interest, as of the first date such option may be exercised by such or any other Member, or, if different, as of the expiration of the period during which such option to purchase may be

exercised) of all Members having such option and who otherwise timely exercise such option in accordance with the applicable provisions of this Agreement.

"Proposed Transferee" has the meaning set forth in Section 8.7(a).

"ROFR Members" has the meaning set forth in Section 8.6(a).

"Sale Notice" has the meaning set forth in Section 8.6(a).

"Sale of the Company" means any of the following: (a) the sale of all or substantially all of the assets of the Company or any of its Subsidiaries on a consolidated basis, (b) the sale of fifty percent (50%) or more of the outstanding equity interests of the Company or all of its Subsidiaries or (c) the merger or combination of the Company or any of its Subsidiaries with any other Person, after which the current owners of the Company or such Subsidiary no longer hold fifty percent (50%) or more of the outstanding equity interests of the Company or such Subsidiary.

"Seller Note" means that certain Seller Note issued by the Company pursuant to that certain Securities Purchase and Contribution Agreement dated as of October 14, 2022, by and among the Company, Supercub Holdings, LLC and Stephen Discher.

"Selling Member" has the meaning set forth in Section 8.7(a).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity, in any jurisdiction, of which (a) if a corporation, a limited liability company or a limited partnership (with voting securities), a majority of the total voting power of Equity Interests thereof entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees (or members of any similar governing body) thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company (without voting securities), a partnership, an association or other business entity, a majority of the Equity Interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person shall be deemed to have a majority ownership interest in a limited liability company, a partnership, an association or other business entity if such Person shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director, managing member or general partner (or equivalent) of such limited liability company, partnership, association or other business entity.

"Tag-Along Member" has the meaning set forth in Section 8.7(a).

"Tag-Along Notice" has the meaning set forth in Section 8.7(b)(ii).

"Tag-Along Period" has the meaning set forth in Section 8.7(b)(ii).

"Tag-Along Portion" has the meaning set forth in Section 8.7(b)(i).

"Tag-Along Sale" has the meaning set forth in Section 8.7(a).

"Tax Distribution" has the meaning set forth in Section 3.2(d).

"Tax Payment" has the meaning set forth in Section 3.2(a).

"Tax Proceedings" has the meaning set forth in Section 11.2.

"Tax Representative" has the meaning set forth in Section 11.1.

"Taxable Year" means, with respect to the Company, the calendar year (or such other fiscal period, if any, required to be adopted as the "taxable year" of the Company for federal income tax purposes) (or portion thereof during which the Company is in existence), in each case as determined by the Manager.

"Third-Party Purchaser" has the meaning set forth in Section 8.5(a).

"Transfer" means, as a noun, any voluntary or involuntary sale, exchange, pledge, assignment, hypothecation, or other disposition of any rights in tangible or intangible property, and, as a verb, means voluntarily or involuntarily (including an assignment or other disposition by reason of Bankruptcy) to sell, exchange, pledge, assign, hypothecate, abandon, or otherwise dispose of such property.  For any Member that is a corporation, partnership, joint venture, enterprise, limited liability company, unincorporated association, trust, estate or other business or legal entity, including any state law entity disregarded as a separate entity for federal and state income tax purposes, Transfer shall also mean any voluntary or involuntary, direct or indirect, transfer, assignment, sale, pledge hypothecation, abandonment or other disposition of more than fifty percent (50%) of the Equity Interests of the Member in a single transaction or a series of related transactions.  "Transfer" when used as a verb shall have a correlative meaning.

"Treasury Regulations" or "Regulations" means the Treasury Regulations promulgated under the Code, as such Treasury Regulations may be amended and in effect from time to time.

"Unit" or "Units" has the meaning set forth in Section 2.1(b).

"Unitholder" shall mean, with respect to any class of Units, a Member (or other Person) owning a Unit or Units of such class.

"Unreturned Capital Contributions" means, for any Class A Member, the amount of Capital Contributions made by such Class A Member (and by its predecessors-in-ownership with respect to the interest in the Company owned by such Class A Member), less the aggregate amount of distributions made to such Class A Member (and such Class A Member's predecessors-in-ownership) from inception of the Company pursuant to Section 3.1(a)(i) (or treated as so made pursuant to Section 9.3(c)).

"Unvested Incentive Unit" means, with respect to any Incentive Unit that is subject to vesting, any such Incentive Unit that has not yet vested in accordance with the terms of the Incentive Award Agreement pursuant to which such Incentive Unit was granted, as applicable.

"Vested Incentive Unit" means, with respect to any Incentive Unit that is subject to vesting, any such Incentive Unit that has vested in accordance with the terms of the Incentive Award Agreement pursuant to which such Incentive Unit was granted, as applicable.

**APPENDIX B**

**SPECIAL TAX AND ACCOUNTING PROVISIONS**

I.      <u>Tax and Accounting Definitions</u>.  The following terms, which are used predominantly in <u>Section 4</u> of this Agreement and this <u>Appendix B</u>, shall have the meanings set forth below:

A.      "<u>Adjusted Capital Account</u>" means, with respect to any Member, such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(1)      credit to such Capital Account any amounts which such Member is obligated to restore pursuant to this Agreement or as determined pursuant to Regulations §1.704-1(b)(2)(ii)(c), or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations §§1.704-2(g)(1) and 1.704-2(i)(5); and

(2)      debit to such Capital Account the items described in clauses (4), (5) and (6) of Regulations §1.704-1(b)(2)(ii)(d).

B.      "<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in such Member's Adjusted Capital Account.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

C.      "<u>Allocation Period</u>" means, unless otherwise required pursuant to the Code and Treasury Regulations, (i) the Taxable Year of the Company, (ii) any portion of the Taxable Year for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss, deduction or other items pursuant to <u>Article IV</u> or this <u>Appendix B</u> or (iii) any other period reasonably determined by the Manager as appropriate for a closing of the Company's books.

D.      "<u>Book Value</u>" means, with respect to any Company asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(1)      the initial Book Value of any asset (other than money) contributed by a Member to the Company shall be the fair market value thereof as of the date of contribution, as set forth in this Agreement or, if not set forth in this Agreement, as reasonably determined by the Manager and the contributing Member as of the date of contribution;

(2)      the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager (but subject to Code §7701(g)), as of the following times: (i) the acquisition of additional interests in the Company by any new or existing Member in exchange for more than a de minimis initial or additional Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of cash or property as consideration for an interest in the Company; (iii) the issuance by the Company of a non-compensatory option (other than an option to acquire a de minimis interest in the Company); (iv) in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; or (v) the Liquidation of the Company; <u>provided</u> that an adjustment described in <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u> immediately above shall be made only if the Manager reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(3)     the Book Value of any Company asset distributed to any Member shall be adjusted immediately before its distribution to equal its gross fair market value on the date of distribution, as reasonably determined by the Manager;

(4)     the Book Values of the Company's assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code §734(b) or Code §743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations §1.704-1(b)(2)(iv)(m); provided, however, that Book Values shall not be adjusted pursuant to this Section I.D(4) to the extent that an adjustment pursuant to Section I.D(2) is otherwise made thereto in connection with or as a result of any transaction or event that would otherwise result in an adjustment pursuant to this Section I.D(4); and

(5)     if the Book Value of any asset subject to the allowance for depreciation or amortization has been determined or adjusted pursuant to Section I.D(1), Section I.D(2), or Section I.D(4), such Book Value shall thereafter be adjusted by the Depreciation taken into account, from time to time, with respect to such asset for purposes of computing Profits or Losses of the Company.

For purposes Section I.D(2), the term "Liquidation of the Company" means the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining assets to its Members).

E.     "Capital Account" means, with respect to any Member, the Capital Account maintained by the Company for such Member in accordance with Regulations §1.704-1(b)(2). Except as otherwise provided in said Regulations section, each Member's Capital Account shall be maintained or adjusted in accordance with the following rules or provisions:

(1)     to each such Member's Capital Account, there shall be credited the amount of cash contributed to the Company by such Member and the initial Book Value of any property, other than cash, contributed to the capital of the Company such Member (net of any liability secured by such contributed property that the Company is considered to assume or to take subject to pursuant to Code §752), such Member's allocable share of Profits and any items of income or gain comprising the Profits that are allocated to such Member, and the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member;

(2)     to each such Member's Capital Account, there shall be debited the amount of cash and the Book Value of any property distributed by the Company to such Member pursuant to any provision of this Agreement (net of Company liabilities secured by such distributed property that such Member is considered to assume or take subject to pursuant to Code §752), such Member's allocable share of Losses and any items of expense or loss comprising the Losses that are allocated to such Member, and the amount of any liabilities of such Member (excluding liabilities taken into account in accordance with Section I.E(1)) assumed by the Company or that are secured by any property contributed by such Member to the Company;

(3)     to the extent that the unrealized income, gain, loss or deduction inherent in property distributed (or deemed to be distributed) in kind (whether or not distributed in liquidation) is not then reflected in the Members' Capital Accounts, the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property would be allocated among the Members under the Agreement

if there were a fully taxable disposition of such property for all cash for its then fair market value, as determined by the Manager, in its reasonable discretion, as of the date of its actual (or deemed) distribution;

(4)     in the event that the Book Value of Company assets are adjusted as described in Section I.D(2), the Members' Capital Accounts shall be adjusted to reflect their allocable share of the gain or loss (not then reflected in the Members' Capital Accounts) which the Company would recognize as of or immediately before such adjustment, if it sold all of its assets, as of such time, for all cash in a fully taxable transaction for an amount equal to such assets' adjusted Book Value;

(5)     in the event that any Company property is subject to Code §704(c), or in the event Company property is re-valued, at the election of the Manager, in accordance with Regulations § 1.704-1(b)(2)(iv)(f) and, as a result, has a Book Value different from such property's adjusted income tax basis, the Members' Capital Accounts shall be adjusted in accordance with Regulations §1.704-1(b)(2)(iv)(g) to reflect only allocations to them of Depreciation, if any, allowable for such Company property and by the gain or loss arising from the sale or other disposition of such property, as computed for book purposes and not for income tax purposes, by reference to such property's adjusted Book Value; and

(6)     If there is a transfer of a Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

The foregoing provisions and the other provisions of this Agreement (or this Appendix B) relating to the maintenance of Capital Accounts are intended to comply with Regulations §1.704-1(b) and §1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations. The initial Capital Account balances of the Members are as set forth on Schedule 1.7.

F.     "Company Minimum Gain" has the same meaning as the term "partnership minimum gain" under Regulations §§1.704-2(b)(2) and 1.704-2(d).

G.     "Depreciation" means, for each Taxable Year, or other fiscal period of the Company, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if such depreciation, amortization or other cost recovery deductions with respect to any such asset for federal income tax purposes is zero for any Allocation Period, Depreciation shall be determined with reference to such asset's Book Value at the beginning of such period using any reasonable method selected by the Manager.

H.     "Economic Risk of Loss" has the meaning assigned to that term in Regulations §1.752-2(a).

I.     "Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" under Regulations §1.704-2(b)(4).

J.      "<u>Member Nonrecourse Debt Minimum Gain</u>" has the same meaning as the term "partner nonrecourse debt minimum gain" under Regulations §1.704-2(i)(2) and shall be determined in accordance with Regulations §1.704-2(i)(3).

K.      "<u>Member Nonrecourse Deductions</u>" has the same meaning as the term "partner nonrecourse deductions" under Regulations §1.704-2(i)(1) and shall be determined in accordance with Regulations §1.704-2(i)(2).

L.      "<u>Nonrecourse Debt</u>" or "<u>Nonrecourse Liability</u>" has the same meaning as the term "nonrecourse liability" under Regulations §1.704-2(b)(3).

M.      "<u>Nonrecourse Deductions</u>" has the meaning set forth in Regulations §1.704-2(b)(1) and shall be determined according to the provisions of Regulations §1.704-2(c).

N.      "<u>Profits</u>" or "<u>Losses</u>" of the Company for each Allocation Period means an amount equal to the Company's taxable income or loss for each such Allocation Period, as determined for federal income tax purposes in accordance with the accounting method followed by the Company for federal income tax purposes and in accordance with Code §703 (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code §703(a)(1) shall be included in taxable income or loss), subject to the following modifications:

(1)      any income of the Company that is exempt from federal income taxation and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(2)      any expenditures of the Company described in Code §705(a)(2)(B) or treated as Code §705(a)(2)(B) expenditures pursuant to Regulations §1.704-1(b)(2)(iv)(i), and not otherwise taken into account, shall be subtracted from such taxable income or loss;

(3)      in the event the Book Value of any Company property is adjusted pursuant to <u>Section I.D.(2)</u> or <u>Section I.D.(3)</u> of this <u>Appendix B</u>, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the Company property) or an item of loss (if the adjustment decreases the Book Value of the item of Company property) from the disposition of such Company property and shall be taken into account for purposes of computing Profits or Losses;

(4)      gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the Company property disposed of, notwithstanding that the adjusted tax basis of such Company property differs from its Book Value;

(5)      in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Period, computed in accordance with the definition of Depreciation;

(6)      to the extent an adjustment to the adjusted tax basis of any item of Company property pursuant to Code §734(b) is required, pursuant to Regulations §1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the item of

Company property) or loss (if the adjustment decreases such basis) from the disposition of such item of Company property and shall be taken into account for purposes of computing Profits or Losses;

(7)     notwithstanding any other provision of this definition or <u>Article IV</u> of this Agreement, any items that are specially allocated pursuant to <u>Section II</u> of this <u>Appendix B</u> shall not be taken into account in computing Profits or Losses; and

(8)     the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to <u>Section II</u> shall be determined by applying rules analogous to those set forth in <u>subsections (1)</u> through <u>(6)</u> above.

II.     <u>Special Allocations</u>.  Notwithstanding the provisions of <u>Section 4.1</u> of this Agreement to the contrary, the following special rules shall apply:

A.     <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Regulations § 1.704-2(f), notwithstanding any other provision of this <u>Appendix B</u>, if there is a net decrease in Company Minimum Gain during any Allocation Period, each Member shall be specially allocated items of Company income and gain for such Allocation Period (and, if necessary, subsequent Allocation Periods) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations § 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations §§ 1.704-2(f)(6) and 1.704-2(j)(2).  This subsection is intended to comply with the minimum gain chargeback requirement in Regulations § 1.704-2(f) and shall be interpreted consistently therewith.

B.     <u>Member Minimum Gain Chargeback</u>.   Except as otherwise provided in Regulations § 1.704-2(i)(4), notwithstanding any other provision of this <u>Appendix B</u>, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Allocation Period (and, if necessary, subsequent Allocation Periods) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations § 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations §§ 1.704-2(i)(4) and 1.704-2(j)(2).  This subsection is intended to comply with the minimum gain chargeback requirement in Regulations § 1.704-2(i)(4) and shall be interpreted consistently therewith.

C.     <u>Qualified Income Offset</u>.  In the event that any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) and has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of <u>Section II.A</u> and <u>Section II.B</u> but before the application of any other provision of this <u>Section II</u>, items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this subsection shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Appendix B</u> have been tentatively made as if this subsection were not applicable.

D.     <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Allocation Period (or other applicable period) shall be specially allocated pro rata among the Members in proportion to their respective Membership Percentages, except to the extent that the Code and Treasury Regulations require that such deductions be allocated in some other manner.  Any Member Nonrecourse Deductions for any Allocation Period shall be specially allocated to the Member who bears the Economic Risk of Loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations § 1.704-2(i)(1).  If more than one Member bears the Economic Risk of Loss with respect to Member Nonrecourse Debt, Member Nonrecourse Deductions attributable thereto shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss.

E.     <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Regulations § 1.704-1(b)(2)(iv)(m)(2) or Regulations § 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such provisions.

F.     <u>Curative Allocations</u>.

(1)     The allocations set forth in <u>Sections II.A</u> through <u>II.E</u> of this <u>Appendix B</u> are intended to comply with certain requirements imposed by Code §704(b) and the Regulations promulgated thereto (the "<u>Regulatory Allocations</u>").  If in any Taxable Year any Regulatory Allocations (which term shall include any other allocations required to be made under Code §704(b) or under the Regulations promulgated thereunder) are made, then in allocating the remainder of the Profits or Losses (or items thereof) thereafter pursuant to <u>Section 4.1</u> of this Agreement, whether in the same Allocation Period or in subsequent Allocation Periods, the Regulatory Allocations shall be taken into account so that, to the maximum extent possible and as quickly as possible, the net amount of allocations made to each of the Members under <u>Section 4.1</u> of this Agreement and <u>Sections II.A</u> through <u>II.E</u> of this <u>Appendix B</u> (and otherwise under Code §704(b) and the Regulations promulgated thereunder), and this <u>Section II.F(1)</u>, shall be equal to the net amount that would have been allocated to each of the Members solely under <u>Section 4.1</u> of this Agreement had the Regulatory Allocations not been applicable.  The application of this <u>Section II.F(1)</u> and the making of curative allocations pursuant hereto shall be made in any reasonable manner determined by the Manager, following consultation with the Company's tax advisors.

(2)     For purposes of applying <u>Section II.F(1)</u>, Regulatory Allocations which constitute allocations of Nonrecourse Deductions or Member Nonrecourse Deductions shall not be offset by subsequent curative allocations of Profits or items of income or gain comprising the Profits or Losses of the Company pursuant to <u>Section II.F(1)</u> prior to the first Taxable Year thereafter during which there is a net decrease in the Company Minimum Gain (or a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt, as the case may be), and then, shall only be offset by curative allocations pursuant to <u>Section II.F(1)</u>, if the Manager reasonably determines that such Regulatory Allocations are not offset (or reasonably likely to be offset) by allocations (including expected future allocations) of income or gain under <u>Section II.A</u> or <u>Section II.B</u> of this <u>Appendix B</u>.

III.     Excess Nonrecourse Liabilities.  For purposes of determining the Members' Proportionate Share of "excess nonrecourse liabilities," if any, of the Company within the meaning of Regulations §1.752-3(a)(3) for any Allocation Period, the Members' respective interests in Company "profits" shall be in the same proportions that the Members shared Profits during such Allocation Period.

IV.     Tax Treatment of Fees Paid by the Company to Member/Affiliate.  For income tax reporting purposes, any and all fees paid by the Company to any Member and/or any Affiliate thereof, shall be treated as expenses of the Company and, if paid to a Member, shall be treated as payments made pursuant to §707(a) of the Code.  To the extent that payments of such fees to any Member or Affiliate thereof (or any other fees or compensation paid to any Member or Affiliate thereof) ultimately are not determined to be Code §707(a) payments, the Member receiving such fee or compensation shall be specially allocated gross income of the Company in an amount equal to the amount of such fee or compensation, and the Member's Capital Account shall be adjusted to reflect the payment of such fee or compensation, subject to the next sentence.  If the Company's gross income for an Allocation Period is less than the amount of such fee or compensation paid in such year, the Member shall be specially allocated gross income of the Company in the succeeding Allocation Period(s) until the total amount so allocated equals the total amount of such fee or compensation.

V.      Related Matters.  Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement.

VI.     Deficit Restoration.  Notwithstanding any other provision of this Agreement to the contrary, upon liquidation of a Member's Membership Interest (whether or not in connection with a liquidation of the Company), no Member shall have any liability to restore any deficit in any deemed or hypothetical Capital Account.  In addition, no allocation to any Member of any Loss, whether attributable to depreciation or otherwise, shall create any asset of or obligation to the Company, even if that allocation reduces, or creates or increases a deficit in that Member's deemed or hypothetical Capital Account; it is also the intent of the Members that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company. Notwithstanding the foregoing, upon the liquidation of a Member's Membership Interest, the Company may, with the approval of the Manager, allocate to such Member items of income and gain with respect to the Taxable Year in which such liquidation occurs, and with respect to any prior Taxable Year to the extent permitted by law, in order to eliminate any such deficit.

## APPENDIX C

## ILLUSTRATIVE WATERFALL EXAMPLE

| Assumptions | |
|---|---|
| Date | Event |
| | |
| January 1, 2022 | The formation of GOT Distribution SPV, LLC |
| | |
| January 1, 2022 | Supercub Holdings, LLC contributes assets valued at $5,000,000.00. Company issues 12,600 Class A units. |
| | |
| January 1, 2022 | GOT Investor distribution contributes cash and assets valued at $5,000,000.00. Company issues 77,400 Class A units |
| | |
| Calendar tax year 2022 | No distributions. |
| | |
| Calendar tax year 2022 | Income = expenses resulting in no taxable income. |
| | |
| December 31, 2022 | Company liquidates after paying all expenses, the Company has net proceeds to distribute to the members in the amount of $100,000,000.00. |
| | |

| Member Name | Capital Account | Preferred Return Account | Class A Units | Proportionate Share |
|---|---|---|---|---|
| | | | | |
| Supercub Holdings, LLC | $5,000,000.00 | $300,000.00 | 12,600 | 14% |
| | | | | |
| GOT Investor | $5,000,000.00 | $300,000.00 | 77,400 | 86% |
| | | | | |

| Distributions under §3.1(a) | | |
|---|---|---|
| Section Number | Supercub Holdings, LLC* | GOT Distribution |
| | | |
| §3.1(a)(i) | $5,000,000.00 | $5,000,000.00 |
| | | |
| §3.1(a)(ii) | $300,000.00 | $300,000.00 |
| | | |
| §3.1(a)(iii) | $12,516,000.00 | $76,884,000.00 |

*Supercub Holdings, LLC actual distributions of $17,816,000.00 per §3.1(a) above are allocated between Supercub Holdings, LLC and the Class B Member, pursuant to §3.1(b), per below.

| Distributions under §3.1(b) | | |
|---|---|---|
| **Section Number** | **Supercub Holdings, LLC** | **Class B Members** |
| | | |
| §3.1(b)(i) | $5,000,000.00 | $0.00 |
| | | |
| §3.1(b)(ii) | $300,000.00 | $0.00 |
| | | |
| §3.1(b)(iii) | $0.00 | $72,000.00 |
| | | |
| §3.1(b)(iv) | $9,955,200.0 | $2,488,800.0 |